## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| VIDEOLOGY, INC., *et al.*,[1] | : | Case No. 18-_____ (___) |
| Debtors. | : | Joint Administration Requested |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS UNDER
BANKRUPTCY CODE SECTIONS 105(a), 363(b), 363(c), 507(a), AND 541
(I) AUTHORIZING PAYMENT OF CERTAIN PRE-PETITION EMPLOYEE
OBLIGATIONS, INCLUDING COMPENSATION, BENEFITS, EXPENSE
REIMBURSEMENTS, AND RELATED OBLIGATIONS, (II) CONFIRMING RIGHT
TO CONTINUE EMPLOYEE BENEFIT PROGRAMS ON POST-PETITION BASIS,
(III) AUTHORIZING PAYMENT OF WITHHOLDING AND PAYROLL-RELATED
TAXES, (IV) AUTHORIZING PAYMENT OF PRE-PETITION CLAIMS OWING TO
ADMINISTRATORS OF, OR THIRD PARTY PROVIDERS UNDER, EMPLOYEE
BENEFIT PROGRAMS, AND (V) DIRECTING BANKS TO HONOR PRE-PETITION
CHECKS AND FUND TRANSFERS FOR AUTHORIZED PAYMENTS**

The debtors and debtors-in-possession in the above-captioned cases (collectively, the

"Debtors") hereby move (the "Motion") for entry of interim and final orders, under sections

105(a), 363(b), 363(c), 507(a), 541, 1107(a) and 1108 of Title 11 of the United States Code (the

"Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"): (i) authorizing the Debtors to pay certain pre-petition amounts owing

to or for the benefit of their current employees for compensation, benefits and reimbursable

expenses (collectively, and as further described below, the "Pre-Petition Employee

Obligations"); (ii) confirming the Debtors' right to continue post-petition, in the ordinary course

of business, the employee-related benefits, plans, programs, and policies (collectively, and as

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Videology, Inc. (2191), Collider Media, Inc. (8602), Videology Media Technologies, LLC (6243), LucidMedia Networks, Inc. (8566) and Videology Ltd.  The address of the Debtors' corporate headquarters is 1500 Whetstone Way, Suite 500, Baltimore, MD 21230.

further described below, the "Employee Benefit Programs") in effect immediately prior to the filing of these cases; (iii) authorizing the Debtors to pay any and all local, state and federal withholding and payroll-related or similar taxes relating to pre-petition periods; (iv) confirming the Debtors' right to continue to deduct and to transmit deductions from payroll checks as authorized by employees or required under any employee-related plan, program or policy or as required by law; (v) authorizing the Debtors to pay any pre-petition claims owing to the administrators of, or third party providers under, their employee-related plans, programs and policies as necessary to ensure the delivery of compensation, benefits and expense reimbursements to their employees; and (vi) authorizing and directing all banks to receive, process, honor, and pay all of the Debtors' pre-petition checks and electronic fund transfers on account of any obligations authorized to be paid pursuant hereto.  In support of this Motion, the Debtors rely upon and incorporate by reference the Declaration of Kenneth Tarpey, Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings, filed with the Court concurrently herewith (the "Tarpey Declaration").  In further support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties,

2

cannot enter final orders or judgments consistent with Article III of the United States Constitution.

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363(b), 363(c), 507(a), 541, 1107(a), and 1108 and Bankruptcy Rules 6003 and 6004.

## BACKGROUND

### A.      Bankruptcy Filings

4.      On the date hereof (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the Tarpey Declaration.

5.      The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.  No trustee or examiner has been requested in the Chapter 11 Cases, and no committees have been appointed.

### B.      The Debtors' Employees

6.      As of the Petition Date, the Debtors and their non-debtor foreign affiliates have approximately 212 employees, of which approximately 210 are full-time (the "Full-Time Employees") and 2 are part-time (the "Part-Time Employees" and, together with the Full-Time Employees, the "Employees").  Of the Employees, 146 are employed within the Debtors' operations in the United States (collectively, the "U.S. Employees"), 59 are employed with the Debtors' operations in the United Kingdom (collectively, the "U.K. Employees") and 7

3

(including an intern) are employed with Videology UK's registered branch office in Spain (the "ESP Employees", and together with the U.K. Employees, the "EMEA Employees").[2]

7.      The Employees perform a variety of critical functions, including sales, customer service, information technology, merchandising and product strategy, administrative, legal, accounting, finance, management, and similar tasks.  The skills and experience of the Employees, as well as their relationships with customers and vendors and knowledge of the Debtors' business are essential to the Debtors' ongoing operations and ability to preserve the going concern value of the Debtors' assets pending the sale process described in the Tarpey Declaration.  None of the Debtors' employees is subject to a collective bargaining agreement.

**C.      Employee Compensation**

*(i)      Compensation*

8.      In the ordinary course of business, the U.S. Employees are paid semi-monthly (usually on the 15th and last day of the month) and the EMEA Employees are paid monthly (usually on the last business day of the month).  The Debtors' payroll is self-administered and utilizes a software program developed by The Ultimate Software Group ("UltiPro"), a third-party service provider.  All of the Employees receive their pay through direct deposits, which are administered in the U.S. through UltiPro and outsourced in the U.K. and Spain to in-country provider Celergo LLC ("Celergo" and together with UltiPro, the "Payroll Processors").[3]

9.      The Debtors estimate that, as of the Petition Date, they owe accrued wages and salaries that have been earned by the Employees as of the Petition Date in following approximate

---

[2] The Debtors' non-debtor foreign subsidiaries have 22 employees.  These employees are not included in the relief being sought by this Motion and do not participate in the Employee Benefit Programs described herein.

[3] UltiPro is also used to administer the payroll for employees of non-Debtor subsidiary Videology Canada, Inc. Celergo is the in-country provider with respect to payroll services for the Debtors' other foreign non-Debtor subsidiaries.

amounts: (a) $589,408 to U.S. Employees, (b) £130,136 to U.K. Employees, and (c) €10,096 to ESP Employees.[4]

10.    The Debtors also estimate that they will owe certain amounts to UltiPro and Celergo for services relating to payroll processing. Both UltiPro and Celergo are crucial in providing the Debtors with a payroll system that functions seamlessly. The Debtors typically pay UltiPro approximately $16,000 per quarter. Fees due Celergo, with respect to payroll services for the U.K. Employees and the ESP Employees, typically aggregate approximately £2,200 per month and €558 per month, respectively. The Debtors seek authority to pay any amount due to both UltiPro and Celergo to ensure there is no disruption to the Debtors' payroll system.

    *(ii)    Variable Compensation and Executive Bonus Plan*

11.    The Debtors offer their Employees variable pay to complement their regular salary by enrolling them in a Variable Compensation Plan (the "VCP"). Participation in a particular VCP is determined by the Employee's role and the best way to incentivize desired performance. The Debtors maintain a "Sales Performance Variable Compensation Plan" ("Sales VCP"), which is intended to reward covered Employees for contributions towards maximizing certain financial performance metrics, and a "Corporate Performance Variable Compensation Plan" ("Corporate VCP"), to reward covered Employees for contributions toward the company's success.

