## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| VIDEOLOGY, INC., *et al.*,[1] | : | Case No. 18-_____ (___) |
| | : | |
| Debtors. | : | Joint Administration Requested |
| | : | |

## DECLARATION OF KENNETH TARPEY IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Kenneth Tarpey, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information and belief:

1.      I am the Chief Financial Officer of Videology, Inc. ("Videology"), and oversee financial management of Videology and its wholly-owned direct and indirect subsidiaries, including those wholly-owned subsidiaries that are also debtors filing the above-captioned chapter 11 cases (together with Videology, the "Debtors").  An organizational chart of the Debtors and the non-Debtor subsidiaries of Videology (the "Organizational Chart") is attached hereto as Exhibit A.

2.      I submit this declaration (this "Declaration") in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and pleadings filed on the date hereof (the "Petition Date") seeking various types of "first day" relief (collectively the "First Day Motions").  The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession and minimize the adverse effects of the chapter 11 filings on their businesses.  I am familiar with the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Videology, Inc. (2191), Collider Media, Inc. (8602), Videology Media Technologies, LLC (6243), LucidMedia Networks, Inc. (8566) and Videology Ltd.  The address of the Debtors' corporate headquarters is 1500 Whetstone Way, Suite 500, Baltimore, MD 21230.

contents of each First Day Motion and believe the relief sought in each of these Motions is necessary to enable the Debtors to operate their businesses during the pendency of these cases (the "Chapter 11 Cases") with minimal disruption or loss of productivity and value, constitutes a critical element in achieving a successful restructuring of the Debtors' liabilities, and best serves the Debtors, their estates and all parties in interests.  The facts set forth in each of the First Day Motions are incorporated herein by reference.

3.      I have been the Chief Financial Officer of Videology since November 2014.  I have more than 30 years of financial leadership experience and expertise directing strategic operational and financial programs and private technology companies. Earlier in my career, I served as a senior manager at PricewaterhouseCoopers.  I hold a BA from The College of the Holy Cross and an MBA from Babson College.

4.      I am familiar with the Debtors' day-to-day operations, books and records, businesses, and financial affairs.  Except as otherwise indicated, the facts set forth in this Declaration are based on my personal knowledge of the Debtors' businesses, employees, operations, and finances; information learned from my review of relevant documents; my discussions with members of the Debtors' senior management and other professionals; information provided to me by employees working under my supervision; or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial condition.  If called upon to testify, I would testify competently to the facts set forth in this Declaration and the First Day Motions.  I am authorized to submit this Declaration on the Debtors' behalf.

5.      This Declaration is intended to provide a summary overview of the Debtors' businesses and the need for their restructuring under chapter 11 of the Bankruptcy Code.  This

57731/0002-15776624v4

Declaration has been organized into five sections. Section one provides an overview of the Debtors' business. Section two describes the ownership of the Debtors and their pre-petition capital structure. Section three describes the events leading to the filing of the Chapter 11 Cases. Section four describes the Debtors' pre-petition efforts to market and sell the Company and the Debtors' entry into a "stalking horse" asset purchase agreement with Amobee, Inc., a wholly-owned subsidiary of Singapore Telecommunications Limited. Finally, section five describes the relief requested in the First Day Motions and the basis for that requested relief.

## I.    The Debtors' Business

A.    Overview of the Debtors' Business

6.    Videology was founded to provide the software solution for the convergence of television and digital video, through the use of a proprietary allocation theory technology that is unique to the Debtors. Before Videology, advertising technologies had not been developed to address the development of consumers accessing television and video across multiple devices. Videology built its technology to help advertisers and media companies, both buyers and sellers of advertising, to plan, execute, and measure ad campaigns across television and digital media, with innovations including a direct integration with Nielsen, the dominant provider of television data in the United States, as well as many other data providers, including those with global capabilities.

7.    Videology has technology that can connect television viewing with digital media behavior and through optimal allocation theory, and provide clients with insights as to how best to achieve their advertising goals with maximum effectiveness.

8.    During the past year, the Videology platform delivered over 17 billion targeted impressions across digital video and television for more than 13,000 advertisers in 24 countries. Videology currently supports over 4,000 active users around the globe, with a customer base

3

including global agency holding companies, world-leading advertisers, media companies, and premium publishers.

9.    Videology has built a client list including some of the biggest names on both the demand and supply side of the market.

10.    The Debtors' executive and administrative offices are located at 1500 Whetstone Way, Suite 500, Baltimore, Maryland.  The Debtors do not own any real property.  Rather, the Debtors lease properties from which they conduct their operations.  In addition to their executive and administrative offices in Baltimore, the Debtors and their non-debtor affiliates maintain offices in the United States in Austin, Chicago, and Reston, and internationally in London, Madrid (which is a branch office of debtor Videology Ltd.), Toronto, Sydney, Singapore, Tokyo and Shanghai.

11.    As of the Petition Date, the Debtors and their non-debtor foreign affiliates have approximately 212 employees, with 146 employed within the Debtors' operations in the United States, 59 in London and 7 at Videology, Ltd.'s registered branch office in Madrid.  The Debtors' non-debtor foreign subsidiaries, including those in the Asia-Pacific countries, have 22 employees.

12.    The Debtors report for financial purposes on a calendar year.  For the year ended December 31, 2017, the Debtors generated revenues on a consolidated basis of $143,240,252 and had a net loss on a consolidated basis of ($27,219,644).

13.    The Debtors' primary assets consist of accounts receivable and its intellectual property.  As of May 9, 2018, the Debtors estimate the receivables to be approximately $33,322,000 and available cash totals $3,300,000.  In addition, the Debtors have other current assets, which as of April 30, 2018, include prepaid expenses aggregating approximately

4

$1,755,000, fixed assets of approximately $5,600,000 and other assets (comprised primarily of deposits and prepayments) totaling approximately $437,000. As of the quarter ending March 31, 2018, the Debtors books and records also reflect intangible assets, net, of $18,917,631 and investments (including in the Debtors' non-Debtor subsidiaries) of $23,195,423. Thus, as of April 30, 2018, and without regard to any intercompany obligations, the Debtors' assets have an estimated total book value of approximately $86.5 million.

## II.    The Debtors' Ownership and Pre-Petition Capital Structure

A.    The Debtors' Ownership Structure

14.    Videology was founded in 2007 and organized under the laws of the State of Delaware. As reflected in the Organizational Chart, Videology is the direct parent of each of the Debtors. Each of the Debtors, with the exception of Videology, Ltd. ("Videology UK"), is organized under the laws of Delaware. Videology UK is a company organized under the laws of England and Wales.

15.    During the years prior to the Petition Date, Videology obtained funding for the development of its technology and operations through the sale of its Preferred Stock in four separate equity financings, as summarized below.

