## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------x
                                            :   Chapter 11
In re:                                      :
                                            :   Case No. 18-11120 (BLS)
VIDEOLOGY, INC., et al.,¹                   :
                                            :   Jointly Administered
               Debtors.                     :
                                            :   Bid Procedures Hearing Date: June 5, 2018 at
                                            :   10:00 a.m.
                                            :   Bid Procedures Obj. Deadline: May 29, 2018 at
                                            :   4:00 p.m.
------------------------------------------------------x   Sale Hearing Date: TBD
                                                Sale Obj. Deadline: TBD
```

**DEBTORS' MOTION FOR ORDERS (I)(A) APPROVING BIDDING PROCEDURES
FOR SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B)
APPROVING STALKING HORSE AGREEMENT AND BID PROTECTIONS, (C)
SCHEDULING AUCTION FOR, AND HEARING TO APPROVE, SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (D) APPROVING FORM AND
MANNER OF NOTICES OF SALE, AUCTION AND SALE HEARING,(E) APPROVING
ASSUMPTION AND ASSIGNMENT PROCEDURES AND (F) GRANTING RELATED
RELIEF AND (II)(A) APPROVING SALE OF DEBTORS' ASSETS FREE AND CLEAR
OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (B) AUTHORIZING
ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES AND EXECUTORY
CONTRACTS, AND (C) GRANTING RELATED RELIEF**

Videology, Inc. and certain of its subsidiaries and affiliates that are debtors and debtors-

in-possession (collectively, ("Videology" or the "Debtors") in the above-captioned chapter 11

cases (the "Chapter 11 Cases") hereby file the *Debtors' Motion for Orders (I)(A) Approving*

*Bidding Procedures for Sale of Substantially all of the Debtors' Assets, (B) Approving Stalking*

*Horse Agreement and Bid Protections, (C) Scheduling Auction for, and Hearing to Approve,*

*Sale of Substantially All of the Debtors' Assets, (D) Approving Form and Manner of Notices of*

*Sale, Auction and Sale Hearing,(E) Approving Assumption and Assignment Procedures and (F)*

---

¹ The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
Videology, Inc. (2191), Collider Media, Inc. (8602), Videology Media Technologies, LLC (6243) and LucidMedia
Networks, Inc. (8566), and Videology, Ltd. ("Videology UK"), a company organized under the laws of England and
Wales. The address of the Debtors' corporate headquarters is 1500 Whetstone Way, Suite 500, Baltimore, MD
21230.

*Granting Related Relief and (II)(A) Approving Sale of Debtors' Assets Free and Clear of Liens,*

*Claims, Interests and Encumbrances, (B) Authorizing Assumption and Assignment of Unexpired*

*Leases and Executory Contracts, and (C) Granting Related Relief* (the "Motion").    In support of

the Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      Since its founding in 2007, Videology has worked to capture the video advertising

boom.  As consumer consumption of video has fragmented across screens (Television, Mobile,

PC) both the demand (advertisement broadcasters) and supply side (advertisers) have turned to

automated platforms for the planning and execution of advertising campaigns.  While Videology

believes its technology is uniquely effective, changing market conditions over the last several

years put considerable strain on the Debtors' resources as it began to succeed in gaining

momentum in capturing a growing portion of the television market for advertising technology.

2.      Beginning in 2014, Videology's Board of Directors (the "VID Board") began

receiving strategic updates on insights into the competitive and the merger and acquisition

landscape in the advertising technology space.  For three years the company engaged in "soft"

outreach until the situation became more dire.

3.      In the summer of 2017, Videology refinanced a revolving line of credit and

undertook a capital raise to generate much-needed funds.  At the same time, the VID Board

focused on finding a strategic purchaser for the Company.  Despite the extensive marketing

process, described in more detail below, no purchaser was found.

4.      Given the lack of results from the strategic sale process, the Debtors undertook

restructuring/refinancing efforts in early 2018.  Two unexpected events, however, disrupted the

Debtors' efforts.  First, the Debtors' largest customer placed a temporary global hold on

2

payments of invoices to the Debtors.  After that, on March 23, 2018, the Debtors' secured

lenders issued notices of defaults based on covenant defaults, terminated the Debtors' revolving

line of credit facility, and seized control of the Debtors' operating bank accounts.  These actions

disrupted the Debtors' ability to achieve any kind of restructuring or refinancing outside of

Chapter 11.

5.      Notwithstanding these developments, the Debtors vigorously pursued efforts to

enter into an agreement for the sale of the Debtors' assets and business to parties who had

expressed an interest in the Debtors' business.   Following extensive arm's length negotiations,

the Debtors secured a stalking horse bid (the "Stalking Horse Bid") from Amobee, Inc.

("Amobee" or the "Stalking Horse Bidder") to purchase substantially all of the Debtors' assets

(the "Purchased Assets") on the terms and conditions set forth in that certain Asset Purchase

Agreement, dated as of May 4, 2018 (the "Stalking Horse Agreement").

6.      Given the exigencies of the Debtors' financial condition and the Milestones and

conditions to closing the Sale (as defined herein) set forth in the Stalking Horse Agreement, the

Debtors believe that the timely sale of the Purchased Assets in accordance with the sale process

outlined in this Motion is the best way to achieve the best outcome for the Debtors' creditors and

other stakeholders.

7.      To ensure that the Stalking Horse Bid is in fact the highest or otherwise best offer

for the purchase of the Purchased Assets, the Debtors propose bidding and auction procedures

(the "Bidding Procedures") to govern the sale of Purchased Assets, consistent with the

requirements of the Stalking Horse Agreement.  The Bidding Procedures are customary,

reasonable and were designed with the objective of generating the best value for the Purchased

Assets, while affording the Debtors maximum ability to execute the Sale in a reasonably quick

3

and efficient manner.  The Bidding Procedures and the other relief requested herein satisfy the

requirements of section 363 of title 11 of the United States Code (the "Bankruptcy Code") and

will facilitate the sale of the Purchased Assets for the best value to the benefit of all of the

Debtors' economic stakeholders.

## RELIEF REQUESTED

8.      By this Motion, pursuant to sections 105(a), 363, 365, 503, and 507 of the

Bankruptcy Code, Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of Bankruptcy Practice

and Procedure for the District of Delaware (the "Local Rules"), the Debtors request entry of the

following:

a)      An order, substantially in the form attached hereto as Exhibit A (the "Bidding Procedures Order"),[2]

  i.      Authorizing and approving the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order as Exhibit 1, in connection with the sale (the "Sale") of substantially all of the Debtors' assets (the "Purchased Assets");

  ii.     Approving the Stalking Horse Protections (defined below) in accordance with the terms and conditions set forth in the Stalking Horse Agreement and the Bidding Procedures;

  iii.    Scheduling an auction of the Purchased Assets (the "Auction");

  iv.     Scheduling a hearing (the "Sale Hearing") to consider approval of the proposed Sale;

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Bidding Procedures Order, the Bidding Procedures, or the Stalking Horse Agreement, as applicable.

4

v.     Authorizing and approving the (A) notice of the Sale of the Purchase Assets, the Potential Bidder Deadline, the Bid Deadline, the Auction and Sale Hearing, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u> (the "<u>Sale Notice</u>") and (B) notice to each relevant non-Debtor counterparty (each, a "<u>Counterparty</u>") to an executory contract or unexpired lease listed on the Purchased Contracts Schedule (attached to the Stalking Horse Agreement as Schedule 2.6(a)) (collectively, the "<u>Purchased Contracts</u>" or "<u>Assumed Contracts</u>" and each a "<u>Purchased Contract</u>" or "<u>Assumed Contract</u>") regarding the Debtors' potential assumption and assignment of such Counterparty's Purchased Contracts and the calculation of the amount necessary to cure any defaults thereunder (the "<u>Cure Costs</u>"), substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u> (the "<u>Cure Notice</u>");

vi.    Authorizing and approving procedures for the assumption and assignment of the Purchased Contracts and the determination of Cure Costs with respect thereto (collectively, the "<u>Assumption and Assignment Procedures</u>"); and

vii.   Granting related relief.

b)   An order (the "<u>Sale Order</u>"), substantially in the form attached hereto as <u>Exhibit B</u>, authorizing and approving the following:

i.     The sale of the Purchased Assets free and clear of all Liens, Claims, interests, and Encumbrances, except certain Assumed Liabilities as determined by the Debtors and any purchaser of the Purchased Assets;

ii.    The assumption and assignment of the proposed Assumed Contracts and Assumed Leases (collectively, the "<u>Proposed Assumed Contracts</u>") in connection with the proposed Sale; and

iii.   Granting related relief.

