## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  | x |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| VIDEOLOGY, INC.., *et al*.,[1] | : | Case No. 18-11120 (BLS) |
|  | : |  |
| Debtors. | : | Jointly Administered |
|  | : | **Hearing Date:  May 23, 2018 at 9:30 a.m.** |
|  | x | **Objection Deadline: May 21, 2018 at 12:00 p.m.** |

### DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING SECURED POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS TO POST-PETITION LENDER, (III) SCHEDULING FINAL HEARING AND (IV) RELATED RELIEF

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby move for the entry of an interim order (the "Interim Order")[2], substantially in the form attached hereto as **Exhibit A**, and following a final hearing to be set by the Court, entry of a final order (the "Final Order") pursuant to sections 105, 361, 362, 363, 364, 364(e)  503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Rules: (i) authorizing the Debtors to obtain postpetition financing pursuant to a secured debtor-in-possession financing facility (the "DIP Facility") on the terms described herein and in that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement dated as of May 15, 2018, substantially in the form attached hereto as **Exhibit B** (as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Videology, Inc. (2191), Collider Media, Inc. (8602), Videology Media Technologies, LLC (6243), LucidMedia Networks, Inc. (8566); and Videology, Ltd., a company organized under the laws of England and Wales..  The address of the Debtors' corporate headquarters is 1500 Whetstone Way, Suite 500, Baltimore, MD 21230.

[2] Capitalized terms used herein but not otherwise defined, shall have the meanings ascribed to them in the Interim Order or DIP Credit Agreement, as applicable.

thereof, the "DIP Credit Agreement");[3] (ii) granting senior perfected liens and superpriority claims to the lender under the DIP Facility, Draper Lending, LLC (the "DIP Lender"); (iii) scheduling a final hearing with respect to the relief requested herein; and (iv) granting related relief.  In support of this Motion, the Debtors incorporate the statements contained in the Declaration of Kenneth Tarpey in Support of First Day Motions [D.I. 14] (the "First Day Declaration"), and further respectfully state as follows:

## Preliminary Statement

1.      As more fully described in this Motion and in the First Day Declaration, the Debtors require cash on hand and use of cash flow from their operations to fund their liquidity needs so that they can continue to operate while working toward a successful sale transaction.

2.      The proposed DIP Facility, a term loan in the total amount of up to $25 million, is intended to provide the Debtors with sufficient liquidity to pay off the Prepetition Lenders (as defined below) under the pre-petition facilities, and to provide sufficient liquidity through the closing on a sale transaction with the stalking-horse purchaser (Amobee, Inc.) or another higher and better bidder, pursuant to the sale motion filed by the Debtors.

3.      Absent post-petition financing, the Debtors' ability to continue operations would be highly uncertain due to limited liquidity and the uncertainty of the amounts and timing of post-petition cash flow.  Without the proposed financing, it would be extremely difficult for the Debtors to operate their business without disruption.  It is therefore imperative that the Debtors have a reliable source of funds to avoid imminent and irreparable harm and to complete a successful sale process that will generate the maximum value for the benefit of creditors and their estates.

---

[3] The Debtors will supplement this Motion with the completed schedules to the DIP Credit Agreement and the Initial Approved Budget (Exhibit 2 to the Interim Order).

4.      Subject to entry of the Interim Order, the DIP Lender has agreed to fund $20 million during the interim period, which the Debtors intend to use to fund the Debtors' working capital requirements, pay off the remaining amounts due and owing to the Prepetition Lenders under the existing pre-petition facilities, and pay certain fees due to the DIP Lender. .  Upon final approval, the Debtors expect to draw the remaining $5 million under the DIP Facility which will be used to fund working capital needs through closing on the sale transaction.

5.      The terms of the DIP Facility reflect the best financing terms the Debtors were able to obtain, and there is no more favorable alternative financing available to the Debtors as of the date of this Motion.  As discussed at the first-day hearing in these cases, the Debtors were able to find a third party willing to provide new money on terms the Debtors determined to be more favorable than the terms proposed by the Prepetition Lenders or anyone else.  Accordingly, the Debtors respectfully request that the DIP Facility be approved.

