**<u>Exhibit A</u>**

**Interim DIP Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>VIDEOLOGY, INC., *et al.*,[1]<br><br>        Debtors. | Chapter 11<br><br>Case No. 18-11120 (BLS)<br><br>Jointly Administered<br><br>**Related to Docket No.** \_\_\_\_ |

### INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) MODIFYING THE AUTOMATIC STAY; (IV) AUTHORIZING THE DEBTORS TO ENTER INTO AGREEMENTS WITH DRAPER LENDING, LLC; (V) AUTHORIZING USE OF CASH COLLATERAL; (VI) SCHEDULING A FINAL HEARING AND (VIII) GRANTING RELATED RELIEF

THIS MATTER having come before the Court upon the motion (the "**Motion**")[2] of the above-captioned debtors (the "**Debtors**" or the "**Borrowers**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code, (11 U.S.C. §§ 101 *et seq.*, as amended, the "**Bankruptcy Code**"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rules 2002-1 and 4001-2, seeking entry of an interim order (the "**Interim Order**") and a final order (the "**Final Order**") granting *inter alia*:

  i.   authority, pursuant to sections 105, 363, and 364(c) of the Bankruptcy Code, for each of the Debtors, jointly and severally, to obtain senior secured pospetition financing ("**DIP Facility**") in an aggregate principal amount of up to $25 million (the "**Delayed Draw**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Videology, Inc. (2191), Collider Media, Inc. (8602), Videology Media Technologies, LLC (6243), LucidMedia Networks, Inc. (8566), and Videology, Ltd., a company organized under the laws of England and Wales.  The address of the Debtors' corporate headquarters is 1500 Whetstone Way, Suite 500, Baltimore, MD 21230.

[2] Unless stated otherwise, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Credit Agreement (as defined below), as applicable.

**Commitment**") (of which (x) $20 million (the "**Interim Advance**") shall be made available to the Debtors upon entry of this Interim Order upon satisfaction or waiver of the borrowing conditions set forth in the DIP Loan Documents (as defined below) and may be drawn in a single draw on the Closing Date and (y) subject to entry of the Final Order, the balance shall be made available to the Debtors at intervals and in amounts that correspond to the Approved Budget (as defined below));

ii.        authority (a) for the Debtors to enter into that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement, among the Debtors as Borrowers and Draper Lending, LLC (the "**DIP Lender**") in substantially the same form as attached hereto as **Exhibit 1** (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**DIP Credit Agreement**" and, together with any ancillary, collateral or related documents and agreements, the "**DIP Loan Documents**" );

iii.        authority for the Debtors to use the DIP Facility and the proceeds thereof in accordance with the Initial Approved Budget attached hereto as **Exhibit 2** to (a) fund the post-petition working capital needs of the Debtors during the pendency of the Chapter 11 Cases, (b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in the DIP Loan Documents, (c) pay all Outstanding Prepetition Obligations (defined below) and (d) pay the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the Approved Budget this Interim Order and the Final Order;

iv.        authority for the Debtors to grant to the DIP Lender valid, enforceable, non-avoidable, automatically and fully perfected security interests, liens and superpriority claims, including allowed superpriority administrative expense claims pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out and liens pursuant to sections

2

364(c)(2) and 364(c)(3) of the Bankruptcy Code in the DIP Collateral (as defined below) (and all proceeds thereof), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, ("**Cash Collateral**"), to secure all DIP Obligations (as defined below), as more fully set forth in this Interim Order, subject only to the Carve-Out (as defined below);

v.      subject to and only effective upon entry of the Final Order, waiver by the Debtors of all rights to surcharge against the collateral of the DIP Lender pursuant to section 506(c) of the Bankruptcy Code;

vi.      subject to and only effective upon entry of the Final Order, waiver of the equitable doctrine of marshaling or any other similar doctrine with respect to any collateral of the DIP Lender.

vii.      modification of the automatic stay to the extent hereinafter set forth and waiving the 14-day stay provisions of Bankruptcy Rules 4001(a)(3) and 6004(h);

viii.      the scheduling of a final hearing (the "**Final Hearing**") on the Motion for June__, 2018 to consider entry of the Final Order *inter alia,* authorizing borrowings under the DIP Facility on a final basis and approving notice procedures with respect thereto; and

ix.      related relief.

The Court having considered the Motion and the exhibits attached thereto, the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on May 23, 2018 (the "**Interim Hearing**") and having found that due and proper notice (the "**Notice**") of the Motion and the Interim Hearing having been served by the Debtors in accordance with Bankruptcy Rule 4001 and 9006 and Local Rule 2002-1; and it appearing that no other or further notice need be provided; and the Interim Hearing to consider the interim relief requested in the

3

Motion having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested is necessary to avoid potential immediate and irreparable harm to the Debtors and their estates and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses and represents a sound exercise of the Debtors' business judgment; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW BASED UPON THE MOTION, THE REPRESENTATIONS OF COUNSEL AND EVIDENCE SUBMITTED DURING THE INTERIM HEARING**:[3]

A.    *Petition Date*.    On May 10, 2018 (the "**Petition Date**"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Court**") commencing these Chapter 11 Cases.

B.    *Debtors in Possession*.    The Debtors are continuing in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

C.    *Notice*.    Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors in compliance with Bankruptcy Rule 4001(c), whether by facsimile, email, overnight courier, or hand delivery, to certain parties in interest, including:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the Securities and

---

[3]    To the extent, any findings of fact constitute conclusions of law, they are adopted as such, and vice versa, pursuant to Fed. R. Bankr. P. 7052.

Exchange Commission; (iii) the Internal Revenue Service; (iv) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (v) counsel to the Prepetition Secured Parties; (vi) counsel to the proposed DIP Lender, Arent Fox LLP, 1675 Broadway, New York, New York 10019 (Attn: Robert M. Hirsh, Esq. and Jordana L. Renert, Esq.) and Bayard LLP, 600 N. King Street, Suite 400, Wilmington DE 19801 (Attn: Justin R. Alberto, Esq.); and (vii) any party that has requested notice pursuant to Bankruptcy Rule 2002; and it appearing that no other or further notice need be provided and that the provisions of Del. Bankr. L. R. 9013-1(m) are inapplicable.

D.    _Jurisdiction and Venue_.  This Court has core jurisdiction over the persons and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

E.    _No Credit Available on More Favorable Terms_.  The Debtors are unable to procure financing in the form of unsecured credit allowable as an administrative expense under §§ 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code and have been unable to procure the necessary financing on terms more favorable, taken as a whole, than the financing offered by DIP Lender pursuant to the DIP Loan Documents.

F.    _Best Interests of Estates_.  It is in the best interest of the Debtors' estates and creditors that the Debtors be allowed to enter into the DIP Facility to obtain postpetition secured financing from the DIP Lender under the terms and conditions set forth herein and in the DIP Loan Documents, as such financing is necessary to avoid immediate and irreparable harm to the Debtors' estates and for the continued operation of the Debtors' businesses.

G.      _Good Faith_.  The extension of credit and financial accommodations under the DIP Loan Documents are fair, reasonable, in good faith, negotiated at arm's length, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.   Accordingly, the DIP Lender is entitled to the protections of Bankruptcy Code section 364(e).

H.      _Good Cause_. The relief requested in the Motion is necessary and appropriate, and is in the best interest of and will benefit the Debtors, their creditors and their estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' businesses and ongoing operations, (2) preserve and maximize the value of the Debtors' estates for the benefit of all the Debtors' creditors, and (3) avoid potential immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.

I.      _Necessity of DIP Facility Terms_.  The terms of the DIP Loan Documents and the Interim Order assuring that the liens and the various claims, superpriority claims, and other protections granted in the Interim Order will not be affected by any subsequent reversal or modification of the Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the postpetition financing arrangement contemplated in the DIP Loan Documents, are necessary in order to induce the DIP Lender to provide postpetition financing to the Debtors.

J.      _Need for Post-Petition Financing_.  The Debtors do not have sufficient and reliable sources of working capital, including cash collateral, to continue to operate their businesses in the ordinary course of business without the financing requested in the Motion.  The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay

6

their employees, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of their estates for the benefit of all creditors of the Debtors through a sale as a going concern.  The ability of the Debtors to obtain sufficient and stable working capital and liquidity through the proposed post-petition financing arrangements with the DIP Lender as set forth in the Interim Order and the DIP Loan Documents is vital to the preservation and maintenance of the going concern value of each Debtor.  Accordingly, the Debtors have an immediate need to obtain the postpetition financing in order to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' bankruptcy estates in order to maximize the recovery to all creditors of the estates.

K.    _Need to Use Cash Collateral_.  The Debtors need to use Cash Collateral (subject to the Approved Budget), in order to, among other things, preserve, maintain and maximize the value of their assets and businesses.  The ability of the Debtors to maintain liquidity through the use of Cash Collateral is vital to the Debtors and their efforts to maximize the value of their assets.  Accordingly, the Debtors have demonstrated good and sufficient cause for the relief granted herein.

L.    _Sections 506(c) and 552(b)_.  As material inducement to the DIP Lender to agree to provide the DIP Facility, and in exchange for the DIP Lender's agreement to subordinate their superpriority claims to the Carve-Out, a waiver of any equities of the case exceptions under section 552(b) of the Bankruptcy Code and a waiver of the provisions of section 506(c) of the Bankruptcy Code.

M.    _Pre-Petition Debt_.    The Debtors were, prior to the Petition Date, party to the following agreements, with the following parties:

(a)    "**U.S. Prepetition Loan Facility**"

a.    Loan and Security Agreement, dated as of July 10, 2017, among the Debtors (other than Videology UK) (the "**Prepetition Borrowers**"), those financial institutions party thereto from time to time as lenders (the "**U.S. Prepetition Lenders**"), Fast Pay Partners LLC ("**FastPay**" or the "**U.S. Prepetition Agent**"), as agent for the U.S. Lenders, and Tennenbaum Capital Partners, LLC ("**TCP**"), as documentation agent for the U.S. Prepetition Lenders and as the Investment Manager for the U.S. Prepetition Lenders (other than FastPay);

b.    Continuing Guaranty, dated as of July 10, 2017, executed by Videology UK in favor of the U.S. Agent;

c.    Pledge Agreement, dated as of July 10, 2017, by and between Videology and the U.S. Prepetition Agent;

d.    Pledge Agreement, dated as of July 10, 2017, by and between Videology UK and the U.S. Prepetition Agent;

e.    Amendment No. 1 to Loan and Security Agreements, dated as of January 12, 2018, by and among, FastPay, as U.S. Agent and U.S. Lender, FPP Sandbox LLC ("FPP" or the "U.K. Prepetition Agent"), as U.K. Prepetition Agent and U.K. Prepetition Lender (as defined below), TCP, as U.S. Documentation Agent and U.K. Documentation Agent, various affiliates of TCP, as U.S. Prepetition Lenders and U.K. Prepetition Lenders, and the Prepetition Borrowers ("**Amendment No. 1 to Loan and Security Agreements**");

f.    Amendment No. 2 to Loan and Security Agreements, dated as of January 31, 2018, by and among, FastPay, as U.S. Prepetition Agent and U.S. Lender, FPP, as U.K. Prepetition Agent and U.K. Prepetition Lender, TCP, as U.S. Documentation Agent and U.K. Documentation Agent, various affiliates of TCP, as U.S. Prepetition Lenders and U.K. Prepetition Lenders, and the Prepetition Borrowers ("**Amendment No. 2 to Loan and Security Agreements**"); and

g.    Amendment No. 3 to Loan and Security Agreements, dated as of January 12, 2018, by and among, FastPay, as U.S. Prepetition Agent and U.S. Prepetition Lender, FPP, as U.K. Prepetition Agent

and U.K. Prepetition Lender, TCP, as U.S. Documentation Agent and U.K. Documentation Agent, various affiliates of TCP, as U.S. Prepetition Lenders and U.K. Lenders, and the Prepetition Borrowers ("**Amendment No. 3 to Loan and Security Agreements**").

(b)    "**U.K. Prepetition Loan Facility**"

    a.    Loan and Security Agreement, dated as of July 10, 2017, among the Prepetition Borrowers, the financial institutions party thereto from time to time as lenders (the "**U.K. Prepetition Lenders**"), the U.K. Prepetition Agent, and TCP, as documentation agent for the U.K. Prepetition Lenders and as the Investment Manager for the U.K. Prepetition Lenders (other than FPP);

    b.    Continuing Guaranty, dated as of July 10, 2017, executed by Videology UK in favor of the U.K. Prepetition Agent;

    c.    Pledge Agreement, dated as of July 10, 2017, by and between Videology and the U.K. Prepetition Agent;

    d.    Pledge Agreement, dated as of July 10, 2017, by and between Videology UK and the U.K. Prepetition Agent

    e.    Amendment No. 1 to Loan and Security Agreements;

    f.    Amendment No. 2 to Loan and Security Agreements; and

    g.    Amendment No. 3 to Loan and Security Agreements.

(c)    "**EMEA PRepetition Factored Facility**"

    a.    Financing Agreement, made and entered into as of July 28, 2017, by and between Videology UK, as Seller, and FastPay Roundabout ("**FPR**" or the "**FastPay Factor**"), as Purchaser; and

    b.    Debenture, dated July 28, 2018, between Videology UK and the FastPay Factor.

(d)    "**Prepetition Secured Loan Facilities**"

    a.    U.S. Prepetition Loan Facility;

    b.    U.K. Prepetition Loan Facility; and

    c.    EMEA Prepetition Factored Facility.

      (e)      "**Prepetition Secured Parties**"

          a.      U.S. Prepetition Lenders;

          b.      U.S. Prepetition Agent;

          c.      U.K. Prepetition Lenders (and together with the "U.S. Prepetition Lenders", the "**Prepetition Lenders**");

          d.      U.K. Agent (and together with the "U.S. Prepetition Agent", the "**Prepetition Agents**"); and

          e.      FastPay Factor.

N.    <u>Immediate Entry</u>.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.    <u>DIP Facility Approval</u>.  The DIP Facility is hereby approved.  Any objections to the interim relief requested in the Motion that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.  The Debtors are authorized, pursuant to section 363 of the Bankruptcy Code, to enter into and be a party to the DIP Facility pursuant to the DIP Loan Documents (with such changes, if any, as were authorized to be made as amendments to the DIP Loan Documents in accordance with this Interim Order), to perform under the DIP Loan Documents and such other and additional documents necessary or desired to implement the DIP Facility or the DIP Loan Documents, and to obtain postpetition secured financing from the DIP Lender, to avoid immediate and irreparable harm to the Debtors' estates.

2.    <u>DIP Obligations</u>.  The DIP Loan Documents shall constitute and evidence the valid and binding effect of the Debtors' obligations under the DIP Facility, which DIP

10

Obligations shall be legal, valid, and binding obligations of the Debtors party thereto and enforceable against the Debtors, their estates, any successors thereto, including, without limitation, any trustee appointed in any of the Debtors' cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any such cases, or in any other proceedings superseding or related to any of the foregoing, any successors thereto, and any party determined to be the beneficial owner of the DIP Collateral by this Court. The Debtors and their successors shall be jointly and severally liable for repayment of any funds advanced pursuant to the DIP Loan Documents, together with interest thereon, at the times and in the amounts set forth in the DIP Loan Documents and all Obligations as defined and provided for in the DIP Credit Agreement (collectively, the "**DIP Obligations**"). No obligation, payment, transfer or grant of security under the DIP Loan Documents or the Interim Order, with respect to the DIP Facility shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

3.    <u>Authorization to Borrow</u>. Upon entry of this Interim Order and during the period prior to entry of the Final Order, the Debtors are immediately authorized to borrow from the DIP Lender under the DIP Facility, the Interim Advance of up to $20 million, subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order and in accordance with the Approved Budget. Subject to the terms and conditions of this Interim Order and the DIP Loan Documents and in accordance with the Approved Budget, the Debtors are authorized to use Cash Collateral until the earlier of (a) the Maturity Date and (b) the date upon which the Debtors' right to use Cash Collateral is terminated hereunder as a result of an Event of Default

(as defined in the DIP Credit Agreement).  Once repaid, the DIP Facility Loans incurred may not be re-borrowed.

