IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| VIDEOLOGY, INC., *et al.*,[1] | Case No. 18-11120 (BLS) |
| Debtors. | Jointly Administered |
| | Re: Docket No. 47 |

**DECLARATION OF KENNETH TARPEY IN SUPPORT OF DEBTORS'
MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING SECURED POST-
PETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS TO
POST-PETITION LENDER, (III) SCHEDULING FINAL HEARING AND
(IV) GRANTING RELATED RELIEF**

I, Kenneth Tarpey, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information and belief:

1. I am over the age of 18 and am competent to testify. I am the Chief Financial Officer of Videology, Inc. ("Videology"), and oversee financial management of Videology and its wholly-owned direct and indirect subsidiaries, including those wholly-owned subsidiaries that are also debtors filing the above-captioned chapter 11 cases (together with Videology, the "Debtors").

2. I submit this Declaration in support of the *Debtors' Motion for Interim and Final Orders (I) Authorizing Secured Post-Petition Financing, (II) Granting Liens and Superpriority Claims to Post-Petition Lender, (III) Scheduling Final Hearing and (IV) Granting Related Relief* [Docket No. 47] (the "DIP Motion").[2]

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Videology, Inc. (2191), Collider Media, Inc. (8602), Videology Media Technologies, LLC (6243), LucidMedia Networks, Inc. (8566) and Videology Ltd. The address of the Debtors' corporate headquarters is 1500 Whetstone Way, Suite 500, Baltimore, MD 21230.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Motion.

## Qualifications

3. I have been the Chief Financial Officer of Videology since November 2014. I have more than 30 years of financial leadership experience and expertise directing strategic operational and financial programs and private technology companies. Earlier in my career, I served as a senior manager at PricewaterhouseCoopers. I hold a BA from The College of the Holy Cross and an MBA from Babson College.

4. I am familiar with the Debtors' day-to-day operations, books and records, businesses, and financial affairs. Except as otherwise indicated, the facts set forth in this Declaration are based on my personal knowledge of the Debtors' businesses, employees, operations, and finances; information learned from my review of relevant documents; my discussions with members of the Debtors' senior management and other professionals; information provided to me by employees working under my supervision; or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial condition. More specifically to the DIP Motion, I have been heavily involved in the pre-petition process of searching for a DIP loan and securing the DIP loan proposed in the DIP Motion.

5. If called upon to testify, I would testify competently to the facts set forth in this Declaration and the DIP Motion. I am authorized to submit this Declaration on the Debtors' behalf.

## Case Background and the Need for Post-Petition Financing

6. From the outset of these Chapter 11 Cases, the Debtors have had a single overarching goal: the consummation of a sale of substantially all of their assets pursuant to section 363 of the Bankruptcy Code to the proposed stalking horse, Amobee, Inc., or another higher and better bidder, for the purpose of maximizing recoveries for the benefit of creditors and to preserve the organization's business operations, customer relationships and empoyees'

2

jobs. To that end, the Debtors have worked diligently to identify a stalking horse bidder to purchase substantially all of the assets and have filed the Bidding Procedures Motion seeking Court approval to commence a sale process with the process hopefully culminating in the entry of a sale order on or about July 17, 2018 and subsequent prompt closing. Since filing the Bidding Procedures Motion, the Debtors have had ten new expressions of interest in the assets and anticipate a robust sale process. In the coming days, the Debtors intend to file an application to retain LUMA Capital Partners, an investment banking firm that is leading the sale process for the Debtors. While there are no guarantees that the very positive early indications of interest from potential bidders will result in qualified overbids, the Debtors are optimistic that a robust sale process will result, assuming the Debtors are able to fund operations through mid to late July when the proposed sale process is projected to conclude.

7. Though the Debtors anticipate that the sale process will yield significant value to the estates and their creditors, the Debtors do not believe that they will be able to continue operations through July 17 absent additional post-petition financing. The Debtors obtained Court approval to use their cash collateral only through May 23, 2018. The Debtors requested consent for a further extension through June 5, 2018 (the "second-day" hearing in this case and date the final DIP Motion hearing and final cash collateral hearing will be scheduled), and the Prepetition Lenders declined to approve the requested extension. Obtaining an extension to use cash collateral beyond May 23, 2018 (for potentially more than the few days necessary to secure the DIP loan and pay off the lenders) would come at a substantial cost that would require the payment of significant default interest. If no DIP loan is obtained, continuing to use cash collateral may also require the payment to the Prepetition Lenders of additional adequate protection payment from customer receipts (although the Debtors would strongly contest this),