---

[4] The Debtors pay substantially all obligations related to their respective operations in the United Kingdom and Spain, including all payroll obligations, in British pounds (GBP) and Euros, respectively. In light of this and the fluctuation of the conversion rate, the Debtors have reported their estimates with respect to their U.K. Employee obligations in GBP, and their ESP Employee obligations in Euros. As of 5:00 p.m. on May 9, 2018, the conversion rates for GBP and Euros were approximately $1.35 and $1.19, respectively. Thus, for example, the accrued base wage and salary obligations due to the U.K. Employees would total approximately $176,343 in U.S. Dollars and the obligations to the ESP Employees would total approximately $11,965 in U.S. Dollars.

12.     The Debtors also offer certain eligible executives the opportunity to participate in an Executive Bonus Plan (the "Executive Bonus Plan").  The Executive Bonus Plan is similar in nature to the Corporate Performance Variable Compensation Plan, and is intended to reward executives for contributions toward the company's success, and attract, incentivize and retain executives who are top performers.

13.     Each of the VCPs and the Executive Bonus Plan set certain "Goal Periods."  The Sales VCP are aligned with the calendar quarters, and payments under the Sales VCP are made quarterly after the close of the Goal Period, usually within second month following the close of the Goal Period.  The Corporate VCP runs semi-annually (January-June and July-December) and typically gets paid in the third month following the end of the semi-annual Goal Period.  The Executive Bonus Plan is aligned with the calendar year and is paid annually, usually in March of the year following the close of the Goal Period.

14.     The Debtors estimate that VCP related to the pre-petition period could be payable in the following approximate amounts: (a) $2,365,840 to U.S. Employees, (b) £650,428 to U.K. Employees and (c) €38,120 to ESP Employees.[5]  The Debtors have no obligation to pay any amount due with respect to the Executive Bonus Plan until March 2019.

15.     As of the Petition Date, the Debtors estimate that they owe to their Employees, on account of pre-petition compensation (collectively, the "Unpaid Compensation"), which include accrued but unpaid wages, salaries and VCP the following approximate amounts: (a) $2,955,248 to U.S. Employees, (b) £780,563 to U.K. Employees, and (c) €48,216 to ESP Employees.

---

[5] All VCP payouts are maximum potential opportunity.  These do not take into account all actual goal scores for the Corporate VCP, sales goal achievement for the Sales VCP, or all criteria set out in the plan documents that determine the actual payout.

16.     The Debtors do not believe that they will owe any individual Employee base salary obligations in an amount in excess of the $12,850 priority granted by section 507(a)(4) of the Bankruptcy Code.  However, given the nature of the VCP and the Executive Bonus Plan, and the timing in which they are each awarded and paid in the ordinary course, sixty (60) Employees will in fact exceed the $12,850 priority amount granted by section 507(a)(4) for Unpaid Compensation, all of which is scheduled to be paid after the Petition Date.  The Debtors seek authority to honor and pay all of the Unpaid Compensation due with respect to any period prior to the Petition Date, but, subject to further order of the Court, will not pay any amount on account of the VCP or Executive Bonus Plan exceeding the $12,850 cap until after the entry of a final order with respect to the Motion.

17.     The Debtors also request authority to pay UltiPro and Celergo sums, if any, that are due for services rendered prior to the Petition Date related to the payroll services.

*(iii)     Time Off Benefits, Including PTO*

18.     The Debtors offer several paid ("PTO") and unpaid time-off benefits for all Employees, including vacation time, sick leave, holidays, and other paid leave (collectively, "Time Off Policies").

(a)     U.S. Employees

19.     Commencing with their start date, Employees in the United States are entitled, on a calendar year basis, to a certain number of PTO days (between 15 and 25 days), depending on each Employee's years of service.  U.S. Employees accrue PTO based on the Employee's length of employment as follows:

| Years Since Hire | Number of PTO Days |
|---|---|
| 1st Partial Year (year of hire) | Fifteen (15) days available; prorated based on date of hire |
| 1st Full Year[6] | Fifteen (15) days available for the year, starting January 1st |
| 2nd – 4th Full Year | Twenty (20) days available for the year, starting January 1st |
| 5th or More Full Years | Twenty-five (25) days available for the year, starting January 1st |

20.    PTO accrues each pay period, yet is available to use immediately upon an Employee's start date and at the beginning of each calendar year. Employees can use the PTO in advance of earning it throughout the year, but upon separation, are required to repay any time that the Employee uses in advance of being earned (unless state statute dictates otherwise). Under the Debtors' PTO policy, up to 5 days may be carried forward to the next calendar year (with management approval), but must be used in the first quarter of the following calendar year.[7] Any PTO in excess of 5 days, as well as any carried over PTO that is unused at the end of the first quarter, is forfeited. Employees that are terminated in the first quarter of a calendar year forfeit any carried over PTO.

21.    In addition to PTO, the Debtors offer their Employees ten fixed paid holidays and, for full-time Employees, one floating/personal holiday throughout the year (collectively, the "Holidays"). Generally, eligible Employees are not required to work on a designated Holiday but are paid at their regular base rate of pay.

22.    Eligible Employees can also take advantage of certain parental leave policies. The Debtors offer U.S. Employees four weeks of paid maternity leave following the birth of the Employee's child, provided the Employee has worked for more than one year. Paid maternity

---

[6] Years of service are defined by calendar years. Employees who are hired mid-year must wait until January 1st of the following year to begin their first full year of service.

[7] Under California state law, Employees in California are allowed to earn PTO on a rolling basis provided that the total amount of PTO does not exceed 1.5 times what is earned in a calendar year. Once this maximum amount has been reached, the California Employee will no longer earn PTO and can only resume earning PTO once PTO time has been used by them.

8

leave is in addition to any leave that may be provided through S-T Disability Insurance (defined below) and PTO.  In addition, the Debtors provide certain Employees, who have been employed for six (6) months, with two (2) weeks (10 days) paid paternity leave upon the birth or adoption of the Employee's child.

23.     The Debtors also provide eligible Employees extended time to attend to certain family or personal needs such as bereavement leave, jury duty, and military duty.  In general, there is no entitlement to any additional unpaid leave, although the Debtors may make certain exceptions on an emergency basis.