- Series A Financing: Beginning in February and ending in July of 2008, Videology sold shares of its Series A Preferred Stock to various investors, including New Enterprise Associates 12, Limited Partnership and Valhalla Partners II, L.P., the lead investors for such financing, for an aggregate purchase price of approximately $15.1 million.

- Series B Financing: Beginning in October of 2009 and ending in January of 2010, Videology sold shares of its Series B Preferred Stock to various investors,

including Comcast Ventures, LP, the lead investor for such financing, for an aggregate purchase price of approximately $16.4 million.

- <u>Series C Financing</u>: Beginning in March and ending in May of 2011, Videology sold shares of its Series C Preferred Stock to various investors, including New Enterprise Associates 12, Limited Partnership, the lead investor for such financing, for an aggregate purchase price of approximately $30.4 million.

- <u>Series D Financing</u>: Beginning in May and ending in June of 2013, Videology sold shares of its Series D Preferred Stock to various investors, including Catalyst Investors QP III, L.P., the lead investor for such financing, for an aggregate purchase price of approximately $68.2 million.

16.    The following Capitalization Table/Ownership Summary indicates the authorized and outstanding capital stock, options and equity awards of Videology as of the date hereof:

| Videology Inc. - Capitalization Table / Ownership Summary | | | | |
|---|---|---|---|---|
| | Shares Authorized | Issued and Outstanding Shares[2] | Common Stock Equivalent Shares[3] | Percent Ownership |
| COMMON STOCK | 35,834718 | | | |
| CLASS A | 265,000 | 265,000 | 265,000 | 1.2486% |
| CLASS B | 19,205,000 | 3,825,628 | 3,825,628 | 18.0258% |
| CLASS C | 16,364,718 | 0 | 0 | 0.00% |
| | | **4,090,628** | **4,090,628** | |
| | | | | |
| PREFERRED STOCK | 15,960,327 | | | |
| SERIES 1-AB | 1,469,410 | 1,426,561 | 1,426,561 | 6.7218% |
| SERIES 1-C | 29,998 | 29,998 | 29,998 | 0.1413% |
| SERIES 1-D | 3,500,000 | 2,048,373 | 2,048,373 | 9.6517% |
| SERIES 1-XY | 101,295 | 101,295 | 101,295 | 0.4773% |

---

[2] Total shares issued and outstanding, including shares committed for issuance and reserves, assuming conversion of all convertible securities and exercise of all outstanding awards.

[3] CSE Shares* - Common Stock Equivalent (CSE) shares reflects the Common Stock issuable for the security type (option, stock, warrant, notes/debt) after the appropriate conversion ratio is applied with regard to parameters set for aggregation/rounding for each class/series.

57731/0002-15776624v4

| Videology Inc. - Capitalization Table / Ownership Summary | | | | |
|---|---|---|---|---|
| | Shares Authorized | Issued and Outstanding Shares[2] | Common Stock Equivalent Shares[3] | Percent Ownership |
| SERIES A | 2,178,666 | 1,582,816 | 1,582,816 | 7.4580% |
| SERIES B | 1,689,067 | 1,527,759 | 1,527,759 | 7.1986% |
| SERIES C | 2,704,996 | 2,674,998 | 2,674,998 | 12.6042% |
| SERIES D | 3,800,000 | 2,219,109 | 2,219,109 | 10.4561% |
| SERIES X | 210,000 | 120,823 | 120,823 | 0.5693% |
| SERIES Y | 276,895 | 86,022 | 86,022 | 0.4053% |
| | | 11,817,754 | 11,817,754 | |
| | | | | |
| WARRANTS | | | | |
| Warrants (CLASS B) | | | | |
| Outstanding | | 225,000 | 225,000 | 1.0602% |
| | | | | |
| Warrants (SERIES D) | | | | |
| Outstanding | | 46,875 | 46,875 | 0.2209% |
| | | 271,875 | 271,875 | |
| | | | | |
| EQUITY AWARDS | | | | |
| Reserved Under 2008 Incentive Stock Plan: 5,300,000 Class B Shares | | | | |
| Options Outstanding | | 4,593,209 | 4,610,589 | 21.6426% |
| Shares Remaining For Issuance | | 445,568 | 335,774 | 2.1183% |
| | | | | |
| Totals | | 21,223,034 | 21,223,034 | |

17.     In addition to obtaining funding through the equity financings described above, prior to the Petition Date, in August and October of 2017, Videology sold Convertible Promissory Notes to certain holders of its Preferred Stock for an aggregate purchase price of approximately $17.1 million in order to raise capital for its operations.  Such Convertible Promissory Notes are convertible into capital stock of Videology at the election of the holders and under certain other conditions specified therein.  In order to provide additional incentive to purchasers of Convertible Notes, Videology created a senior class of equity, Series 1, in to which holders of prior preferred shares (Series A, B, C and D) could convert their existing equity based

7

on the value of notes purchased.  Because this Series 1 was preferred over all other classes of

shares, except other Series 1 shares, purchasers gained an additional bonus to "pull-up" existing

equity to the top of the equity stack.

B.       The Prepetition Credit Facilities[4]

      *i.*      *U.S. Loan Facility*

18.       Each of the Debtors (other than Videology UK) is a Borrower under that certain

Loan and Security Agreement dated as of July 10, 2017 (including all annexes, exhibits, and

schedules thereto, as from time to time amended, the "U.S. Loan Facility"), with financial

institutions party thereto from time to time as lenders (the "U.S. Lenders"), Fast Pay Partners

LLC ("FastPay" or the "U.S. Agent"), as agent for the U.S. Lenders, and Tennenbaum Capital

Partners, LLC ("TCP"), as documentation agent for the U.S. Lenders and as the Investment

Manager for the U.S. Lenders (other than FastPay).  Certain affiliates of TCP are among the U.S.

Lenders.

19.       Videology UK is a guarantor of the U.S. Loan Facility.

20.       The U.S. Loan Facility provides for revolving credit commitments from the U.S.

Lenders, including swingline commitments, in an aggregate principal amount of up to $40

million, which amount may be extended through a one-time increase of up to $5,000,000.00.

21.       The U.S. Loan Facility matures in January 2020.

22.       The U.S. Loan Facility is an asset-based revolving credit facility, issued in

conjunction with the U.K. Loan Facility (as defined below), that extends credit to the Borrowers

based on a percentage of "Eligible Accounts" owing to the Borrowers.

---

[4] Capitalized terms not otherwise defined in this Section, shall be given the meanings ascribed to them in the
Prepetition Secured Loan Facilities (defined below).  Copies of the Prepetition Secured Loan Facilities are attached
to the Cash Collateral Motion (as defined below).