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b) and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent

of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

10.     Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

11.     On May 10, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The factual background regarding the Debtors, including their business operations, their capital and debt structure and the events leading to the filing of the Chapter 11 Cases, is set forth in the *Declaration of Kenneth Tarpey in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 14] (the "Tarpey Declaration"), which is relied upon and fully incorporated herein by reference.

12.     The Debtors continue to manage and operate their business as debtors in possession pursuant to Bankruptcy Code Sections 1107 and 1108.  No trustee or examiner has been requested in the Chapter 11 Cases, and no committees have been appointed.

### Pre-Petition Marketing Efforts

13.     Beginning in April 2014, LUMA Partners LLC ("LUMA"), a leading investment bank focused on digital media and marketing and media, began providing strategic updates to the VID Board with emphasis on insights into the competitive and the merger and acquisition landscape in the advertising technology space.  During the three year period from 2014-2017, LUMA facilitated conversations with market participants and potential strategic partners/parties.  During this period, the LUMA outreach was soft as Videology was not officially "for sale," but was testing the waters.

57731/0001-15857060v4

14.    In the summer of 2017, Videology engaged in two actions to raise funds. First, Videology refinanced its revolver line of credit from Wells Fargo and Pinnacle to the Prepetition Secured Parties. This refinancing activity took some cash out of Videology in exit fees, but was deemed necessary to preserve the Company's options. Second, Videology undertook a capital raise of $17.1M of Convertible Notes. The $17.1 million financing comprised $12.4 million from Videology's Board members and existing major investors and $4.7 million via a subsequent Rights Offering under the same terms and conditions) to other smaller legacy investors in Videology. The use of proceeds of the fund-raising was to provide a bridge to a strategic sale targeted to be completed by year-end 2017.

15.    At the same time, the VID Board asked LUMA to seek a strategic buyer for Videology. Luma contacted 27 strategic likely potential buyers. By the fall of 2017, five parties remained in the process and were the focus of extensive due diligence meetings and analysis. A Letter of Intent was received and ultimately withdrawn by a single party. The other parties dropped from the process and/or failed to deliver an offer for the Company. Potential strategic parties expressed a number of reasons for failing to submit an offer for the Company. For example one party indicated an interest in acquiring a portion but not all of Videology's business (geographic and product line preferences) and as such found buying all of Videology to be "too much/too complicated." Other parties indicated that Videology's capital structure, levered balance sheet and multi-rounds of securities and stakeholders made delivering a clean deal challenging, and other noted they were only looking without a mandate to make a near-term acquisition.

16.    Given the lack of results from the strategic sale process, the Company undertook an effort to pursue a restructuring/refinancing in early 2018. After extensive deliberations with

7

its advisors, analysis of the benefits of the other potential transactions for the Debtors' creditors, employees, vendors and other stakeholders and after several rounds of negotiation with the Stalking Horse Bidder, the Debtors determined that the Stalking Horse Bid presented by the Stalking Horse Bidder was the best option available to the Debtors.  Following intense, arm's-length and good-faith negotiations, the Debtors and the Stalking Horse Bidder agreed to the terms of the Stalking Horse Agreement.

17.    Based on the value already conferred on the Debtors' estates by the Stalking Horse Bid and the interest in the Purchased Assets already expressed by other potential bidders the Debtors believe that the sale process will allow them to maximize the value of their estates for the benefit of their creditors and other stakeholders.

### The Stalking Horse Agreement

18.    The Stalking Horse Agreement represents a binding bid to purchase the Purchased Assets.  By this Motion, the Debtors request authority to provide the Stalking Horse Bidder with stalking horse protections, in particular (a) the payment of a breakup fee in an amount equal to 3.0% of the Cash Consideration (as defined in the Stalking Horse Agreement)[3] (the "Breakup Fee") and (b) reimbursement of up to $500,000 for reasonable and documented costs and expenses incurred by the Stalking Horse Bidder in connection with the negotiation and execution of, and the carrying out of its obligations under, the Stalking Horse Agreement (other than such costs or expenses that the Stalking Horse Bidder has agreed to pay thereunder) (the "Expense Reimbursement" and together with the Breakup Fee, the "Stalking Horse Protections").

---

[3] Under the terms of the Stalking Horse Agreement, the Purchase Price for the Purchased Assets consists of (i) an amount equal to (A) the Cash Consideration ($45,000,000.00) *minus* (B) the amount by which the Accounts Receivable that is fully and effectively assigned to the Stalking Horse Bidder and as set forth in the Closing Statement is less than Thirty-Seven Million Dollars ($37,000,000.00) *minus* (C) the amount of the Deposit ($2,250,000.00), *and* (ii) the assumption of the Assumed Liabilities.

8

19.    The Stalking Horse Agreement includes various customary representation, warranties and covenants by and from the Debtors and the Stalking Horse Bidder.  In addition, the Stalking Horse Agreement includes certain conditions to closing the contemplated Sale and rights of termination related to the Chapter 11 Cases.

20.    In accordance with Local Rule 6004-1, the chart below summarizes the significant terms of the Stalking Horse Agreement.[4]

| MATERIAL TERMS OF THE STALKING HORSE AGREEMENT | |
|---|---|
| **Sellers** | Videology, Inc., Videology Media Technologies, LLC, Lucid Media Networks, Inc., Collider Media, Inc., Videology Ltd.<br><br>(*see* Introductory Paragraph and Annex A of Stalking Horse Agreement) |
| **Stalking Horse Bidder** | Amobee, Inc.<br><br>(*see* Introductory Paragraph of Stalking Horse Agreement) |
| **Purchase Price** | The Purchase Price for the Purchased Assets consists of:<br><br>(i) an amount equal to (A) the Cash Consideration ($45,000,000.00) *minus* (B) the amount by which the Accounts Receivable that is fully and effectively assigned to the Stalking Horse Bidder and as set forth in the Closing Statement is less than Thirty-Seven Million Dollars ($37,000,000.00) *minus* (C) the amount of the Deposit ($2,250,000.00), *and*<br><br>(ii) the assumption of the Assumed Liabilities.<br><br>(*see* § 3.1 of Stalking Horse Agreement) |
| **Assumed Liabilities** | Stalking Horse Bidder shall assume and agrees to perform and discharge when due in accordance with their respective terms, the following Liabilities of Sellers:<br><br>a)    all Liabilities arising as a result of the ownership of the Purchased Assets and performance of the Purchased Contracts after the Closing Date (excluding any Liability that accrued, or is based on circumstances or actions or breaches that occurred, prior to the Closing) it being understood that Liabilities arising from the ownership of the Purchased Assets, the performance of the Purchased Contracts or the operation of the Business, in each case prior to the Closing Date, shall not constitute Assumed |

---

[4] To the extent that there is any conflict or inconsistency between the Stalking Horse Agreement and the summary of such terms in this Motion, the terms of the Stalking Horse Agreement shall govern.  Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to them in the Stalking Horse Agreement.

9

<table>
<tr><td></td><td>

Liabilities regardless of when the obligation to pay such Liabilities arises other than to the extent contemplated by Section 2.3(b) of the Stalking Horse Agreement

b)      all Liabilities arising after the Closing Date that are specifically assumed by Stalking Horse Bidder pursuant to Article IX of the Stalking Horse Agreement (excluding any Liability that accrued, or is based on circumstances or actions or breaches that occurred, prior to the Closing); and

c)      those Liabilities listed on Schedule 2.3(c) to the Stalking Horse Agreement, which Schedule may be modified by Stalking Horse Bidder from the Effective Date through three (3) Business Days prior to the hearing of the Sale Motion

(*see* § 2.3 of Stalking Horse Agreement)

</td></tr>
<tr><td>

**Excluded Liabilities**

</td><td>

Notwithstanding any provision in this Agreement to the contrary, Stalking Horse Bidder shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge, and Sellers shall be solely and exclusively liable with respect to, any Liability of any Group Company that is not an Assumed Liability (collectively, the "Excluded Liabilities"), including, without limitation:
a) all Liabilities relating to the Excluded Assets, including the Excluded Contracts;

(b) all Cure Costs with respect to any Contract set forth on Schedule 2.6(a) of the Stalking Horse Agreement up to One Million Four Hundred Thousand Dollars ($1,400,000.00) (the "Cure Cost Cap") in the aggregate;

(c) all Liabilities for Excluded Taxes;

(d) all Liabilities relating to any Indebtedness of any Group Company, whether or not included in the Closing Statement and deducted from the Purchase Price;

(e) all Claims;

(f) all Liabilities relating to amounts required to be paid by any Group Company under the Transaction Documents;

(g) all Liabilities of the Group Companies relating to legal services, accounting services, financial advisory services, investment banking services or any other professional services or other Third-Party costs or expenses performed in connection with the Transaction Documents, the Transactions or the Bankruptcy Case (and similar proceedings in foreign jurisdictions), including all Transaction Expenses;

(h) except to the extent specifically provided in Section 2.3(b) or Article IX of the Stalking Horse Agreement, all Liabilities arising out of, relating to or with respect to any Benefit Plans, employment or performance of

</td></tr>
</table>

10

services, termination of employment or services by any Group Company of any individual;

(i) all Proceedings relating to any Group Company;

(j) all Liabilities relating to (other than as set forth in Section 2.3(b) of the Stalking Horse Agreement), former employees, consultants, former consultants or retirees of any Group Company based on or arising under such Person's employment or engagement with one or more Group Company or the termination of such employment or engagement with one or more Group Company, including but not limited to any Liability related to or arising out of a claim a Person(s) is misclassified under the Fair Labor Standards Act or applicable state law, any Liability related to or arising out of a claim for wrongful termination, harassment or any similar federal or state law, any amounts due to such Persons (including but not limited to all termination costs of such Persons, payment accrued but unused vacation, payment of any statutory, contractual or common law termination pay or severance owed, payment of any severance due in accordance with any Group Company policy or practice, and such amounts arising after the Closing Date with respect to the Non-Offered Employees) and any Liability relating to the WARN Laws with respect to the Non-Offered Employees;

(k) all Transfer Taxes; and

(l) those Liabilities listed on Schedule 2.4(l) of the Stalking Horse Agreement, which Schedule may be modified by Stalking Horse Bidder from the Effective Date through one (1) Business Day prior to the hearing of the Sale Motion.