**Jurisdiction and Venue**

6.      This Court has jurisdiction over these Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

7.      Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

8.      The statutory bases for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503 and 507, Bankruptcy Rules 2002, 4001 and 9014 and the Local Rules.

**Background**

**A.**      **General Background**

9.      On May 14, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The factual background regarding the Debtors, including their business operations, their capital and debt structures and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the Tarpey Declaration filed on the Petition Date.

10.      The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.  No trustee or examiner has been requested in the Chapter 11 Cases, and no committees have been appointed.

11.      As more fully described below and in the Tarpey Declaration, the Debtors require use of cash and cash flow from their operations to fund their operating needs, so that they can continue to operate their business and preserve its highest and best value, while working toward a successful sale transaction.  The Debtors also require access to additional funds in the form of debtor-in-possession financing to operate through the closing on a sale.

B.    **The Prepetition Credit Facilities**[4]

    *(i)    U.S. Loan Facility*

12.    Each of the Debtors (other than Videology UK) is a Borrower under that certain Loan and Security Agreement dated as of July 10, 2017 (the "U.S. Loan Facility"), with the lenders and issuing lenders parties thereto from time to time, Fast Pay Partners LLC, as agent for the PastPay Lenders, and Tennenbaum Capital Partners, LLC, as documentation agent. Videology UK is a guarantor of the U.S. Loan Facility.  As of the Petition Date, the aggregate principal amount outstanding in connection with the U.S. Loan Facility is $0.[5]

    *(ii)    U.K. Loan Facility*

13.    Each of the Borrowers is also a Borrower under that certain Loan and Security Agreement dated as of July 10, 2017 (including all annexes, exhibits, and schedules thereto, as from time to time amended, the "U.K. Loan Facility" and together with the U.S. Facility, the "Non-Factored Loan Facilities"), with the lenders and issuing lenders party thereto from time to time (collectively, the "FPP Lenders" and together with the FastPay Lenders, the "Prepetition Lenders"), FPP Sandbox LLC, as agent for the U.S. Lenders, and TCP as documentation agent. Videology UK is also a guarantor of the U.K. Loan Facility.  As of the Petition Date, according to the U.K. Agent, the aggregate principal outstanding in connection with the U.K. Loan Facility was $11,265,532.[6]  The Debtors have not yet verified whether this amount is correct.  In addition

---

[4] The prepetition credit documents are describe in greater detail in, and are attached to, the *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 361 and 363; (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Scheduling Final Hearing, and (IV) Granting Related Relief* [D.I. 13].

[5] The U.S. Facility provides for a "End of Term Premium" of 3% of the Revolver Commitments as of the Closing Date.  *See* U.S. Loan Facility at § 3.2.4; Amendment No. 3 to Loan and Security Agreements, dated March 1, 2018, increasing the fee from 2% to 3%.  The End of Term Premium has not been paid.

[6] Like the U.S. Loan Facility, the U.K. Loan Facility also provides for an End of Term Premium of 3% of the Revolver Commitments as of the Closing Date.  *See* U.K. Loan Facility at § 3.2.4; Amendment No. 3 to Loan and Security Agreements, dated March 1, 2018, increasing the fee from 2% to 3%.

57731/0003-15866800v1

to the approximately $11.2 million due under the U.K. Loan Facility, the Prepetition Lenders assert $5.25 million in fees combined under the U.S. Facility and U.K. Facility (together, the "Pre-Petition Loan Obligations").[7]

(iii)    *The EMEA Factored Facility*

14.    Videology UK, as Seller, is also a party to that certain Financing Agreement, dated as of July 28, 2017 (the "EMEA Factored Facility"), with FastPay Roundabout Limited, as Purchaser.  As of the date hereof, the aggregate principal outstanding under the EMEA Factored Facility is $0.

C.    **Circumstances leading to Chapter 11 and the Debtors' Sale Process**

15.    Since their founding, the Debtors have invested enormous sums in developing their proprietary software, and have developed their market position with strong relations with some of the largest media buyers and media companies in the world.  This process, as well as the process of developing a business model designed for the ever-evolving television and video advertising market, has required substantial resources.