4.      Use of Proceeds.  The Debtors shall use advances of credit under the DIP Facility (the "**DIP Facility Loans**") only for the express purposes specifically set forth in this Interim Order, the DIP Loan Documents and in compliance with the Approved Budget subject to the permitted variances set forth in the DIP Loan Documents.  The Debtors are authorized to use the proceeds of the DIP Facility Loans to (a) fund the post-petition working capital needs of the Debtors during the pendency of the Chapter 11 Cases, (b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in the DIP Loan Documents, (c) pay all Outstanding Prepetition Secured Obligations (defined below), and (d) pay the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the Approved Budget and this Interim Order.  Notwithstanding anything herein, the extensions of credit under the DIP Facility shall not constitute cash collateral of the Prepetition Secured Parties.

5.      Repayment of Outstanding Prepetition Secured Loan Obligations.  Upon entry of this Interim Order, the Debtors shall use the proceeds of the DIP Facility to pay all outstanding obligations now due and payable under the Prepetition Secured Loan Facilities in full (the "Outstanding Prepetition Secured Obligations"), in accordance with the terms, conditions, and procedures set forth in the DIP Financing Agreement.

6.      Budget and Reporting.  Except as otherwise provided herein or approved by the DIP Lender, the proceeds from the DIP Facility shall be used only in compliance with the terms of the DIP Loan Documents.

57731/0003-15866827v1

(a) <u>Initial Approved Budget</u>.  Attached as **<u>Exhibit 2</u>** is the Initial Approved Budget containing a cash forecast for the period from the Petition Date through the Maturity Date setting forth projected cash flows and disbursements, in form, scope and substance acceptable to the DIP Lender.  Upon entry of this Interim Order and approval by the DIP Lender, the Initial Approved Budget shall be deemed an "**<u>Approved Budget</u>**."

(b) <u>Updated Budget</u>. No later than the date that is the two-week anniversary of the Closing Date, the Debtors shall prepare for the DIP Lender's review and consent an updated detailed rolling cash projection covering the period through the Maturity Date, which shall be updated weekly as necessary but shall not be updated less than once every two weeks (each, a "**<u>Proposed Budget</u>**").  Upon the Debtors' receipt of the DIP Lender's consent to a Proposed Budget, such budget shall become an Approved Budget and shall replace the then operative Approved Budget for all purposes.  The Initial Approved Budget shall be the Approved Budget until such time as a new Proposed Budget is approved, following which such Proposed Budget shall constitute the Approved Budget until a subsequent Proposed Budget is approved.  The Debtors shall operate in accordance with the Approved Budget and all disbursements shall be consistent with the provisions of the Approved Budget (subject to the Permitted Variance).  The Debtors may submit additional Proposed Budgets to the DIP Lender, but until the DIP Lender consents to such Proposed Budget, no Proposed Budget shall become an Approved Budget and the Debtors shall continue to comply with the then operative Approved Budget (subject to the Permitted Variance).

13

(c) <u>Variance Reporting</u>.  No later than 4:00 p.m. Pacific time on Friday of each week (commencing with the Friday falling during the first full calendar week after the Closing Date), the Debtors shall provide to the DIP Lender a report detailing the actual disbursements and receipts by the Debtors for the preceding week versus the line items contained in the Approved Budget for such period, as well as an explanation of any material variances for each line item (a "**<u>Variance Report</u>**").

(d) <u>Permitted Variance and Performance Covenants</u>.  For any four-week rolling period, tested on a cumulative basis, as opposed to a line-by-line basis, the Debtors' actual total disbursements including disbursements with respect to estate professional and advisor fees on a weekly basis shall not exceed the budgeted total disbursements in the Approved Budget by more than 10%. The foregoing permitted variance from the Approved Budget is referred to herein as the "**<u>Permitted Variance</u>**". The Debtors shall comply with the Permitted Variances and Performance Covenants as set forth in the DIP Credit Agreement.  The Debtors shall comply with the Approved Budget, subject to the Permitted Variances, and all budget requirements set forth herein and in the DIP Loan Documents.  Notwithstanding any provision to the contrary in this Section 6, the Debtors' failure to adhere to the Approved Budget or future Proposed Budgets shall not be an Event of Default under the DIP Credit Agreement or this Order unless and until the termination of the Purchase Agreement (as defined in the DIP Credit Agreement).

7.    <u>Payment of DIP Fees and Expenses</u>.  The (a) Commitment Fee; (b) the Funding Fee; (c) Work Fee, which shall serve as a retainer for the DIP Lender's counsel; (d) the Stated

Maturity Fee, and (e) the Exit Fee are each hereby approved and the Debtors are hereby authorized and directed to and shall pay such fees in accordance with, and on the terms set forth in this Interim Order and the DIP Loan Documents.  The Debtors are also hereby authorized and directed to pay upon demand, all other fees, costs, expenses and other amounts payable under the terms of this Interim Order and the DIP Loan Documents and all other reasonable fees and out-of-pocket costs and expenses of the DIP Lender in accordance with the terms of this Interim Order and the DIP Loan Documents (including, without limitation, the reasonable and documented postpetition fees and out-of-pocket costs and expenses of Arent Fox LLP as counsel and Bayard LLP as local counsel to the DIP Lender to the extent not covered by the portion of the Work Fee paid prior to the Petition Date), subject to receiving a written invoice therefor. None of such fees, costs, expenses or other amounts shall be subject to Court approval except as otherwise provided herein or required to be submitted in any particular format, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided, however, that copies of any such invoices shall be provided contemporaneously to the U.S. Trustee and the official committee of unsecured creditors (if appointed); provided further, however, that such invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information (the "**Redactions**"), and the provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine.  If the U.S. Trustee objects to the reasonableness of the fees and expenses of the DIP Lender, and such objection cannot be resolved within ten (10) days of receipt of such invoices, the U.S. Trustee shall file with the Court and serve on the DIP Lender, an objection limited to the reasonableness of such fees and

57731/0003-15866827v1

expenses (each, a "**Reasonableness Fee Objection**").  Without limiting the foregoing, if the U.S. Trustee objects to the Redactions and such objection cannot be resolved within ten (10) days of receipt of such invoices, the DIP Lender shall file with the Court and serve on the Debtors and the U.S. Trustee a request for Court resolution of the disputes concerning the propriety of the disputed Redactions (each, a "**Redaction Fee Objection**," and each Reasonableness Fee Objection and Redaction Fee Objection may be referred to herein generally as a "**Fee Objection**").  The Debtors shall pay, in accordance with the terms and conditions of this Interim Order and the Final Order, within ten (10) days after receipt of the applicable invoice (a) the full amount invoiced if no Fee Objection has been timely filed, and (b) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed.  All such unpaid fees, costs, expenses and other amounts owed or payable to the DIP Lender shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations  under this Interim Order, and the DIP Loan Documents.

8.      <u>Indemnification</u>.   The Debtors are hereby authorized to and hereby agree to indemnify and hold harmless the DIP Lender and its affiliates, directors, officers, employees, agents, attorneys, or any other Person affiliated with or representing the DIP Lender (collectively, an "**Indemnified Party**") from and against: (a) all obligations, demands, claims, damages, losses and liabilities (including, without limitation, reasonable fees and disbursements of counsel) (collectively, "**Indemnity Claims**") as set forth in the DIP Loan Documents including those asserted by any other party in connection with the transactions contemplated by the DIP Loan Documents; and (b) all losses or expenses incurred, or paid by the DIP Lender from, following, or arising from the transactions contemplated by the DIP Loan Documents (including reasonable and documented attorneys' fees and expenses), except for Indemnity

16

Claims and/or losses directly caused by the DIP Lender's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Debtors or any of their respective directors, security holders or creditors, an Indemnified Party or any other Person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Loan Party or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is determined by a court of competent jurisdiction in a final non-appealable judgment or order to have resulted solely from such Indemnified Party's gross negligence or willful misconduct. All indemnities of the Indemnified Parties shall constitute DIP Obligations secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order, the Final Order and the DIP Loan Documents.

9.      <u>Use of Cash Collateral</u>.  The Debtors are authorized to use Cash Collateral in accordance with and pursuant to this Interim Order, the DIP Loan Documents and the Approved Budget.  Prior to the Maturity Date and until indefeasible payment in full of the DIP Obligations, the Debtors agree that they will not use or seek to use Cash Collateral other than pursuant to the terms of this Interim Order.

10.      <u>DIP Superpriority Claims</u>.  In accordance with section 364(c)(1) of the Bankruptcy Code, the DIP Obligations shall constitute allowed senior administrative expense claims against each Debtor and their estates (the "**<u>DIP Superpriority Claims</u>**") with priority in

payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the DIP Superpriority Claims shall be subject to and subordinate to only the Carve-Out; provided, further that the DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property and assets of the Debtors and their estates, all DIP Collateral and all proceeds thereof, including for the avoidance of doubt, (i) any deposit in connection with a proposed Sale (whether terminated or otherwise) that becomes property of the Debtors' estates (a "**Sale Deposit**") subject, however, only to the senior lien rights of the stalking horse purchaser under the Purchase Agreement and such stalking horse bid protections as may be approved by this Court, (ii) claims against the Debtors' directors and officers (if any) and (iii) subject to and only effective upon entry of the Final Order, any and all avoidance power claims or causes of action under sections 544, 545, 547, 548 through 551 and 553(b) of the Bankruptcy Code (the "**Avoidance Actions**").

      11.    DIP Liens.

      (a)    Effective immediately as of the entry of this Interim Order, as security for the DIP Obligations, the DIP Lender is granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (collectively, the "**DIP Liens**") on all DIP Collateral as collateral security for the prompt and complete

performance and payment when due (whether at the Stated Maturity Date (i.e. September 30, 2018), by acceleration, or otherwise) of the DIP Obligations.  The term "**DIP Collateral**" means collectively, all of the pre- and post-petition assets and property of the Debtors, including (x) 65% of the voting stock of (i) Videology Ltd. and (ii) any other Subsidiary formed or acquired by a U.S. Loan Party organized after the date hereof and organized in a jurisdiction other than the District of Columbia or a state, commonwealth or territory of the United States of America, and (y) all other tangible and intangible personal property of each Debtor (including, for the avoidance of doubt, Videology Ltd.), wherever located and whether now owned or hereafter acquired, including but not limited to all accounts, contracts rights, chattel paper, cash, general intangibles, investment property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments and commercial tort claims, together with all proceeds thereof, including insurance proceeds (as each such term above is defined in the UCC).

        (b)     To the fullest extent permitted by the Bankruptcy Code or applicable law, and except as otherwise set forth herein, any provision of any lease other than a real property lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or the payment of any fees or obligations to any entity in order for any of the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, shall have no force or effect with respect to the DIP Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Lender in accordance with the terms of the DIP Loan Documents, or this Interim Order.

12.    <u>Priority of DIP Liens</u>.

(a)    To secure the DIP Obligations, immediately upon and effective as of entry of this Interim Order, the DIP Lender, is hereby granted on a final basis, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected first priority DIP Liens pursuant to section 364(c)(2) of the Bankruptcy Code,

(b)    Except as expressly set forth herein, the DIP Liens and the DIP Superpriority Claims: (i) shall not be made junior to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any successor cases and/or upon the dismissal of any of the Chapter 11 Cases or any successor cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (C) any intercompany or affiliate lien or claim; and (D) subject to entry of the Final Order, any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors and (ii) shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code.

13.    <u>Carve-Out</u>.

(a)    *Carve-Out*.  As used in this Interim Order, the term "**<u>Carve-Out</u>**" means, collectively, the sum of:  (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. §1930(a) and section 3717 of title 31 of the United States Code; (ii) the reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; and (iii) the aggregate amount of unpaid fees and expenses of the Debtors'

20

and any official committee of unsecured creditors' professionals, in each case retained by final order of the Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under sections 327(a), 328 or 1103(a) of the Bankruptcy Code (the "**Case Professionals**"), to the extent such fees and expenses are allowed and payable pursuant to an order of the Court (which order has not been reversed, vacated or stayed) ("**Allowed Professional Fees**"), and the reimbursement of out-of-pocket expenses allowed by the Court and incurred by the members of the Committee in the performance of their duties (but excluding fees and expenses of third party professionals employed by such members) ("**Committee Expenses**"), which amount under this clause (iii) shall not exceed the sum of: (x) an aggregate amount per week limited to the amount set forth in the Approved Budget for such week for Allowed Professional Fees and Committee Expenses incurred prior to the delivery of a Carve-Out Trigger Notice, *plus* (y) $150,000 for Allowed Professional Fees and Committee Expenses (the "**Post Carve-Out Notice Trigger Cap**") incurred from and after the delivery of the Carve-Out Trigger Notice (as defined below), *less* the outstanding amount of retainers received by Professionals prior to the Petition Date.  No portion of the Carve-Out or any Cash Collateral may be used in violation of this Interim Order.  Nothing in this Interim Order or otherwise shall be construed to increase the Carve-Out if actual (i) Allowed Professional Fees of any Case Professional or (ii) Committee Expenses are higher in fact than the fees and disbursements reflected in the Approved Budget.

(b)      *Carve-Out Trigger Notice*.  As used herein, the term "**Carve-Out Trigger Notice**" means a written notice provided by the DIP Lender to the Debtors, counsel to any official committee of unsecured creditors, and the U.S. Trustee that the Post Carve-Out Trigger Notice Cap is invoked, which notice may be delivered following the occurrence and during the

21

continuance of an Event of Default and/or acceleration of the DIP Obligations under the DIP Loan Documents.  Upon delivery of the Carve-Out Trigger Notice to the Debtors (the "**Termination Declaration Date**"), the Debtors shall provide notice by email and facsimile to all Case Professionals, at the email addresses and facsimile numbers set forth in each Professional's notice of appearance filed with the Bankruptcy Court (or, if there is no such notice of appearance, at such Professional's last known email address and facsimile number) within one (1) day after the Debtors' receipt of a Carve-Out Trigger Notice informing them that such Carve-Out Trigger Notice has been received and further advising them that the Debtors' ability to pay such Case Professionals is subject to and limited by the Post Carve-Out Notice Trigger Cap.

(c)     *Payment of Allowed Professional Fees Prior to Termination Declaration Date.*  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)     *Payment of Carve-Out on or After the Termination Declaration Date*. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  Any funding of the Carve-Out shall be added to, and made a part of the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code and applicable law.

(e)     *Objection Rights*.  Nothing contained herein is intended to constitute, nor shall be construed as consent to the allowed of any Case Professional's fees, costs and expenses by any party and shall not affect the rights of the Debtors, the DIP Lender or any other party in interest to object to the allowance and/or payment of any such amounts incurred or requested.

14.     <u>Bankruptcy Code Sections 506(c) and 552(b) Waivers</u>.  Subject to entry of a Final Order, without limiting the Carve-Out, the Debtors irrevocably waive and shall be prohibited from asserting (i) any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender upon the DIP Collateral and no costs or expenses of administration that have been or may be incurred in any of the Chapter 11 Cases at any time shall be charged against the DIP Lender or its claims or liens (including any claims or liens granted pursuant to this Interim Order), and (ii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code in connection with the DIP Facility.

15.     <u>Application of Proceeds</u>.  In no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral, and all proceeds thereof shall be received and used in accordance with this Interim Order.