while the DIP Credit Facility is a term loan that is not conditioned on customer receipts to receive drawn funds.  In addition, if no DIP loan is obtained, it would trigger an $800,000 change in control fee which would be avoided if the DIP loan is obtained, as the DIP loan would pay off the Prepetition Lenders in advance of a sale transaction.  While the total cost of the DIP loan is approximately $2.52 million (if all $25 million is drawn), and approximately $2.13 million if the interim amount of $20 million is drawn), the incremental cost of the DIP loan is relatively nominal as compared to continued use of cash collateral.  Specifically, continued use of cash collateral would cost the Debtors approximately $1.9 million, consisting of interest of approximately $800 thousand for an eight week period, a change in control fee (as discussed above) of $800,000, and estimate fees and expenses of $300,000 (combined between the lenders and Debtors) to have an anticipated contested cash collateral dispute.  Accordingly, the incremental cost of the DIP loan versus continued use of cash collateral is approximately $236 thousand, if the $20 million interim amount is drawn, and $623 thousand, if the additional $5 million that would become available upon final approval of the DIP Credit Facility is drawn.

8.     In addition to the costs of continued use of cash collateral, there is uncertainty whether such a disputed cash collateral hearing would succeed without having to pay the Prepetition Lenders more than interest payments, and if customer receipts beyond interest were required to be dedicated to use of cash collateral, the Debtors' ability to operate through a sale transaction would be seriously jeopardized.  As such, the Debtors strongly believe, in their business judgment, that the DIP loan is far superior and more certain than use of cash collateral. In addition to the foregoing, the DIP loan is a term loan that is premised primarily on the stalking horse bidder staying under contract, while the Debtors believe that any use of cash collateral (or DIP agreement from the Prepetition Lenders) would be loaded with conditions of customer

4

receipts, the exact timing of some of which is currently uncertain. For these reasons, not only is the DIP loan superior to use of cash collateral, it is superior to the DIP loan offered by the Prepetition Lenders, which was expensive and contained unacceptable funding conditions as proposed by the pre-petition lender.

### The DIP Financing Marketing Process and the Selection of the DIP Facility

9. Because of the restrictions placed on their accounts at the direction of the Prepetition Lenders, the Debtors were unable complete an agreement with a professional investment banking firm as the debtor did not have funds to pay said firm to assist them in procuring DIP financing. Despite not having the benefit of a more formal banking process to procure a DIP loan, the Debtors engaged in robust, pre- and post-petition efforts to obtain the most favorable DIP financing available using their personal and professional relationships to identify potential sources of financing.

10. Through these connections, the Debtors engaged with a total of six potential DIP lenders pre-petition, including the Prepetition Lenders. Two of these lenders quickly withdrew from consideration. Two have not provided the Debtors with any offer – formal or informal – to provide post-petition funding.

11. Aside from the proposed DIP loan, the only other concrete indication of interest came from the Prepetition Lenders on the eve of filing these chapter 11 cases. Following extensive negotiations, the Prepetition Lenders provided the Debtors with a term sheet for an asset-based loan facility. After reviewing and comparing the DIP Credit Facility, the Debtors determined that the DIP Facility was superior, as described above, and thus the Debtors decided to proceed with the DIP Lenders' proposal.

12. In addition to being superior from a structural and liquidity standpoint, the DIP Credit Facility allows the Debtors to payoff the Prepetition Lenders which is an enormous benefit to the Debtors, given the pre-petition conduct of the Prepetition Lenders and the tenuous relationship that has arisen between the Debtors and Prepetition Lenders in recent months, since the Prepetition Lenders restricted the Debtors' funds and made it impossible for them to restructure outside of a bankruptcy process.

## The Need for the DIP Credit Facility

13. Without approval of the DIP Credit Facility, the Debtors are projected to run out of liquidity (or come very close to it) by the end of May. Accordingly, interim approval of the DIP Credit Facility is needed. After using the interim funds of $20 million to pay off the Prepetition Lenders, and payment of the DIP Lenders' fees from the initial $20 million draw, the Debtors will increase their liquidity by $2.8 million, which will allow the Debtors to meet payroll and other obligations in the short term. The Debtors will also have the ability to draw the additional $5 million on or after June 5, assuming the DIP Credit Facility is approved on a final basis. Assuming the Debtors receive payment on invoices from its customers, the DIP Credit Facility is expected to be an effective bridge to a sale in the mid-July time frame, as reflected in the budget attached to the proposed Interim DIP Order.

14. Without the DIP Credit Agreement, the Debtors believe the risk of running out of liquidity prior to a sale transaction is substantially higher. The outcome of a contested cash collateral hearing with the Prepetition Lenders is uncertain, and, as noted above, even if successful, cash collateral usage would be almost as expensive (with far greater risk) than obtaining the DIP Credit Facility and paying off the Prepetition Lenders. With that said, and as noted above, even with the DIP Credit Facility, the Debtors require compliance with the terms of customer agreements to pay their invoices.

15. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: May 20, 2018
       Baltimore, Maryland

*/s/ Kenneth Tarpey*
Name: Kenneth Tarpey
Title: Chief Financial Officer