24.     The Debtors estimate that as of the Petition Date, Employees in the United States have accrued approximately $717,148 in PTO liabilities and on account of other Time Off Policies.  The Debtors seek authority to honor their obligations for PTO and other Time Off Policies in the ordinary course of business but **not** to pay any amounts on account of PTO and Time Off Policies outside of the ordinary course except as mandated under state law.[8]

(b)     EMEA Employees

25.     PTO is also available to the Debtors' Employees in the United Kingdom and Spain.  All full-time permanent Employees in the United Kingdom and Spain receive 25 days per calendar year in addition to 8 U.K. Bank/Public Holidays, 1 "Floating Day" and 2 "Summer Fridays" (which may be requested on a Friday during the months of July and August).  PTO accrues for each pay period.  Like their counterparts in the United States, Employees in the United Kingdom and Spain can use their PTO in advance, but must repay any time used in

---

[8] For example, with respect to the California Employees, state labor law requires the Debtor to pay all such vested and unused PTO as wages to the California Employees "at [their] final rate in accordance with such contract of employment or employer policy respecting eligibility or time served."  *See* California Labor Code § 227.3 (2016).  The same is true whether the employee is discharged or quits. *See id.* § 201, 202.

advance, if the Employee separates from the Debtors.  Unless prohibited by law in the United Kingdom or Spain, PTO must be taken during a calendar year in which it is earned or such days are forfeited, unless management permits a carryover of any unused PTO up to a maximum of 5 days.  Employees that were unable to use their PTO because of long term sick leave or maternity leave can carry over up to 20 days of unused PTO into the next calendar year.  On termination, an Employee is entitled to pay in lieu of unused statutory PTO in relation to the calendar year of termination.

26.    Employees in the United Kingdom and Spain are also entitled to 10 working days of sick leave paid by the Debtors, subject to certain conditions.  Paid sick leave is allocated on a yearly basis and prorated from the date of hire.

27.    The Debtors also provide for statutory parental leave for their EMEA Employees. Under the Debtors' Shared Parental Leave Policy, Eligible EMEA Employees are able to determine how to share the care of their child during the first year following birth or adoption. Mothers are entitled to statutory maternity pay/maternity allowance for up to 39 weeks.  Eligible mothers are entitled to 52 weeks maternity leave, with 16 weeks paid in full, 23 weeks paid at the statutory rate and 13 weeks unpaid.[9]

28.    The Debtors estimate that as of the Petition Date, Employees in the United Kingdom and Spain have accrued approximately £167,860 and €11,357, respectively, in PTO liabilities and other Time Off Policies.  The Debtors seek authority to honor these PTO obligations in the ordinary course of business but *not* to pay any amounts on account of PTO and

---

[9] During maternity leave, Employees continue to accrue holiday and contributions to the pension will continue for the 39 week period.

57731/0002-15600560v7

Time Off Policies outside of the ordinary course except as mandated under law in either the United Kingdom or Spain.

  *(iv)*  *Deductions, Withholdings and Payroll Taxes*

  29.  For each applicable pay period, the Debtors, through the Payroll Processors, routinely deduct certain amounts from each Employee's gross payroll, including, without limitation, garnishments, child support, spousal support, and similar deductions and other pre- and after-tax deductions payable pursuant to certain of the employee benefit plans discussed below (*e.g.* the Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, 401(k) contributions, the U.K. Pension contributions and other deductions) (collectively, the "Deductions"). During the pay periods discussed above, on average, the Debtors deduct, on an aggregate basis, the following approximate amounts from paychecks of Employees (a) $122,187 from U.S. Employees, (b) £16,660 from U.K. Employees and (c) €21 from ESP Employees. The Debtors/Payroll Processors may not have forwarded certain of the Deductions to the appropriate third-party recipients before the Petition Date.

  30.  In addition to the Deductions, federal and state law requires the Debtors to withhold amounts related to federal, state and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state or local taxing authority (collectively, the "Withheld Amounts"). The Debtors have similar deductions for which they are responsible in the United Kingdom and Spain (such as PAYE taxation, and National Insurance in the United Kingdom and National Social Security Institute in Spain), which also constitute Withheld Amounts. In addition, in the United States, the Debtors must match from their own funds for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withheld Amounts, the "Payroll Taxes"). In the aggregate, the

11

Payroll Taxes, including both the Employees' and Debtors' portions, total, on average, approximately (a) $302,360, (b) £185,154 and (c) €17,502, respectively, for the pay periods discussed above.[10]

31.    To the extent any of the Deductions or Payroll Taxes may not have been forwarded to the appropriate third-party recipients, the Debtors seek authority to pay or transfer pre-petition Deductions and Payroll Taxes (and to continue to forward Deductions and Payroll Taxes on a post-petition basis whether or not related to the pre-petition period) to the applicable third-party recipients in the ordinary course of business and consistent with past practice.

**D.    Reimbursable Expenses**

32.    Prior to the Petition Date, the Debtors routinely reimbursed Employees for ordinary and necessary business-related expenses incurred on behalf of the Debtors in the scope of their employment (collectively, the "Reimbursable Expenses"). The Reimbursable Expenses are incurred in the ordinary course of the Debtors' business operations and include, without limitation, expenses for travel, automobile mileage, meals, business-related entertainment, and other business-related expenses. The Reimbursable Expenses are submitted, processed and reimbursed through Concur. In most cases, the Reimbursable Expenses are submitted monthly.

33.    Typically, Employees are expected to submit all expenses by the 5th of the month following that in which they are incurred and no later than 60 days after the expense has been incurred. In certain cases (where expenses are relatively minimal), expenses are expected to be sought quarterly. Expense reports are generally reviewed and approved within one (1) week of

---

[10] The Payroll Processors are responsible for completing the Debtors' payroll tax filings, including federal, state and local tax filings.

submission to Concur.  Once approved, Reimbursable Expenses are paid through Concur by direct deposit and generally not on a fixed scheduled.

34.    In some cases, Employees may not have submitted reimbursement requests in time to have been processed before the Petition Date, or reimbursement expenses may not have been processed or available for deposit in the Employee's respective bank account before the Petition Date.  Based on historical data, the Debtors estimate that they could owe as much as (a) $170,000, (b) £75,000 and (c) €2,845, respectively, on account of pre-petition Reimbursable Expenses as of the Petition Date and seek authority to honor such obligations.

35.    Additionally, certain of the Debtors' Employees hold American Express and other credit cards issued in the name of Videology, Inc. (the "Amex Cards") and Visa (the "Visa Cards") through Wells Fargo Bank, N.A. ("Wells Fargo").  A total of 11 Amex Cards and 5 Visa Cards are held by Employees.  These credit cards are used solely to pay company-related business expenses.  Average monthly obligations on the Amex Cards have totaled approximately $35,828 and average monthly obligations on the Visa Cards have totaled approximately $141,480.  Before the Petition Date, the Debtors paid all obligations on the Amex Cards and Visa Cards in full.  However, to the extent a balance exists on the Amex Cards or Visa Cards, the Debtors seek authority to pay those amounts if, and only if, American Express and Wells Fargo are willing to continue providing credit through the Amex Cards and Visa Cards, respectively.  To the extent American Express and Wells Fargo are willing to agree, in writing, to honor the Debtors' accounts post-petition through the consummation of their going concern asset sale, the Debtors seek authority to pay the pre-petition amounts outstanding on the Amex Cards and Visa

13

Cards so that employees may continue to use these cards in the ordinary course of business for business related purposes.[11]

## E.    **Employee Benefit Programs**

36.     In the ordinary course of business, the Debtors maintain various Employee Benefit Programs and policies, including, without limitation, group health insurance, dental plan, vision plan, life insurance and life assurance, accidental death and dismemberment insurance, long-term disability insurance, short-term disability insurance, voluntary supplement life insurance, voluntary accidental death & dismemberment insurance, an employee assistance program and other benefit plans.  These programs generally are available to Full-Time Employees, who in the United States work thirty (30) or more hours a week, and in the United Kingdom and Spain are considered full-time regular Employees (collectively, the "Eligible Employees").  The Debtors seek authority, in the exercise of their discretion, to honor obligations and to continue the Employee Benefit Programs in the ordinary course of business and consistent with past practice, subject to the Debtors' rights, if any, to modify or discontinue any Employee Benefit Programs, and to pay all pre-petition amounts related to the Employee Benefit Programs.