23.     The U.S. Loan Facility is secured by all or substantially all of the Debtors' assets, including (a) all Accounts; (b) all Chattel Paper, including electronic chattel paper; (c) all Commercial Tort Claims; (d) all Deposit Accounts; (e) all Documents; (f) all General Intangibles, including Intellectual Property (but excluding any intent-to-use trademark applications for which no statement of use has been filed); (g) all Goods, including Inventory, Equipment and fixtures; (h) all Instruments; (i) all Investment Property; (j) all Letter-of-Credit Rights; (k) all Supporting Obligations; (l) all monies, whether or not in the possession or under the control of Agent, a Lender, or a bailee or Affiliate of Agent or a Lender, including any Cash Collateral; (m) all accessions to, substitutions for, and all replacements, products, and cash and non-cash proceeds of the foregoing, including proceeds of and unearned premiums with respect to insurance policies, and claims against any Person for loss, damage or destruction of any Collateral, and (n) all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs and computer records) pertaining to the foregoing (collectively, and, inclusive of the other Collateral identified in Section 7 of the U.S. Loan Facility, the "Existing Collateral").

24.     Interest on the U.S. Loan Facility accrues at variable rates based on the LIBOR Rate plus 8.50%.  The U.S. Loan Facility provides further that "[d]uring an Insolvency Proceeding with respect to any Borrower, or during any other Event of Default, Obligations shall bear interest at the Default Rate (whether before or after any judgment), payable on demand."[5]

25.     On March 23, 2018, the Agents sent a letter to the Debtors purporting to declare an Event of Default under each of the Non-Factored Loan Facilities (as defined below), advising as follows:

---

[5] "Default Rate" is defined in each Loan Facility as follows:  "'Default Rate': for any Obligation (including, to the extent permitted by law, interest not paid when due), 3% plus the interest rate otherwise applicable thereto."

> Per Sections 11.1(l) and (m) of each Loan Agreement, Events of Default have occurred when: (i) any event occurs or condition exists that has a Material Adverse Effect or (ii) when US Agent or UK Agent, acting in good faith and in a commercially reasonable manner, deems itself at any time insecure with respect to the prospect of repayment of the Obligations. The recent events with respect to the non-payment of Accounts owed by [the Debtors' largest client] to the Borrowers and Loan Parties under the Loan Agreements constitutes a Material Adverse Effect and also results in each Agent, acting in good faith and in a commercially reasonable manner, deeming themselves insecure with respect to the repayment of the Obligations. Each of US Agent and UK Agent hereby gives notice to Borrowers and the Loan Parties that, per Section 11.1 of each Loan Agreement, Events of Default have occurred and are continuing (such Events of Default, the "Specified Events of Default").

26.     Following that March 23, 2018 letter asserting the alleged Specified Events of Default, the U.S. Lenders significantly constricted funding under the U.S. Loan Facility and, although the U.S. Agent did not accelerate the U.S. Loan Facility pursuant to its March 23, 2018 default notice, the U.S. Agent has used the proceeds of the Existing Collateral (including amounts received on account of the Borrowers' accounts receivable and cash in the Obligors' bank accounts) to pay down the existing Obligations due under the U.S. Loan Facility, which included the repayment of interest at the Default Rate from and after March 23, 2018.

27.     Based upon the information from the U.S. Agent, as of the Petition Date, I believe the Revolver Loans have been repaid in their entirety. Accordingly, I believe the aggregate principal amount outstanding in connection with the U.S. Loan Facility is currently $0. Although there are no Revolver Loans outstanding, the U.S. Loan Facility has not, however, been terminated and the U.S. Loan Facility provides for a 3% "End of Term Premium".

*ii.*     *U.K. Loan Facility*

28.     Each of the Borrowers is also a Borrower under that certain Loan and Security Agreement dated as of July 10, 2017 (including all annexes, exhibits, and schedules thereto, as

from time to time amended, the "U.K. Loan Facility" and together with the U.S. Loan Facility,

the "Non-Factored Loan Facilities"), the financial institutions party thereto from time to time as

lenders (the "U.K. Lenders" and together with the U.S. Lenders, the "Lenders"), FPP Sandbox

LLC, as agent for the U.K. Lenders ("FPP" or the "U.K. Agent"), and TCP, as documentation

agent for the U.K. Lenders and as the Investment Manager for the U.K. Lenders (other than

FPP).  Certain affiliates of TCP are among the U.K. Lenders.

29.     Videology UK is also a guarantor of the U.K. Loan Facility.

30.     The U.K. Loan Facility is also an asset-based revolving credit facility, issued in

conjunction with the U.S. Loan Facility, that extends credit to the Borrowers based on "Eligible

Accounts" owing to Videology UK, rather than the Accounts owing to the Borrowers (which are

covered by the U.S. Loan Facility).

31.     The aggregate amount of revolver commitments under the U.K. Loan Facility also

includes $20,000,000 with respect to an Eligible Overadvance Amount,[6] in addition to the

revolving commitments under the same $40,000,000 committed under the U.S. Loan Facility.

Both the U.K. Loan Facility and the U.S. Loan Facility provide that the revolver commitments

---

[6] Only the U.K. Loan Facility provided the Debtors with access to the Eligible Overadvance Amount.  The definition of the Eligible Overadvance Amount was the subject of three separate amendments to the U.S. and U.K. Loan Facilities, dated January 12, 2018, January 31, 2018, and March 1, 2018, respectively.  The current definition of Eligible Overadvance Amount (as set forth in the Amendment No. 3 to Loan and Security Agreements, dated as of March 1, 2018, is as follows:

> "Eligible Overadvance Amount": means, an amount equal to the difference of:
> (i) up to $20,000,000, minus, (ii) an amount equal to the amount necessary to
> reduce the Eligible Overadvance Amount to $10,000,000 on July 17, 2017,
> minus each of (iii) (A) an amount equal to $1,111,111.12 on November 1, 2017;
> (B) an amount equal to $1,111,111.12 on December 1, 2017; (C) an amount
> equal to $4,444,444.48 on April 1, 2018; and (D) an amount equal to
> $1,111,111.12 on the first day of every month thereafter until July 1, 2018 (or
> sooner if any voluntary reductions are made pursuant to Section 2.1.4(c)) when
> the Eligible Overadvance Amount will be reduced to $0.  The parties
> acknowledge that as of February 26, 2018, the Eligible Overadvance Amount is
> $7,777,777.76.

under each Loan Facility may never exceed $70,000,000, plus any increases under the one-time permitted increase of $5,000,000 identified above.

32.     The U.K. Loan Facility is secured by the same Collateral as that of the U.S. Loan Facility, *i.e.*, the Existing Collateral.