(*see* § 2.4 of Stalking Horse Agreement)

| | |
|---|---|
| **Sale to Insider**<br>*Local Rule 6004-1(b)(iv)(A)* | The Stalking Horse Bidder is not an "insider", as that term is defined in Bankruptcy Code section 101(31). |
| **Agreements with Management**<br>*Local Rule 6004-1(b)(iv)(B)* | None |
| **Releases**<br>*Local Rule 6004-1(b)(iv)(C)* | Waiver of claims by and between the Stalking Horse Bidder and the Sellers as set forth in paragraph 11.3 of the Stalking Horse Agreement. |
| **Private Sale/No Competitive Bidding**<br>*Local Rule 6004-1(b)(iv)(D)* | As described more thoroughly in the Bidding Procedures, the Debtors intend to conduct an open auction process if one or more Qualified Bids are received. |
| **Closing and Other Deadlines**<br>*Local Rule 6004-1(b)(iv)(E)* | The closing of the transactions contemplated by the Stalking Horse Agreement shall take place at the offices of Goodwin Procter LLP, 3 Embarcadero Center, 28th Floor, San Francisco, California 94111 (or at such other place as Sellers and Stalking Horse Bidder may designate in writing) at 10:00 a.m. (prevailing Eastern Time) on the date that is no later than five (5) Business Days after the date on which all conditions to the |

| | |
|---|---|
| | obligations of the parties to consummate the transactions have been satisfied or waived, unless another time or date, or both, are agreed to in writing by the Parties.<br><br>(*see* § 4.1 of Stalking Horse Agreement) |
| **Good Faith Deposit**<br>*Local Rule 6004-1(b)(iv)(F)* | Within seven (7) Business Days of the filing of the Bankruptcy Case, the Stalking Horse Bidder is required to deposit with the Escrow Agent a purchase price deposit toward payment of the Purchase Price in the amount equal to Two Million Two Hundred Fifty Thousand Dollars ($2,250,000) (the "Cash Deposit"). The Cash Deposit shall be held by the Escrow Agent and disbursed as follows:<br><br>(i)      If the Closing shall occur, then the Deposit Amount shall be credited against the Purchase Price as set forth in the calculation of Adjusted Cash Consideration and the Stalking Horse Bidder and the Sellers shall provide a joint written instruction to the Escrow Agent to release the Deposit Amount to the Sellers; or<br>(ii)      If the Stalking Horse Agreement is terminated pursuant to and in accordance with any provision of Section 4.4 of the Stalking Horse Agreement then the Stalking Horse Bidder and the Sellers shall promptly (and no event later than three (3) Business Days after such termination) to release the Deposit Amount to the Stalking Horse Bidder.<br><br>(*see* § 3.2 of Stalking Horse Agreement) |
| **Interim Arrangements with Proposed Purchaser**<br>*Local Rule 6004-1(b)(iv)(G)* | None |
| **Use of Proceeds**<br>*Local Rule 6004-1(b)(iv)(H)* | If the Breakup Fee and Expense Reimbursement become due and payable by the Debtors to the Stalking Horse Bidder under the Stalking Horse Agreement, such amounts shall be paid by wire transfer of immediately available funds under the terms and conditions provided for in the Stalking Horse Agreement.<br><br>(*see* § 4.6(a) of Stalking Horse Agreement) |
| **Tax Exemption**<br>*Local Rule 6004-1(b)(iv)(I)* | The Stalking Horse Agreement does not seek to have the sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code. |
| **Record Retention**<br>*Local Rule 6004-1(b)(iv)(J)* | Each of Sellers and the Stalking Horse Bidder, at its own expense, agree to preserve and keep the records, or in the case of Sellers, arrange for the preservation and keeping of the records, held by it relating to the Business and the Purchased Assets for six (6) months after the later of the Closing Date and the date of entry of a final decree closing the Bankruptcy Case, and shall make such records available to the other Party as may be reasonably required by such Party in connection with, among other things, any insurance claims, Proceedings or Tax Claims against or governmental investigations of Sellers or the Stalking Horse Bidder or any of the Stalking Horse Bidder's Affiliates, administering the Bankruptcy Case, including in connection with any motion or claim objection filed or to be filed by or against any of Sellers or its Affiliates in the Bankruptcy Case or |

| | |
|---|---|
| | reconciling claims filed in the Bankruptcy Case, winding up of Sellers, the liquidation, sale or other disposition of any Excluded Assets and the closing of the Retained Accounts, the filing of Tax Returns, terminating and winding up of any Benefit Plans (other than the Transferred Plans), or in order to enable Sellers or the Stalking Horse Bidder to comply with its obligations under this Agreement and the other Transaction Documents. The Stalking Horse Bidder shall have the right to make copies of any portions of any retained books and records set forth in Section 2.2(g) of the Stalking Horse Agreement that related to the Business or any of the Purchased Assets to the extent any Seller is not required by Law to keep such retained books and records confidential or private.<br><br>(*see* § 8.8 of Stalking Horse Agreement) |
| **Sale of Avoidance Actions**<br>*Local Rule 6004-1(b)(iv)(K)* | The Sellers are selling to the Stalking Horse Bidder all Avoidance Actions (whether known or unknown, contingent or otherwise) accruing or arising prior to the Closing Date against any counterparty to a Purchased Contract. |
| **Requested Findings as to Successor Liability**<br>*Local Rule 6004-1(b)(iv)(L)* | The Sale Order and Stalking Horse Agreement contemplate that the Stalking Horse Bidder will not have any successor or transferee liability as a result of the Sale.<br><br>(*see* § 8.2 of Stalking Horse Agreement) |
| **Sale Free and Clear of Unexpired Leases**<br>*Local Rule 6004-1(b)(iv)(M)* | The Debtors seek to sell all of the Purchased Assets free and clear of all Encumbrances (other than the Assumed Liabilities)<br><br>(*see* § 8.2 of Stalking Horse Agreement) |
| **Credit Bid**<br>*Local Rule 6004-1(b)(iv)(N)* | The Stalking Horse Agreement provides grants the Stalking Horse Bidder the right and ability to credit bid any portion of its Breakup Fee and Expense Reimbursement. |
| **Relief from Bankruptcy Rule 6004(h)**<br>*Local Rule 6004-1(b)(iv)(O)* | The Debtors are seeking relief from the fourteen-day stay provided by Bankruptcy Rule 6004(h). |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**<br>*Local Rule 6004-1(c)(i)(C)* | The Stalking Horse Bidder shall be entitled to payment of (i) a Breakup Fee in an amount equal to 3.0% of the Cash Consideration (as defined in the Stalking Horse Agreement); and (ii) expense reimbursement of up to $500,000 for reasonable and documented costs and expenses incurred by the Stalking Horse Bidder in connection with the negotiation and execution of, and the carrying out of its obligations under, the Stalking Horse Agreement.<br><br>(*See* § 8.1 of Stalking Horse Agreement, Annex B to Stalking Horse Agreement (defining "Breakup Fee" and "Expense Reimbursement") |

**Bidding Procedures**

57731/0001-15857060v4

### A. Overview

21.     The Bidding Procedures are designed to promote a competitive and expedient sale process.  If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or otherwise best offer for the Purchased Assets on a schedule consistent with the deadlines under the Stalking Horse Agreement and the Debtors' chapter 11 strategy.