16.    The demand for additional resources to fund the next phase of the Debtors' progress led the Debtors to pursue additional funding and strategic alternatives.  Although the Debtors are confident that their business is poised for exponential growth over the next five years, they were unable to raise the necessary capital to sustain their operations and to capitalize on this future growth as an independent company.

17.    In early March 2018, the Debtors' largest client, GroupM, placed a temporary hold on payments which led the Prepetition Secured Parties to call a default under the Loan Agreements on March 23, 2018.  These circumstances prevented the Debtors from paying their

---

[7] The pre-petition lenders also assert a change of control fee of $800,000 for the combined U.K. and U.S. Facilities, which has not yet (and may not ever be) triggered.

57731/0003-15866800v1

vendors and other creditors in the ordinary course of business and caused disruptions in the Debtors' ability to serve their global market.

18.      In the midst of these circumstances, the Debtors continued to pursue efforts to sell their business to ensure that the Debtors' business has the capital necessary to continue the Debtors' growth and to strengthen the Debtors' position in the global marketplace, as the television and digital advertising market continues to go through the evolution triggered by the continued developments in digital media and how people watch television and video, and the impact of these developments on the advertising industry.

19.      Prior to the commencement of these cases, the Debtors engaged in extensive discussions which culminated in an Asset Purchase Agreement dated May 4, 2018 (the "Stalking Horse Agreement") with Amobee, Inc., for the sale of the Debtors' business, subject to a bankruptcy sale process and this Court's approval.  On May 14, 2018, the Debtors' filed their motion requesting the Court's approval of sale procedures [Docket No. 39) that will ensure that the Debtors' business is sold for the highest and best price to achieve the best outcome possible in these Chapter 11 cases for the best interest of the Debtors' creditors, employees, clients, and other parties in interest.

20.      Contemporaneously with the commencement of these Chapter 11 cases, Videology UK filed with the Court an application for recognition of Videology's Chapter 11 proceed as a main proceeding under UK insolvency laws, as well as an application for a temporary moratorium as to Videology U.K. while pursuing sale efforts here.

21.      Immediate access to post-petition financing is necessary to provide the Debtors' with a stable source of funds necessary for the Debtors' ongoing business, and to pay the Debtors' employees and vendors and other creditors with whom the Debtors conduct their

business in the ordinary course, and to provide key constituencies with confidence that the Debtors have sufficient resources to maintain their operations and to pay their post-petition obligations, and to permit the Debtors to complete a successful sale process.  Absent post-petition financing, the Debtors' business operations, ability to consummate a favorable sale transaction, and ability to satisfy obligations to clients would be in jeopardy and vulnerable to irreparable harm.  The proposed DIP Facility therefore is in the best interest of the Debtors' estates, creditors, and other parties in interest.

## Relief Requested

22.     By this Motion, the Debtors request that the Court enter an Order: (i) approving the DIP Facility and related loan documents (the "DIP Loan Documents"); (ii) authorizing the Debtors to enter into the DIP Credit Agreement; (iii) authorizing the Debtors to use the DIP Facility to (a) fund post-petition working capital needs, (b) pay the fees, costs and expense of the DIP Facility on the terms and conditions set forth in the DIP Credit Agreement and related DIP Loan Documents, (c) pay the Outstanding Prepetition Obligations, and (d) pay allowed administrative costs and expenses of the Chapter 11 cases; (iv) permit the Debtors to grant first-priority liens and security interests in the Debtors' property, subject to the Carve-Out (as defined below); (v) authorizing the Debtors to grant to the DIP Lender valid, enforceable and fully perfected first priority security interests and superpriority claims; (vi) subject to entry of the Final Order, section 506(c) and "equities of the case" waivers under section 552(b), as well as the doctrine of marshalling; and (vii) modifying the automatic stay; and (viii) scheduling a final hearing on this Motion for June 5, 2018.