16.     <u>Disposition of Collateral; Application of Proceeds</u>.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, other than in the ordinary course of business or in connection with the payments contemplated under this Interim Order without the prior written consent of the DIP Lender (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lender or from any order of this Court).  Notwithstanding anything otherwise provided in this Interim Order, other than the DIP Liens, no liens or security interests existing as of the Petition Date shall attach to any Sale Deposit received by the Debtors in connection with a proposed or failed Sale of the Debtors' assets.  Notwithstanding anything otherwise provided herein, in the event any Sale is terminated and such Sale Deposit becomes property of the Debtors' estates (and is permitted to be retained

23

by the Debtors) in accordance with the stalking horse agreement or similar sale agreement or any order of this Court governing the bidding procedures and sale process, such Sale Deposit shall be remitted directly to the DIP Lender, subject, however, only to the senior lien rights of the stalking horse purchaser under the Purchase Agreement and such stalking horse bid protections as may be approved by this Court.  Notwithstanding anything otherwise provided herein, 100% of any net cash proceeds of any sale of DIP Collateral outside of the ordinary course of business shall, subject to the satisfaction of the Carve-Out, be used to immediately satisfy the DIP Obligations.

17.    <u>Restrictions on Granting Postpetition Liens</u>.   Other than the Carve-Out or as otherwise provided in this Interim Order, the Final Order or the DIP Loan Documents, no claim or lien having a priority superior or *pari passu* with those granted by this Interim Order and the DIP Loan Documents to the DIP Lender shall be granted or permitted by any order of this Court heretofore or hereafter entered in the Chapter 11 Cases, and the Debtors will not grant any such mortgages, security interests or liens in the DIP Collateral (or any portion thereof) or to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise, while (i) any portion of the DIP Facility, any DIP Facility Loans or any other DIP Obligations, are outstanding or (ii) the DIP Lender has any Commitment under the DIP Loan Documents.

18.    <u>Automatic Effectiveness of Liens</u>.   The DIP Liens shall not be subject to a challenge and shall attach and become valid, perfected, binding, enforceable, non-avoidable and effective by operation of law as of the date of the entry of this Interim Order on a final basis, without any further action by the Debtors and the DIP Lender, respectively, and without the necessity of execution by the Debtors or the filing or recordation, of any financing statements, security agreements, deposit control agreements, vehicle lien applications, mortgages, filings

with a governmental unit (including, without limitation, the U.S. Patent and Trademark Office or the Library of Congress), or other documents or the taking of any other actions.  All DIP Collateral shall be free and clear of other liens, claims and encumbrances, except as provided in the DIP Loan Documents, and this Interim Order.  If the DIP Lender hereafter requests that the Debtors execute and deliver to the DIP Lender, financing statements, security agreements, pledge agreements, control agreements, collateral assignments, mortgages, or other instruments and documents considered by the DIP Lender to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens the Debtors are hereby authorized and directed to execute and deliver such financing statements, security agreements, pledge agreements, control agreements, mortgages, collateral assignments, instruments, and documents, and the DIP Lender is hereby authorized to file or record such documents in its discretion without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of the entry of this Interim Order; provided, however, no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens.  The DIP Lender, in its sole discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to, or in lieu of, such financing statements, notices of liens or similar statements.[4]

19.    Protection Under Section 364(e) of the Bankruptcy Code.  The DIP Lender has acted in good faith in connection with this Interim Order and its reliance on this Interim Order is in good faith.  The reversal or modification on appeal of the authorizations under section 364 of the Bankruptcy Code contained in this Interim Order does not affect the validity of any DIP

---

[4] The provisions of Bankruptcy Code § 1146(a) do not apply herein.

Obligation or the DIP Liens, whether or not the DIP Lender knew of the pendency of the appeal, unless such authorization and incurrence of DIP Obligations and DIP Lien and advance of the DIP Facility Loan under 364 of the Bankruptcy Code in this Interim Order and the Final Order, were stayed pending appeal.

20. <u>Reservation of Rights of the DIP Lender</u>.  Notwithstanding any other provision of this Interim Order to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of the DIP Lender under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of such parties to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of these Chapter 11 Cases, conversion of any of these Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of these Chapter 11 Cases, (iii) seek to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal or equitable or otherwise) of the DIP Lender.  The delay in or failure of the DIP Lender to seek relief or otherwise exercise their respective rights and remedies shall not constitute a waiver of any of the DIP Lender's rights and remedies.

21. <u>Right to Credit Bid</u>.

(a) *DIP Lender.*  Pursuant to section 363(k) of the Bankruptcy Code, unless the Court orders otherwise for cause as provided under section 363(k) of the Bankruptcy Code, the DIP Lender shall have the right to credit bid the total of the DIP Obligations for any or all of the DIP Collateral at a sale, lease or other disposition of such DIP Collateral outside the ordinary course of business (including any auction or similar sales), whether pursuant to a plan of

57731/0003-15866827v1

reorganization or a motion pursuant to section 363 of the Bankruptcy Code or otherwise (which credit bid rights under section 363(k) or otherwise shall not be impaired in any manner).

(b)    A credit bid may be applied only to reduce the cash consideration with respect to those assets in which the party submitting such credit bid holds a perfected security interest.  The DIP Lender shall be considered a "Qualified Bidder" with respect to their rights to acquire all or any of the assets by credit bid.

22.    Remedies and Notice Upon the Occurrence of Maturity Date or Event of Default. Upon prior written notice by the DIP Lender to counsel for the Debtors, counsel for any official committee of unsecured creditors, and the U.S. Trustee of the occurrence of an Event of Default (each as defined in the DIP Loan Documents and incorporated herein by reference) and without further order of the Court, the DIP Lender may (i) declare the DIP Obligations to be immediately due and payable; (ii) terminate the DIP Lender's commitment under the DIP Facility (other than the Carve-Out) or use of Cash Collateral; (iii) charge default rate interest; and/or (iv) upon five (5) days' notice to counsel to the Debtors, counsel to any official committee of unsecured creditors and the U.S. Trustee, exercise all default-related rights and remedies against the DIP Collateral, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under sections 362 and 105 of the Bankruptcy Code or otherwise, provided however, that during the five (5) day notice period, any party in interest shall have the right to file a pleading in opposition to the DIP Lender's exercise of rights and remedies including the delivery of the Carve-Out Trigger Notice; provided further that the only issue that may be raised by any party in such pleading shall be whether in fact, an Event of Default has occurred and is continuing; but provided further that, if an Event of Default occurs as a result of the Debtors' failure to indefeasibly satisfy the DIP Obligations by the Stated Maturity Date (as

defined in the DIP Loan Documents), the above referenced five (5) day notice period shall not apply and the Debtors and all other interested parties shall not have the right to challenge whether or not the Maturity Date or an Event of Default has occurred.

23.    <u>Modification of Stay</u>.  Subject to the terms set forth herein, the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms, rights, benefits, privileges, remedies and provisions of this Interim Order, and the DIP Loan Documents including without limitation, to permit the DIP Lender to exercise all rights and remedies provided for in the DIP Loan Documents and take any and all actions provided therein, in each case, without further notice, application to, order of or hearing before this Court, including those set forth in paragraph 22 of this Interim Order.

24.    <u>Survival of DIP Liens, DIP Superiority Claims, and Other Rights</u>.  If, in accordance with section 364(e) of the Bankruptcy Code, this Interim Order does not become a final non-appealable order, if a trustee terminates this Interim Order, or if any of the provisions of this Interim Order are hereafter modified, amended, vacated or stayed by subsequent order of this Court or any other court, such termination or subsequent order shall not affect the priority, validity, enforceability or effectiveness of (or subordination to the Carve-Out of) any lien, security interests or any other benefit or claim authorized hereby with respect to any DIP Obligations incurred prior to the effective date of such termination or subsequent order.  All such liens, security interests, claims and other benefits shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted herein, including the liens and priorities granted herein, with respect to any DIP Loan, subject to the Carve-Out.

25.     <u>Survival of this Interim Order</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order: (i) confirming any plan of reorganization in any of the Chapter 11 Cases; (ii) converting any of the Chapter 11 Cases to a chapter 7 case; or (iii) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Interim Order as well as the DIP Superpriority Claims and the DIP Liens in the DIP Collateral granted pursuant to this Interim Order and the DIP Loan Documents shall continue in full force and effect notwithstanding the entry of any such order.  Such claims and liens shall maintain their priority as provided by this Interim Order and the DIP Loan Documents, and to the maximum extent permitted by law, until all of the DIP Obligations are indefeasibly paid in full in cash and discharged or otherwise treated under a plan of reorganization, which is reasonably acceptable to the DIP Lender.  In no event shall any plan of reorganization be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the DIP Loan Documents unless agreed to by and among the Debtors and the DIP Lender.

26.     <u>Modifications of DIP Loan Documents</u>.  The Debtors and the DIP Lender are hereby authorized, to implement, in accordance with the terms of the DIP Loan Documents, any non-material modifications of the DIP Loan Documents without further notice, motion or application to, order of or hearing before, this Court.  Any material modification or amendment to the DIP Loan Documents shall only be permitted pursuant to an order of this Court, after being submitted to this Court upon five (5) days' notice to the U.S. Trustee and counsel to the official committee of unsecured creditors; <u>provided</u>, that any forbearance from, or waiver of, (a) a breach by the Debtors of a covenant representation or any other agreement or (b) a default or an Event of Default, in each case under the DIP Loan Documents shall not require an order of

57731/0003-15866827v1

this Court.  In the event of any inconsistency between this Interim Order and the DIP Credit Agreement, this Interim Order shall control.

27.    <u>Insurance Policies</u>.  Upon entry of this Interim Order, on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral: (i) the DIP Lender shall be, and shall be deemed to be, without any further action by or notice to any person, named as additional insureds; and (ii) the DIP Lender shall be and shall be deemed to be, without any further action by or notice to any person, named as loss payee for DIP Collateral on which the DIP Lien holds a first priority lien.  The Debtors are hereby authorized on a final basis, to and shall take any actions necessary to have the DIP Lender be added as an additional insured and loss payee on each insurance policy maintained by the Debtors consistent with this Interim Order which in any way relates to the DIP Collateral.

28.    <u>Financial Information</u>.  The Debtors shall deliver to the DIP Lender such financial and other information concerning the business and affairs of the Debtors and any of the DIP Collateral as may be required pursuant to the DIP Loan Documents and/or as the DIP Lender shall reasonably request from time to time.  The Debtors shall allow the DIP Lender access to the premises in accordance with the terms of the DIP Loan Documents for the purpose of enabling the DIP Lender to inspect and audit the DIP Collateral and the Debtors' books and records.

29.    <u>Proofs of Claim</u>.  Notwithstanding any order entered by the Bankruptcy Court in relation to the establishment of a bar date in the Chapter 11 Cases to the contrary, or otherwise, the DIP Lender shall not be required to file proofs of claim in the Chapter 11 Cases for any claim allowed herein.

30.    <u>Immediate Effect of Order</u>.  The terms and conditions of this Interim Order shall be effective and immediately enforceable upon its entry by the Clerk of the Court

notwithstanding any potential application of Bankruptcy Rule 6004(h) or otherwise. Furthermore, to the extent applicable, the notice requirements and/or stays imposed by Bankruptcy Rules 4001(a)(3), 6003(b), and 6004(a) are hereby waived for good and sufficient cause. The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion. .

Dated: _____, 2018
      Wilmington, Delaware      _____

                                        THE HONORABLE BRENDAN L. SHANNON,
                                        CHIEF UNITED STATE BANKRUPTCY JUDGE

**Exhibit 1**

**DIP Credit Agreement**

**Execution Version**

**$25,000,000**

**SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION
LOAN AND SECURITY AGREEMENT**

**by and among**

**VIDEOLOGY, INC.
COLLIDER MEDIA, INC.
VIDEOLOGY MEDIA TECHNOLOGIES, LLC
LUCIDMEDIA NETWORKS, INC.
VIDEOLOGY LTD.**

**as Borrowers,**

**and**

**DRAPER LENDING, LLC
as Lender**

**Dated as of May 15, 2018**

# TABLE OF CONTENTS

1.    DEFINITIONS AND CONSTRUCTION ................................................................................1

    1.1    Definitions ................................................................................................................1

    1.2    Accounting Terms..................................................................................................11

    1.3    UCC .......................................................................................................................11

    1.4    Construction...........................................................................................................11

    1.5    Schedules and Exhibits .........................................................................................12

2.    LOAN AND TERMS OF PAYMENT ...............................................................................12

    2.1    Agreement to Lend; Delayed Draw; Security Documents and Loan Documents ..........12

    2.2    Borrowing Procedures ...........................................................................................12

    2.3    Payments; Reductions of Commitments; Prepayments ....................................13

    2.4    Interest Rates and Rates, Payments and Calculations.......................................14

    2.5    Crediting Payments; Clearance Charge ...............................................................15

    2.6    Designated Account ...............................................................................................16

    2.7    Maintenance of Loan Account; Statements of Obligations ...........................16

    2.8    Fees .......................................................................................................................16

3.    CONDITIONS; TERM OF AGREEMENT .......................................................................16

    3.1    Conditions Precedent to Advances of Facility Amount....................................16

    3.2    Conditions Precedent to all Extensions of Credit ...........................................17

    3.3    Maturity .................................................................................................................18

    3.4    Effect of Maturity .................................................................................................18

4.    REPRESENTATIONS AND WARRANTIES....................................................................18

    4.1    Due Organization and Qualification .....................................................................19

    4.2    Due Authorization; No Conflict............................................................................19

    4.3    Binding Obligations...............................................................................................19

    4.4    Title to Assets; No Encumbrances ........................................................................19

    4.5    Jurisdiction of Formation; Location of Chief Executive Office; Organizational; Identification Number; Commercial Tort Claims...........................................19

    4.6    Litigation................................................................................................................20

    4.7    Fraudulent Transfer...............................................................................................20

    4.8    Indebtedness...........................................................................................................20

    4.9    Payment of Taxes..................................................................................................20

    4.10   Budget ...................................................................................................................20

5.    AFFIRMATIVE COVENANTS ........................................................................................20

| | | | |
|---|---|---|---|
| | 5.1 | Financial Statements, Reports, Certificates | 20 |
| | 5.2 | Reporting | 20 |
| | 5.3 | Existence | 21 |
| | 5.4 | Maintenance of Properties; Permits | 21 |
| | 5.5 | Taxes | 21 |
| | 5.6 | Insurance | 21 |
| | 5.7 | Inspection | 22 |
| | 5.8 | Environmental | 22 |
| | 5.9 | Compliance with Laws | 23 |
| | 5.10 | Disclosure Updates | 23 |
| | 5.11 | Formation of Subsidiaries | 23 |
| | 5.12 | Further Assurances | 23 |
| | 5.13 | Staffing | 23 |
| | 5.14 | Budget | 23 |
| 6. | | NEGATIVE COVENANTS | 24 |
| | 6.1 | Indebtedness | 24 |
| | 6.2 | Liens | 24 |
| | 6.3 | Restrictions on Fundamental Changes | 24 |
| | 6.4 | Disposal of Assets | 24 |
| | 6.5 | Change Name | 24 |
| | 6.6 | Nature of Business | 24 |
| | 6.7 | Prepayments and Amendments | 25 |
| | 6.8 | Change of Control | 25 |
| | 6.9 | Accounting Methods | 25 |
| | 6.10 | Transactions with Affiliates | 25 |
| | 6.11 | Use of Advances | 25 |
| | 6.12 | Limitation on Capital Expenditures | 25 |
| | 6.13 | Chapter 11 Case | 25 |
| | 6.14 | Plan | 25 |
| 7. | | PERFORMANCE COVENANTS | 25 |
| | 7.1 | Budget Covenant | 25 |
| | 7.2 | Minimum Net Cash Collections | 25 |
| 8. | | EVENTS OF DEFAULT | 26 |
| | 8.1 | Event of Default | 26 |
| | 8.2 | Rights and Remedies | 27 |

8.3    Application of Proceeds upon Event of Default ...........................................................28

8.4    Remedies Cumulative ............................................................................................28

9.    PRIORITY AND COLLATERAL SECURITY ..................................................................29

9.1    Superpriority Claims; Subordination in favor of Lender Liens ...............................29

9.2    Grant of Security Interest in the Collateral ............................................................29

9.3    Representations and Warranties in Connection with Security Interest ......................30

9.4    Covenants with Respect to Collateral .....................................................................30

9.5    Lender's Ability to Perform Obligations on Behalf of Borrowers with Respect to the Collateral ............................................................................................................31

9.6    Filing of Financing Statements ..............................................................................31

9.7    No Discharge; Survival of Claims ..........................................................................31

10.    WAIVERS; INDEMNIFICATION ...................................................................................31

10.1    Demand; Protest; etc ...........................................................................................31

10.2    Lender's Liability for Collateral ............................................................................31

10.3    Indemnification ...................................................................................................31

11.    NOTICES ......................................................................................................................32

12.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER ...........................................33

13.    AMENDMENTS; WAIVERS; SUCCESSORS; INDEMNIFICATION ..............................34

13.1    Amendments and Waivers ......................................................................................34

13.2    No Waivers; Cumulative Remedies ........................................................................34

13.3    Successors ............................................................................................................34

14.    GENERAL PROVISIONS ...............................................................................................35

14.1    Effectiveness ........................................................................................................35

14.2    Section Headings ..................................................................................................35

14.3    Interpretation .......................................................................................................35

14.4    Severability of Provisions .....................................................................................35

14.5    Debtor-Creditor Relationship ................................................................................35

14.6    Counterparts; Electronic Execution .......................................................................35

14.7    Revival and Reinstatement of Obligations .............................................................35

14.8    Lender Expenses ..................................................................................................36

14.9    Integration ...........................................................................................................36

15.    JOINT AND SEVERAL LIABILITY ...............................................................................36

15.1    Inducement ..........................................................................................................36

15.2    Combined Liability ...............................................................................................36

15.3    Separate Exercise of Remedies .............................................................................36

## SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

**THIS SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** (this "<u>Agreement</u>"), is entered into as of May 15, 2018 (the "<u>Effective Date</u>"), by and among (i) Parent Borrower (as defined below); (ii) Collider Media, Inc., a Delaware corporation; (iii) Videology Media Technologies, LLC, a Delaware limited liability company; (iv) LucidMedia Networks, Inc., a Delaware corporation; and (v) Videology UK (as defined below) (the entities set forth in clauses (i) through (v) above, collectively, the "<u>Borrowers</u>") and Draper Lending, LLC as lender (the "<u>Lender</u>").