   *(i)    Group Health Insurance*

        (a)    U.S. Employees

37.     The Debtors offer Eligible Employees and their dependents the opportunity to participate in a fully-insured group health insurance (the "Medical Insurance") provided through CareFirst BlueCross BlueShield ("CareFirst").  As of April 1, 2018, approximately 145 of

---

[11] If, on the other hand, American Express or Wells Fargo suspends or cancels the cards, the Debtors will not pay amounts outstanding on account of those cards other than as provided for under the Bankruptcy Code.

Employees participated in the Medical Insurance. Premiums for the Medical Insurance are paid, in part, by the Debtors and, in part, through premiums collected from Eligible Employees enrolled in the Medical Insurance. Monthly premiums for the Medical Insurance are paid one month in arrears and total, on average, approximately $121,572, of which the Debtors pay approximately $86,592 and premiums collected from Eligible Employees pay the balance.

38.     Eligible Employees may select from four (4) different options, two of which are "high deductible" plans, which permit participation in a Health Savings Account ("HSA"), *i.e.*, "Basic" BlueChoice HMO QHDHP (which is available only for Employees in Maryland, Washington D.C. and Northern Virginia), "Select" BluePreferred PPO QHDHP (collectively, the "HSA Options"), and two of which are premium plans with lower deductibles and not eligible to contribute to and participate in an HSA, *i.e.*, "Plus" HealthyBlue Advantage and "Premium" BluePreferred PPO.

39.     Though the Debtors believe they would be obligated to pay the full premium due, the Debtors estimate that the portion of premiums allocable to the pre-petition period to the Medical Insurance total approximately $81,048, including $57,728 payable by the Debtors and $23,320 withheld from the pay of Eligible Employees and not yet remitted.

    (b)     U.K. Employees

40.     The Debtors also offer Eligible Employees in the United Kingdom and their dependents the opportunity to participate in a fully-insured group health insurance, *i.e.*, Medical Insurance, provided through AXA PPP Healthcare ("AXA"). Eligible Employees are eligible to enroll for benefits on the first day of the month following their start date. The Debtors pay the

entirety of the monthly premiums for Medical Insurance for each Eligible Employee.[12]  Eligible

Employees are permitted to add their dependents at the Eligible Employee's own cost.

41.    The Medical Insurance plan in the United Kingdom runs from May 1 to April 30.

Premiums on the Medical Insurance covering the U.K. Employees have historically been paid on

an annual basis.  Accordingly, the Debtors paid all amounts due with respect to Medical

Insurance premiums for the U.K. Employees through April 30, 2018.  With the plan year having

just recommenced, the Debtors will be obligated to pay for the plan year May 1, 2018 to April

30, 2019.  However, the Debtors have determined to pay that premium monthly, rather than on

an annual basis.  The annual renewal premium will total £57,234 for the plan year.  The initial

payment due, covering May 2018, will approximate £4,770, and is due to be paid within 30 days

of the date the Debtors' receive an invoice from AXA.  As of the Petition Date, the Debtors have

not received that invoice.

(c)    ESP Employees

42.    The Debtors also offer Eligible Employees in Spain and their dependents the

opportunity to participate in a fully-insured group health insurance, *i.e.*, Medical Insurance,

provided through Sanitas, Sociedad Anónima de Seguros ("Sanitas").  Eligible Employees are

eligible to enroll for benefits on the first day of the month following their start date.  The Debtors

pay the entirety of the monthly premiums for Medical Insurance for each Eligible Employee in

Spain.  Eligible Employees are permitted to add their dependents, and the Debtors pay 50% of

the premiums relating to the Eligible Employee's dependents, and the Eligible Employee's pay

the other 50%.

---

[12] The benefit premium paid by the Debtors on account of Eligible Employees is considered taxable income and
Eligible Employees that participate in the Medical Insurance are taxed on that amount.

16

43.     Monthly premiums for the Medical Insurance are paid one month in arrears and total, on average, approximately €455.

(ii)     *Dental Plans*

(a)     <u>U.S. Employees</u>

44.     The Debtors offer dental benefits (the "<u>Dental Plan</u>") to Eligible U.S. Employees and their dependents.  The Dental Plan is provided by CareFirst.  As of April 1, 2018, approximately 136 Employees participated in the Dental Plan.

45.     Premiums for the Dental Plan in the United States are paid, in part, by the Debtors and, in part, through premiums collected from Eligible Employees enrolled in the Dental Plan. The premiums for the Dental Plan vary depending on whether the participating Employee covers dependents under the Dental Plan in addition to the Employee.

46.     Premiums relating to the Dental Plan are paid estimated to be approximately $8,435 per month.  The Debtors believe they are current to CareFirst with respect to the Dental Plan in the United States.  However, to the extent a balance exists to CareFirst with respect to the Dental Plan, the Debtors seek authority to pay those amounts to ensure the continuous availability of coverage and administration needed for that plan.

(b)     <u>U.K. Employees</u>

47.     The Debtors also offer Eligible Employees in the United Kingdom a Dental Plan. The Dental Plan in the United Kingdom is provided by Cigna HealthCare Benefits ("<u>Cigna</u>"). Only spouses are eligible for participation in the U.K. Dental Plan (as children are covered by National Insurance).

48.     Premiums for the Dental Plan in the United Kingdom are paid entirely by the Debtors; however, Employees are obligated to pay the costs of any premium relating to the Dental Plan for their spouse.

57731/0002-15600560v7

49.     As is the case with the Medical Insurance plan in the United Kingdom, the Dental

Plan in the United Kingdom runs from May 1 to April 30.  Like the Medical Insurance Plan, the

Debtors have historically paid the premiums on the Dental Plan covering the U.K. Employees on

a lump sum basis annually.  Accordingly, premiums for the Dental Plan covering the U.K.

Employees have been paid through April 30, 2018.  The Debtors have renewed the coverage,

commencing May 1, 2018, and will also now pay the premiums for the plan year monthly, rather

than annually.  The annual renewal premium for the Dental Plan covering the U.K. Employees

will total £15,816, and will be paid in monthly installments estimated to be £1,318.  The initial

payment due, covering May 2018, is due to be paid within 30 days of the date the Debtors'

receive an invoice from Cigna.  As of the Petition Date, the Debtors have not received that

invoice.

(c)     ESP Employees

50.     Sanitas also provides Eligible Employees in the Spain with a Dental Plan.  The

premiums for the Dental Plan in Spain are included with the Medical Insurance payment noted

above.