33.     The Loans and other Obligations under both the U.K. Loan Facility and the U.S. Loan Facility constitute one general obligation of Borrowers and are secured by the Agents' Lien on all Collateral; provided, however, that each Agent and each Lender shall be deemed to be a creditor of, and the holder of a separate claim against, each Borrower to the extent of any Obligations jointly or severally owed by such Borrower.

34.     Interest on the U.K. Loan Facility accrues at variable rates based on the LIBOR Rate plus 10%.  The U.K. Loan Facility, like the U.S. Loan Facility, also provides that "[d]uring an Insolvency Proceeding with respect to any Borrower, or during any other Event of Default, Obligations shall bear interest at the Default Rate (whether before or after any judgment), payable on demand", *i.e.*, "3% plus the interest rate otherwise applicable thereto."

35.     The U.K. Loan Facility also matures in January 2020.

36.     As noted above, however, on March 23, 2018, the U.K. Agent issued the default notice to the Debtors.  Consistent with the actions of its counterparts under the U.S. Loan Facility, the U.K. Lenders significantly constricted funding under the U.K. Loan Facility and used the proceeds of the Existing Collateral (including amounts received on account of Videology UK's accounts receivable and cash in the Obligors' bank accounts) to pay down the existing Obligations due under the U.K. Loan Facility, which included the repayment of interest at the Default Rate from and after March 23, 2018.  The U.K. Loan Facility has not been accelerated.

37.     While the principal balance of all Revolver Loans under the U.S. Loan Facility has been paid down in full, there remain amounts due under the U.K. Loan Facility (in addition to the 3% "End of Term Premium" provided in the U.K. Loan Facility).  As of the date hereof, the aggregate principal outstanding in connection with the U.K. Loan Facility is alleged by the U.K. Agent to total $11,265,532, which includes $7,963,249 on account of the Eligible Overadvance Amount.

*iii.      The EMEA Factored Facility*

38.     Videology UK, as Seller, is also a party to that certain Financing Agreement, dated as of July 28, 2017 (including all annexes, exhibits, and schedules thereto, as from time to time amended, the "EMEA Factored Facility" and together with the Non-Factored Loan Facilities, the "Prepetition Secured Loan Facilities"), with FastPay Roundabout Limited ("FPR" or the "FastPay Factor" and together with the Lenders and the Agents, the "Prepetition Secured Parties"), as Purchaser.

39.     The EMEA Factored Facility is a factoring agreement, with maximum commitments not to exceed $3 million.  Under the terms of the EMEA Factored Facility, the FastPay Factor advances to Videology UK 80% of Accounts that it purchases with respect to Account Debtors that are not incorporated or organized in the United Kingdom, the United States or Canada (collectively, the "EMEA Accounts").  Essentially, the EMEA Accounts are those Accounts of Account Debtors located in countries in Europe (other than the United Kingdom) and in the Middle East and Africa.  The Agents and the FastPay Factor, which are all affiliates of each other, are parties to that certain Intercreditor Agreement dated as of July 27, 2017, which confirms the FastPay Factor's priority in the EMEA Accounts and the Agent's priority in non-EMEA Accounts.

57731/0002-15776624v4

40.     Under the EMEA Factored Facility, Videology UK is required to pay a 14.5% Factoring Fee to the FastPay Factor on any amount advanced.

41.     The EMEA Factored Facility also provides for a "Misdirected Payment Fee" of 20%.[7]

42.     Following the Agents' March 23, 2018 notice of the Specified Events of Default (as described above), the Agents' affiliate and Purchaser under the EMEA Factored Facility, the FastPay Factor, issued its own purported notice of default on March 23, 2018, describing the same Specified Events of Default as the basis for the FastPay Factor declaring its own alleged default.

43.     Following that March 23, 2018 letter, the FastPay Factor ceased factoring any more Accounts and has since been repaid the entirety of the amounts of all Advances (together with all fees, including any Factoring Fee due).  Accordingly, as of the date hereof, the aggregate principal outstanding under the EMEA Factored Facility is $0.  Although there is nothing remaining due thereunder, the EMEA Factored Facility has not, however, been terminated.

C.     Pre-Petition Unsecured Debt

44.     In addition to the amounts due the Prepetition Secured Parties, the Debtors estimate that they owe trade creditors and other unsecured creditors approximately $76,642,600,

---

[7] That section provides as follows:

> Misdirected Payment Fee: Repayment of all Advances must be paid either:
> (i) by the Account Debtor directly to FPR or (ii) by the Account Debtor directly to a deposit account subject to FPR's exclusive control with respect to disbursements from such deposit account (such deposit account, the "Controlled Bank Account").  In the event an Account Debtor fails to pay in the foregoing manner, FPR will provide Seller a grace period of five (5) Business Days to notify FPR of any Misdirected Payment and to forward the full amount of the Misdirected Payment to FPR otherwise Seller may be assessed a Misdirected Payment Fee equalling [sic] 20% of the amount of such payment.

which includes approximately $50 million on account of trade debt, but is exclusive of the amounts due on account of the Convertible Promissory Notes (as described above).

### III.    Events Leading to Chapter 11 Cases and Need for Relief

45.    As consumer consumption of video has fragmented across screens (Television, Mobile, PC) both the demand (advertiser) and supply side (advertising inventory) have turned to automated platforms for the planning and execution of advertising campaigns.  Such automated platforms can also support the application of 1st and 3rd party data to provide for the delivery of more targeted audience (right ad, right time, right consumer).  Automation plus application of data is often described/labeled as a "Programmatic" platform.

46.    Videology is a Programmatic platform allowing buyers and sellers to plan and execute video advertising campaigns.  This business is executed through two Debtors, Videology UK and Videology Media Technologies, LLC.  Videology has two principal lines of business that it calls (i) "Legacy Media Sales," and (ii) "Core Use Case".  Each different line of business is based on product offerings centered around integrated planning, execution and management across television and premium video.

47.    **Legacy Media Sales**:  Videology was founded in 2007 and established itself in market as a Demand Side Platform ("DSP").  The vast majority of revenues were derived from advertising agencies sending insertion orders (IO's) to Videology and other competitive platforms seeking a bid on delivering a target audience at a set price.  In delivering such services, which Videology describes as its "Legacy Media Sales", Videology would procure inventory, apply 3rd party data, and generate a margin on such campaigns. Over time, Videology's Legacy Media Sales business faced substantial competition and gross spend has declined significantly, putting pressure on the Company's financial results.  During the period 2012 through 2017, the Company's Legacy Media Sales declined rapidly.