22.     While all interested bidders should read the Bidding Procedures in their entirety, the following describes the salient points of the Bidding Procedures and discloses certain information required pursuant to Local Rule 6004-1:[5]

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
| --- | --- |
| **Provisions Governing Qualification of Bidders and Qualified Bids** *Local Rule 6004-1(c)(i)(A)-(B)* | Part III of the Bidding Procedures sets forth the Qualified Bid and Qualified Bidder requirements. <br><br> **A.  Indications of Interest.**  Unless otherwise ordered by the Bankruptcy Court, in order to participate in the bidding process, prior to the Bid Deadline (defined below), each person, other than the Stalking Horse Bidder, who wishes to participate in the bidding process (a "Potential Bidder") must deliver to the Notice Parties (as defined below) to the extent not previously delivered, an executed confidentiality agreement containing standard non-solicitation provisions (to be delivered prior to the distribution of any confidential information by the Debtors to a Potential Bidder) in form and substance satisfactory to the Debtors. <br><br> **B.  Due Diligence.**  Upon execution of a valid confidentiality agreement in form and substance reasonably acceptable to the Debtors, the Debtors will afford any Potential Bidder such due diligence access or additional information as the Debtors, in consultation with their advisors, deem appropriate, in their reasonable discretion.  The Debtors will limit access to due diligence to those parties they believe, in the exercise of their reasonable judgment, are pursuing the transaction in good faith and are capable of submitting a Qualified Bid (as defined below). |

---

[5] The following description of the Bidding Procedures is a summary of the terms set forth in the Bidding Procedures attached to the Bidding Procedures Order as Exhibit 1. To the extent of any conflict between this summary and the Bidding Procedures, the terms of the Bidding Procedures attached to the Bidding Procedures Order shall govern. Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Bidding Procedures.

57731/0001-15857060v4

**C. Bid Deadline** – July 2, 2018 at 5:00 p.m. (prevailing Eastern time).

**D. Qualified Bid Requirements.**

To constitute a Qualified Bid, a bid must:

a)      fully disclose the identity of the Potential Bidder and include contact information for the specific person (s) the Debtors should contact if they have any questions about the Potential Bidder's bid;

b)      state that the Potential Bidder offers to purchase the Purchased Assets or some substantial portion thereof;

c)      include a signed writing that the Potential Bidder's offer is formal, binding, unconditional, and irrevocable until (i) the closing of the transaction with the Successful Bidder (as defined below) and (ii) for two (2) business days after the earlier of the closing of the sale transaction with the Successful Bidder or the termination of the Successful Bid, if such bidder is designated the Back-Up Bidder (as defined below) at the conclusion of the Auction;

d)      confirm that there are no conditions precedent to the Potential Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid;

e)      set forth each regulatory and third-party approval required for the Potential Bidder to consummate the transaction and the time period within which the Potential Bidder expects to receive such approvals;

f)      include a duly authorized and executed copy of a Stalking Horse Agreement (a "Bidder Purchase Agreement"), including the purchase price for the Purchased Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Stalking Horse Agreement and the proposed order to approve the sale; provided, however, that such Bidder Purchase Agreement shall not include any financing or diligence conditions;

g)      include written evidence of sufficient cash on hand to fund the purchase price or sources of immediately available funds that are not conditioned on further third party approvals or commitments, that will allow the Debtors to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the transaction contemplated by the Bidder Purchase Agreement; such written evidence shall include the most current audited and the most current unaudited financial statements, and any bank account or investment account statements or other evidence of any bank line(s) of credit or available cash to complete the purchase, or such other financial information as may be acceptable to the Debtors in their reasonable discretion (collectively, the "Financials") of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the

Purchased Assets, the Financials of the Potential Bidder's equity holder(s) or other financial backer(s);

h)     provide for a cash purchase price of at least the Purchase Price *plus* a cash overbid of $1,950,000 (collectively, the "Minimum Overbid"), and otherwise has a value to the Debtors, in the Debtors' exercise of their reasonable business judgment, that is greater or otherwise better than the value offered under the Stalking Horse Agreement, including impact of the liabilities assumed in the Stalking Horse Agreement;

i)     identify with particularity which executory contracts and unexpired leases the Potential Bidder wishes to assume and provides for the Potential Bidder to pay related Cure Amount;

j)     contain sufficient information concerning the Potential Bidder's ability to provide adequate assurance of future performance with respect to executory contracts and unexpired leases to be assumed and assigned;

k)     include an acknowledgement and representation that the bidder: (A) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (B) has relied solely on its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; (C) did not rely on any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction (defined below), except as expressly stated in the Stalking Horse Agreement; and (D) is not entitled to any expense reimbursement, breakup fee, or similar type of payment in connection with its bid;

l)     include evidence, in form and substance reasonably satisfactory to the Debtors, of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Stalking Horse Agreement;

m)     be accompanied by a good faith deposit in the form of a wire transfer, certified check or such other form acceptable to the Debtors, payable to the order of the Debtors (or such other party as the Debtors may determine, including an escrow agent) in an amount equal to ten percent (10%) of the Qualified Bid;

n)     state that the Potential Bidder agrees to serve as a Back-Up Bidder (as defined below) if such bidder's Qualified Bid is selected as the next highest or otherwise next best bid after the Successful Bidder (as defined below) with respect to the Purchased Assets;

o)     state that the Potential Bidder consents to the jurisdiction of the Bankruptcy Court; and

16

| | |
|---|---|
| | p)      contain such other information reasonably requested by the Debtors. |
| **Provisions Providing Bid Protections to Stalking Horse or Initial Bidder** *Local Rule 6004-1(c)(i)(C)* | Article 8.1 of the Stalking Horse Agreement outlines the terms of the Stalking Horse Protections being provided to the Stalking Horse Bidder. <br><br> **No-Shop or No-Solicitation Provisions**.  None. <br><br> **Breakup Fee and Expense Reimbursement.**  If the Stalking Horse Bidder is not the Successful Bidder, the Debtors will, in certain circumstances, pay to the Stalking Horse Bidder a Breakup Fee and an Expense Reimbursement Amount.  The payment of the Breakup Fee and Expense Reimbursement Amount will be governed by the provisions of the Stalking Horse Agreement and the Bidding Procedure Order. <br><br> Breakup Fee.  The Breakup Fee is a cash amount equal to three percent (3%) of the Cash Consideration ($1,350,000), which amount shall constitute a superpriority administrative expense of Sellers with priority over any and all administrative expenses of any kind, including those specified in Sections 503(b) or 507(b) of the Bankruptcy Code, and shall be secured by a lien on any deposit posted by any bidder with respect to a potential Alternative Transaction pursuant to the Bidding Procedures Order, which lien shall be senior to any debtor-in-possession financing or other secured obligations of the Sellers. <br><br> Expense Reimbursement.  The Expense Reimbursement is an amount equal to the out-of-pocket costs, fees and expenses of Stalking Horse Bidder and its Affiliates incurred before or after the date hereof (including reasonable expenses of legal, financial advisory, accounting and other similar costs, fees and expenses and all filing fees under the HSR Act) related to the transactions contemplated by this Agreement (including, without limitation, those incurred in connection with the diligence, negotiation, documentation, bidding and auction process), which amount shall constitute a superpriority administrative expense of Sellers with priority over any and all administrative expenses of any kind, including those specified in Sections 503(b) or 507(b) of the Bankruptcy Code and shall be secured by a lien on any deposit posted by any bidder with respect to a potential Alternative Transaction pursuant to the Bidding Procedures Order, which lien shall be senior to any debtor-in-possession financing or other secured obligations of the Sellers; provided, however, that in the event that the amount of the Expense Reimbursement exceeds $500,000, then such amount of Expense Reimbursement shall be deemed to equal $500,000. <br><br> Bidding Increment. $100,000 <br><br> **Treatment of Breakup and Topping Fees and Expense Reimbursement at Auction**.  The Stalking Horse Bidder has the right to credit bid all or a portion of its Breakup Fee and/or Expense Reimbursement. |
| **Modification of Bidding and Auction Procedures** *Local Rule 6004-* | The Debtors have the right to conduct any number of auctions to accommodate Qualified Bids for certain, but less than all of the Purchased Assets if the Debtors determine, in their business judgment, that such process |

57731/0001-15857060v4

| | |
|---|---|
| *1(c)(i)(D)* | would be in the best interest of the Debtors' estates and result in a materially higher recovery for the estates. *See* Bidding Procedures Section IV(C). |
| **Provisions Regarding Closing with Alternative Backup Bidders** *Local Rule 6004-1(c)(i)(E)* | Parts IV(D) and (E) of the Bidding Procedures set forth procedures by which the Debtors shall select the Successful Bid and the designation of Back-Up Bidders, respectively. <br><br> Selection of Successful Bid. Before the conclusion of the Auction, the Debtors will review and evaluate each Qualified Bid in accordance with the procedures set forth herein and determine which offer is the highest or otherwise best offer from among the Qualified Bidders submitted at the Auction (the "Successful Bid" and the bidder(s) making such bid, the "Successful Bidder"), and communicate to the Qualified Bidders the identity of the Successful Bidder and the details of the Successful Bid. The determination of the Successful Bid by the Debtors at the conclusion of the Auction shall be final, subject only to approval by the Bankruptcy Court. <br><br> Back-Up Bidder. If an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Qualified Bid to the Successful Bidder, as determined by the Debtors at the Auction in the exercise of their business judgment shall be required to serve as a back-up bidder (the "Back-Up Bidder" and, the bid submitted by the Back-Up Bidder, the "Back-Up Bid") and keep such bid open and irrevocable until either two (2) business days after closing of the sale transaction with the Successful Bidder or five (5) business days after termination of a Successful Bid, whichever applies. Following the Sale Hearing, if the Successful Bidder fails to consummate the approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the Sale with the Back-Up Bidder without further order of the Bankruptcy Court. For the avoidance of doubt, absent participation in the Auction and the making of an overbid, the Stalking Horse Bidder cannot be designated the Back-Up Bidder, unless it consents to such designation. |

### B. Key Dates and Deadlines

23.     Consistent with the Debtors' need to consummate a sale of the Purchased Assets as quickly and efficiently as practicable, the Debtors propose the following key dates and deadlines for the sale process, certain of which dates and deadlines may be subject to extension in accordance with the Bidding Procedures:

| | |
|---|---|
| **June 5, 2018** | Hearing to consider approval of the Bidding Procedures and entry of the Bidding Procedures Order |

| July 2, 2018 | Deadline to Submit Qualifying Bid |
|---|---|
| July 2, 2018 | Deadline to Object to Sale |
| July 9, 2018 | Auction (if Qualified Bid(s) received) |
| July 10, 2018 | Target date for Debtors to file with the Bankruptcy Court the Notice of Auction Results |
| July 17, 2018 | Proposed date of Sale Hearing and entry of Sale Order |

### C. Noticing Procedures

24.    Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify their

creditors of the proposed sale of the Purchased Assets, including disclosure of the time and place

of the Auction, the terms and conditions of the sale, and the deadline for filing any objections

thereto.  The Sale Notice (a copy of which is attached as Exhibit 2 to the Bidding Procedures

Order) contains information required under Rule 2002(a) and (c), and also includes details about

the Bidding Procedures and the procedures for submission of competing Bids.  The information

will enable interested parties to participate in the Auction and the Sale Hearing if they so choose.