57731/0003-15866800v1

## Summary of Material Terms of DIP Financing

23.     In accordance with Bankruptcy Rule 4001(c)(1) and Local Rule 4001-2, the following is a concise statement and summary of the proposed material terms of the DIP Financing, as specified in the DIP Credit Agreement and the Interim Order:[8]

| Material Provision | Summary Description of Material Provision |
|---|---|
| Borrowers | Videology, Inc., Collider Media, Inc., Videology Media Technologies, LLC, Lucidmedia Networks, Inc., and Videology Ltd. (together, "Borrowers") |
| DIP Lender | Draper Lending, LLC |
| Security | First lien on all of Borrowers' assets, including without limitation all of the pre- and post-petition assets and property of the Debtors, including (x) 65% of the voting stock of (i) Videology Ltd. and (ii) any other Subsidiary formed or acquired by a U.S. Loan Party organized after the date hereof and organized in a jurisdiction other than the District of Columbia or a state, commonwealth or territory of the United States of America, and (y) all other tangible and intangible personal property of each Debtor (including, for the avoidance of doubt, Videology Ltd.), wherever located and whether now owned or hereafter acquired, including but not limited to all accounts, contracts rights, chattel paper, cash, general intangibles, investment property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments and commercial tort claims, together with all proceeds thereof, including insurance proceeds (as each such term above is defined in the UCC) (the "DIP Collateral"), subject only to the Carve-Out (Interim Order, paragraph 11) The DIP Obligations will constitute allowed senior administrative expense claims against each Debtor and their estates (the "DIP Superpriority Claims") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, provided, however, that the DIP Superpriority Claims shall be subject to and subordinate to only the Carve-Out, provided, further that the DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property and assets of the Debtors and their estates, all DIP Collateral and all proceeds thereof, including for the avoidance of doubt, |

[8] This summary is qualified, in its entirety by the provisions of the DIP Credit Agreement and the proposed Interim Order and Final Order. Unless otherwise set forth in this summary, capitalized terms used within this summary shall have the meanings ascribed to them in the DIP Credit Agreement.

| | |
|---|---|
| | subject to and only effective upon entry of the Final Order, any and all avoidance power claims or causes of action under sections 544, 545, 547, 548 through 551 and 553(b) of the Bankruptcy Code (Interim Order, paragraph 10) |
| **Carve-Out** | As detailed in paragraph 13 of the Interim Order: (i) U.S. Trustee fees; (ii) reasonable fees and expenses up to $25,000 incurred by any Chapter 7 trustee; and (iii) subject to the terms of the paragraph 13, (a) unpaid allowed estate professional fees limited to the amount set forth in the Approved Budget incurred prior to the delivery of the Carve-Out Trigger Notice, and (b)$150,000 for allowed estate professional fees incurred after the delivery of the Carve-Out Trigger Notice(the "Carve-Out") (Interim Order, paragraph 13) |
| **Facility Amount** | $25 million term loan; $20 million of which will become available upon entry of the Interim Order (DIP Credit Agreement, paragraph 2.1. Interim Order, paragraph 3) |
| **Material Conditions to Advances and extensions of credit** | Closing and the initial funding under the DIP Facility will be subject to the conditions outlined in Sections 3.1 and 3.2 of the DIP Credit Agreement, including, among other things, execution of the DIP Loan Agreement, and entry of the Interim Order (and thereafter the Final Order), receipt of the Budget by the DIP Lender, and payment of all fees required to be paid on the Closing Date (DIP Credit Agreement, paragraphs 3.1, 3.2) |
| **Maturity Date** | The earlier of: (i) September 30, 2018; (ii) the effective date of a Plan of Reorganization; (iii) if the Final Order is not entered, the date that is one day after the Final Hearing; (iv) entry of an order converting the Chapter 11 Case or dismissing the Chapter 11 Case; (v) the closing on any sale transaction (including the sale to Amobee, Inc.); and (vi) the acceleration of obligations under the DIP Credit Facility or termination of the commitments including, without limitation, as a result of the occurrence or continuation of an Event of Default (DIP Credit Agreement, Definitions) |
| **Commitment Fee** | 2.0% of the amount of the DIP Facility, earned and payable upon entry of the Interim Order and paid on the Closing Date (DIP Credit Agreement, Definitions) |
| **Funding Fee** | 2.0% of each Advance, payable in Cash upon funding of such Advance (DIP Credit Agreement, Definitions) |
| **Interest Rate** | 12.0% per annum, payable in cash monthly (DIP Credit Agreement, paragraph 2.4) |
| **Exit Fee** | 4.0% of the amount of the DIP Facility, earned at time of funding and payable in cash upon maturity or pre-payment or repayment (DIP Credit |