**WHEREAS**, on May 10, 2018 (the "<u>Petition Date</u>"), the Borrowers commenced a voluntary bankruptcy proceeding, under Chapter 11 of the Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), which case is pending as Case No. 18-11120 (the "<u>Chapter 11 Case</u>").

**WHEREAS**, the Borrowers remain in possession of their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, Borrowers have requested that Lender provide financing to Borrowers consisting of a senior secured super priority term loan in a principal amount of up to $25,000,000 (the "<u>Facility</u>") pursuant to Sections 105, 364(c) and 364(d) of the Bankruptcy Code;

**WHEREAS**, Lender has indicated its willingness to agree to extend the Facility to Borrowers, all on terms and conditions set forth herein and in the other Loan Documents and in accordance with Sections 105, 364(c) and 364(d) of the Bankruptcy Code, so long as the Obligations are (i) secured by Liens on the Collateral granted by the Borrowers as hereinafter provided, and (ii) given superpriority status as provided in the Interim Order and Final Order as applicable; and

**WHEREAS**, Borrowers have agreed to provide the Collateral and the grant of Superpriority Claims, as applicable and as set forth in this Agreement the Interim Order and the Final Order, subject to the approval of the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## 1.    DEFINITIONS AND CONSTRUCTION.

**1.1    <u>Definitions</u>**. As used in this Agreement, the following terms shall having the meanings specified below:

"<u>Additional Documents</u>" has the meaning specified in <u>Section 5.12</u> of the Agreement.

"<u>Advances</u>" has the meaning specified in <u>Section 2.1(a)</u> of the Agreement.

1

"<u>Affiliate</u>" means, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) of any Person described in clause (a) above with respect to such Person, or (c) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the date hereof) of twenty-four percent (24%) or more of any class of the outstanding voting equity interests, securities or other equity or ownership interests of such Person. For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise.

"<u>Amobee Sale</u>" means the Sale to Amobee, Inc. of all or substantially all of the assets of the Borrowers, pursuant to the Purchase Agreement.

"<u>Authorized Person</u>" means any one of the individuals identified on <u>Schedule A-2,</u> as such schedule is updated from time to time by written notice from Borrowers to Lender.

"<u>Bankruptcy Code</u>" has the meaning specified in the recitals hereto.

"<u>Bankruptcy Court</u>" has the meaning specified in the recitals hereto.

"<u>Borrowers</u>" has the meaning set forth in the preamble to the Agreement.

"<u>Budget</u>" has the meaning specified in <u>Section 5.14</u> of the Agreement.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the State of New York.

"<u>Capital Expenditures</u>" means, with respect to any Person for any period, the aggregate of all expenditures by such Person during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed.

"<u>Capital Lease</u>" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"<u>Change of Control</u>" means, except with respect to the consummation of a Sale (including the Amobee Sale), whether under a Plan or under Section 363 of the Bankruptcy Code, or as otherwise approved by Lender:

(i)     if any Borrower is a corporation, any merger, consolidation, sale, transfer or pledge of such Borrower's equity interests or the creation or issuance of new stock;

(ii)     if any Borrower is a limited liability company, (w) any merger or consolidation, (x) unless Borrower has obtained the prior written consent of Lender, the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member), or (y) the sale, transfer or pledge of the membership interest of a

2

managing member (or if no managing member, any member), or (z) the sale or transfer of non-managing membership interests or the issuance of new non-managing membership interests;

(iii)    If without the Lender's prior consent, in its sole discretion, (i) any Borrower voluntarily removes or replaces an independent director, if any, of any Borrower; (ii) the current chief restructuring officer of any Borrower is removed or replaced; or (iii) a majority of current board of directors of any Borrower is removed or replaced.

"Chapter 11 Case" has the meaning specified in the recitals hereto.

"Chapter 11 Plan" means a chapter 11 plan that provides for, *inter alia*, payment in full in cash of all Obligations on the effective date thereof, together with releases, exculpations, waivers and indemnification to the extent acceptable to Lender, in its reasonable discretion.

"Closing Date" means the date upon which the first Advance is made under Section 2.1.

"Collateral" means (x) 65% of the voting stock of (i) Videology UK and (ii) any other Subsidiary formed or acquired by a U.S. Borrower organized after the date hereof and organized in a jurisdiction other than the District of Columbia or a state, commonwealth or territory of the United States of America, and (y) all other tangible and intangible personal property of each Borrower (including, for the avoidance of doubt, Videology UK), wherever located and whether now owned or hereafter acquired, including but not limited to all accounts, contracts rights, chattel paper, cash, general intangibles, investment property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments and commercial tort claims, together with all proceeds thereof, including insurance proceeds (as each such term above is defined in the UCC).

"Collections" means all cash, checks, notes, instruments, and other items of payment (including insurance proceeds, cash proceeds of asset sales, and rental proceeds).

"Commitment" means the maximum principal amount of Lender's obligation to make Advances to Borrowers pursuant to Section 2 hereof.  As of the Closing Date, the Commitment is $25,000,000 and upon entry of the Final Order, the Commitment shall be $25,000,000.

"Commitment Fee" means the fee of 2.00% of the amount of the Facility, which shall be earned and payable upon entry of the Interim Order and which shall be paid to the Lender on the Closing Date from the proceeds of the Facility.

"Committee" means the statutory committee of unsecured creditors, if appointed by the United States Trustee in relation to the Chapter 11 Case.

"Compliance Certificate" means a certificate substantially in the form of Exhibit A delivered by the Authorized Person of Borrowers to Lender.

"Control Agreement" means, with respect to each Deposit Account of a Borrower, an agreement in form and substance reasonably satisfactory to the Lender, pursuant to which the depository institution maintaining such Deposit Account agrees to comply with the Lender's

instructions with respect to disposition of funds in such Deposit Account without further consent by the relevant Borrower.

"Daily Balance" means, as of any date of determination and with respect to any fixed monetary Obligations, the amount of such Obligations owed at the end of such day.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Deposit Account" means any deposit account, as that term is defined in the UCC.

"Designated Account" means the Deposit Account of Borrowers identified on Schedule D-1.

"Designated Account Bank" has the meaning specified in Schedule D-1.

"Dollars" or "$" means United States dollars.

"Environmental Action" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority, or any third party involving violations of Environmental Laws or releases of Hazardous Materials (a) from any Collateral; (b) from adjoining properties or businesses of any real property that constitutes Collateral, or (c) from or onto any facilities, with respect to the Collateral, which received Hazardous Materials generated by any Borrower.

"Environmental Law" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on the Borrowers, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"Environmental Liabilities" means all liabilities, monetary obligations, losses, damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities.

"Equipment" means equipment, as that term is defined in the UCC.

"Event of Default" has the meaning specified in Section 8.1 of the Agreement.

"Exit Fee" means the fee of 4.00%, as applicable (i) of the principal amount of any Advance that is prepaid pursuant to Section 2.3(c) or (d), or (ii) without duplication of any amounts paid pursuant to clause (i), of the amount of the Commitment on the Maturity Date, in each case to be repaid in cash and without further order of the Bankruptcy Court.

"Facility" has the meaning specified in the recitals to the Agreement.

"Fees" means all fees due to the Lender under this Agreement, any Loan Document or the Interim Order or Final Order, as applicable, including the Commitment Fee, the Exit Fee, the Funding Fee, the Stated Maturity Date Fee and the Work Fee.

"Final Order" means a final order of the Bankruptcy Court authorizing and approving the Borrowers' entry into this Agreement and the other Loan Documents, in form and substance satisfactory to Lender, in its sole discretion, Borrowers, and their respective counsel, on a final basis and entered following a final hearing.

"Funding Fee" means, with respect to each Advance, 2.00% of such Advance, payable in cash upon funding of such Advance by the Lender.

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Indebtedness" means (a) all obligations for borrowed money, including, without limitation, the Obligations, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all payment obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices), (f) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by such Person, (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off balance sheet financing products, or (h) any obligation guaranteeing or intended to guarantee (whether directly

or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (h) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"Indemnified Liabilities" has the meaning specified in Section 10.3 of the Agreement.

"Indemnified Person" has the meaning specified in Section 10.3 of the Agreement.

"Interim Funding" means the $20,000,000 to be advanced as the initial funding of the Loan Amount upon entry of the Interim Order.

"Interim Order" means that interim order entered by the Bankruptcy Court authorizing and approving the Borrowers' entry into this Agreement and the other Loan Documents, in form and substance satisfactory to the Lender, in its sole discretion, the Borrowers in their sole discretion, and their respective counsel.

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time.

"Lender" has the meaning set forth in the preamble to the Agreement.

"Lender Expenses" means all (a) costs or expenses (including taxes, and insurance premiums) required to be paid by the Borrowers under any of the Loan Documents that are paid, advanced, or incurred by Lender, including but not limited to the Work Fee owed to Lender's counsel pursuant to the Interim Order, (b) reasonable and actual out-of-pocket fees or charges paid or incurred by Lender in connection with its transactions with the Borrowers under any of the Loan Documents, including, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, appraisal (including periodic collateral appraisals or business valuations to the extent of the fees and charges (and up to the amount of any limitation) contained in the Agreement), real estate surveys, real estate title policies and endorsements, and environmental audits, (c) reasonable and actual out-of-pocket costs and expenses incurred by Lender in the disbursement of funds to Borrowers (by wire transfer or otherwise), (d) out-of-pocket charges paid or incurred by Lender resulting from the dishonor of checks payable by or to any Borrower, (e) reasonable and actual out-of-pocket costs, fees (including attorneys' fees) and expenses paid or incurred by Lender to correct any default or enforce any provision of the Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (f) reasonable out-of-pocket audit fees and expenses of Lender (including travel, meals, and lodging) related to any inspections or audits, (g) reasonable and actual out-of-pocket costs and expenses of third party claims or any other suit paid or incurred by Lender in enforcing or defending the Loan Documents or in connection with the transactions contemplated

by the Loan Documents or Lender's relationship with the Borrowers, (h) Lender's reasonable and actual out-of-pocket costs and expenses (including reasonable attorneys' fees) incurred in advising, structuring, drafting, reviewing, administering (including travel, meals, and lodging), or amending the Loan Documents, and (i) Lender's reasonable costs and expenses (including reasonable and actual attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an insolvency proceeding concerning any Borrower or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought, or in taking any Remedial Action concerning the Collateral.

"<u>Lender Related Person</u>" means, Lender, together with Lender's Affiliates, officers, directors, employees, attorneys, and agents.

"<u>Lender's Liens</u>" means the Liens granted by Borrowers in and to the Collateral in favor of Lender.

"<u>Lien</u>" means any pledge, hypothecation, assignment (which is intended as security), charge, deposit arrangement (which is intended as security), encumbrance, easement, lien (statutory or other), security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever (which is intended as security), including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease, and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"<u>Loan Account</u>" means the Deposit Account of Lender identified on <u>Schedule A-1.</u>

"<u>Loan Amount</u>" means (a) after the entry of the Interim Order and prior to entry of the Final Order, $20,000,000.00 and (b) after the entry of the Final Order, up to $25,000,000.00 *minus*, in the case of each of clauses (a) and (b), the Commitment Fee, Funding Fee, and Work Fee amount paid to Lender's counsel and any other fees or costs due and owing to the Lender.

"<u>Loan Documents</u>" means the Agreement, the Interim Order, the Final Order, the Organizational Documents, the UK Debenture, the Control Agreements, the Additional Documents and any other note or notes executed by Borrowers in connection with the Agreement and payable to Lender, any other agreement entered into, now or in the future, by the Borrowers or Lender in connection with the Agreement, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing.

"<u>Material Adverse Change</u>" means, (a) except as a result of the commencement of the Chapter 11 Case, a material adverse change in the business, operations, results of operations, assets, liabilities or financial condition of the Borrowers with respect to the Collateral (b) a material impairment of the Borrowers' ability to perform their respective obligations with respect to the Collateral under the Loan Documents or of Lender's ability to enforce the Obligations or realize upon the Collateral or (c) a material impairment of the enforceability or priority of Lender's Liens with respect to a material portion the Collateral as a result of an action or failure to act on the part of the Borrowers, all determined at the Lender's discretion.

"Maturity Date" means the earliest of (i) the Stated Maturity Date; (ii) the effective date of a Plan of Reorganization; (iii) if the Final Order has not been entered by the Bankruptcy Court, the date that is one day after the Final Hearing (as defined in the Interim Order); (iv) entry of an order converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or dismissing the Chapter 11 Case; (v) the closing of any Sale (including, for the avoidance of doubt, the Amobee Sale) and (vi) the acceleration of the outstanding Obligations or termination of the Commitments, including, without limitation, as a result of the occurrence and continuation of an Event of Default.

"Net Cash Proceeds" means:

(a) with respect to any sale or disposition of Collateral by any Borrower, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Borrower, in connection therewith, after deducting therefrom only (i) reasonable fees, commissions, and expenses related thereto and required to be paid by such Borrower in connection with such sale or disposition and (ii) taxes paid or payable to any taxing authorities by such Borrower in connection with such sale or disposition, in each case to the extent, but only to the extent, that the amounts so deducted are payable to a Person that is not an Affiliate of such Borrower, and are properly attributable to such transaction; provided however for the avoidance of doubt, that such reasonable fees, commissions and expenses shall exclude fees and expenses of estate professionals.

"Obligations" means all loans, Advances, debts, principal, interest, contingent reimbursement or indemnification obligations, premiums, liabilities (including all amounts charged to the Loan Account pursuant to the Agreement), obligations (including indemnification obligations), Fees (including, without limitation the Commitment Fee, Funding Fee, Work Fee, Exit Fee and Stated Maturity Date Fee), Lender Expenses, guaranties, covenants, and duties of any kind and description owing by any Borrower, to the Lender pursuant to or evidenced by the Loan Documents and/or pursuant to or in connection with any one or more documents, instruments or agreements described in clause (i) of the definition of Lender Expenses and, in each case, irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that Borrowers are required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents, including without limitation in connection with the collection or enforcement of or preservation of rights under the Loan Documents.