(iii)     *Vision Plan (U.S. Employees Only)*

51.     Eligible Employees in the United States are also offered the opportunity to obtain

vision benefits (the "Vision Plan") through Avēsis, a wholly owned subsidiary of the Guardian

Life Insurance Company of America.  Premiums for the Vision Plan are paid entirely by

Employees that participate in the Vision Plan, through Deductions from their paychecks, and the

Debtors pay Avēsis approximately $1,331 per month to administer the Vision Plan.  To the

extent there is any balance due Avēsis, the Debtors request authority to pay it.

57731/0002-15600560v7

(iv)     *Health Savings Accounts/Flexible Spending Accounts (U.S. Employees Only)*

52.     Eligible Employees who select the HSA Options (as described in paragraph 38 above) may make pre-tax deposits into health savings accounts (the "HSA Accounts") that then can be used for medical, dental and prescription drug expenses. Amounts contributed to the HSA Accounts (which aggregate approximately $14,874 per month) are withheld from the Eligible Employees' pay by the Debtors but not included among Deductions. The HSA Accounts are administered by Discovery Benefits, to whom the Debtors pay approximately $243 monthly to administer the HSA Accounts. To the extent a balance exists to Discovery Benefits, the Debtors seek authority to pay those amounts to ensure the continuous administration relating to the HSA Accounts.

53.     For Eligible Employees who are not eligible for an HSA Account, the Debtors offer flexible spending accounts ("FSAs"), which allow such employees to set aside pre-tax income for qualifying healthcare, dependent care, and commuting expenses. The Debtors do not contribute to FSAs, but withhold approximately $4,330 per month from participating Employees' compensation on account of FSA contributions. The Debtors also cover the costs for Discovery Benefits to administer the FSAs. Those costs total approximately $551 on a monthly basis.

54.     The Debtors' request authority to remit Employee FSA contributions as and when due, in the ordinary course of business on a postpetition basis and, to the extent a balance exists to Discovery Benefits, the Debtors seek authority to pay those amounts to ensure the continuous administration needed for these plans.

57731/0002-15600560v7

(v)    *Life and Disability Plans*

    (a)    U.S. Employees

55.    The Debtors provide all Eligible Employees with life insurance (the "Life Insurance") and accidental death and dismemberment insurance ("AD&D Insurance") through a group plan provided by Mutual of Omaha Life Insurance Company ("Mutual of Omaha"). The Debtors pay the full premium for the minimum coverage provided under the Life Insurance and AD&D Insurance plans.

56.    The Debtors also provide all Eligible Employees with short-term disability insurance (the "S-T Disability Insurance") and long-term disability insurance ("L-T Disability Insurance") through group plans provided by Mutual of Omaha. The S-T Disability Insurance and L-T Disability Insurance include amounts paid by the Debtors with respect to NY Disability and Family Leave. The Debtors pay the full premium for the S-T Disability Insurance and L-T Disability Insurance.[13]

57.    As of April 1, 2018, approximately 154 Eligible Employees were covered by the Life Insurance, AD&D Insurance, S-T Disability Insurance and L-T Disability Insurance.

58.    The Debtors pay a combined premium for the Life Insurance, AD&D Insurance, S-T Disability Insurance and L-T Disability Insurance to Mutual of Omaha of approximately $8,944 per month, one month in advance. As of the Petition Date, the Debtors estimate that they owe that monthly premium (approximately $8,944 in the aggregate) for coverage under the Life Insurance, AD&D Insurance, S-T Disability Insurance, and L-T Disability Insurance relating to the pre-petition.

---

[13] In accordance with the Internal Revenue Code, to permit Employees to receive disability benefits as nontaxable income, the premiums paid by the Debtors on the Employees' behalf are considered taxable income to the Employees.

      (b)    <u>U.K. Employees</u>

59.    All Eligible U.K. Employees are provided life assurance through a group plan provided by Unum Limited known as the Unum Life Assurance Master Plan (A) (the "<u>U.K. Life Assurance Plan</u>"). The Debtors also pay the full premium for the minimum coverage provided under the U.K. Life Assurance Plan. The annual premium for the U.K. Life Assurance Plan totals approximately £6,219. The Debtors do not owe any amount on account of the U.K. Life Assurance Plan as of the Petition Date.

      (c)    <u>ESP Employees</u>

60.    Certain of Videology UK's Employees in Spain are provided life assurance through a group plan provided by AXA Aurora Vida, Sociedad Anónima de Seguros y Reaeguros ("<u>AXA Spain</u>") (the "<u>ESP Life Assurance Plan</u>"). The Debtors also pay the full premium for the minimum coverage provided under the ESP Life Assurance Plan. The annual premium that the Debtors pay to AXA Spain for the ESP Life Assurance Plan totals approximately €500. The Debtors do not owe any amount on account of the ESPLife Assurance Plan as of the Petition Date.

      *(vi)*    *Voluntary Benefit Programs (U.S. Employees Only)*

61.    The Debtors offer Eligible U.S. Employees the opportunity to purchase additional life insurance and accidental death and dismember insurance for themselves or their dependents (the "<u>Voluntary Benefit Programs</u>"), all of which are provided through Mutual of Omaha. The Debtors collect premiums from Eligible Employees participating in these Voluntary Benefit Programs and remit those premiums to Mutual of Omaha. On average, premiums withheld and remitted on account of the Voluntary Benefit Programs have totaled approximately $2,065 per month. The Debtors estimate that as of the Petition Date, they have withheld but not yet remitted those premiums related to the Voluntary Benefit Programs.

*(vii)    COBRA Benefits (U.S. Employees Only)*

62.    The Debtors are required under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") to provide former employees with the option of electing to continue participating in the Medical Insurance, Dental Plan and Vision Plan.  Former employees who elect COBRA coverage are assessed the full estimated cost of coverage under the applicable plan plus an administration fee of 2%.  The Debtors utilize Discovery Benefits to administer COBRA benefits and pay Discovery Benefits approximately $183 per month.  The Debtors do not believe that any amounts were payable to Discovery Benefits for the pre-petition period, but to the extent there are any amounts due, the Debtors request authority to pay it to ensure no lapse in the services provided to former employees.

*(viii)    Employee Assistance Programs*

(a)    <u>U.S. Employees</u>

63.    The Debtors provide their Employees with a confidential counseling and referral service (the "Employee Assistance Program") that pairs Employees with clinicians, financial professionals, and attorneys.  In the United States, the Employee Assistance Program is administered by Mutual of Omaha.  There is no cost to the Employees for the Employee Assistance Program and the Debtors pay no additional premium for the Employee Assistance Program, as it is built into the disability coverage referred to above.  Except to the extent there remains premiums due with respect to the disability coverage noted above, the Debtors do not believe they owe any amounts on account of the Employee Assistance Program.