15

48.    **Core Use Case:  Integrated Planning, Execution and Management**:  During the same period, client demand increased dramatically for Videology's advanced offerings (the "Core Use Case") - the long term planning, management, and execution of a company's entire portfolio of advertising campaigns or advertising inventory with complex, overlapping targets, objectives, and constrains, across multiple delivery channels. Videology believes a core driver of such increased interest in these capabilities was as a result of the soft 2015 TV upfronts (*i.e.*, weak pricing for prime-time television slots bought in advance of the upcoming broadcast television season), which led to a significant number of core media and enterprise clients seeking use of the Videology platform and technology to better portfolio manage and optimize advertising budgets.  However, the sales and operational implementation cycle with these strategic focused clients is often a year or more because the implementation means embedding the Videology technology platform within client organizations.  Additionally, implementation alone is just the first step.  Turning this sales pipeline into gross spend can accordingly take a considerable period to ramp.  During the period 2012 through 2017, the Company's pipeline of enterprise clients grew dramatically.

49.    Though Videology planned for a transition from its Legacy Media Sales to the Core Use Case, the decline of the Legacy Media Sales occurred considerably faster than anticipated growth of Videology's pipeline of new TV and premium clients.  In fact, such growth was considerably slower in the move from pipeline to throughput/revenue than forecast.  This accelerated decline in Legacy Media Sales and longer than expected lead time on the Core Use Case based revenue streams created Videology's financial challenges and need to raise additional capital.

16

50.     Even before the decline in the Legacy Media Sales became a crisis, Videology management recognized that a strategic partnership needed to be considered.  Beginning in April 2014, LUMA Partners LLC ("LUMA"), a leading investment bank focused on digital media and marketing and media, began providing strategic updates to the VID Board with emphasis on insights into the competitive and the merger and acquisition landscape in the advertising technology space.  During the three year period (2014 – 2017), LUMA facilitated conversations with market participants and potential strategic partners/parties.  During this period, the LUMA outreach was soft as Videology was not officially "for sale," but was testing the waters.

51.     Although Videology maintains that the Core Use Case application of the Company's technology—the data-driven television and video advertising market—is poised for exponential growth over the next five years, the Debtors were unsuccessful in raising the additional necessary capital to sustain its operations and to capitalize on this future growth as an independent company.

52.     In the summer of 2017, Videology engaged in two actions to raise funds.  First, Videology refinanced its revolver line of credit from Wells Fargo and Pinnacle to the Prepetition Secured Parties.  This refinancing activity took some cash out of Videology in exit fees, but was deemed necessary to preserve the Company's options.  Second, Videology undertook a capital raise of $17.1M of Convertible Notes.  The $17.1 million financing comprised $12.4 million from Videology's Board members and existing major investors and $4.7 million via a subsequent Rights Offering under the same terms and conditions) to other smaller legacy investors in Videology.  The use of proceeds of the fund-raising was to provide a bridge to a strategic sale targeted to be completed by year-end 2017.

53.     In the summer of 2017, the VID Board asked LUMA to seek a strategic buyer for Videology.  Luma contacted 27 strategic parties likely potential buyers.  By the fall of 2017, five shortlisted parties remained in the process and were the focus of extensive due diligence meetings/analysis.  A Letter of Intent was received and ultimately withdrawn by a single party. The other parties dropped from the process and/or failed to deliver an offer for the Company. Potential strategic parties expressed a number of reasons for failing to submit an offer for the Company.  For example one party indicated an interest in acquiring a portion but not all of Videology's business (geographic and product line preferences) and as such found buying all of Videology to be "too much/too complicated."  Other parties indicated that Videology's capital structure, levered balance sheet and multi-rounds of securities and stakeholders made delivering a clean deal challenging, and other noted they were only looking without a mandate to make a near-term acquisition.

54.     Given the lack of results from the strategic sale process, the Company undertook an effort to pursue a restructuring/refinancing in early 2018.   It was during this time that Videology sought to push out certain trade payments to certain clients as well as delay other amortization payments under the Company's term loan with its vendors.  It was during this effort, that one of Videology's largest clients became increasingly concerned with Videology's financial condition and responded through a temporary global hold on payments to the Company. The resulting cash squeeze resulting from this payment hold caused the Prepetition Secured Lenders to issue notices of default under the Prepetition Secured Loan Facilities, even though there was no payment default at the time.

55.     Following the Prepetition Secured Parties' notices of default, the Lenders seized control of the Debtors' main operating accounts, which caused significant disruption in the

ability of the Debtors to pay vendors in the ordinary course of business.  In fact, the Lenders would not allow the Debtors to directly pay creditors and instead decided which invoices owed by the Debtors to pay and the Lenders wired payments to the approved creditors for a period of time leading up to the Petition Date.  The Lenders, with absolute control over the Debtors' accounts, used the proceeds of the Existing Collateral, to significantly reduce the obligations under the Non-Factored Loan Facilities (from approximately $30 million at the end of February 2018 to $11.2 million today), including repayment of those obligations with interest at the Default Rate from and after March 23, 2018.  This exacerbated Videology's existing cash-flow issues that, in turn, resulted in a payment crisis among the Debtors' vendors, making it impractical for the Debtors to continue to conduct their business in the ordinary course, and impairing the Debtors' ability to meet their obligations to other creditors.

56.    With the protection of the Bankruptcy Court, the Debtors believe that they will be able to continue to offer their unique, best-in-class technology, and to realize the highest and best value for the benefit of the Debtors' creditors and other interested parties.

57.    With the protection of the Bankruptcy Court, the Debtors believe that they will be able to continue to offer their unique, best-in-class technology, and to realize the highest and best value for the benefit of the Debtors' creditors and other interested parties.

### IV.    Marketing of Company and Stalking Horse Bid

A.    Pre-Petition Marketing Efforts

58.    With no transaction resulting from the investment banking process described above, the Company undertook an effort to pursue a recapitalization in early 2018.  Those efforts were ultimately terminated when the circumstances identified above, particularly after the Prepetition Secured Parties seized the Debtors' bank accounts, resulted in the difficulties forcing the Company to pursue chapter 11.

59.     In light of the changed circumstances, the Company sought to reengage with parties that had previously undertaken due diligence on the opportunity in that the current situation created a unique opportunity for a buyer.  Through the chapter 11 process, the Debtors complex capitalization structure would be radically simplified and it would receive substantial relief from the debts incurred in the past which resulted from the need to press ahead with the Core Use business case and support recent wins, but facing a significant reduction in its digital business.  Given the changes in the Debtors' situation which, while placing the Debtors under extreme distress, also made a sale of the business much simpler, and two of those formerly interested parties reengaged.

60.     While both of those parties have expressed interest in acquiring the Debtors' assets to continue the Debtors' operations, one, Amobee, Inc., has memorialized that interest and entered into a binding Asset Purchase Agreement dated as of May 4, 2018.