The Debtors accordingly request that the Court approve the form and content of the Sale Notice.

25.    The Debtors propose to serve the Bidding Procedures Order by no later than three

(3) days after its entry, the Bidding Procedures and the Sale Notice by first-class mail, upon (a)

all entities known to have expressed an interest in a transaction with respect to some or all of the

Purchased Assets during the past nine (9) months; (b) all entities known to have asserted any

lien, claim, interest or encumbrance in or upon any of the Purchased Assets; (c) all federal, state

and local environmental or other regulatory authorities that regulate any aspect of the Debtors'

business, if any; (d) United States Attorney's office; (e) the Securities and Exchange

Commission; (f) the Internal Revenue Service; (g) all state and local taxing authorities in the

states in which the Debtors have or may have any tax liability; (h) counsel to the Prepetition

Secured Parties; (i) the U.S. Trustee; and (j) those parties who have filed the appropriate notice

requesting notice of all pleadings filed in the Chapter 11 Cases (the "Initial Mailing Service

List"). In addition, by the Initial Mailing Date, the Debtors' claims and noticing agent shall post a copy of the Bidding Procedures Order, the Bidding Procedures and the Sale Notice to the website maintained for the Debtors in these cases.

26.     The Debtors (or their agents) will also serve the Sale Notice by first-class mail, postage prepaid or by email, where available, upon (x) all known creditors other than those given notice pursuant to the Initial Mailing Service List; and (y) all holders of interests in the Debtors. The Debtors (or their agents) will serve the Cure Notice by first-class mail, postage prepaid or by email, where available, upon all counterparties to the Debtors' executory contracts and unexpired leases, and the Debtors' claims and noticing agent shall post the Cure Notices (as defined below) to the website maintained for the Debtors in these cases.

27.     In addition, as soon as practicable, the Debtors will publish the Sale Notice (modified for publication, as necessary) in the national edition of *USA Today* and such trade or other publications of general circulation as the Debtors and the Stalking Horse Bidder shall determine in good faith. Such publication notice shall be deemed sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

28.     The Debtors submit that (a) the notice to be provided through the Sale Notice and (b) the method of service and publication proposed herein constitutes good and adequate notice of the sale of the Purchased Assets and the proceedings to be had with respect thereto. Therefore, the Debtors respectfully request that the Court approve the foregoing.

## SALE HEARING

29.     At the Sale Hearing, the Debtors will seek approval of (i) the sale of the Purchased Assets to the Successful Bidder, free and clear of all liens, claims, interests and encumbrances pursuant to section 363 of the Bankruptcy Code (except as otherwise provided in the Stalking

Horse Agreement or Bidder Purchase Agreement, as applicable), with all liens, claims, interests and encumbrances to attach to the net sale proceeds with the same validity and in the same order of priority as they attached to the Purchased Assets prior to the Sale; and (ii) the assumption by the Debtors and assignment to the Successful Bidder of the Purchased Contracts pursuant to section 365 of the Bankruptcy Code.  The Debtors will submit and present additional evidence, as necessary, at the Sale Hearing demonstrating that the Sale is fair, reasonable, in the best interest of the Debtors' estates and all interested parties.

### Procedures for the Assumption and Assignment of Assumed Contracts and Leases

30.    The Debtors shall serve by first-class mail, postage prepaid on each non-Debtor counterparty to an executory contract and unexpired lease, including without limitation, an Assumed Contract a cure notice substantially in the form attached to the Sale Order as Exhibit 3 (the "Cure Notice") that shall (i) state the cure amounts that the Debtors believe are necessary to assume such executory contract or unexpired lease, including, without limitation, the Assumed Contracts pursuant to section 365 of the Bankruptcy Code (the "Cure Amount"); (ii) notify the non-Debtor party that such party's contract or lease may be assumed and assigned to a purchaser of the Purchased Assets at the conclusion of the Auction; (iii) state the applicable deadline by which the non-Debtor party shall file an objection to the Cure Amount (a "Cure Amount Objection"), to the assumption and assignment of an Assumed Contract (an "Assumption Objection"), and that the deadline to file a Sale Objection is the Sale Objection Deadline; and (iv) state the date of the Sale Hearing and that Cure Amount Objections, Assumption Objection, and Sale Objections will be heard at the Sale Hearing, or at a later hearing if so determined by the Debtors; provided, however, that the inclusion of a contract, lease or agreement on the Cure Notice shall not constitute an admission that such contract, lease or agreement is an executory

21

contract or unexpired lease. The estates reserve all of their rights, claims and causes of action

with respect to the contracts, leases and agreements listed on the Cure Notice.

31.     Any Cure Amount Objection must be filed with the Court and served so as to be

received on or before June 29, 2018 at 4:00 p.m. (Prevailing Eastern Time) (the "Cure Amount

Objection Deadline") by the following parties:  (1) the Debtors, 1500 Whetstone Way, Suite 500,

Baltimore, MD 21230 (Attn: Daniel J. Smith), dsmith@videologygroup.com; (2) proposed

counsel for the Debtors, Cole Schotz P.C., 300 E. Lombard Street, Suite 1450, Baltimore,

Maryland 21202 (Attn: Irving E. Walker, Esq.), iwalker@coleschotz.com and 500 Delaware

Avenue, Suite 1410, Wilmington, Delaware 19801 (Attn: Patrick J. Reilley, Esq.),

preilley@coleschotz.com; (3) counsel to the Stalking Horse Bidder, (a) Goodwin Procter LLP, 3

Embarcadero Center, 28th Floor, San Francisco, CA 94111 Attn: Lawrence M. Chu, Esq.

(lawchu@goodwinlaw.com) and Alessandra L. Simons, Esq. (asimons@goodwinlaw.com), (b)

Goodwin Procter LLP, 620 Eighth Avenue, New York, NY 10018 Attn: Gregory W. Fox, Esq.

(gfox@goodwinlaw.com), and (c) Womble Bond Dickinson (US) LP, 222 Delaware Avenue

Suite 1501, Wilmington, DE 19801 Attn: Matthew P. Ward, Esq. (Matthew.Ward@wbd-

us.com); and (4) the Office of the United States Trustee for the District of Delaware, 844 King

Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: David Buchbinder) (the

"Cure Amount Notice Parties").  Any such objection must also (i) state the basis for such

objection and (ii) state with specificity what cure amount the counterparty to the Assumed

Contract believes is required (in all cases with appropriate documentation in support thereof).