| | |
|---|---|
| | Agreement, Definitions) |
| **Work Fee** | Non-refundable work fee of $100,000 ($50,000 of which was paid prior to the Petition Date) to DIP Lender's counsel for due diligence and legal services rendered (DIP Credit Agreement, Definitions) |
| **Stated Maturity Date Fee** | Fee of 10% of amount of the DIP Facility, due in cash on the thirtieth (30th) day following the Stated Maturity Date, in the event the Obligations are not paid in full on the thirtieth (30th) day following the Stated Maturity Date |
| **Waiver of Rights under Section 506(c), Equities of Case under Section 552(b), and Doctrine of Marshalling** | These waivers are being requested subject to entry of the Final Order (Interim Order, paragraphs 14-15) |
| **Events of Default** | Detailed in Section 8.1 of the DIP Credit Agreement |
| **Waiver of Automatic Stay** | Modified as necessary to effectuate all terms, benefits, privileges, remedies and provisions if Interim Order and the DIP Loan Documents, without further notice or order of the Court (Interim Order, paragraph 23) |
| **Right to Credit Bid** | See Interim Order, paragraph 21 |
| **Indemnification** | As detailed in paragraph 8 of the Interim Order, the Debtors are requesting that they be authorized and to and hereby indemnity and hold harmless the DIP Lender and certain of its affiliates from Indemnity Claims (Interim Order, paragraph 8) |
| **Post-Petition Lien on Debtors' claims and causes of action** | The Interim Order provides for the immediate grant to the DIP Lender of liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code (Interim Order, paragraph 11(a)) |

### Basis for Relief

24.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security.  If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to section 364(c)

of the Bankruptcy Code, a court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing.

25.     Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

- with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code;

- secured by a lien on property of the estate that is not otherwise subject to a lien; or

- secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).  Thus, pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain adequate unsecured credit, and the proposed borrowing is in the best interests of its estate. *See, e.g., Richmond Leasing Co. v. Capital Bank, NA.*, 762 F.2d 1303, 1311 (5th Cir. 1985) (Indeed, "more exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially"); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *see also* 3 Collier on Bankruptcy ¶ 364.03 (Alan N. Resnick & Henry J. Sommer eds. 16th ed.).

26.     The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under § 503(b)(l) of [the Bankruptcy Code] as an administrative expense." *See Ames Dep't Stores*, 115 B.R. at 37–39 (a debtor must show it has made a reasonable effort to seek other sources of financing under Bankruptcy Code §§ 364(a) and (b)); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under Bankruptcy Code § 364(c) must prove it was unable to obtain unsecured credit pursuant to Bankruptcy Code § 364(b)).

27.     Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c):

- the debtor is unable to obtain unsecured credit solely under section 364(b) (*i.e.*, by granting a lender administrative expense priority);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See, e.g., In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011); *In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere"); *Ames Dep't Stores*, 115 B.R. at 37-39.

57731/0003-15866800v1

28.     To show financing required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c).  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.* When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc*., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc*., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

29.     The Debtors attempted to secure financing on more favorable terms, but they were unable to do so.  The Debtors have been unable to obtain (a) adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense; (b) credit for money borrowed secured solely by a lien on property of the estate that is not otherwise subject to a lien; or (c) credit for money borrowed secured by a junior lien on property of the estate which is subject to a lien, in each case, on more favorable terms and conditions than those provided in the DIP Financing.  As set forth in at the first-day hearing, the Debtors requested a post-petition loan from the Prepetition Lenders and received a term sheet.  The Debtors searched for a competitive post-petition loan, but the DIP Financing was the only offer they received other than the offer from the Prepetition Lenders.  The DIP Facility, in the Debtors' judgment, met the Debtors' requirements to obtain a reliable source of funding, as the terms proposed  by the

14

Prepetition Lenders would have subjected the Debtors to a high risk of default and disruption of the sale process.