"Ordinary Course" shall mean, in respect of any Person, the ordinary course and reasonable requirements of such Person's business, as conducted in accordance with past practices, and undertaken in good faith.

"Organizational Documents" means (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of designation or other instrument relating to the rights of preferred shareholders or stockholders of such corporation, any shareholder rights agreement and all applicable resolutions of the board of directors (or any committee thereof) of such corporation, (b) for any partnership, the partnership agreement and, if applicable, the certificate

of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or organization and all applicable resolutions of any managing member of such limited liability company, and (d) any agreement between any Borrower and its shareholders, members, partners or its equity owners, or among any of the foregoing.

"Parent Borrower" means Videology, Inc., a Delaware corporation.

"Performance Covenants" means the covenants set forth in Section 7 of this Agreement.

"Permits" means any license, lease, power, permit, franchise, certificate, authorization or approval issued by a Governmental Authority.

"Permitted Indebtedness" means:

(a)     Indebtedness evidenced by the Agreement and the other Loan Documents; and

Indebtedness, including any unsecured guarantees, incurred in the Ordinary Course with respect to surety and appeal bonds, performance bonds, bid bonds, appeal bonds, statutory bonds, completion guarantees and similar obligations

"Permitted Protest" means the right of any Borrower to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment, provided that (a) a reserve with respect to such obligation is established on such Borrower's books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Borrower in good faith and (c) Lender is reasonably satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Lender's Liens.

"Permitted Variance" means a variance of net cash flow on the Budget of no more than 10%, which variance shall be tested on a four week cumulative basis, as opposed to a line-by-line, basis; provided that, for the avoidance of doubt, the calculation of any aforementioned Permitted Variance includes any disbursements in connection with estate professional fees.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Petition Date" means May 10, 2018.

"Purchase Agreement" means that certain asset purchase agreement, dated as of May 4, 2018, by and among Parent Borrower, certain subsidiaries thereof, and Amobee, Inc.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"Sale" means the sale of all or substantially all of any of the assets of any Borrower or any subsidiary thereof (including any Collateral transferred to another Borrower), to any party, including the Lender, pursuant to the provisions of Section 363 of the Bankruptcy Code.

"Schedules" means those certain schedules annexed to the Agreement and made a part thereof.

"Security Documents" means (i) all UCC financing statements, or amendments or continuations thereof, and (ii) any other documents or filings in connection with the perfection of the Liens hereunder.

"Stated Maturity Date" means September 30, 2018.

"Stated Maturity Date Fee" means the fee of 10.0% of the Facility, which shall be due and payable in cash, without further order of the Bankruptcy Court, immediately upon the thirtieth (30th) day following the Stated Maturity Date in the event that the Obligations are not indefeasibly paid in full on the thirtieth (30th) day following the Stated Maturity Date.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock (or equivalent ownership or controlling interest) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, governors or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"Superpriority Claim" has the meaning specified in Section 9.1(a)(i) of the Agreement.

"UCC" means the Uniform Commercial Code as in effect in the State of New Jersey; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New Jersey, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"UK Debenture" means that certain debenture governed by the laws of England and Wales dated on or about the date hereof, by and between Videology UK and the Lender, which shall be in form and substance reasonably acceptable to Lender and Videology UK.

"United States" means the United States of America.

"U.S. Borrower" means any Borrower organized under the laws of District of Columbia or a state, commonwealth or territory of the United States of America.

"Videology UK" means Videology Ltd., a limited company organized under the laws of England and Wales.

"Weekly Budget Variance Report" has the meaning specified in Section 5.2 of the Agreement.

"Work Fee" means a non-refundable fee in the amount of $100,000, to be paid to Lender's counsel for due diligence and legal services rendered.

**1.2**    **Accounting Terms.** All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided, that if Borrowers notify Lender that Borrowers requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if Lender notifies Borrowers that Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then Lender and Borrowers agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such change in GAAP with the intent of having the respective positions of Lender and Borrowers after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the provisions in this Agreement shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective. When used herein, the term "financial statements" shall include the notes and schedules thereto. Whenever the term "Borrowers" is used in respect of a financial covenant or a related definition, it shall be understood to mean Borrowers on a consolidated basis, unless the context clearly requires otherwise.

**1.3**    **UCC.** Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

**1.4**    **Construction.** Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders,

11

and supplements set forth herein). The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights. Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in full in cash of all Obligations other than unasserted contingent indemnification Obligations (with all such Obligations consisting of monetary or payment Obligations having been paid in full in cash). Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record.

**1.5** **Schedules and Exhibits.** All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

**2.** **LOAN AND TERMS OF PAYMENT.**

**2.1** **Agreement to Lend; Delayed Draw; Security Documents and Loan Documents**.

(a) Subject to the terms and conditions of this Agreement, Lender agrees, that after entry of the Interim Order or the Final Order, as applicable, and subject to the satisfaction or waiver of the conditions precedent in Section 3, to make advances to Borrowers (the "Advances"); provided that in no event shall the Advances made by Lender exceed Lender's Commitment nor shall the aggregate amount of all Advances exceed the Loan Amount. Notwithstanding anything to the contrary herein, the Borrowers shall be limited to four (4) Advances, with a minimum amount of $1,000,000 for any Advance. Any Advance, or portion thereof, that is repaid or prepaid (whether as an optional prepayment or a mandatory prepayment) cannot be reborrowed.

(b) The Advances shall be secured by the Collateral as set forth in this Agreement, the Interim Order, the Final Order, and the other Loan Documents.

(c) All Obligations (including the Exit Fee) shall be due and payable on the Maturity Date.

(d) Each Borrower agrees that it is jointly and severally liable for the prompt payment and performance of, all Obligations and all agreements under the Loan Documents. Borrowers promise to pay the Obligations (including principal, interest, fees, costs, and expenses) in Dollars in full on the Stated Maturity Date or, if earlier, on the date on which the Obligations are declared due and payable pursuant to the terms of this Agreement.

**2.2** **Borrowing Procedures**. Each Advance under Section 2.1(a) shall be made by a written request substantially in the form of the Request for Advance attached hereto as Exhibit D executed by an Authorized Person of the Parent Borrower and delivered to the Lender no later than three (3) Business Days prior to the requested funding date (or such shorter period as the Lender may permit in its sole discretion); provided, that (i) Parent Borrower shall submit such

requests only after approval of the Interim Order or the Final Order, as applicable, and (ii) the aggregate amount of all such Advances shall not exceed $25,000,000. Upon satisfaction or waiver of the conditions precedent specified herein, Lender shall make the proceeds of the relevant Advance available to the Borrowers on the requested funding date by causing the principal amount of the relevant Advance to be credited to the Designated Account.

### 2.3    Payments; Reductions of Commitments; Prepayments.

(a)    **Payments by Borrowers**. Except as otherwise expressly provided herein, all payments by Borrowers shall be made to the Loan Account for the account of Lender and shall be made in immediately available funds, no later than 4:00 p.m. (Eastern time) on the date specified herein. Any payment received by Lender later than 4:00 p.m. (Eastern time) shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(b)    **Apportionment and Application**. All payments remitted to Lender and all proceeds of Collateral received by Lender shall be applied as follows (unless otherwise directed by Lender):

(i)    <u>first</u>, to pay any Lender Expenses (including cost or expense reimbursements, such as attorneys' fees in excess of the Work Fee) then owed to the Lender or Lender Related Persons in accordance with the Interim Order or the Final Order, as applicable, or indemnities then due to Lender under the Loan Documents, until paid in full;

(ii)    <u>second,</u> to pay any Fees then due to Lender under the Loan Documents until paid in full;

(iii)    <u>third,</u> to pay interest due in respect of the Advances until paid in full;

(iv)    <u>fourth,</u> to pay the principal of all Advances until paid in full;

(v)    <u>fifth,</u> to pay any other Obligations until paid in full; and

(vi)    <u>sixth,</u> to Borrowers (to be wired to the Designated Account) or as otherwise required by applicable law.

In the event of a direct conflict between the priority provisions of this <u>Section 2.3(b)</u> and any other provision contained in any other Loan Document (except for the Interim Order or Final Order, as applicable), it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this <u>Section 2.3(b)</u> shall control and govern. Notwithstanding the foregoing, to the extent there is a conflict between the Interim Order or the Final Order, as applicable, and any other Loan Document, the Interim Order or the Final Order, as applicable, shall control and govern.

(c)      **Optional Prepayments.** Upon three Business Days' prior notice to Lender, Borrowers may prepay any Advance, in whole or in part, at any time, <u>provided</u> that (i) the principal amount being prepaid shall be an amount not less than $1,000,000 and (ii) Borrowers shall also pay all accrued and unpaid interest on such principal amount and the Exit Fee as applied to the principal amount that was prepaid.

(d)      **Mandatory Prepayments**.

(**i**)      **Dispositions**. In accordance with the applicable provisions of the Interim Order (and any corresponding paragraph in the Final Order), within one (1) Business Day of the date of receipt by any Borrower of the Net Cash Proceeds of any voluntary or involuntary sale of any Collateral (other than sales in the Ordinary Course), such Borrower shall prepay such portion of the outstanding amount of the Obligations in accordance with <u>Section 2.3(b)</u> in an amount equal to 100% of such Net Cash Proceeds (including condemnation awards and payments in lieu thereof) received in connection with such sales or dispositions plus the Exit Fee as applied to the amount of such prepayment.   Nothing contained in this <u>Section 2.3(d)(i)</u> shall permit any Borrower to sell any Collateral other than in accordance with <u>Section 6.4.</u>

(**ii**)      **Indebtedness**. Within one (1) Business Day of the date of incurrence by any Borrower of any Indebtedness secured by the Collateral or any portion thereof (other than Permitted Indebtedness), such Borrower shall prepay the outstanding principal amount of the Obligations in accordance with <u>Section 2.3(b)</u> in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with the incurrence of such Indebtedness plus the Exit Fee as applied to the principal amount of such prepayment. The provisions of this <u>Section 2.3(d)(ii)</u> shall not be deemed to be implied consent to any such incurrence otherwise prohibited by the terms and conditions of this Agreement.

**2.4      <u>Interest Rates and Rates, Payments and Calculations.</u>**

(a)      **Interest Rate.** Except as provided in <u>Section 2.4(b)</u>, all Advances shall bear interest on the Daily Balance thereof at a rate equal to 12.00% per annum. For the avoidance of doubt, for the purpose of calculating interest for purposes of this <u>Section 2.4(a)</u>, Daily Balance shall exclude accrued but unpaid interest due or owing hereunder.

(b)      **Default Rate.** Upon the occurrence and during the continuation of an Event of Default, all Obligations shall bear interest on the Daily Balance thereof at a per annum rate equal to five percentage points (5%) above the per annum rate otherwise applicable hereunder without any notice from Lender or any other Person.  For the avoidance of doubt, for the purpose of calculating interest for purposes of this <u>Section 2.4(b)</u>, Daily Balance shall exclude accrued but unpaid interest due or owing hereunder.

(c)      **Payment.** Except to the extent provided to the contrary herein, interest, all Fees payable hereunder or under any of the other Loan Documents, and all costs, expenses,

and Lender Expenses payable hereunder or under any of the other Loan Documents shall be due and payable, in arrears, on the first day of each month at any time that Obligations or Commitments are outstanding. Borrowers hereby authorize Lender, from time to time, without prior notice to Borrowers, to charge all interest and all Fees payable hereunder or under any of the other Loan Documents (in each case, as and when due and payable), all costs, expenses, and Lender Expenses payable hereunder or under any of the other Loan Documents (in each case, as and when due and payable), all Fees provided for in Section 2.8 (in each case, as and when due and payable), and all other payments as and when due and payable under any Loan Document to the Loan Account, which amounts thereafter shall constitute Obligations hereunder and shall accrue interest at the rate then applicable to Obligations.

(d)    **Computation**. All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360 day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue.

(e)    **Intent to Limit Charges to Maximum Lawful Rate**. In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Borrowers and Lender, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, Borrowers is and shall be liable only for the payment of such maximum as allowed by law, and payment received from Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

**2.5    Crediting Payments; Clearance Charge**. The receipt of any payment item by Lender shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to the Loan Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment and interest shall be calculated accordingly. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Lender only if it is received into the Loan Account on a Business Day on or before 4:00 p.m. (Eastern time). If any payment item is received into the Loan Account on a non-Business Day or after 4:00 p.m. (Eastern time) on a Business Day, it shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day.

**2.6    Designated Account.**

(a)    Borrowers agree to establish and maintain the Designated Account with the Designated Account Bank and to receive the proceeds of the Advances requested by Borrowers and made by Lender hereunder in such Designated Account.

(b)    Borrowers agree to deposit all proceeds of sales of the Collateral into the Designated Account.

**2.7    Maintenance of Loan Account; Statements of Obligations.** Lender shall maintain true, correct and complete electronic or written records evidencing the Indebtedness and other Obligations owed by the Borrowers to Lender, in which Lender will record (i) the amount of all Advances made under this Agreement, (ii) the amount of any principal and/or interest due and payable and/or to become due and payable from the Borrowers to the Lender under this Agreement and (iii) all amounts received by Lender under this Agreement from any Borrower.

**2.8    Fees.** Upon entry of the Interim Order, Borrowers shall pay from the proceeds of the Facility (i) to the Lender, the Commitment Fee and the Funding Fee as set forth in the Interim Order and (ii) to the Lender (or Lender's counsel, Arent Fox LLP, at the direction of the Lender) the Work Fee (less the portion of the Work Fee paid prior to the Effective Date), against which all accrued but unpaid attorneys' fees and expenses shall be credited, whether or not incurred as of the date of the Interim Order or thereafter. All such fees shall be non-refundable and non-avoidable obligations of the Borrowers and shall be paid by the Borrowers in cash.

**3.    CONDITIONS; TERM OF AGREEMENT.**

**3.1    Conditions Precedent to Advances of Facility Amount**. Lender shall not be required to make any Advances unless and until all of the conditions specified below shall have been satisfied or waived by Lender in its sole discretion (the making of any Advance by Lender being conclusively deemed to be its satisfaction or waiver of the conditions precedent contained in this Section 3.1).

(a)    Lender shall have received a copy of the Budget.

(b)    With respect to the extension of the Interim Funding, the Bankruptcy Court shall have entered the Interim Order, and with respect to the extension of the balance of the Loan Amount, the Bankruptcy Court shall have entered the Final Order, in each case (i) in form and substance satisfactory to Lender, in its sole discretion, and (ii) such order shall be in full force and effect and shall not have been modified or amended (unless otherwise approved by Lender), reversed, stayed or subject to a motion for re-argument or reconsideration, or appealed. Borrowers and Lender shall be entitled to rely in good faith upon the Interim Order or the Final Order, as applicable, and shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objections thereto, unless the relevant order has been stayed by a court of competent jurisdiction.

(c)    Lender shall have received a copy of the duly executed UK Debenture.

(d)     Lender shall have received (i) evidence, in form and substance reasonably acceptable to Lender, that Borrowers have made all necessary filings and recordations necessary to provide Lender with a valid, perfected first lien security interest in the Collateral, or (ii) to the extent such filings and recordations cannot be made until the effectiveness of this Agreement, final drafts of such filings and recordations, to be filed or recorded, as applicable, promptly upon the Effective Date.

(e)     All fees required to be paid on the Closing Date under this Agreement shall have been paid (including, without limitation, the Work Fee).

(f)     All other documents in connection with the transactions contemplated by this Agreement shall have been delivered, executed, or recorded and shall be in form and substance reasonably satisfactory to Lender.

**3.2     <u>Conditions Precedent to all Extensions of Credit.</u>**

The obligation of Lender to make any Advances hereunder (or to extend any other credit hereunder), at any time shall be subject to the satisfaction (or waiver by Lender in its sole discretion) of the following additional conditions precedent (the making of any Advance or other extension of credit by Lender being conclusively deemed to be its satisfaction or waiver of the conditions precedent with respect to such Advance):

(a)     Borrowers shall be in compliance with the conditions precedent set forth in <u>Section 3.1</u> of this Agreement.