(b)    <u>U.K. Employees</u>

64.    The Debtors also provide similar Employee Assistance Programs to their Employees in the United Kingdom.  In that regard, the Debtors maintain Employee Assistance Programs administered, respectively, by Unum Lifeworks and AXA.  There is no cost to the

22

Employees for the Employee Assistance Programs. While there is no cost to the Debtors associated with the Unum Lifeworks Employee Assistance Program (as it is included within other existing coverage provided by Unum), the Debtors include approximately £638 with their premiums for the Medical Insurance payable to AXA for the Employee Assistance Program administered by AXA.

65.     Because the Debtors have satisfied all amounts due with respect to the Medical Insurance and U.K. Life Assurance Plan as of the Petition Date (which amounts are paid annually), the Debtors do not believe that they owe any amounts on account of the Employee Assistance Programs in the United Kingdom either.

**F.     Severance Obligations**

       (a)     U.S. Employees

66.     Pursuant to practices in place prior to the Petition Date, employees that were terminated were paid severance (the "U.S. Severance Practice"). The benefits received under the U.S. Severance Practice, particularly the amount of pay received (the "U.S. Severance Pay"), depend on the amount of an eligible Employee's base salary and years of service to the Debtors. Under the U.S. Severance Practice, U.S. Severance Pay is paid either in lump sum, or in a manner consistent with the Debtors' usual payroll practices. Terminated employees generally receive as U.S. Severance Pay an amount equivalent to that employee's rate of pay for period of two weeks plus one (1) week for each year of service over one (1) year. Under the U.S. Severance Practice, terminated employees have historically been paid any accrued, but unused PTO.

       (b)     U.K. Employees

67.     In the United Kingdom, severance practices are governed by the employee's employment agreement and by local law. The Debtors are required to adhere to statutory

23

processes when selecting employees to be released as the result of identified redundant positions. Such process includes identifying redundant positions, notifying potentially impacted employees, executing a selection process to identify employees to be dismissed, and dismissing employees (the "U.K. Severance Practice"). The benefits received under the U.K. Severance Practice, particularly the amount of pay received (the "U.K. Severance Pay"), is dictated by the employee's employment agreement with the Debtor and U.K. law. Under the U.K. Severance Practice the employee is entitled to that employee's notice period, as provided in such employee's employment agreement. The range of notice ranges from one week to three months. In addition to notice, each employee who has been made redundant is entitled to no less than statutory severance pay. At this time, Videology UK has been paying only the statutory sum, which ranges from 1 to 1.5 weeks of salary for each year worked (based on age), capped at a weekly rate of £508 with an absolute cap of £15,240. In addition, under the U.K. Severance Practice, terminated employees have historically been paid any accrued, but unused PTO.

(c)    ESP Employees

68.    The Debtors' severance practice in Spain is similar to that in the United Kingdom. Like the United Kingdom, severance practices are governed by the employee's employment agreement and by local law and the Debtors are required to adhere to statutory processes when selecting employees to be released (the "ESP Severance Practice" and together with the U.S. Severance Practice and the U.K. Severance Practice, the "Severance Practices"). The benefits received under the ESP Severance Practice, particularly the amount of pay received (the "ESP Severance Pay" and together with U.S. Severance Pay and the U.K. Severance Pay, the "Severance Pay"), is dictated by the employee's employment agreement and Spanish law. At most, under Spanish law, an employee that is terminated would be able to receive ESP Severance Pay equal to 33 days per year of service, up to 24 months, though, working through a process

24

under Spanish law, the amount of ESP Severance Pay would be drastically reduced. In addition, under the ESP Severance Practice, terminated employees have historically been paid any accrued, but unused PTO.

69.     In order to maintain employee morale and goodwill, the Debtors are seeking authority, but not direction, to continue to honor obligations that come due, and in the ordinary course of business, in accordance with the Severance Practices for non-insider employees postpetition,[14] as those policies may be modified, supplemented, and amended in the ordinary course of business, not to exceed the statutory cap. The Debtors also seek authority, but not direction, to pay any amounts due as of the Petition Date for Severance Pay of qualifying terminated employees in an amount up to the $12,850 cap.

## G.    Workers' Compensation Insurance

70.     Under the laws of the states in which the Debtors operate, the Debtors must maintain workers' compensation insurance for their Employees for claims arising from or related to employment by the Debtors. The Debtors provide this coverage (the "Workers' Compensation Insurance") through insurance policies currently provided by Travelers Property Casualty Company of America ("Travelers"). The Workers' Compensation Insurance covers (i) workers' compensation and (ii) employer liability for accident and disease.

71.     Under the Debtors' current Workers' Compensation Insurance, workers compensation claims are administered and paid by Travelers up to statutory limits for workers compensation and Employer liability limits of $1,000,000. The policies are "guaranteed cost" policies and, therefore, do not have a deductible. The coverage period under the current Policy

---

[14] The Debtors are not seeking authority to make any payments inconsistent with section 503(c) of the Bankruptcy Code.

runs from 2/14/18 through 2/14/19. The annual premium for the Policy totals approximately

$46,000. The Debtors will be required to make a monthly payment of $0.

72.    The Debtors seek authority to continue to administer their Workers'

Compensation Insurance.

**H.    401(k) Plan (U.S. Employees Only)**

73.    Eligible U.S. Employees who have attained the age of twenty-one are eligible to

participate in the Videology Inc. 401(k) Plan (the "401k Plan"). The 401k Plan is administered

by Mass Mutual and Wells Fargo provides investment advisory services to the Plan. Reliance

Trust Company serves as the Trustee for the 401k Plan.[15]

74.    There are approximately 203 U.S. Employees or former employees with current

account balances in the 401k Plan. Approximately $163,118 in total is withheld from

Employees' pay each month on account of contributions to the 401k Plan and repayment of loans

taken by participants from the 401k Plan. As of the Petition Date, the Debtors do not match

Employee contributions to the 401k Plan, though the Debtors have the discretion to do so. All

amounts withheld from Employees are immediately remitted to Mass Mutual on the payroll date.

The Debtors seek authority to continue to pay or transfer all employee contributions and to

continue to honor their obligations under the 401k Plan in the ordinary course.

**I.    Pension (U.K. Employees)**

75.    All U.K. Employees have the option to join the Debtors' Stakeholder Pension

Scheme, The Elect Self Invested Pension Plan (the "U.K. Pension Plan") where they can

---

[15] The administrative fees paid to Mass Mutual, Reliance Trust Company and Wells Fargo are paid by the 401k Plan, not the Debtors.

contribute towards the fund and rollover any pensions form previous employers. Aegon serves as the Pension Provider and Mercer Limited serves as the Pension Advisor.

76.     Under the U.K. Pension Plan, the Debtors make contributions totaling 3% of a U.K. Employee's monthly base salary immediately after U.K. Employees have been paid. Employees also contribute to the U.K. Pension Plan (in an amount no less than 3% of their monthly base salary), through Deductions from their monthly payslips.  The contributions are, thus, processed the month after the Employees are paid, based on the prior month's pay.  For example, a U.K. Employee is paid on April 30th, and the Debtors process the contribution attributable to that Employee for the U.K. Pension Plan during the first week of May.  Pension contributions must be completed and deducted from the Debtors' bank by the 19th of the month. Contribution amounts for each Employee are deducted by the Debtors through UltiPro, with the Debtors then providing the contributions to Aegon.