61.     In short order, the Debtors will file that Asset Purchase Agreement and will seek approval of a process to complete the sale.  Though it remains subject to Bankruptcy Court approval, the timetable for that sale process is set forth in the Asset Purchase Agreement, which requires, among other things, that the Bankruptcy Court enter a bid procedures order no later than 25 days following the Petition Date and that an order approving the sale be entered no later than 65 days following the Petition Date.

## V.     First Day Motions[8]

62.     Contemporaneously with the filing of their chapter 11 petitions, the Debtors have filed the First Day Motions seeking relief that is necessary to enable them to transition smoothly into chapter 11 and to minimize disruptions to their business operations.  I respectfully submit

---

[8] Capitalized terms used but not defined in this section of this Declaration shall have the respective meanings ascribed to those terms in the relevant First Day Motion.

that the relief requested in each First Day Motion should be granted because such relief is a critical element in stabilizing and facilitating the Debtors' operations during the pendency of the Chapter 11 Cases so the Debtors can pursue meaningfully a going concern sale of their business assets.  A summary of the relief requested in each First Day Motion is provided below.  I have reviewed each of the First Day Motions and confirm that all the facts set forth therein are true and correct to the best of my knowledge and belief, based upon my personal knowledge of the Debtors' businesses, employees, operations, and finances; information obtained from my review of relevant documents; my discussions with members of the Debtors' senior management and advisors; information provided to me by employees working under my supervisions; or my opinion based upon experience, knowledge, and information concerning the Debtors' businesses.

A.     <u>Administrative and Procedural Motions</u>

      i.     *Debtors' Motion for an Order, Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1, Authorizing Joint Administration of Their Chapter 11 Cases (the "<u>Joint Administration Motion</u>")*

63.     The Debtors request entry of an order (i) directing joint administration of their Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and (ii) providing that the Court maintain one file and one docket for all of the Debtors' Chapter 11 Cases under the lead case *In re Videology, Inc., et al.*

64.     There are five (5) Debtors and approximately 1,700 creditors and hundreds of other parties-in-interest in the Chapter 11 Cases.  I understand that a court may order the joint administration of multiple cases where debtors are "affiliates" as defined in section 101(2) of the Bankruptcy Code.  Each of the Debtors is a direct subsidiary of Videology, Inc.  Accordingly, I understand that the Debtors are "affiliates" and this Court is authorized to order joint administration of their estates.

65.     The Debtors operate as an integrated business with common ownership and control.  The Debtors share almost all financial and operational systems.  As a result, many of the motions and orders that will be filed and entered in the Chapter 11 Cases will affect each Debtor.  Joint administration will save time and money and avoid such duplicative and potentially confusing filings by permitting counsel for all parties in interest to (a) use a single caption on the numerous documents that will be served and filed herein and (b) file the papers in one case rather than in multiple cases.  The relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 with minimal disruption.

ii.     *Debtors' Application Seeking an Order (I) Authorizing and Approving the Appointment of Omni Management Group as Claims and Noticing Agent and (II) Granting Related Relief (the "*Claims and Noticing Agent Retention Application*")*

66.     Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be in excess of 1,700 creditors, 220 employees and numerous other parties in interest to be noticed.  Accordingly, the Debtors request entry of an order appointing Omni Management Group as the Claims and Noticing Agent for the Debtors and the Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Chapter 11 Cases.

67.     The Debtors' selection of Omni Management Group to act as the Claims and Noticing Agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)* in that the Debtors have obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process.

68.     Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that Omni Management Group's rates are competitive and reasonable given Omni Management Group's quality of services and expertise.  The terms of Omni Management Group's retention are set forth in the Engagement Agreement attached as Exhibit C to the Claims and Noticing Agent Retention Application.

69.     The Debtors submit that appointing Omni Management Group as the Debtors' Claims and Noticing Agent will maximize the efficiency of the distribution of notices and the processing of claims, as well as relieve the Office of the Clerk of the Bankruptcy Court from the administrative burden of processing a large number of claims and notices.

   iii.     *Debtors' Motion for Entry of an Order Authorizing the Debtors to File Consolidated Lists of The Debtors' (A) Creditors and (B) Top 30 General Unsecured Creditors.*

70.     By this motion, the Debtors seek entry of an order authorizing them to file a consolidated list of their 30 largest unsecured creditors and to approve the form and manner of notifying the creditors of these Chapter 11 Cases.  Given the interrelated nature of the Debtors' business operations, the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome; as such, utilizing a consolidated list of key creditors will help alleviate these burdens and costs, while reducing the possibility of duplicative service.  In this motion, the Debtors also seek authority to serve a single notice of commencement on the creditors and seek approval of the form thereof.  Accordingly, the Debtors believe that filing a consolidated list of creditors and serving a single notice of commencement will maximize efficiency and assist in an orderly transition into chapter 11.

B.      Operational Motions

   i.      *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 361 and 363: (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Scheduling Final Hearing; and (IV) Granting Related Relief (the "Cash Collateral Motion")*

71.      The Debtors seek entry of interim and final orders (i) authorizing them to use the Cash Collateral of their Prepetition Secured Parties, (ii) granting adequate protection to the Prepetition Secured Parties for the use of the Cash Collateral, and (iii) scheduling a final hearing on the Cash Collateral Motion.

72.      The Debtors' access to the Cash Collateral is necessary to ensure they have sufficient working capital and liquidity to operate their businesses, while the going concern sale of their assets is pursued, and to pay the costs of administration of the Chapter 11 Cases.  Access to the Cash Collateral on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors pending a final hearing.

73.      The express terms on which the Debtors are seeking to use the Cash Collateral are set forth in detail in the Cash Collateral Motion.  Although the Debtors believe the Prepetition Secured Parties are adequately protected merely by virtue of the equity cushion available, the Debtors propose providing additional adequate protection to the Prepetition Secured Parties in the forms of replacement liens and financial reporting.