32.     Unless a non-Debtor party to any executory contract or unexpired lease, including

an unexpired real property lease, files a Cure Amount Objection by the Cure Amount Objection

Deadline, then the Cure Amount set forth in the Cure Notice shall be binding upon the non-

22

Debtor counterparty to such agreement for all purposes and will constitute a final determination

of the Cure Amount required to be paid in connection with the assumption and assignment of

such agreement.  In addition, all counterparties to the Assumed Contracts who fail to file an

objection shall be (i) forever barred from objecting to the Cure Amount and from asserting any

additional cure or other amounts with respect to such Assumed Contract, and the Debtors, the

Stalking Horse Bidder or the Successful Bidder, as the case may be, shall be entitled to rely solely

upon the Cure Amount set forth in the Cure Notice, and (b) be forever barred and estopped from

asserting or claiming against the Debtors, the Stalking Horse Bidder or the Successful Bidder, as

the case may be, or any other assignee of the Assumed Contract that any additional amounts are

due or defaults exist, or conditions to assumption and assignment must be satisfied with respect

to such Assumed Contract.

33.    The Debtors may resolve any disputed Cure Amount only with the express written

consent of the Stalking Horse Bidder or the Successful Bidder, as the case may be.  In the event

that the Debtors and the non-Debtor party cannot resolve the Cure Amount, the Debtor shall

segregate any disputed Cure Amounts ("Disputed Cure Amounts") pending the resolution of any

such disputes by the Court or mutual agreement of the parties, with the express consent of the

Stalking Horse Bidder or the Successful Bidder, as applicable.   In the event that a dispute

regarding the Cure Amount with respect to an Assumed Contract (such contract, a "Disputed

Contract") is determined by an order (the "Disputed Contract Order") of the Bankruptcy Court

after closing of the sale, the Stalking Horse Bidder or Successful Bidder, as applicable, shall

have the option to designated the Disputed Contract as an Excluded Contract (defined below);

provided, however, that if Stalking Horse Bidder does not designate such Disputed Contract as

an Excluded Contract (defined below) within thirty (30) days after the date of the Disputed

23

Contract Order, such Disputed Contract shall automatically be deemed to be an Assumed Contract.

34.     The Debtors shall (a) within 48 hours of receipt of a Qualified Bid from a Bidder (other than the Stalking Horse Bidder) and (b) with respect to the Stalking Horse Bidder, by no later than June 22, 2018 (the later of (a) and (b), the "Adequate Assurance Deadline"), provide the necessary financial information to demonstrate that the Qualified Bidder or Stalking Horse Bidder, as applicable, can provide adequate assurance of future performance under Section 365 of the Bankruptcy Code (the "Adequate Assurance Information") to those counterparties to the Assumed Contracts (or their counsel) who have (x) submitted a written request (by e-mail to Debtors' counsel is acceptable) for Adequate Assurance Information and (y) confirmed in writing to the Debtors' counsel (by e-mail is acceptable) their agreement to keep such Adequate Assurance Information strictly confidential and use it solely for the purpose of evaluating whether a Qualified Bidder or the Stalking Horse Bidder has provided adequate assurance of future performance under the applicable Assumed Contract; provided, however, that the Stalking Horse Bidder or Qualified Bidder, as applicable, may require the counterparties to the applicable Assumed Contract to execute confidentiality agreements prior to the remittance of any confidential, non-public information to such counterparty.

35.     Any objection (an "Assumption Objection") to the provision of adequate assurance of future performance or the assumption and assignment to the Stalking Horse Bidder of an executory contract and unexpired lease, including, without limitation, an Assumed Contract must be filed with the Court and served on the Cure Amount Notice Parties so as to be received on or before June 29, 2018 (Prevailing Eastern Time) (the "Assumption Objection Deadline"). Any such objection must also state the basis therefor.  If a non-Debtor party to any executory

contract or unexpired lease fails to object to the assumption or assignment and provision of adequate assurance of future performance by the Assumption Objection Deadline or at the Sale Hearing, as the case may be, such counterparty shall be forever barred from raising any such objection. Assumption Objections may be resolved by the Court at the Sale Hearing, or at a separate hearing either before the Sale Hearing or after the Sale Hearing. Any counterparty to an executory contract or unexpired lease, including, without limitation, an Assumed Contract that fails to timely file and serve an objection to the Cure Amounts shall be forever barred from asserting that a Cure Amount is owed in an amount in excess of that set forth in the Cure Notice.

36.    To the extent that a non-Debtor counterparty to an executory contract or unexpired lease, including, without limitation, an Assumed Contract was not provided with a Cure Notice (any such contract or lease a "Previously Omitted Contract"), the Debtors will notify the Successful Bidder within three (3) Business Days after the Debtors become aware of the omission. The Debtors shall serve a notice (the "Previously Omitted Contract Notice") to the counterparties to the Previously Omitted Contract indicating the Debtors' intent to assume and assign the Previously Omitted Contract. The counterparties will have fourteen (14) days to object to the Cure Amount or the assumption. If the parties cannot agree on a resolution, the Debtors will seek an expedited hearing before the Court to determine the Cure Amount and approve the assumption. If there is no objection, then the counterparties will be deemed to have consented to the assumption and assignment and the Cure Amount, and such assumption and assignment and the Cure Amount shall be deemed approved by the Sale Order without further order of this Court.

37.    Notwithstanding anything to the contrary herein, at any time before the Auction, the Stalking Horse Bidder or any Qualified Bidder who becomes the Successful Bidder, as the

case may be, shall have the right to exclude any of the Assumed Contracts from the Purchased

Assets (an "Excluded Contract"), and any such Excluded Contract shall constitute an Excluded

Asset (as defined in the Stalking Horse Agreement) and shall not constitute, for any purpose

whatsoever, a Purchased Asset; provided, however, that any Excluded Contract nevertheless

may be assumed and assigned, at the Successful Bidder's (including the Stalking Horse Bidder's)

written request to Debtors' counsel made no later than the Closing (as defined in the Stalking

Horse Agreement) (the "Subsequently Added Contract") unless alternative mutual arrangements

are made between the Debtors and the Successful Bidder (including the Stalking Horse Bidder);

and provided further that any Excluded Contract that does not become a Subsequently Added

Contract shall be deemed rejected pursuant to section 365(a) of the Bankruptcy Code effective as

of the start of the Auction.  The Successful Bidder shall not incur any liability, obligation, or debt

in connection with or related to any such Excluded Contract that constitutes an Excluded Asset.

## BASIS FOR RELIEF REQUESTED

**B.**    **The Bidding Procedures Are Fair and Are Designed to Maximize the Value Received for the Purchased Assets**

38.    The Bidding Procedures are specifically designed to promote what courts have

deemed to be the paramount goal of any proposed sale of property of a debtor's estate:

maximizing the value of sale proceeds received by the estate.  *See Burtch et al. v. Ganz, et al. (In*

*re Mushroom Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty

to maximize and protect the value of the estate's assets); *In re Food Barn Stores, Inc.*, 107 F.3d

558, 564-65 (8th Cir. 1997) (recognizing that main goal of any proposed sale of property of a

debtor's estate is to maximize value).  Courts uniformly recognize that the procedures

established for the purposes of enhancing competitive bidding are consistent with the

fundamental goal of maximizing value of a debtor's estate.  *See Calpine Corp v. O'Brien Envtl.*

*Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that

bidding procedures that promote competitive bidding provide a benefit to a debtor's estate);

*Official Comm. of Subordinated Bondholders v. Integrated Res. Ind. (In re Integrated Res. Inc.)*,

147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that sale procedures "encourage bidding

and…maximize the value of the debtor's assets").

      39.     The Bidding Procedures provide for an orderly, uniform, and appropriately

competitive process through which interested parties may submit offers to purchase the Purchased

Assets.  Given the time constraints, the Debtors, with the assistance of their advisors, have

structured the Bidding Procedures to promote active bidding by interested parties and to confirm

the highest or otherwise best offer reasonably available for the Purchased Assets.  Additionally,

the Bidding Procedures will allow the Debtors to conduct the Auction in a fair and transparent

manner that will encourage participation by financially capable bidders with demonstrated ability

to consummate a timely Sale.  Accordingly, the Bidding Procedures should be approved because

they are reasonable, appropriate, and in the best interests of the Debtors, their estates, and all

parties in interest.