30.     For these reasons, the Debtors believe that entry into the DIP Credit Agreement is in the best interest of the Debtors' estates, is necessary to preserve the value of estate assets and is an exercise of the Debtors' sound and reasonable business judgment.

*(iv)     The DIP Financing is Necessary to Preserve the Assets of the Estates*

31.     The DIP Facility will allow continued operation the Debtors' operations, provided that the Debtors' continue to receive payments owed by the Debtors' key clients.   Without immediate approval of a new source of future liquidity, the Debtors' business operations and these Chapter 11 cases in general could be seriously jeopardized.   The new liquidity offered by the proposed DIP Facility will give the Debtors the opportunity to realize the value of their assets as a going concern , through the proposed sale process.

*(v)     The Terms of the DIP Financing Are Fair, Reasonable, and Appropriate*

32.     The proposed DIP Financing provides generally that the security interests and superpriority administrative expense claims granted to the DIP Lender are subject to the Carve-Out described above. In *Ames Department Stores*, the bankruptcy court found that such "carve-outs" are not only reasonable but are necessary to insure the debtors' estates are adequately assisted by counsel and other professionals. *Ames*, 115 B.R. at 40.

33.     The Debtors believe the fees and other charges required by the DIP Lender under the DIP Facility, while substantial, are acceptable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in section 364 of the Bankruptcy Code. *See In re Korea Chosun Daily Times, Inc.*, 337 B.R. 773, 783 (Bankr. E.D.N.Y. 2005) (postpetition financing arrangements under 364

"may include the payment of a loan commitment fee and reimbursement of reasonable fees and expenses in the event that the financing arrangement is not consummated.").

34.     The Debtors are unable to obtain alternate credit sources on more favorable terms, the terms of the DIP Facility have been negotiated at arms-length and are not principally for the benefit of a creditor to the detriment of other parties in interest, and the Debtors' believe, in their business judgment, the DIP Facility is in the best interest of all parties involved.  The terms of the DIP Facility are in the realm of the incentives contemplated by section 364 to induce potential Lender to undertake the risks involved in providing postpetition financing to a bankruptcy estate, and should be approved.

### (vi)    *Application of the Business Judgment Standard*

35.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under the circumstances specified therein. Provided that an agreement to obtain secured credit does not undermine the policies underlying the Bankruptcy Code, courts grant a debtor considerable deference in the exercise of its sound business judgment in obtaining such credit. *See, e.g.*, *In re Ames Dept. Stores, Inc.*, 115 B.R. at 40 ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment").  Thus, the "normal function in reviewing requests for post-petition financing is to defer to a debtor's own business judgment so long as a request for financing does not leverage the bankruptcy process and unfairly cede control of the

16

reorganization to one party in interest." *In re Barbara K Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008).

36.     To determine whether this standard is met, the Court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting courts should not second guess a debtor's business decision when the decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code") (internal citation omitted).

37.     Courts recognize that a debtor is entitled (if not required), in exercise of its business judgment, to consider non-economic benefits offered by a proposed postpetition facility:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including noneconomic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.

*In re ION Media Networks, Inc.*, No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. Jul. 6, 2009).  After evaluating all options, the Debtors have concluded the DIP Facility provides the best alternative available in the circumstances of these cases.  Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting the interim loan, receivables facility, and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on

the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

38.    The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment. Specifically, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs and determined the Debtors would require significant postpetition financing to support their operational and restructuring activities through closing on a sale, with terms that would provide flexibility in the event that the Debtors' experience a delay in their receipt of revenues from when they are due in the ordinary course. Accordingly, the Debtors negotiated the DIP Credit Agreement with the DIP Lender in good faith, at arm's-length, and with the assistance of their advisors. The DIP Facility provides the Debtors with the capital necessary to meet the working capital needed to fund the Debtors' operations during the course of the time period expected for completion of the sale process. This kind of determination reflects the quintessential exercise of business judgment and is entitled to deference from the Court. *See In re Trans World Airlines, Inc.*, 163 B.R. at 974 (finding the debtor's entry into the financing that served as the "framework" and "cornerstone" for the debtor's plan of reorganization reflected exercise of the debtor's "sound and prudent business judgment").