(b)     Borrowers shall have complied fully and completely with all applicable covenants through the date of the requested Advance as set forth in this Agreement, other than those set forth in Section 7 below as long as the Purchase Agreement is still in full force and effect.

(c)     The representations and warranties of Borrowers contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

(d)     No Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof.

(e)     The Interim Order or the Final Order, as applicable, shall have been entered by the Bankruptcy Court in form and substance satisfactory to Lender in its sole discretion, and shall be in full force and effect and shall not have been modified or amended

(unless otherwise approved by the Lender), reversed, stayed or subject to a motion for re-argument or reconsideration, or appealed.

(f)     No injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against any Borrower or Lender; and

(g)     No action, proceeding, investigation, regulation or legislation shall have been instituted or threatened before any Governmental Authority to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of this Agreement or any of the other Loan Documents or the consummation of the transactions contemplated hereby and thereby and which, in Lender's sole judgment, would make it inadvisable to consummate the transactions contemplated by this Agreement or any of the other Loan Documents.

### 3.3     **Maturity.**

(a)     This Agreement shall continue in full force and effect until the Maturity Date. All Obligations, including without limitation the outstanding unpaid principal balance and all accrued and unpaid interest on the Advances shall be due and payable on the Maturity Date.

(b)     The foregoing notwithstanding, Lender may terminate its obligations under this Agreement immediately upon the occurrence and during the continuation of an Event of Default.

### 3.4     **Effect of Maturity.**  On the Maturity Date, all commitments of Lender to provide additional credit hereunder shall automatically be terminated and all Obligations immediately shall become due and payable without notice or demand. No termination of the obligations of Lender (other than payment in full of the Obligations and termination of the Commitments) shall relieve or discharge any Borrower of its duties, Obligations, or covenants hereunder or under any other Loan Document and Lender's Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations have been paid in full and the Commitments have been terminated. When all of the Obligations have been indefeasibly paid in full in immediately available funds and Lender's obligations to provide additional credit under the Loan Documents have been terminated, Lender will, at the Borrowers' expense, execute and deliver any termination statements, lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, Lender's Liens and all notices of security interests and Liens previously filed by Lender with respect to the Obligations.

### 4.     **REPRESENTATIONS AND WARRANTIES.**

In order to induce Lender to enter into this Agreement, each Borrower makes the following representations and warranties to Lender.  The Borrowers further represent that such representations and warranties shall be true, correct, and complete, in all respects, as of the Closing Date, and shall be true, correct, and complete, in all respects, as of the date of the making of each Advance (or other extension of credit) made thereafter, as though made on and as of the date of such Advance (or other extension of credit) (except to the extent that such

representations and warranties relate solely to an earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement:

**4.1     Due Organization and Qualification.**

(a)     Each Borrower (i) is duly formed and existing and in good standing under the laws of the jurisdiction of its formation, (ii) where the ownership of Collateral requires such qualification, is qualified to do business in any state where the failure to be so qualified could reasonably be expected to result in a Material Adverse Change, and (iii) subject to the Bankruptcy Court's entry of the Interim Order or the Final Order, as applicable, and any limitation under the Bankruptcy Code or other debtor relief law, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

(b)     Schedule 4.1(b) sets forth the complete and accurate ownership of each Borrower.

**4.2     Due Authorization; No Conflict**.  Subject to the Bankruptcy Court's entry of the Interim Order or Final Order, as applicable, as to each Borrower, the execution, delivery, and performance by such Borrower of the Loan Documents to which it is a party have been duly authorized by all necessary action or pursuant to the Interim Order or the Final Order, as applicable, on the part of such Borrower.

**4.3     Binding Obligations**.  Each Loan Document has been duly executed and delivered by each Borrower that is a party thereto and is the legally valid and binding obligation of such Borrower pursuant to the Final Order, enforceable against such Borrower in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally (regardless of whether such enforceability is considered in a proceeding at law or in equity).

**4.4     Title to Assets; No Encumbrances.**  Except for the existing Liens of Borrower's pre-Petition Date lenders set forth on Schedule 4.4, each Borrower has (i) good, sufficient and legal title to, and (ii) good and marketable title to (in the case of personal property), all of such Borrower's right, interest and title in the Collateral.

**4.5     Jurisdiction of Formation; Location of Chief Executive Office; Organizational; Identification Number; Commercial Tort Claims.**

(a)     The name (within the meaning of Section 9-503 of the UCC) and jurisdiction of formation of each Borrower is set forth on Schedule 4.5 (as such Schedule may be updated from time to time by notice from such Borrower to Lender).

(b)     The chief executive office of each Borrower is located at the address indicated on Schedule 4.5 (as such Schedule may be updated from time to time by notice from such Borrower to Lender).

(c)    The tax identification numbers and organizational identification numbers, if any, of each Borrower are as set forth in that certain letter dated May 15, 2018 provided by Borrowers to Lender.

**4.6**    **Litigation.** Intentionally deleted.

**4.7**    **Fraudulent Transfer**. No transfer of property is being made by a Borrower and no obligation is being incurred by a Borrower in connection with the transactions contemplated by this Agreement or the Loan Documents with the intent to hinder, delay or defraud either present or future creditors of any Borrower.

**4.8**    **Indebtedness.** Set forth on Schedule 4.8 is a true and complete list of all Indebtedness of each Borrower outstanding immediately prior to the Closing Date and such Schedule accurately sets forth the aggregate principal amount of such Indebtedness as of the Closing Date.

**4.9**    **Payment of Taxes.**    Except as provided on Schedule 4.9, all United States federal, state and other material tax returns and reports of each Borrower required to be filed by any of them with respect to the Collateral have been timely filed, and all taxes due with respect to the period covered by such tax returns and all material assessments, fees and other governmental charges upon any Collateral that are due and payable have been paid when due and payable, other than (a) taxes that are the subject of a Permitted Protest, and (b) with respect to the Collateral, the Borrowers are not aware of any proposed tax assessment against a Borrower with respect to either (i) taxes imposed by any governmental authority in the United Kingdom or (ii) United States federal, state or municipal taxes that is not being actively contested by such Borrower diligently, in good faith, and by appropriate proceedings; provided that such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

**4.10**    **Budget**. Attached to this Agreement as Exhibit B is a true and complete copy of the Budget.

**5.**    **AFFIRMATIVE COVENANTS.**

Each Borrower covenants and agrees that, until termination of all of the Commitments and payment in full of the Obligations, it shall comply with each of the following:

**5.1**    **Financial Statements, Reports, Certificates.** Each Borrower shall deliver to Lender (a) promptly upon becoming aware of any default, notice of such defaults, (b) promptly upon becoming aware of any pending or threatened litigation or other material events, notice of such litigation or material event; and (c) at the time of a request for any Advance, a Compliance Certificate. In addition, the Borrowers agree to maintain a system of accounting that enables the Borrowers to produce unaudited financial statements in accordance with GAAP.

**5.2**    **Reporting.** Each Borrower, as applicable, will: (a) comply with the agreements, requirements, covenants and undertakings set forth in Exhibit C, in accordance with the terms

thereof; (b) commencing on the first Friday to occur after the entry of the Final Order and on the Friday of each week thereafter, prepare and deliver to Lender (x) a report showing actual cash receipts and disbursements of the entities covered by the Budget for the preceding Saturday through Friday certified in writing by an Authorized Person of Parent Borrower as being true and accurate, and (y) a written explanation of all material variances (the "<u>Weekly Budget Variance Report</u>"); (c) update and roll-forward the proposed Budget no less frequently than every four (4) weeks or at such other interval as agreed to by the Lender and the Borrowers, each such amended Budget to be delivered to Lender no later than the third Business Day of each week for the week immediately prior; and (d) participate in a weekly conference call, if required, commencing on the third Business Day of each week following the Petition Date regarding the Budget, management issues, sale process, and other matters.

      **5.3**    **<u>Existence.</u>** Except as otherwise permitted under <u>Section 6.3</u> or <u>Section 6.4</u>, at all times, each Borrower shall (a) maintain and preserve in full force and effect its existence (including being in good standing in its jurisdiction of formation) and (b) maintain all its rights and franchises, licenses and permits, except where the failure to maintain any such rights and franchises, or licenses and permits, could not reasonably be expected to result in a Material Adverse Change.

      **5.4**    **<u>Maintenance of Properties; Permits.</u>** Except where the failure to do so could not be expected to result in a Material Adverse Change, each Borrower shall (a) maintain and preserve the Collateral, that is necessary to the proper conduct of its business in good working order and condition, ordinary wear, tear, and casualty excepted, (b) comply with the material provisions of all material leases related to the Collateral, so as to prevent the loss or forfeiture thereof, unless such provisions are the subject of a Permitted Protest; and (c) maintain, comply with and keep in full force and effect its Permits with respect to the Collateral, except as could not be expected to result in a Material Adverse Change. Except as set forth on <u>Schedule 5.4</u>, each Borrower is in material compliance with, and has, all Permits required for the operation of its business as it relates to the Collateral, and for the execution, delivery and performance by, and enforcement against, such Borrower of each Loan Document. Except as set forth in Schedule 5.4, no Borrower is in material breach of or default under the provisions of any such Permit, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both, would constitute or result in any of the foregoing.

      **5.5**    **<u>Taxes.</u>** Each Borrower shall cause all assessments and taxes imposed, levied, or assessed  after the Petition Date against any Collateral to be paid in full, before delinquency or before the expiration of any extension period.

      **5.6**    **<u>Insurance.</u>** At the relevant Borrower's expense, such Borrower shall maintain insurance with respect to the Collateral in which such Borrower has any right, interest or title, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses. Each Borrower shall maintain business interruption, general liability, product liability insurance, director's and officer's liability insurance, fiduciary liability insurance, employment practices liability insurance, title insurance as well as insurance against larceny, embezzlement, and criminal misappropriation. All such policies of insurance shall be with responsible and reputable insurance companies and in such amounts as is carried generally in accordance with sound

business practice by companies in similar businesses similarly situated and located and in any event in amount, adequacy and scope reasonably satisfactory to Lender. All property insurance policies and title insurance policies covering the Collateral are to be made payable to Lender for the benefit of Lender, in case of loss, pursuant to a standard loss payable endorsement with a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as Lender may reasonably require to fully protect Lender's interest in the Collateral and to any payments to be made under such policies. All certificates of property and general liability insurance are to be delivered to Lender, with the loss payable (but only in respect of Collateral) and additional insured endorsements in favor of Lender and shall provide for not less than 30 days (10 days in the case of non-payment) prior written notice to Lender of the exercise of any right of cancellation. If any Borrower fails to maintain the insurance required by this Section 5.6, Lender may arrange for such insurance, but at such Borrower's expense and without any responsibility on Lender's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Each relevant Borrower shall give Lender prompt notice of any loss covered by its casualty or business interruption insurance. Upon the occurrence and during the continuance of an Event of Default, Lender shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

5.7 **Inspection.**  Each Borrower shall permit Lender and each of its duly authorized representatives or agent to visit any of its properties and inspect any of its Collateral or books and records, to conduct appraisals and valuations, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times and intervals as Lender may reasonably require and, so long as no Default or Event of Default exists, with reasonable prior notice to the applicable Borrower.

5.8 **Environmental**.  Each Borrower shall:

(a) Keep the Collateral owned or operated by any Borrower free of any Environmental Liens,

(b) Comply with all applicable Environmental Laws,

(c) Promptly notify Lender of any release of which such Borrower has knowledge of a Hazardous Material in any reportable quantity from or onto property owned or operated by any Borrower that could reasonably be expected to result in a Material Adverse Change, and

(d) Promptly, but in any event within five (5) Business Days of its receipt thereof, provide Lender with written notice of any of the following: (i) notice that an Environmental Lien has been filed against any of the Collateral, (ii) commencement of any Environmental Action or written notice that an Environmental Action will be filed against any Borrower,

and (iii) written notice of a violation, citation, or other administrative order from a Governmental Authority.

**5.9** <u>**Compliance with Laws.**</u> Each Borrower shall comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change.

**5.10** <u>**Disclosure Updates.**</u> Each Borrower shall promptly and in no event later than three (3) Business Days after obtaining actual knowledge thereof, notify Lender if any written information, exhibit, or report (other than materials marked as drafts and forward-looking information and projections and information of a general economic nature and general information about such Borrower's industry) furnished to Lender contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein (taken as a whole) not misleading in light of the circumstances in which made. The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto.

**5.11** <u>**Formation of Subsidiaries**</u>. No Borrower may form any direct or indirect Subsidiary or acquire any direct or indirect Subsidiary after the Closing Date without the consent of Lender, in its sole discretion. Any Subsidiary that is formed after the Closing Date shall be considered a Borrower and execute any documentation reasonably requested by Lender.

**5.12** <u>**Further Assurances**</u>. At any time upon the reasonable request of Lender, each Borrower shall execute or deliver to Lender any and all financing statements, fixture filings, security agreements, pledges, assignments, endorsements of certificates of title, mortgages, deeds of trust, and all other documents (collectively, the "<u>Additional Documents</u>") that Lender may reasonably request in form and substance reasonably satisfactory to Lender, to create, perfect, and continue perfected or to better perfect Lender's Liens in all the Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal).

**5.13** <u>**Staffing**</u>. Each Borrower shall maintain at all times an appropriate and necessary staff to carry out its business with respect to the Collateral in compliance with all other applicable laws and with training and experience and in number equal to or greater than would be customarily maintained by businesses engaging in similar activities, except where the failure to maintain such staff could not, after taking into account any formal or informal compliance deadline extensions granted by applicable regulatory authorities in effect, reasonably be expected to result in a Material Adverse Change.

**5.14** <u>**Budget**</u>. Attached hereto as <u>Exhibit B</u> is an initial budget, prepared by Borrowers, that sets forth in reasonable detail all of the Borrowers' projected receipts and disbursements on a weekly basis, separated into line items for each category of receipt or disbursement, and is otherwise in form and substance reasonably acceptable to Lender (the "<u>Budget</u>").

**6.**      **NEGATIVE COVENANTS.**

Each Borrower, covenants and agrees that, and without the prior consent of Lender in its sole discretion, until termination of all of the Commitments and payment in full of the Obligations, such Borrower will not do any of the following:

**6.1**      **Indebtedness.** Except for the Obligations hereunder, create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness with respect to the Collateral other than in the Ordinary Course.

**6.2**      **Liens.**  Create, incur, or assume, on or after the date of this Agreement, directly or indirectly, any Lien on or with respect to any of the Collateral, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Liens (a) created by the Loan Documents, (b) required by the Purchase Agreement in favor of the escrow agent in connection with the Amobee Sale, and (c) any other Lien that is the subject of a Permitted Protest.

**6.3**      **Restrictions on Fundamental Changes.**  Except in connection with a Plan of Reorganization or a Sale or Sales approved by the Bankruptcy Court or otherwise with the prior written consent of Lender, such Borrower shall not:

(a)      Enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its equity interests,

(b)      Liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), or

(c)      Suspend or close a substantial portion of the business of the Borrowers.

**6.4**      **Disposal of Assets.** Convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any Collateral held by any Borrower, other than in the Ordinary Course, without prior written consent of Lender, which consent shall not be unreasonably withheld; provided that, for the avoidance of doubt, any proceeds of such disposed Collateral shall be used to satisfy the Obligations consistent with Section 2.3(d).

**6.5**      **Change Name.** Change any Borrower's name, state of organization, organizational identity or, to the extent applicable, organizational identification number.

**6.6**      **Nature of Business.** With respect to the Borrowers only, make any change in the nature of its or their business as described in Schedule 6.6 or acquire any properties or assets that are not reasonably related to the conduct of such business activities; provided, that the foregoing shall not prevent any Borrower from (i) engaging in any business that is reasonably related or ancillary to its or their business, or (ii) complying with any requirement of the Bankruptcy Code.