77.     The Debtors seek authority to continue to pay or transfer all Employee contributions and to continue to honor their obligations under the U.K. Pension Plan in the ordinary course, including their obligation to fund the Debtors' portion of the contribution.  The Debtors are scheduled to make contributions in the next few days on account of the U.K. Pension Plan, relating to periods prior to the Petition Date, in an amount totaling approximately £34,662 in the aggregate.  The Debtors do not believe that any amounts were payable to any of Aegon or Mercer Limited for the pre-petition period relating to the administration of the U.K. Plan, but to the extent there are any such obligations covering the pre-petition period, to fund those in the ordinary course.

**J.    Honoring Pre-Petition Checks and Payments**

78.     Before the Petition Date, the Debtors paid certain of their Pre-Petition Employee Obligations with checks that may not have been presented for payment as of the Petition Date.

27

In order to ensure the orderly payment of the Pre-Petition Employee Obligations, the Debtors request that the Court enter an order requiring the Debtors' banks and Payroll Processors to honor any such checks which are drawn on the Debtors' accounts, and authorizing the banks to rely on the representations of the Debtors as to which checks are subject to this Motion. To the extent any such checks nevertheless are dishonored, the Debtors additionally request authority to issue replacement checks and to reimburse their Employees for any damages resulting therefrom.

## RELIEF REQUESTED

79.     By this Motion, the Debtors seek entry of an order authorizing them, in their discretion, to pay, continue or otherwise honor all Pre-Petition Employee Obligations to or for the benefit of all current and former Employees, including, but not limited to, all Unpaid Compensation, VCP, PTO, Deductions, Payroll Taxes, Reimbursable Expenses, the costs associated with the Employee Benefit Programs, including all premiums, and all administrative and third-party costs associated with the foregoing. The Debtors also seek authority to continue their Employee Benefit Programs, Workers' Compensation Insurance, 401k Plan and U.K. Pension Plan in the ordinary course of business and to pay all associated administrative and third-party costs. The Debtors also seek an order directing their banks to honor pre-petition payments, including checks, issued on account of Pre-Petition Employee Obligations, Employee Benefit Programs, the Workers' Compensation Insurance, the 401k Plan, and the U.K. Pension Plan.

## AUTHORITY FOR RELIEF

**A.      Payment of the Pre-Petition Employee Obligations Should Be Authorized Under Bankruptcy Code Section 507(a)**

80.     Bankruptcy Code sections 507(a)(4) and 507(a)(5) require that certain claims for pre-petition wages, salaries, commissions, vacation, sick and other leave policies, and employee

28

benefit contributions be accorded priority in payment in an amount not to exceed $12,850.00 for each individual. Because of the number of Employees working for the Debtors, and because some amounts are unknown pending submission of claims, the Debtors do not know the exact amount due each Employee for the pre-petition period. However, the Debtors' believe that the vast majority of their Employees are owed amounts under the $12,850.00 cap of Bankruptcy sections 507(a)(4) and 507(a)(5), to the extent such caps are applicable. At least with respect to wages and salaries only (but without taking into account amounts that may be due for VCP and the Executive Bonus Plan), as of the Petition Date no Employee will be owed more than $12,850.00 (and no amount on account of VCP and the Executive Bonus Plan is proposed to be paid prior to entry of a final order on this Motion). Accordingly, granting the relief requested will not adversely affect the Debtors' other unsecured creditors. To the extent that Employees are owed aggregate amounts in excess of these caps (for items other than base salary), the Debtors submit that payment of the Pre-Petition Employee Obligations in such higher amounts or otherwise non-priority amounts is nonetheless justified in this case, as the Debtors' Employees are extremely important in maintaining the current value of the Debtors' estates.

81.     Additionally, the Debtors believe that all Pre-Petition Employee Obligations that exceed the priority cap or are otherwise non-priority have arisen in the ordinary course of the business of the Debtors and are reasonable in relation to the value of the services rendered.

**B.      The Proposed Payments Are Appropriate Under Bankruptcy Code Section 363**

82.     Under Bankruptcy Code section 363, a bankruptcy court is empowered to authorize a chapter 11 debtor to expend funds in the bankruptcy court's discretion outside the ordinary course of business. *See* 11 U.S.C. § 363. In order to obtain approval for the use of estate assets outside the ordinary course of business, the debtor must articulate a valid business justification for the requested use. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr.

29

S.D.N.Y. 1989). To the extent the payment of pre-petition wage, salary and benefit claims are deemed to be outside the ordinary course of business, the preservation and protection of a debtor's business, the retention of a debtor's currently working employees and the maintenance of positive employee morale provide a sufficient business justification for such payment. *See id.*

83.    Accordingly, this Court should grant the requested relief under Bankruptcy Code section 363.

**C.    Payment of Certain of the Pre-Petition Employee Obligations is Appropriate Under Bankruptcy Code Section 541**

84.    The payment of the Employee contribution component of the 401(k) Plan, the U.K. Pension Plan or payment of garnished wages or other Deductions will not prejudice the Debtors' estates because such withholdings are derived from Employee funds and held in trust for the benefit of the related payees and, thus, do not constitute property of the Debtors' estates under Bankruptcy Code section 541. *See Begier v. IRS*, 496 U.S. 53, 58-59 (1990). *See also In re Columbia Gas Sys., Inc.*, 997 F.2d 1039, 1059 (3d Cir. 1993) (concluding that property which debtor holds in trust – either express or constructive – for another does not become property of the estate when the debtor files for bankruptcy, and stating that "Congress clearly intended the exclusion by section 541(d) to include not only funds held in express trust, but also funds held in constructive trust."); *EBS Pension L.L.C. v. Edison Bros. Stores, Inc. (In re Edison Bros., Inc.)*, 243 B.R. 231 (Bankr. D. Del. 2000) (same). Moreover, payments which are critical to the retention and morale of the Debtors' workforce actually add value to the estates because an unplanned reduction in Employee retention or productivity could have disastrous effects on the Debtors' business operations.

57731/0002-15600560v7

**D.** **Payment of the Pre-Petition Employee Obligations is Authorized Under Bankruptcy Code Sections 1107(a) and 1108**

85.     The Debtors, operating their businesses as debtors in possession under Bankruptcy Code sections 1107(a) and 1108, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id.*

86.     According to the *CoServ* court, there are instances in which a debtor in possession can fulfill its fiduciary duty "only ... by the preplan satisfaction of a pre-petition claim." *See id.* The *CoServ* court specifically noted that preplan satisfaction of pre-petition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.* The court provided a three-pronged test for determining whether a preplan payment on account of a pre-petition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's pre-petition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.* at 498.

87.     Payment of the Pre-Petition Employee Obligations meets each element of the *CoServ* court's standard. Any failure by the Debtors to pay the Pre-Petition Employee Obligations would have a severe negative impact on the morale of the Debtors' Employees at a critical time for the Debtors and their businesses. Moreover, as described above, the Employees

likely maintain priority claims against the Debtors for the vast majority, if not all, of the Pre-Petition Employee Obligations.