74.      The Debtors' inability to access the Cash Collateral would immediately and irreparably harm their business operations and severely undermine their efforts to conduct a meaningful going concern sale process in the Chapter 11 Cases, to the detriment of the Debtors' estates and all stakeholders.  Accordingly, access to the Cash Collateral is critical to preserve and maintain the value of the Debtors' business assets.

ii.     *Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 345 and 363 and Fed. R. Bankr. P. 6003 and 6004 and Del.  Bankr. L.R. 2015-2 (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks and Business Forms, (II) Authorizing Continuation of Existing Deposit Practices, (III) Authorizing Continuation of Intercompany Transactions and (IV) Waiving the Requirements Of 11 U.S.C. § 345(b) (the "Cash Management Motion")*

75.     The Debtors request entry of an order (i) authorizing, but not directing, the

Debtors to continue to maintain and use their existing cash management system, including

maintenance of the Debtors' existing bank accounts, checks and business forms; (ii) granting the

Debtors a waiver of certain bank account and related requirements of the United States Trustee

to the extent that such requirements are inconsistent with (a) the Debtors' existing practices

under the cash management system or (b) any action taken by the Debtors in accordance with

any order granting the Cash Management Motion or any other order entered in the Chapter 11

Cases; (iii) authorizing, but not directing, the Debtors to continue to maintain and use their

existing deposit practices notwithstanding the provisions of Bankruptcy Code section 345(b), and

waiving the requirements of Bankruptcy Code section 345(b); and (iv) authorizing, but not

directing, the Debtors to continue certain ordinary course intercompany transactions.

a.     The Cash Management System

76.     In the ordinary course of their businesses, the Debtors maintain a cash

management system (collectively, the "Cash Management System") which includes collection,

operating, payables, and other bank accounts.  The Cash Management System is integral to the

operation and administration of the Debtors' businesses.  In this regard, the Cash Management

System allows the Debtors to efficiently (a) identify the Debtors' cash requirements, (b) transfer

cash as needed to respond to cash requirements and (c) track all intercompany transfers.  The

Debtors believe the Cash Management System is similar to those utilized by many other

companies of comparable size and complexity to collect, hold, transfer, and disburse funds in a cost-effective and efficient manner.

77.     Flow charts demonstrating the movement of funds through the Cash Management System, broken down by those Bank Accounts maintained in, among other regions of the world, (a) North America, (b) Europe, the Middle East and Africa ("EMEA") are attached to the Cash Management Motion collectively as Exhibit A.  A Schedule of the Bank Accounts is attached to the Cash Management Motion as Exhibit B.

78.     As of the Petition Date, the Debtors and their non-debtor affiliates maintained approximately thirty-four (34) bank accounts.  Videology, Inc. maintains the majority of the Debtors' bank accounts in North America and Videology, Ltd. the majority in the United Kingdom and other parts of the EMEA.

79.     With the exception of an operating account maintained with Silicon Valley Bank, all of Videology, Inc.'s Bank Accounts are with Wells Fargo.  Videology, Inc. maintains four (4) bank accounts domestically and two (2) with respect to its operations in Canada.  The only other Debtor that maintains a bank account in the United States is Videology Media Technologies, LLC, which maintains an operating account at Wells Fargo.  Neither Collider Media, Inc. nor LucidMedia Networks, Inc. maintains any bank accounts.

80.     Videology, Ltd. has eight (8) Bank Accounts globally, seven (7) of which are in the United Kingdom and one (1) in Spain.  Six (6) of the United Kingdom operating and disbursement accounts are maintained with Wells Fargo London Branch.  Videology, Ltd. also maintains a disbursement account at HSBC Bank plc in London and an operating account in Spain with Banco Santander S.A.

81.     The Cash Management System is managed primarily by the financial personnel in the Debtors' finance department at their headquarters in Baltimore, Maryland.  The finance department's control over the administration of the various Bank Accounts to effect the collection, disbursement and movement of cash facilitates accurate cash forecasting and reporting and enables the Debtors to monitor the collection and disbursement of funds.

82.     The specific Bank Accounts that the Debtors maintain at each of these banking institutions and their respective function(s) are described in detail in the Cash Management Motion.  Nine (9) of the Debtors' Bank Accounts are subject a deposit account control agreement in place in favor of the Prepetition Secured Parties and, as described above, have been under the exclusive control of the Prepetition Secured Parties following the issuance of their notices of default.  Those Bank Accounts that are subject to a DACA are identified on Exhibit B to the Cash Management Motion (and more particularly described in the accompany Cash Collateral Motion).

83.     The Debtors believe that the Cash Management System is an ordinary course, customary and essential business practice that allows them to identify efficiently their cash requirements, transfer cash as needed to respond to those requirements and track all intercompany transfers.

       b.     <u>Checks and Forms</u>

84.     The Debtors seek authorization to continue using all checks substantially in the form existing immediately before the Petition Date, without reference to the Debtors' status as debtors in possession; <u>provided</u>, <u>however</u>, that once the Debtors are able practically to do so, the Debtors will generate new checks to be utilized during the pendency of the Chapter 11 Cases, which checks will include a legend referring to the Debtors as "Debtors in Possession." Changing the Debtors' existing checks, correspondence and other business forms would be

expensive, unnecessary and burdensome to the Debtors' estates.  Further, such changes would be

disruptive to the Debtors' business operations and would not confer any benefit on those dealing

with the Debtors after the Petition Date.  For these reasons, the Debtors respectfully request that

they be authorized to use their existing check format, all correspondence and other business

forms without being required to replace such documents.

        c.       <u>Intercompany Transactions</u>

85.     In connection with the daily operation of the Debtors' businesses, as funds are

moved within the Cash Management System at any given time, there may be intercompany

claims owing by one Debtor to another Debtor or between a Debtor and one or more of the non-

Debtor subsidiaries (the "<u>Intercompany Transactions</u>").

86.     The Debtors perform the majority of the treasury management services from their

Baltimore, Maryland office, including remitting payments for all of the Debtors and non-Debtor

subsidiaries throughout the world.

87.     With respect to all of the foregoing, the Debtors maintain records of all fund

transfers and can ascertain, trace and account for all Intercompany Transactions.  At the same

time, however, if the Intercompany Transactions were to be discontinued, the Debtors' business

operations would be hindered unnecessarily and acutely.  As such, absent continuation of the

Intercompany Transactions, the Debtors' ability to preserve going concern value pending

consummation of the sale of their business assets would be impaired drastically.  Therefore,

avoiding such potentially crippling hindrances by allowing the Debtors to continue the

Intercompany Transactions is in the best interests of the Debtors and their estates.

88.     Maintenance of the Cash Management System and Intercompany Transactions is

critical to the Debtors' ongoing operations and successful execution of a sale of the Debtors'

businesses as a going concern.  Modifications and disruptions to the Cash Management System

28

and Intercompany Transactions likely would case large-scale payment delays, impede the

Debtors' ability to efficiently track the flow of funds and obtain important financial information,

frustrate employees and vendors and cause severe and irreparable disruptions to the Debtors'

businesses, diminishing the value of the Debtors and their estates.  Therefore, the Debtors

request that the Court grant the Cash Management Motion.