**C.**    **The Breakup Fee and Expense Reimbursement Have Sound Business Purposes and are Necessary to Preserve the Value of the Debtors' Estates.**

      40.     As noted above, the Stalking Horse Agreement provides for a Breakup Fee in the

amount of 3.0% of the Cash Consideration, to be paid to the Stalking Horse Bidder upon entry of

an order approving, or the consummation of, an Alternative Transaction.  In addition, the

Stalking Horse Agreement provides for the reimbursement of the Stalking Horse Bidder's

expenses, up to $500,000, to be paid upon the occurrence of certain events typical and customary

for transactions of this kind.  The Debtors believe that the Stalking Horse Protections are

necessary for the Stalking Horse Bidder to enter into the Stalking Horse Agreement.  In addition,

27

the Debtors believe that the presence of a stalking horse bidder will set a floor for the value of

the Purchased Assets and attract other potential buyers to bid for assets, thereby maximizing the

realizable value of the Purchased Assets for the benefit of the Debtors' estates, their creditors,

and all other parties in interest.

41.     Approval of the Stalking Horse Protections is governed by standards for

determining the appropriateness of bid protections in the bankruptcy context.  Courts have

identified at least two instances in which bid protections may benefit the estate.  First, a break-up

fee or expense reimbursement may be necessary to preserve the value of a debtor's estate if

assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that

otherwise would not have been made and without which bidding would have been limited." *In re

O'Brien Envtl. Energy, Inc.*, 181 F.3d at 533.  Second, if the availability of break-up fees and

expense reimbursements were to induce a bidder to research the value of the debtor and convert

the value to a dollar figure on which other bidders can rely, the bidder may have provided a

benefit to the estate by increasing the likelihood that the price at which the debtor is sold will

reflect its true worth.  *See id.*; *see also In re Reliant Energy Channel View LP*, 594 F.3d 200,

206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to

entice a party to make the first bid or if it would induce a stalking horse bidder to remain

committed to a purchase).

42.     In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the

lower court as relevant in deciding whether to award a breakup fee:

      a)      The presence of self-dealing or manipulation in negotiation the breakup
fee;

      b)      Whether the fee harms, rather than encourages, bidding;

      c)      The reasonableness of the breakup fee relative to the purchase price;

28

d)      Whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

e)      The ability of the request for a breakup fee to attract a retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f)      The correlation of the fee to a maximum value of the debtor's estate;

g)      The support of the principal secured creditors and creditors' committees of the breakup fee;

h)      The benefits of the safeguards to the debtor's estate; and

i)      The substantial adverse impact of the breakup fee on unsecured creditors where such creditors are in opposition to the breakup fee.

*See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 536.

43.      Here, the Breakup Fee set forth in the Stalking Horse Agreement falls squarely within the *O'Brien* factors. The Breakup Fee will enable the Debtors to secure an adequate floor for the Purchased Assets and insist that all competing bids be materially higher or otherwise better than the Stalking Horse Agreement – a clear benefit to the Debtors' estates. Moreover, the Stalking Horse Bidder would not agree to act as a stalking horse without the Breakup Fee and the Expense Reimbursement, and there has been no showing of any self-dealing or manipulation in the negotiation of the Breakup Fee. Without the Breakup Fee and the Expense Reimbursement, the Debtors might lose the opportunity to obtain the highest or otherwise best offer for the Purchased Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder. Furthermore, without the benefit of the Stalking Horse Bidder, the bids received at the Auction for the Purchased Assets could be substantially lower than the one offered by the Stalking Horse Bidder.

44.      The Breakup Fee and Expense Reimbursement are reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended

by the Stalking Horse Bidder.  Moreover, the Break-Up Fee and Expense Reimbursement are

actually necessary to preserve the value of the Debtors' estates. The combined 3% Breakup Fee

of $1,350,000 and Expense Reimbursement of no more than $500,000 represent an aggregate of

4.1% of the $45 million Cash Consideration under the Stalking Horse Agreement.[6]  Additionally,

both the Breakup Fee and the Expense Reimbursement were heavily negotiated in good faith,

and both were necessary to secure the Stalking Horse Bidder's commitment under the Stalking

Horse Agreement.  In sum, the Debtors' ability to offer the Stalking Horse Protections enables

them to ensure the sale of the Stalking Horse Assets at a price they believe to be fair, while, at

the same time, providing them with the potential to achieve an even greater benefit to the

Debtors' estates in the form of a higher or otherwise better offer for the Purchased Assets.

**D.**       **The Proposed Sale Satisfies the Requirements of Section 363 of the Bankruptcy Code**

45.       Ample authority exists for approval of the Sale contemplated by this Motion.

Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate." 11 U.S.C. § 363(b)(1).  Although section 363 of the Bankruptcy Code does not

specify a standard for determining when it is appropriate for a court to authorize the use, sale or

lease of property of a debtor's estate, courts have approved the authorization of a sale of a

debtor's assets if such sale is based upon the sound business judgment of the debtor. *See, e.g.,*

*Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d

513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus.,*

---

[6] As noted above, under the Stalking Horse Agreement the Cash Consideration is subject to adjustment depending on the level of the Debtors' Accounts Receivable at the time of closing. However, there is no Break-Up Fee being sought with respect to any Cure Amounts in excess of the $1.4 million Cure Cost Cap that the Stalking Horse Bidder may elect to pay in order to receive assignment of a Purchased Contract (which would remove such contract counterparty from the Debtors' creditor pool, enhancing recoveries for these estates).  Accordingly, the Debtors submit that calculating the Break-Up Fee off of the $45 million Cash Consideration is proper.

*Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

46.    Courts typically consider the following factors in determining whether a proposed sale satisfies this standard:  (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)). Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Van Gorkum*, 488 A.2d 858, 872 (Del. 1985)).

*1.*    ***The Debtors have demonstrated a sound business justification for the Sale***

47.    A sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders. *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1063; *In re Food Barn Stores, Inc.*, 107 F.3d at 564-65 (recognizing the paramount goal of any proposed sale of property of estate is to maximize value).

48.    As set forth above, a strong business justification exists for the sale of the Purchased Assets as described herein. An orderly but expeditious sale of the Purchased Assets is critical to maximizing the value of the Debtors' assets and recoveries for the Debtors' economic stakeholders.

*2.*    ***The Noticing Procedures Proposed by the Debtors are Reasonable and Adequate***

31

57731/0001-15857060v4

49.     The Noticing Procedures described above are reasonably calculated to provide all of the Debtors' known creditors and all other parties in interest with adequate, timely notice of, among other, the proposed Sale, Bidding Procedures, Auction and Sale Hearing.

**3.      *The Proposed Sale Will Produce a Fair and Reasonable Purchase Price for the Purchased Assets***

50.     As set forth above, the Debtors believe that the Sale will produce a fair and reasonable purchase price for the Purchased Assets. The Stalking Horse Agreement is an offer to purchase the Purchased Assets for a price that the Debtors, with the advice of their advisors, have determined to be fair and reasonable. Given that the Stalking Horse Agreement, together with the Stalking Horse Protections, will serve as a floor for Qualified Bids for the Purchased Assets, the Debtors are confident that the sale process will culminate in the Debtors' obtaining the highest or otherwise best value for the Purchased Assets.

51.     In addition, the Bidding Procedures were carefully designed to facilitate a robust and competitive bidding process. The Debtors are poised to capitalize on the progress made during the prepetition phase of their sale process to maximize the value of the Purchase Assets sold at the Auction. The Bidding Procedures provide an appropriate framework for the Debtors to review, analyze and compare all bids received to determine which bids are in the best interests of the Debtors' estates and their economic stakeholders. The Sale, as governed by the Bid Procedures, will undoubtedly serve the important objectives of obtaining not only a fair and reasonable purchase price for the Purchased Assets but also the highest or otherwise best value for the Purchased Assets, which will inure to the benefit all parties in interest in the Chapter 11 Cases.

57731/0001-15857060v4

**4.    *The Successful Bidder Should be Entitled to the Protections of Section 363(m) of the Bankruptcy Code***

52.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code]…does not affect the validity of a sale…to an entity that purchased…such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale…were stayed pending appeal.

11 U.S.C. § 363(m).

53.    Section 363(m) of the Bankruptcy Code fosters the "'policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely.'" *Reloeb Co. v. LTV Corp (In re Chateaugay Corp.*, No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 147). *See also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal").

54.    While the Bankruptcy Code does not define "good faith," the Third Circuit has held that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" *In re Abbotts Diaries*, 788 F.2d at 147 (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders); *see also In re Bedford*

57731/0001-15857060v4

*Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995).

55.     In other words, a party would have to show fraud or collusion between the buyer and the debtor in possession, the trustee or other bidders to demonstrate a lack of good faith. *See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"). Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, with a focus on the "integrity of [a bidder's] conduct in the course of the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1998 (7th Cir. 1978)).