39.    Accordingly, the DIP Facility reflects an exercise of sound business judgment that should be approved. *See ION Media*, 2009 WL 2902568, at *4 ("[C]ooperation and establishing

18

alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.").

## D.    The Scope of the Carve-Out is Appropriate

40.    The proposed DIP Facility subjects the security interests and administrative expense claims of the DIP Lender to the Carve-Out.  Such carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can obtain appropriate assistance from counsel and other professionals. *See, e.g.*, *Ames*, 115 B.R. at 40; *In re United Retail*, Case No. 12-10405 (Bankr. S.D.N.Y. Feb. 1, 2012); *In re Eastman Kodak Co*., Case No. 12-10202 (Bankr. S.D.N.Y. Jan. 19, 2012); *In re Gen. Maritime Corp*., Case No. 11-15285 (Bankr. S.D.N.Y. Nov. 17, 2011).  The Carve-Out protects against administrative insolvency during the course of these Cases by ensuring assets remain for the payment of U.S. Trustee fees and professional fees notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

## E.    The DIP Lender Should Be Deemed a Good Faith Lender Under Section 364(e)

41.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its rights in any lien or security interest securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides as follows:

> The reversal or modification on appeal of an authorization under this Section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this Section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

42.     As explained in detail herein, the DIP Facility is the result of the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's length, good faith negotiations between and among the Debtors and the DIP Lender.  The terms and conditions of the DIP Facility are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Facility other than as described herein.  Accordingly, the Court should find the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded thereby.

**F.      Request for Modification of the Automatic Stay**

43.     Bankruptcy Code section 362 provides for an automatic stay upon the filing of a bankruptcy petition.  The proposed Interim Order contemplates the modification of the automatic stay (to the extent applicable) to the extent necessary to implement the terms of the Interim Order.  Stay modification provisions of this sort are ordinary and usual features of DIP Facility facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Debtors respectfully request the Court to authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order and DIP Credit Agreement.

**Request for Final Hearing**

44.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request the Court set a date for the Final Hearing as soon as practicable and fix the date and time prior to the Final Hearing for parties to file objections to the relief requested by this Motion.

57731/0003-15866800v1

## Waiver of Bankruptcy Rules 6004(a) and (h)

45.      An efficient and expeditious approval and implementation of the DIP Facility is in the best interest of the Debtors and their creditors and other parties in interest.  Accordingly, the Debtors request waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of orders authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

46.      No trustee, examiner, or statutory committee of unsecured creditors has been appointed in these chapter 11 cases.  Notice of this Motion will be provided to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel for the DIP Lender; (iii) the parties included on the Debtors' consolidated list of the thirty (30) largest unsecured creditors; (iv) the Internal Revenue Service; and (v) the United States Attorney for the District of Delaware.  The Debtors submit that no other or further notice is necessary or required to grant the relief requested in the Motion.

## No Prior Request

47.      No prior motion for the relief requested herein has been made to this or any other court.

## Conclusion

WHEREFORE, the Debtors respectfully request that the Court (i) enter an Order substantially in the form of the proposed DIP Order accompanying this Motion, and (ii) grant the Debtors such other and further relief as is just and proper.

57731/0003-15866800v1

Dated: May 15, 2018

COLE SCHOTZ P.C.

*/s/ G. David Dean*
G. David Dean (No. 6403)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean@coleschotz.com
preilley@coleschotz.com


- and -

Irving E. Walker
300 E. Lombard Street, Suite 1450
Baltimore, MD  21202
Telephone: (410) 230-0660
Facsimile:  (410) 528-9400
iwalker@coleschotz.com

*Proposed Counsel for Debtors*
*and Debtors in Possession*

22