24

**6.7**    **Prepayments and Amendments**.  Change or modify the material terms of any material lease or contract in connection with Collateral or materially alter any Organizational Documents, except, in each case, with the prior written consent of Lender.

**6.8**    **Change of Control.**  Cause, permit, or suffer, directly or indirectly, any Change of Control.

**6.9**    **Accounting Methods.**  Modify or change its fiscal year or its method of accounting (other than, with respect to U.S. Borrowers, as may be required to conform to GAAP).

**6.10**    **Transactions with Affiliates.**  Directly or indirectly enter into or permit to exist any transaction with any other Borrower or any Affiliate of any Borrower, except for transactions that are (a) in the Ordinary Course of such Borrower's business, including intercompany transactions among Borrowers and their Affiliates or (b) reflected in the Budget.

**6.11**    **Use of Advances.**  Use the proceeds of the Advances for any purpose other than (i) to pay the Fees and Lender's Expenses, (ii) to repay the existing Indebtedness of the Borrowers set forth on Schedule 6.11, and (iii) such other expenses and fees for the Borrowers' conduct of business and operations and other post-Petition Date expenses, including the fees and expenses of the administration of the Borrowers' Chapter 11 Cases and insolvency proceedings in the United Kingdom, as such expenses and fees are set forth in the Budget.

**6.12**    **Limitation on Capital Expenditures.**  Except as set forth in the Budget, make or incur any Capital Expenditure.

**6.13**    **Chapter 11 Case**.  Seek, consent or suffer to exist (i) any modification, stay, vacation or amendment to the Interim Order or the Final Order, as applicable; (ii) in connection with the Collateral, a priority claim for any administrative expense or unsecured claim against any Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind specified in Section 503(b), 506(b) or (c) or 507(b) of the Bankruptcy Code) equal to or superior to the priority claim of Lender in respect to the Collateral; and (iii) any Lien on Collateral having a priority equal or superior to the Liens in favor of Lender in respect of the Obligations, other than as required under the Purchase Agreement with respect to the good faith deposit thereunder.

**6.14**    **Plan**.  Propose and/or support any plan or reorganization that fails to indefeasibly and finally pay in full in cash all Obligations on the effective date of said plan or is otherwise not reasonably acceptable to Lender.

## 7.    PERFORMANCE COVENANTS

Borrowers covenant and agree that Borrowers shall:

**7.1**    **Budget Covenant**.  Comply with the Budget and Permitted Variance.

**7.2**    **Minimum Net Cash Collections**.  On a weekly basis from the date of such termination and following entry of the Interim Order or the Final Order, as applicable, generate

net cash collections in an amount no less than 10% of the amount set forth in the Budget for the cumulative period commencing on the date of the entry of the Final Order and ending on such testing date.

## 8. EVENTS OF DEFAULT.

**8.1    Event of Default.**  Any one or more of the following events shall constitute an event of default following giving of any applicable notice and the expiration of the applicable cure period (each, an "Event of Default") under this Agreement:

(a)    Any of the Borrowers shall fail to pay any Obligations to the Lender when due, including, but not limited to, the payment of any fees or costs due to the Lender under this Agreement or any Loan Document;

(b)    Other than as set forth in any other sub-section of this Section 8.1, any Borrower, as applicable, shall fail to perform, or otherwise breach, any of their respective covenants (including the covenants listed in Sections 5, 6, 7, 9 and 16) or obligations contained in this Agreement, which failure or breach shall continue for ten (10) days after the date upon which the relevant Borrower has received a written notice of such failure or breach from the Lender; provided that there shall be no Event of Default under Section 7 unless and until the termination of the Purchase Agreement;

(c)    Any representation or warranty made by any Borrower in this Agreement or in any agreement, certificate, instrument or financial statement or other statement delivered to the Lender pursuant to or in connection with this Agreement shall prove to have been incorrect in any material respect when made or deemed made, which failure or breach shall continue for ten (10) days after the date upon which such Borrower has received a written notice of such failure or breach from the Lender;

(d)    Except upon the Lender's prior written request or with the Lender's express prior written consent (and no such consent shall be implied from any other action, inaction, or acquiescence of the Lender), any Borrower shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Final Order or any of the Loan Documents;

(e)    Any Borrower shall file or obtain Bankruptcy Court approval of a disclosure statement for a Plan of Reorganization which is not reasonably acceptable to the Lender;

(f)    Any Borrower shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens and security interests granted to the Lender under the Interim Order or the Final Order, as applicable, or the Loan Documents with respect to the Collateral or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the Interim Order or the Final Order, as applicable, or as required by

the Purchase Agreement with respect to the good faith deposit provided under the Purchase Agreement;

(g)     The Interim Order or the Final Order, as applicable, shall cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court;

(h)     The occurrence of any default or event of default under the Interim Order or the Final Order, as applicable;

(i)     The entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor, other than the Lender, to realize upon, or to exercise any right or remedy with respect to, the Collateral;

(j)     Conversion of the Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code, or dismissal of the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily;

(k)     The Interim Order or the Final Order, as applicable, is modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Lender (and no such consent shall be implied from any other authorization or acquiescence by Lender);

(l)     A trustee or an examiner with special powers is appointed pursuant to Section 1104 of the Bankruptcy Code;

(m)     A chapter 11 plan is confirmed that does not provide for the payment in full in cash of all Obligations on the effective date thereof, together with releases, exculpations, waivers and indemnifications for the Lender and Lender Related Persons.

(n)     The occurrence of a Change of Control.

**8.2    Rights and Remedies.**

(a)     Upon the occurrence and during the continuance of an Event of Default, and notwithstanding section 362 of the Bankruptcy Code and without further order of the Bankruptcy Court or any other court or the initiation of any further proceeding with Borrowers, in addition to any other rights or remedies provided for hereunder or under any other Loan Document (including the Interim Order or the Final Order, as applicable) or by the UCC or any other applicable law, the Lender may do any one or more of the following:

(i)     declare the Obligations, whether evidenced by this Agreement or by any of the other Loan Documents immediately due and payable, whereupon the same shall become and be immediately due and payable, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by Borrowers;

(ii)     terminate Borrowers' ability to access the Facility;

27

(iii)     upon five (5) days' prior written notice (which period shall be deemed to be reasonable notice) to Borrowers, their lead bankruptcy counsel and the United States Trustee and lead counsel for any creditors' committee, obtain and liquidate the Collateral. If notice of disposition of Collateral is required by law, ten (10) days prior notice by the Lender to the Borrowers designating the time and place of any public sale or the time after which any private sale or other intended disposition of Collateral is to be made, shall be deemed to be reasonable notice thereof and shall constitute "authenticated notice of disposition" within the meaning of Section 9-611 of the UCC, and the Borrowers waive any other notice. The Lender may bid for and purchase the Collateral at any public sale.  The Lender may bid and purchase any Collateral at a private sale if the Collateral in question has a readily ascertainable market value.

(iv)     require the applicable Borrower to assemble all of the Collateral constituting personal property without judicial process pursuant to Section 9-609 of the UCC;

(v)     upon 5 days' prior written notice (which period shall be deemed to be reasonable notice) to the Borrowers and their lead bankruptcy counsel and the United States Trustee and lead counsel for any creditors' committee, take possession of all Collateral constituting tangible personal property without judicial process pursuant to Section 9-609 of the UCC; and

(vi)     exercise any of its other rights under the Loan Documents.

(b)     If permitted by the Final Order, to the extent an Event of Default occurs as a result of the Borrowers' failure to indefeasibly satisfy the Obligations in full by the Stated Maturity Date, Borrowers waive any right to (a) the five (5) day notice period set forth in <u>Section 8.2(iii)</u> and (b) to challenge (i) whether or not the Maturity Date or an Event of Default has occurred, (ii) the Lender's exercise of its rights and remedies against the Collateral, including without limitation, any foreclosure through a state court proceeding, and (iii) the applicability of the Default Rate or the Stated Maturity Date Fee.

**8.3     Application of Proceeds upon Event of Default**.  The Lender shall apply the cash proceeds actually received from any foreclosure sale, other disposition of the Collateral upon an Event of Default as follows: (i) first, to reasonable attorneys' fees and all expenses (including, but not limited to, court costs, advertising expenses, auctioneer's fees, premiums for any required bonds, auditor's fees, amounts advanced for taxes and other expenses) incurred by the Lender in attempting to enforce this Agreement or in the prosecution or defense of any action or proceeding related to the subject matter of this Agreement; (ii) second, to the discharge of any accrued but unpaid interest on the Obligations, (iii) third, to the outstanding principal balance of any Obligations, (iv) fourth, to the satisfaction of the other security interests and liens of record which are inferior to the security interest created by this Agreement, in order of their priority; and (v) fifth, to pay any remaining surplus to the Borrower.

**8.4     Remedies Cumulative.** The rights and remedies of Lender under this Agreement, the other Loan Documents, and all other agreements shall be cumulative.  Lender shall have all other rights and remedies not inconsistent herewith as provided under the UCC, by law, or in equity. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver

by Lender of any Event of Default shall be deemed a continuing waiver. No delay by Lender shall constitute a waiver, election, or acquiescence by it.

## 9.    PRIORITY AND COLLATERAL SECURITY

### 9.1    Superpriority Claims; Subordination in favor of Lender Liens.

(a)    Each Borrower warrants and covenants that, except as otherwise expressly provided in this paragraph, upon the entry of the Interim Order or the Final Order, as applicable, the Obligations of any Borrower under the Loan Documents:

(i)    shall at all times constitute a claim against the Borrowers and their estates in the Chapter 11 Case, which is an administrative expense claim having priority, pursuant to Section 364(c)(1) and 507(b) of the Bankruptcy Code, over any and all allowed administrative expenses, and unsecured claims now existing or hereafter arising, including, without limitation, administrative expenses of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(b) and (c), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 or 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code (such claim, a "Superpriority Claim").  Such Superpriority Claim shall have recourse to and be payable from all prepetition and postpetition property and assets of Borrowers and their respective estates, all  Collateral and all proceeds thereof, including for the avoidance of doubt, (i) any deposit in connection with a proposed Sale (whether terminated or otherwise) that becomes property of the Borrowers' estates, subject, however, only to the senior lien rights of the stalking horse purchaser under the Purchase Agreement and such stalking horse bid protections as may be approved by the Bankruptcy Court, (ii) claims against the Borrowers' directors and officers (if any) and (iii) subject to and only effective upon entry of the Final Order, the proceeds of any and all avoidance power claims or causes of action under sections 544, 545, 547, 548 through 551 and 553(b) of the Bankruptcy Code; and

(ii)    shall be secured by valid, enforceable, non-avoidable and perfected first priority senior liens on and security interests in favor of the Lender in all Collateral in which any Borrower has any right, title or interest, which first priority senior liens and security interests in favor of the Lender shall be senior to all other liens in the Collateral (other than as required under the Purchase Agreement with respect to the good faith deposit provided thereunder), and shall include first priority senior liens under Section 364(c)(2) of the Bankruptcy Code.

(b)    In the event any of the Collateral is transferred to any Borrower, such transfer shall be subject in all respects to the Lender's Liens;

(c)    The Superpriority Claims referred to in this Section 9.1 shall be senior in priority to (i) all claims against any Borrower in the Chapter 11 Case; and (ii) all other Liens on the Collateral as and to the extent described in Section 9.1(a)(i).

### 9.2    Grant of Security Interest in the Collateral.  To secure the payment and performance of the Obligations, each Borrower hereby grants to the Lender a valid, enforceable, non-avoidable and perfected first priority security interest in, and collaterally pledges and assigns, all of such Borrower's right, title and interest in and to the Collateral.

**9.3** **Representations and Warranties in Connection with Security Interest**. Each Borrower represents and warrants to the Lender as follows:

(a) Such Borrower has full right and power to grant to the Lender a perfected, first priority security interest and Lien on its respective interest in the Collateral pursuant to this Agreement and the other Loan Documents, upon entry of the Interim Order.

(b) Upon the execution and delivery of this Agreement and the UK Debenture, and upon the filing of the necessary financing statements and other appropriate filings or recordations and/or delivery of any necessary certificates, as applicable, upon entry of the Interim Order, the Lender will have a good, valid and first priority perfected Lien and security interest in the Collateral granted by such Borrower, subject to no transfer or other restrictions or Liens of any kind in favor of any other Person.

(c) As of the Closing Date, no financing statement, mortgage or any other evidence of lien relating to any of the Collateral granted by such Borrower is on file in any public office except those on behalf of the Lender, other than the filings made by the Borrowers' pre-Petition Date lenders as referenced in Schedule 4.4.

(d) As of the Closing Date, such Borrower is not party or otherwise subject to any agreement, document or instrument that conflicts with this Section 9.

**9.4** **Covenants with Respect to Collateral**. As long as any Obligations are outstanding, each Borrower covenants and agrees as follows:

(a) Such Borrower shall not sell, transfer, give, assign or in any other manner dispose of all or any portion of, or any interest in, any of the Collateral, except to the extent permitted by this Agreement. Such Borrower shall not permit or suffer to exist any liens or security interests encumbering any of the Collateral.

(b) Such Borrower shall inform the Lender of any default or event of default under any agreement in connection with the Collateral as soon as practicable upon becoming aware of any such default or event of default, and shall exercise remedies thereunder at the instruction of, or with the prior written consent of, the Lender.

(c) Such Borrower shall not consolidate with or merge with or into any other corporation, or liquidate or dissolve, without the prior written consent of the Lender. Such Borrower shall not sell all or substantially all of its assets, except in connection with the consummation of the Purchase Agreement or otherwise with the prior written consent of the Lender.

(d) Such Borrower shall not change the jurisdiction of its formation without the prior written consent of the Lender. Such Borrower shall not change its name or the location of its principal executive office without giving the Lender thirty (30) days' prior written notice.

(e) The Collateral shall be kept only at the locations set forth on Schedule 9.4(f) and shall not be moved from such locations without the prior consent of the Lender.

(f)      With respect to any Deposit Account of a Borrower, the relevant Borrower shall cause the depositary institution maintaining such account to enter into a Control Agreement in favor of the Lender.

**9.5      Lender's Ability to Perform Obligations on Behalf of Borrowers with Respect to the Collateral**.  The Lender shall have the right, but not the obligation, to perform on such Borrower's behalf any or all of such Borrower's obligations under this Agreement with respect to the Collateral, when such obligations are due, at the expense, for the account and at the sole risk of the applicable Borrower.

**9.6      Filing of Financing Statements**.  Each Borrower irrevocably authorizes the Lender to prepare and file financing statements provided for by the UCC, to perfect the Lender's security interest in the Collateral, in all jurisdictions in which the Lender believes in its sole opinion that such filing is appropriate.  Each Borrower also irrevocably authorizes the Lender to file such continuation statements and to take such other action as may be required or appropriate, in either case in the Lender's sole judgment, in order to perfect and to continue the perfection of Lender's security interests in the Collateral, unless prohibited by law.

**9.7      No Discharge; Survival of Claims**. Pursuant to Section 1141(d)(4) of the Bankruptcy Code, the Borrowers hereby waive any discharge of the Obligations with respect to any plan of reorganization that shall not provide for the indefeasible payment in full in cash of the Obligations under this Agreement.

## 10.      WAIVERS; INDEMNIFICATION.

**10.1      Demand; Protest; etc.**  To the extent permitted by applicable law, each Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by Lender on which such Borrower may in any way be liable.

**10.2      Lender's Liability for Collateral.**      As long as Lender complies with its obligations, if any, under the UCC, Lender shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person.  All risk of loss, damage, or destruction of the Collateral shall be borne by the Borrowers, except any thereof resulting from the gross negligence, bad faith or willful misconduct of Lender as finally determined by a court of competent jurisdiction.