88.    Second, the potential harm and economic disadvantage that would stem from the failure to pay the Pre-Petition Employee Obligations is grossly disproportionate to the amount of any pre-petition claim that may be paid.  Absent payment of the Pre-Petition Employee Obligations, Employee morale would decrease dramatically, likely leading to the loss of key Employees, lower sales, and other severe business disruptions costing far in excess of the amount of such obligations.

89.    Third, there is no practicable alternative to the payment of the pre-petition Employee Obligations or continuation of the Employee Benefit Programs.  Unpaid Employees who can seek alternative employment will do so, causing significant disruption of the Debtors' business.  Failure to continue the Employee Benefit Programs will require either that the Debtors either undertake the effort to replace these programs at the outset of these bankruptcy cases or deny the Employees the benefits on which they rely, which will have largely the same effect as failing to pay those Employees.

90.    Therefore, the Debtors can only meet their fiduciary duties as debtors in possession under Bankruptcy Code sections 1107(a) and 1108 by payment of the Pre-Petition Employee Obligations.

**E.    Bankruptcy Code Section 105 and the Doctrine of Necessity Support Payment Of the Pre-Petition Employee Obligations**

91.    Additionally, the Debtors' proposed payment of the Employee Obligations should be authorized under Bankruptcy Code section 105(a) and the "doctrine of necessity."

92.    Under Bankruptcy Code section 105, this Court "may issue any order . . . that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105.

For the reasons set forth above, and in light of the need for the Debtors to preserve the going concern value of their businesses, the relief requested herein is proper and should be granted.

93.     The relief sought is further supported by the doctrine of necessity. The doctrine of necessity is a well-settled doctrine that permits a bankruptcy court to authorize payment of certain pre-petition claims prior to the completion of the chapter 11 case where the payment of such claims is necessary to the chapter 11 efforts. *See In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain pre-petition claims, the doctrine of necessity should be invoked to permit payment);[16] *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-192 (Bankr. D. Del. 1994) (noting that debtors may pay pre-petition claims that are essential to continued operation of business) (citing *In re Lehigh & New England Ry. Co.*, 657 F.2d at 581).

94.     The doctrine of necessity is a widely accepted component of modern bankruptcy jurisprudence. *See Just For Feet*, 242 B.R. at 826 (approving payment of key inventory suppliers' pre-petition claims when such suppliers could destroy debtor's business by refusing to deliver new inventory on eve of debtor's key sales season); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (recognizing that the doctrine of necessity is derived from the court's equitable powers and allows debtors to make payment on pre-petition claims to creditors who will refuse to supply services or material essential to the conduct of the debtors' business).

---

[16] The Court's power to utilize the doctrine of necessity in chapter 11 cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The United States Supreme Court first articulated the doctrine of necessity over a century ago, in *Miltenberger v. Logansport, C. & S.W. R. Co.*, 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. *See id.* at 309-14. The modern application of the doctrine of necessity is largely unchanged from the Court's reasoning in *Miltenberger*. *See In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581-82 (3d Cir. 1981) ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the [debtor's] continued operation … in serious jeopardy").

95.     For the reasons discussed herein, it is evident that payment of the Pre-Petition Employee Obligations is necessary to the Debtors' effective chapter 11 process.  In particular, without payment of the Pre-Petition Employee Obligations, the Debtors' businesses and operations will be detrimentally impacted through the reduction in Employee morale and the potential loss of key Employees during a critical time for the Debtors and their businesses. Hence, this Court should exercise its equitable powers to grant the relief requested in this Motion.

F.     **Cause Exists to Authorize the Debtors' Financial Institutions and the Payroll Processors to Honor Checks and Electronic Fund Transfers**

96.     The Debtors have sufficient funds on hand to pay the amounts described herein in the ordinary course of business.  Also, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment on account of Employee Obligations.  Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently and that the Court should authorize and direct all applicable financial institutions and the Payroll Processors, when requested by the Debtors, to receive, process, honor and pay any and all checks or wire transfer requests in respect of the relief requested herein.

G.     **Bankruptcy Rule 6003 Has Been Satisfied and Bankruptcy Rule 6004 Should Be Waived**

97.     Certain aspects of the relief requested herein are subject to Bankruptcy Rule 6003. Pursuant to Bankruptcy Rule 6003, a court may grant such relief on an expedited basis if it is necessary to avoid immediate and irreparable harm.  The Debtors submit that facts set forth herein demonstrate that the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and, thus, Bankruptcy Rule 6003 has been satisfied.

34

98.    Additionally, with respect to any aspect of the relief sought herein constitutes a use of property under Bankruptcy Code section 363(b), the Debtors seek a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is immediately necessary in order for the Debtors to be able to continue to operate their businesses and preserve the value of their estates.  The Debtors thus submit that the requested waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h) is here appropriate.

## RESERVATION OF RIGHTS

99.    Nothing contained herein is intended to be or shall be construed as (a) an admission as to the validity or priority of any lien or claim against the Debtors, (b) a waiver of the Debtors' or any appropriate party-in-interest's rights to dispute any lien or claim or (c) an approval or assumption of any agreement, contract, program or policy under section 365 of the Bankruptcy Code.  If the Court grants the relief requested herein, any payment made pursuant to the Court's order is not intended to be, and should not be construed as, an admission of the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## NOTICE

100.    Notice of this Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to Agents for prepetition lenders; (c) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (d) the United States Securities and Exchange Commission; (e) the Internal Revenue Service; (f) the Office of the United States Attorney for the District of Delaware; (g) Delaware State Treasury; (h) Delaware Secretary of State, Division of Corporations, Franchise Tax; (i) UltiPro; (j) Celergo; (k) Wells Fargo; (l) CareFirst; (m)  Discovery Benefits; (n) Cigna; (o) Mutual of

57731/0002-15600560v7

Omaha; (p) Avēsis; (q) Mass Mutual; (r) Mercer Limited; (s) Aegon; (t) Reliance Trust Company; (u) Travelers; (v) Unum Limited; (w) Unum Lifeworks; (x) AXA Spain and (y) Sanitas.

101.    As this Motion is seeking "first day" relief on an expedited basis, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## NO PREVIOUS REQUEST

102.    No previous request for the relief sought herein has been made by the Debtors in this or any other court.

57731/0002-15600560v7

**WHEREFORE**, the Debtors respectfully request that the Court enter an interim order, substantially in the form annexed hereto, granting the relief requested in the Motion on an interim basis and scheduling a hearing to consider the relief requested herein on a final basis and such other and further relief as may be just and proper.

Dated:   May 10, 2018

COLE SCHOTZ P.C.

Patrick J. Reilley (No. 4451)
G. David Dean (No. 6403)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
preilley@coleschotz.com
ddean@coleschotz.com

- and -

Irving E. Walker
300 E. Lombard Street, Suite 1450
Baltimore, MD  21202
Telephone: 410.230.0660 Fax
Facsimile: 410.528.9400
iwalker@coleschotz.com

*Proposed Counsel for Debtors
and Debtors in Possession*