> iii.    *Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a), 363(b), 363(c), 507(a), and 541 (I) Authorizing Payment of Certain Pre-Petition Employee Obligations, Including Compensation, Benefits, Expense Reimbursements, and Related Obligations, (II) Confirming Right to Continue Employee Benefit Programs on Post-Petition Basis, (III) Authorizing Payment Of Withholding And Payroll-Related Taxes, (IV) Authorizing Payment of Pre-Petition Claims Owing to Administrators of, or Third Party Providers Under, Employee Benefit Programs, and (V) Directing Banks to Honor Pre-Petition Checks and Fund Transfers for Authorized Payments (the "Wages and Benefits Motion")*

89.    The Debtors request authority, but not direction, to maintain and continue to

honor and pay all amounts arising from their business practices, programs and policies for their

employees that were in effect as of the Petition Date, and as may be modified or supplemented

from time to time in the ordinary course of business, relating to the Pre-Petition Employee

Obligations, which include, among other things: (a) Unpaid Compensation, Deductions and

Payroll Taxes; (b) PTO; (c) Reimbursable Expenses; and (c) Employee Benefit Programs;

(d) Workers' Compensation Insurance; (e) the 401k Plan and (f) the U.K. Pension Plan.

90.    The majority of the Debtors' Employees rely on their compensation and benefits

to satisfy daily living expenses.  The Debtors' Employees will be exposed to significant financial

difficulties if the Debtors are not permitted to honor their Employee Obligations.  Absent the

relief requested in the Wages and Benefits Motion, morale and loyalty will undoubtedly sink to

crippling lows and may cause a wave of Employees to seek alternate employment opportunities

at a critical phase of the Chapter 11 Cases.  Such result undoubtedly would destabilize the

Debtors' operations and ability to generate revenue and service customers during a time of perceived uncertainty. The distraction caused by the loss of valuable Employees or low morale would be counterproductive to the Debtors' efforts to alleviate the stress of a Chapter 11 filing on their businesses and preserve going concern value while a sale of their business assets is pursued. Therefore, the Debtors request that the Court grant the Wages and Benefits Motion.

iv.    *Debtors' Motion for an Order, Pursuant to 11 U.S.C. § 366, (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service on Account of Pre-Petition Invoices, (II) Approving Deposit as Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment (the "Utility Motion")*

91.    The Debtors seek entry of interim and final orders, (i) prohibiting the Debtors' utility service providers from altering, refusing or discontinuing service, (ii) approving an adequate assurance deposit as adequate assurance of post-petition payment to the utilities and (iii) establishing procedures for resolving any subsequent requests by the utilities for additional adequate assurance of payment.

92.    As of the Petition Date, approximately 32 Utility Companies provide Utility Services to the Debtors at various locations throughout North America and the EMEA. Before the Petition Date, the Debtors spent approximately $19,285.70 each month, on average, on utility costs and had a history of timely payment thereof. The Debtors are not aware of any past due amounts owed to any of the Utility Companies. However, because of the timing of the filings in relation to the Utility Companies' billing cycles, there may be utility costs that have been invoiced to the Debtors for which payment is not yet due and utility costs for services provided since the end of the last billing cycle that have not been invoiced to the Debtors.

93.    The Utility Services are crucial to the Debtors' continued operations. If the Utility Companies refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, and the Debtors could be forced to cease operations.

94.     The Debtors intend to pay all post-petition obligations owed to the Utility Companies in a timely manner. Nevertheless, to provide additional assurance of payment for future services to the Utility Companies, the Debtors will deposit $9,642.85, an amount equal to approximately 50% of the estimated monthly cost of the Utility Services, into a newly created, segregated, interest-bearing account, within twenty (20) days of the Petition Date (the "Adequate Assurance Deposit").  The Adequate Assurance Deposit will be maintained during the Chapter 11 Cases with a minimum balance equal to 50% of the Debtors' estimated monthly cost of Utility Services, which may be adjusted by the Debtors to account for the termination of Utility Services by the Debtors or other arrangements with respect to adequate assurance of payment reached with individual Utility Companies.

95.     The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future Utility Services in the ordinary course of business, constitutes sufficient adequate assurance to the Utility Companies.

    v.      *Debtors' Motion for Order Pursuant to Section 105(a) of the Bankruptcy Code Enforcing Protections of Sections 362, 365 and 525 of the Bankruptcy Code*

96.     To aid in the administration of the Debtors' bankruptcy cases and to further their reorganization prospects, the Debtors are seeking an order that confirms the application of three key protections provided by the Bankruptcy Code — the automatic stay provisions of section 362, the ipso facto provisions of section 365 and the anti-discrimination provisions of section 525.  The global nature of the Debtors' businesses and their dealings with non-U.S. creditors who may be unfamiliar with the protections afforded chapter 11 debtors under sections 362, 365 and 525 of the Bankruptcy Code require that an order implementing these protections be entered by this Court.

97.     Many of the non-U.S. creditors affected by sections 362, 365 and 525 of the Bankruptcy Code likely are not aware of the significant and necessary protections these sections provide to the Debtors.  Further, the "automatic" and self-executing nature of these protections may not be recognized promptly by foreign creditors or tribunals unless embodied in an order of this Court.  Accordingly, the Debtors respectfully request that the Court issue an order which restates the applicable provisions of sections 362, 365 and 525 of the Bankruptcy Code.  Such an order, which the Debtors will be able to transmit to affected parties, will maximize the protections afforded by such sections of the Bankruptcy Code.

98.     Accordingly, I believe that the relief requested therein is in the best interests of the Debtors, their estates, and creditors and should be approved.

## VI.     Conclusion

99.     This Declaration describes the factors that have precipitated the commencement of the Chapter 11 Cases and demonstrates the need for the Debtors to obtain the relief requested in the First Day Motions.

100.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: May 10, 2018
       Baltimore, Maryland

Name:  Kenneth Tarpey
Title:   Chief Financial Officer

57731/0002-15776624v4

# **EXHIBIT A**

*Organizational Chart*

Videology

# Videology Corporate Structure

All ownership is 100%
**Corporate Entities**/Branch offices

Chart Excludes:
Videology Media Technologies Limited (UK),
subsidiary of Videology Ltd. (Inactive)

Confidential

**Videology, Inc.**
US-DE

- **VDGY Holding, B.V.**
  Netherlands
  - *Videology Media Technologies BV*
    Netherlands

- **LucidMedia Networks, Inc.**
  US-DE

- **Videology Canada, Inc.**
  CAN-N.S.

- **Videology Ltd.**
  UK
  - Videology France
    France
    - Videology Korea
      Republic of Korea
  - Videology Spain
    Spain
    - **Videology Information Technology (Shanghai) Co., LTD**
      China

- *Videology Media Technologies, LLC*
  US-DE

- **Videology Asia PTE LTD**
  Singapore
  - *Videology Media Technologies PTE LTD*
    Singapore
  - **Videology Japan KK**
    Japan
  - **Videology Australia PTY LTD**
    Australia

- **Collider Media, Inc.**
  US-DE

1