56.     The Debtors submit that the Stalking Horse Bidder, or any other Successful Bidder, is or would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code. The Debtors and the Stalking Horse Bidder have entered into the Stalking Horse Agreement without collusion, in good faith and through extensive arm's length negotiations. Indeed, the Stalking Horse Bidder and the Debtors have engaged separate counsel and other professional advisors to represent their respective interests in the negotiation of the Stalking Horse Agreement and in the sale process generally. To the best of the Debtors' knowledge, information and belief, no party has engaged in any conduct that would cause or permit the Stalking Horse Agreement to be set aside under section 363(m) of the Bankruptcy Code.

57.    Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process.  Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of the Purchased Assets.  *See* Bidding Procedures § 4.C.v.  Any asset purchase agreement with a Successful Bidder executed by the Debtors will be negotiated at arm's length and in good faith. Accordingly, the Debtors seek a finding that any Successful Bidder (including the Stalking Horse Bidder) is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

58.    Based on the foregoing, the Debtors submit that they have demonstrated that the proposed Sale is a sound exercise of the Debtors' business judgment and should be approved as a good faith transaction.

**E.      The Purchased Assets Should Be Sold Free and Clear of Liens, Claims, Interests and Encumbrances Under Section 363(f) of the Bankruptcy Code.**

59.    In the interest of attracting the best offers, the Assets should be sold free and clear of any and all liens, claims, interests and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests and encumbrances attaching to the net proceeds of the Sale. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if any one of the following conditions is satisfied:

a)      applicable non-bankruptcy law permits sale of such property free and clear of such interest;

b)      such entity consents;

c)      such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

d)      such interest is in bona fide dispute; or

35

e)    such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

60.    Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code].").

61.    The Debtors submit that the sale of the Purchased Assets free and clear of Liens, Claims, interests and encumbrances will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code.  To the extent that a party objects to the Sale on the basis that it holds a prepetition Lien or Encumbrance on the Purchased Assets, the Debtors believe that any such party could be compelled to accept a monetary satisfaction of such claims, under section 363(f)(4) of the Bankruptcy Code.

62.    Moreover, the Debtors have sent or will send the Sale Notice to any purported prepetition lienholders. If such lienholders do not object to the proposed Sale, then their consent should reasonably be presumed. Accordingly, the Debtors request that, unless a party asserting a prepetition Lien, Claim or Encumbrance on any of the Purchased Assets (other than with respect

36

to Assumed Liabilities (as such term is defined in the Stalking Horse Agreement)) timely objects

to this Motion, such party shall be deemed to have consented to any Sale Transaction approved

at the Sale Hearing. *See Hargave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994)

(by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein).

63.     The purpose of a sale order purporting to authorize the transfer of assets free and

clear of all claims, liens and encumbrances would be defeated if claimants could thereafter use

the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.

Moreover, without such assurances, potential bidders may choose not to participate in the

Auction, or may submit reduced bid amounts, to the detriment of the Debtors' economic

stakeholders.  Accordingly, the Debtors request that the Court authorize the sale of the Assets

free and clear of any liens, claims, interests and encumbrances (with the exception of Permitted

Liens and Assumed Liabilities), in accordance with section 363(f) of the Bankruptcy Code,

subject to such liens, claims, interests and encumbrances (including any Liens and superpriority

claims in favor of a debtor-in-possession lender) attaching to the proceeds thereof in the same

order of relative priority, with the same validity, force and effect as prior to such.

**F.      The Assumption and Assignment of the Assigned Contracts Should Be Authorized.**

64.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession

"subject to the court's approval, may assume or reject any executory contract or unexpired lease

of the debtor."   11 U.S.C. § 365(a).   Courts employ the business judgment standard in

determining whether to approve a debtor's decision to assume or reject an executory contract or

unexpired lease. *See, e.g., In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992)

(assumption or rejection of lease "will be a matter of business judgment by the bankruptcy

court"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that a

debtor's decision to assume or reject executory contract is governed by business judgment

37

standard and may only be overturned if decision is product of bad faith, whim, or caprice). The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989).

65.    Any assumption of the Proposed Assumed Contracts is an exercise of the Debtors' sound business judgment because the transfer of such contracts is necessary to the Debtors' ability to obtain the best value for the Purchased Assets. The assumption and assignment of the Proposed Assumed Contracts is a critical component of the Stalking Horse Agreement. Given that consummation of the Sale is critical to the Debtors' efforts to maximize value for their estates and stakeholders, the Debtors' assumption of the Proposed Assumed Contracts is an exercise of sound business judgment and, therefore, should be approved.

66.    The consummation of the Sale, which involves the assignment of the Proposed Assumed Contracts will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code. Section 365(b)(1) of the Bankruptcy Code requires any outstanding defaults under the Purchased Contracts to be assumed be cured or that the Debtors provide adequate assurance that such defaults will be promptly cured. The Debtors' assumption and assignment of the Purchased Contracts will be contingent upon payment of the Cure Amount and effective only upon the closing of the Sale. As set forth above, the Debtors propose to file with the Court and serve on each Counterparty a Cure Notice, which will set forth the Debtors' good faith calculations of Cure Amount with respect to each Contract and Lease listed on such Cure Notice. Counterparties will have a meaningful opportunity to raise any objections to the proposed assumption of their respective Contracts in advance of the Sale Hearing.

57731/0001-15857060v4

67.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract if "adequate assurance of future performance by the assignee of such contract or lease is provided."  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) (finding that, "[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). Among other things, adequate assurance may be provided by evidencing the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when the prospective assignee of a lease has financial resources and has expressed willingness to devote sufficient funding to the business to give it a strong likelihood of succeeding).

68.     As set forth above and in the Bidding Procedures, for a bid to qualify as a Qualified Bid, a Potential Bidder must include with its bid information regarding its ability (and the ability of its designated assignee, if applicable) to perform under applicable Proposed Assumed Contracts. Each affected Counterparty will have an opportunity to object to the ability of the Successful Bidder to provide adequate assurance as provided in the Bidding Procedures Order.  To the extent necessary, the Debtors will present facts at the Sale Hearing to show the

financial wherewithal, willingness and ability of the Successful Bidder to perform under the Proposed Assumed Contracts.

### **WAIVER OF BANKRUPTCY RULES 6004(a), 6004(h) AND 6006(d)**

69.     The Debtors request that the Court (a) find that the notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances and (b) waive the fourteen-day stay requirements under Bankruptcy Rules 6004(h) and 6006(d).  As described above, the Debtors need the flexibility to close the sale promptly after all closing conditions have been satisfied or waived.  To require the Debtors to effectively be liable under the Assumed Contracts for an extra fourteen (14) days and to delay the closing and resulting pay down of the Debtors' secured obligations will burden the estates and require unnecessary expenditure of the Debtors' resources.  Accordingly, given the lack of prejudice to any party, the Debtors respectfully request that the Bidding Procedures Order, the Sale Order, and any order authorizing the assumption and assignment of a Proposed Assumed Contract in connection with the Sale be effective immediately upon entry and that the fourteen day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) be waived.

### **NOTICE**

70.     The Debtors will provide notice of this Motion to: (a) the United States Trustee for the District of Delaware; (b) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (c) the Debtors' Pre-Petition Secured Creditors; (d) counsel for the Stalking Horse Bidder; (e) all federal, state and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (f) the Securities and Exchange Commission; (g) the Internal Revenue Service; (h) counsel to any official committee appointed in the Chapter 11 Cases; (i) certain parties to executory

57731/0001-15857060v4

contracts and unexpired leases; and (j) to the parties requesting notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").

71.     A copy of this Motion and any order approving it will also be made available on the Debtors' Case Information Website.  In light of the nature of the relief requested in this Motion, the Debtors respectfully submits that no further notice is necessary.

## NO PRIOR REQUEST

72.     The Debtors have no previously sought the relief requested herein from the court or any other court.

WHEREFORE, the Debtors respectfully request that this Court enter the Bidding Procedures Order and, after the Sale Hearing, the Sale Order, substantially in the forms attached hereto as Exhibit A and Exhibit B, respectively, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

57731/0001-15857060v4

Dated:   May 14, 2018

COLE SCHOTZ P.C.

Patrick J. Reilley (No. 4451)
G. David Dean (No. 6403)
Katherine M. Devanney (No. 6356)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
preilley@coleschotz.com

- and -

Irving E. Walker
300 E. Lombard Street, Suite 1450
Baltimore, MD  21202
Telephone: 410.230.0660 Fax
Facsimile: 410.528.9400
iwalker@coleschotz.com

*Proposed Counsel for Debtors
and Debtors in Possession*

57731/0001-15857060v4