**10.3      Indemnification.**  Each Borrower shall pay, indemnify, defend, and hold the Lender Related Persons (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and actual damages, and all reasonable and documented out-of-pocket fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at

any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution and delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of the Borrowers' compliance with the terms of the Loan Documents, (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any Collateral or any Environmental Actions, Environmental Liabilities or Remedial Actions related in any way to any Collateral (each and all of the foregoing, the "Indemnified Liabilities"). The foregoing to the contrary notwithstanding, the Borrowers shall have no obligation to any Indemnified Person under this Section 10.3 with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Person or its officers, directors, employees, attorneys, or agents. This provision shall survive the termination of this Agreement and the repayment of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which any Borrower was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by such Borrower with respect thereto. **WITHOUT LIMITATION, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON.**

## 11.    NOTICES.

All notices or demands relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, or electronic mail (at such email addresses as a party may designate in accordance herewith). In the case of notices or demands to any party hereunder or any service of process to any party hereunder, they shall be sent to the respective addresses set forth below:

If to any Borrower:

Videology, Inc.
1500 Whetstone Way, Suite 500
Baltimore, MD 21230
Attn: Dan Smith, General Counsel
Telephone: 410-818-4857
Email: dsmith@videologygroup.com

With a copy, which shall not constitute notice to:

Cole Schotz P.C.
300 E. Lombard Street, Suite 1450
Baltimore, MD 21202
Attn: Irving E. Walker, Esquire
Telephone: 410-528-2970
Email: iwalker@coleschotz.com

If to Lender:

Draper Lending, LLC
1999 Avenue of the Stars, Suite 2040
Los Angeles, CA 90067
Telephone: 310-286-2929
Attn: Vikas Tandon

with copies to:

Arent Fox LLP
1675 Broadway
New York, NY 10019
Telephone: 212-484-3900
Attn: Robert M. Hirsh, Esquire
(robert.hirsh@arentfox.com)
Cynthia Weiss, Esquire
(cynthia.weiss@arentfox.com)

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this Section 11, shall be deemed received on the earlier of the date of actual receipt or three (3) Business Days after the deposit thereof in the mail; provided, that (a) notices sent by overnight courier service shall be deemed to have been given when received, and (b) notices by electronic mail shall be deemed received when sent upon confirmation of transmission as evidenced by a delivery receipt or similar electronic mail function. If any notice, disclosure, or report is required to be delivered pursuant to the terms of this Agreement on a day that is not a Business Day, such notice, disclosure, or report shall be deemed to have been required to be delivered on the immediately following Business Day.

**12.      CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.**

(a)      THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(b)      THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY

33

COURT AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN NEW YORK; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH BORROWER AND LENDER WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 12(b); PROVIDED, FURTHER, HOWEVER, THAT ALL PARTIES HEREBY AGREE THAT THEY HAVE CONSENTED TO THE JURISDICTION OF THE BANKRUPTCY COURT AND THAT THE BANKRUPTCY COURT WILL RETAIN EXCLUSIVE JURSIDICTION WITH RESPECT TO ALL DISPUTES SO LONG AS THE CHAPTER 11 CASE REMAINS PENDING.

(c)   TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, BORROWERS AND LENDER HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH BORROWER AND LENDER REPRESENT THAT EACH SUCH PARTY HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**13.   AMENDMENTS; WAIVERS; SUCCESSORS; INDEMNIFICATION.**

**13.1   Amendments and Waivers.**  No amendment, waiver or other modification of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Borrower therefrom, shall be effective unless the same shall be in writing and signed by Lender and Borrowers that are party thereto and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given.

**13.2   No Waivers; Cumulative Remedies.**  No failure by Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Lender in exercising the same, will operate as a waiver thereof. No waiver by Lender will be effective unless it is in writing, and then only to the extent specifically stated. No waiver by Lender on any occasion shall affect or diminish Lender's rights thereafter to require strict performance by Borrowers of any provision of this Agreement. Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Lender may have.

**13.3   Successors.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided that no Borrower may assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any

prohibited assignment shall be absolutely void *ab initio*. No consent to assignment by Lender shall, unless otherwise provided in such consent, release any Borrower from its Obligations. Lender may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder or assign any Advances or Commitment (in whole or in part) to an Affiliate without notice to or consent of any Borrower.

## 14.    GENERAL PROVISIONS.

**14.1    Effectiveness.** This Agreement shall be binding and deemed effective when executed by the Borrowers and Lender.

**14.2    Section Headings**.  Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

**14.3    Interpretation**.  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against Lender or any Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

**14.4    Severability of Provisions**.  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

**14.5    Debtor-Creditor Relationship.** The relationship between Lender, on the one hand, and each Borrower, on the other hand, is solely that of creditor and debtor, as applicable. Lender does not have (and shall not be deemed to have) any fiduciary relationship or duty to any Borrower arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between Lender, on the one hand, and Borrowers, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

**14.6    Counterparts; Electronic Execution.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by facsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

**14.7    Revival and Reinstatement of Obligations**.  If the incurrence or payment of the Obligations by Borrowers or the transfer to Lender of any property should for any reason subsequently be asserted, or declared, to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent

conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "Voidable Transfer"), and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Lender is required or elects to repay or restore, and as to all reasonable and actual out-of-pocket costs, expenses, and attorneys' fees of Lender related thereto, the liability of Borrowers automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

**14.8    Lender Expenses.** Notwithstanding the Work Fee, the Borrowers agree to pay any and all Lender Expenses (exclusive of those covered by the Work Fee) promptly after written demand therefor by Lender and that such Obligations shall survive payment or satisfaction in full of all other Obligations.

**14.9    Integration.** This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

## 15.    JOINT AND SEVERAL LIABILITY

Each Borrower acknowledges, represents and warrants the following:

**15.1    Inducement.** Lender has been induced to make the Advances to Borrowers in part based upon the assurances by each Borrower that such Borrower desires that the Advances be honored and enforced as separate obligations of such Borrower, should Lender desire to do so.

**15.2    Combined Liability**. Notwithstanding the foregoing, the Advances and the other Obligations constitute the joint and several obligations of each and every Borrower, and Lender may at its option enforce the entire amount of the Advances and the other obligations of any Borrower against any one or more Borrowers.

**15.3    Separate Exercise of Remedies**. Lender may exercise remedies against each Borrower and its property separately, whether or not Lender exercises remedies against any other Borrower or its property. Lender may enforce one or more Borrower's Obligations without enforcing any other Borrower's Obligations. Any failure or inability of Lender to enforce one or more Borrower's Obligations shall not in any way limit Lender's right to enforce the Obligations of any other Borrower. If Lender forecloses or exercises similar remedies on any Collateral, then such foreclosure or similar remedy shall be deemed to reduce the balance of the Advances only to the extent of the cash proceeds actually realized by Lender from such foreclosure or similar remedy or, if applicable, Lender's credit bid at such sale, regardless of the effect of such foreclosure or similar remedy on the Advances secured by such Collateral under the applicable state law.

[Signature pages follow.]

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

<u>**BORROWERS**</u>**:**

Videology, Inc.

By:_____
Name:
Title:


Collider Media, Inc.

By:_____
Name:
Title:


Videology Media Technologies, LLC

By:_____
Name:
Title:


LucidMedia Networks, Inc.

By:_____
Name:
Title:


Videology Ltd.

By:_____
Name:
Title:

**<u>LENDER</u>:**

Draper Lending, LLC

By:_____
Name: Vikas Tandon
Title:   Authorized Signatory

**EXHIBIT A**

**Form of Compliance Certificate**

Date: _____ , 2018

       This Compliance Certificate (this "<u>Certificate</u>") is given to Draper Lending LLC, a California limited liability company (together with its successors and assigns, the "<u>Lender</u>" or "<u>Agent</u>"), by Videology, Inc, Collider Media, Inc., Videology Media Technologies, LLC, LucidMedia Networks, Inc., a Delaware corporation; and Videology Ltd. (collectively, the "<u>Borrowers</u>") pursuant to <u>Section 5.1</u> of that certain Senior Secured, Super-Priority Debtor-In-Possession Loan and Securities Agreement dated as of May 15, 2018 (as the same has been amended through the date hereof, the "<u>Loan Agreement</u>").  Capitalized terms used and not defined herein have the meanings set forth in the Loan Agreement.

       The Borrowers hereby certify that:

       (a)     Borrowers are in compliance with the conditions precedent set forth in <u>Section 3.1</u> of the Loan Agreement.

       (b)     Borrowers have complied fully and completely with all applicable covenants through the date of the requested Advance as set forth in the Loan Agreement, other than those set forth in Section 7 of the Loan Agreement as long as the Purchase Agreement is still in full force and effect.

       (c)     The representations and warranties of Borrowers contained in the Loan Agreement and in the other Loan Documents are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

       (d)     No Default or Event of Default shall have occurred and be continuing on the requested funding date, nor shall either result from the making thereof.

       (e)     The Interim Order or the Final Order, as applicable, has been entered by the Bankruptcy Court in form and substance satisfactory to Lender in its sole discretion, and remains in full force and effect on the date hereof and has not been, from the time of the entry of such order, modified or amended (unless otherwise approved by the Lender), reversed, stayed or subject to a motion for re-argument or reconsideration, or appealed.

(f)    No injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, has been issued by any Governmental Authority against any Borrower or Lender.

(g)    No action, proceeding, investigation, regulation or legislation has been instituted or threatened before any Governmental Authority to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of the Loan Agreement or any of the other Loan Documents or the consummation of the transactions contemplated thereby.

*IN WITNESS WHEREOF,* Borrowers has caused this Certificate to be executed by the Borrowers this _____ day of _____, 2018.

Videology, Inc.

By:_____
Name:
Title:

Collider Media, Inc.

By:_____
Name:
Title:

Videology Media Technologies, LLC

By:_____
Name:
Title:

LucidMedia Networks, Inc.

By:_____
Name:
Title:

Videology Ltd.

By:_____
Name:
Title:

## EXHIBIT B

## Budget

[To be provided by Borrower]

## EXHIBIT C

### Reporting Requirements

(a)  **Financial Reports**. Borrower shall furnish to Lender, in a form satisfactory to Lender, in its sole discretion, as soon as available and in any event within ten (10) Business Days after the end of each calendar month; provided that such monthly financial statements may be subsequently revised as a result of year-end audit adjustments:

(i)  unaudited consolidated financial statements for such calendar month and/or quarter, as applicable, of the Borrowers consisting of a balance sheet, and related statements of income, retained earnings, cash flows and owners' equity, all of which shall be certified on behalf of the Borrowers by an Authorized Person as being in compliance with this paragraph (a);

(ii)  an operating report for Borrowers, including a detailed comparison of the actual year-to-date operating results against the Budget; and

(iii)  solely with respect to the last month of each fiscal quarter, a management report signed by an Authorized Person of Borrowers, describing in reasonable detail the Borrowers' operations and financial condition for such month.

For the avoidance of doubt, the reports required under sections (a)(i) and (a)(iii) above may consist of the monthly operating reports as filed in the Chapter 11 Case.

All financial statements shall be prepared, and shall be complete, correct and fairly presenting in all material respects, in each case in accordance with GAAP consistently applied with prior periods the financial position and results of operations of the Borrowers (provided that interim financial statements shall not be required to have footnote disclosure and may be subject to normal year-end adjustments).

(b)  **Other Materials**. The Borrowers shall furnish to Lender, in form and substance satisfactory to Lender, as soon as available and in any event within five (5) Business Days after the preparation, receipt or issuance thereof or request therefor by Lender, (A) copies of any reports and management control letters provided by the Borrowers' independent accountants and (B) such additional information, documents, statements, and other materials as Lender may request from time to time in its sole discretion.

(c)  **Notices**. The Borrowers promptly, and in any event within five (5) Business Days after any Borrower or Authorized Person thereof obtains knowledge thereof, shall notify Lender in writing of:

(i)  any pending or threatened action, suit, proceeding or investigation involving any Borrower or Subsidiary thereof, or any such Person's property to the extent the amount in controversy exceeds $250,000 in the aggregate or any injunctive relief is sought;

(ii)     (A) the receipt of any notice or request from any Governmental Authority regarding any liability or claim equal to or exceeding $250,000 in the aggregate or (B) any material action taken or threatened to be taken by any Governmental Authority (or any notice of any of the foregoing);

(iii)     any notice regarding termination of any lease of material real property (other than any such termination resulting from the scheduled expiration thereof, pursuant to the originally agreed upon terms) or of any senior officer, or the loss, termination or expiration of any material contract to which any Borrower or its assets are bound; and

(iv)     the filing, recording or assessment of any federal, state, local or foreign tax Lien against any Collateral (other than real estate taxes and municipal charges related to the Real Property Collateral) or any Borrower.

(d)     **Updates**. The Borrowers shall furnish to Lender revisions to the schedules to any Loan Document to the extent necessary or appropriate; provided, that delivery or receipt thereof by Lender shall not constitute a waiver by Lender or a cure of any Default or Event of Default resulting therefrom, or result in an amendment or modification of such schedules.

(e)     **Material Adverse Change**. Promptly upon an Authorized Person of any Borrower obtaining knowledge of any development or event that has caused, or which could reasonably be expected to cause, a Material Adverse Change with respect to which notice is not otherwise required to be given pursuant to this Exhibit C, an Officer's Certificate of the Borrower setting forth the details of such development or event and stating what action the relevant Borrowers has taken or proposes to take with respect thereto.

(f)     **Management Letters**. Promptly after the receipt thereof by any Borrower, copies of any management letters and any reports as to material inadequacies in accounting controls (including reports as to the absence of any such inadequacies) submitted to such Borrower by its independent certified public accountants in connection with any audit of such Borrower made by such accountants.

(g)     **Other Information**. Any other information, including financial statements and computations, relating to the performance of any Borrower that Lender may from time to time request in its sole discretion and which is reasonably capable of being obtained, produced or generated by such Borrower (without undue effort and undue expense).

**EXHIBIT D**

**Request for Advance**


Draper Lending, LLC                                    Advance Request No. _____
1999 Avenue of the Stars, Suite 2040
Los Angeles, CA 90067
Attention:  Vikas Tandon


Ladies and Gentlemen:

The undersigned executes and delivers this Request for Advance ("Request") in connection with the Senior Secured, Super-Priority Debtor-In-Possession Loan and Security Agreement, dated as of May 15, 2018 (as amended, restated, supplemented, replaced, renewed or otherwise modified from time to time, the "Loan Agreement") by and among (i) Parent Borrower (as defined below); (ii) Collider Media, Inc., a Delaware corporation; (iii) Videology Media Technologies, LLC, a Delaware limited liability company; (iv) LucidMedia Networks, Inc., a Delaware corporation; and (v) Videology UK (as defined below) (the entities set forth in clauses (i) through (v) above, collectively, the "Borrowers") and Draper Lending, LLC as lender (the "Lender"). All capitalized terms used in this Request without definition shall have the same meanings herein as they have in the Loan Agreement.  This Request constitutes a Loan Document.

Pursuant to Section 2.2 of the Loan Agreement, Borrowers hereby request an Advance in the amount of $_____ on _____, 2018.

Each Borrower hereby represents, warrants to Lender as follows:

1.      As of this date, such Borrower is in compliance with all of the terms and conditions of the Loan Agreement and the other Loan Documents and no default or Event of Default thereunder exists, nor shall result from the making of the Advance requested hereunder.

2.      Such Borrower's representations and warranties set forth in the Loan Agreement, the other Loan Documents and any other related document are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date hereof, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

3.      As of the date of this Request, the sum of the outstanding principal under the Loan (after giving effect to the Advance and pledge to be made on such date pursuant to this Request) plus the amount requested in any outstanding but unfunded Request for Advances does not violate Section 2.1 of the Loan Agreement.

[Signature Page Follows]

**<u>BORROWERS</u>:**

Videology, Inc.

By: _____
Name:
Title:


Collider Media, Inc.

By: _____
Name:
Title:


Videology Media Technologies, LLC

By: _____
Name:
Title:


LucidMedia Networks, Inc.

By: _____
Name:
Title:


Videology Ltd.

By: _____
Name:
Title:


[Signature Page to Request for Advance]

**<u>Exhibit 2</u>**

**Initial Approved Budget**

**[To be Supplemented]**