## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| VIDEOLOGY, INC., *et al.*,[1] | Case No. 18-11120 (BLS) Jointly Administered |
| Debtors. | Related to Docket No. 47 |

### INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) MODIFYING THE AUTOMATIC STAY; (IV) AUTHORIZING THE DEBTORS TO ENTER INTO AGREEMENTS WITH DRAPER LENDING, LLC; (V) AUTHORIZING USE OF CASH COLLATERAL; (VI) SCHEDULING A FINAL HEARING AND (VIII) GRANTING RELATED RELIEF

THIS MATTER having come before the Court upon the motion (the "**Motion**")[2] of the above-captioned debtors (the "**Debtors**" or the "**Borrowers**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code, (11 U.S.C. §§ 101 *et seq.*, as amended, the "**Bankruptcy Code**"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rules 2002-1 and 4001-2, seeking entry of an interim order (the "**Interim Order**") and a final order (the "**Final Order**") granting *inter alia*:

i.      authority, pursuant to sections 105, 363, and 364(c) of the Bankruptcy Code, for each of the Debtors, jointly and severally, to obtain senior secured postpetition financing ("**DIP Facility**") in an aggregate principal amount of up to $25 million (the "**Delayed Draw**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Videology, Inc. (2191), Collider Media, Inc. (8602), Videology Media Technologies, LLC (6243), LucidMedia Networks, Inc. (8566), and Videology, Ltd., a company organized under the laws of England and Wales. The address of the Debtors' corporate headquarters is 1500 Whetstone Way, Suite 500, Baltimore, MD 21230.

[2] Unless stated otherwise, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Credit Agreement (as defined below), as applicable.

**Commitment**") (of which (x) $20 million (the "**Interim Advance**") shall be made available to the Debtors upon entry of this Interim Order upon satisfaction or waiver of the borrowing conditions set forth in the DIP Loan Documents (as defined below) and may be drawn in a single draw on the Closing Date and (y) subject to entry of the Final Order, the balance shall be made available to the Debtors at intervals and in amounts that correspond to the Approved Budget (as defined below));

ii.        authority (a) for the Debtors to enter into that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement, among the Debtors as Borrowers and Draper Lending, LLC (the "**DIP Lender**") in substantially the same form as attached hereto as **Exhibit 1** (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**DIP Credit Agreement**" and, together with any ancillary, collateral or related documents and agreements, the "**DIP Loan Documents**");

iii.        authority for the Debtors to use the DIP Facility and the proceeds thereof in accordance with the Initial Approved Budget attached hereto as **Exhibit 2** to (a) fund the post-petition working capital needs of the Debtors during the pendency of the Chapter 11 Cases, (b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in the DIP Loan Documents, (c) pay all Outstanding Prepetition Obligations (defined below) and (d) pay the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the Approved Budget this Interim Order and the Final Order;

iv.        authority for the Debtors to grant to the DIP Lender valid, enforceable, non-avoidable, automatically and fully perfected security interests, liens and superpriority claims, including allowed superpriority administrative expense claims pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out and liens pursuant to sections

364(c)(2) and 364(c)(3) of the Bankruptcy Code in the DIP Collateral (as defined below) (and all proceeds thereof), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, ("**Cash Collateral**"), to secure all DIP Obligations (as defined below), as more fully set forth in this Interim Order, subject only to the Carve-Out (as defined below);

     v.     subject to and only effective upon entry of the Final Order, waiver by the Debtors of all rights to surcharge against the collateral of the DIP Lender pursuant to section 506(c) of the Bankruptcy Code;

     vi.     subject to and only effective upon entry of the Final Order, waiver of the equitable doctrine of marshaling or any other similar doctrine with respect to any collateral of the DIP Lender.

     vii.     modification of the automatic stay to the extent hereinafter set forth and waiving the 14-day stay provisions of Bankruptcy Rules 4001(a)(3) and 6004(h);

     viii.     the scheduling of a final hearing (the "**Final Hearing**") on the Motion for June__, 2018 to consider entry of the Final Order *inter alia,* authorizing borrowings under the DIP Facility on a final basis and approving notice procedures with respect thereto; and

     ix.     related relief.

The Court having considered the Motion and the exhibits attached thereto, the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on May 23, 2018 (the "**Interim Hearing**") and having found that due and proper notice (the "**Notice**") of the Motion and the Interim Hearing having been served by the Debtors in accordance with Bankruptcy Rule 4001 and 9006 and Local Rule 2002-1 on (i) counsel for the Agents for the Prepetition Secured Parties; (ii) the Office of the United States Trustee for the District of

Delaware; (ii) counsel for the DIP Lender; (iii) the parties included on the Debtors' consolidated list of the thirty (30) largest unsecured creditors; (iv) the Internal Revenue Service; and (v) the United States Attorney for the District of Delaware; and the Interim Hearing to consider the interim relief requested in the Motion having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested is necessary to avoid potential immediate and irreparable harm to the Debtors and their estates and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses and represents a sound exercise of the Debtors' business judgment; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW BASED UPON THE MOTION, THE REPRESENTATIONS OF COUNSEL AND EVIDENCE SUBMITTED DURING THE INTERIM HEARING:**[3]

A.    _Petition Date_.   On May 10, 2018 (the "**Petition Date**"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Court**") commencing these Chapter 11 Cases.

B.    _Debtors in Possession_.   The Debtors are continuing in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

---

[3]    To the extent, any findings of fact constitute conclusions of law, they are adopted as such, and vice versa, pursuant to Fed. R. Bankr. P. 7052.

57731/0001-15896502v5

C.    *Notice*.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors to certain parties in interest, including: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (v) counsel to the Prepetition Secured Parties; (vi) counsel to the proposed DIP Lender, Arent Fox LLP, 1675 Broadway, New York, New York 10019 (Attn: Robert M. Hirsh, Esq. and Jordana L. Renert, Esq.) and Bayard LLP, 600 N. King Street, Suite 400, Wilmington DE 19801 (Attn: Justin R. Alberto, Esq.); and (vii) any party that has requested notice pursuant to Bankruptcy Rule 2002.

D.    *Jurisdiction and Venue*.  This Court has core jurisdiction over the persons and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

E.    *No Credit Available on More Favorable Terms*.  The Debtors are unable to procure financing in the form of unsecured credit allowable as an administrative expense under §§ 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code and have been unable to procure the necessary financing on terms more favorable, taken as a whole, than the financing offered by DIP Lender pursuant to the DIP Loan Documents.

F.    *Best Interests of Estates*.  It is in the best interest of the Debtors' estates and creditors that the Debtors be allowed to enter into the DIP Facility to obtain postpetition secured financing from the DIP Lender under the terms and conditions set forth herein and in the DIP Loan Documents, as such financing is necessary to avoid immediate and irreparable harm to the Debtors' estates and for the continued operation of the Debtors' businesses.

G.     *Good Faith*.  The extension of credit and financial accommodations under the DIP Loan Documents are fair, reasonable, in good faith, negotiated at arm's length, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.  Accordingly, the DIP Lender is entitled to the protections of Bankruptcy Code section 364(e).

H.     *Good Cause*. The relief requested in the Motion is necessary and appropriate, and is in the best interest of and will benefit the Debtors, their creditors and their estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' businesses and ongoing operations, (2) preserve and maximize the value of the Debtors' estates for the benefit of all the Debtors' creditors, and (3) avoid potential immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.

I.     *Necessity of DIP Facility Terms*.  The terms of the DIP Loan Documents and the Interim Order assuring that the liens and the various claims, superpriority claims, and other protections granted in the Interim Order will not be affected by any subsequent reversal or modification of the Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the postpetition financing arrangement contemplated in the DIP Loan Documents, are necessary in order to induce the DIP Lender to provide postpetition financing to the Debtors.

J.     *Need for Post-Petition Financing*.  The Debtors do not have sufficient and reliable sources of working capital, including cash collateral, to continue to operate their businesses in the ordinary course of business without the financing requested in the Motion.  The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay

6

their employees, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of their estates for the benefit of all creditors of the Debtors through a sale as a going concern. The ability of the Debtors to obtain sufficient and stable working capital and liquidity through the proposed post-petition financing arrangements with the DIP Lender as set forth in the Interim Order and the DIP Loan Documents is vital to the preservation and maintenance of the going concern value of each Debtor. Accordingly, the Debtors have an immediate need to obtain the postpetition financing in order to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' bankruptcy estates in order to maximize the recovery to all creditors of the estates.

K.    *Need to Use Cash Collateral*. The Debtors need to use Cash Collateral (subject to the Approved Budget), in order to, among other things, preserve, maintain and maximize the value of their assets and businesses. The ability of the Debtors to maintain liquidity through the use of Cash Collateral is vital to the Debtors and their efforts to maximize the value of their assets. Accordingly, the Debtors have demonstrated good and sufficient cause for the relief granted herein.

L.    *Sections 506(c) and 552(b)*. As material inducement to the DIP Lender to agree to provide the DIP Facility, and in exchange for the DIP Lender's agreement to subordinate their superpriority claims to the Carve-Out, subject to entry of the Final Order, a waiver of any equities of the case exceptions under section 552(b) of the Bankruptcy Code and a waiver of the provisions of section 506(c) of the Bankruptcy Code.

M.    *Pre-Petition Debt*. The Debtors were, prior to the Petition Date, party to the

following agreements, with the following parties:

(a)     "**U.S. Prepetition Loan Facility**"

    a.    Loan and Security Agreement, dated as of July 10, 2017, among the Debtors (other than Videology UK) (the "**Prepetition Borrowers**"), those financial institutions party thereto from time to time as lenders (the "**U.S. Prepetition Lenders**"), Fast Pay Partners LLC ("**FastPay**" or the "**U.S. Prepetition Agent**"), as agent for the U.S. Lenders, and Tennenbaum Capital Partners, LLC ("**TCP**"), as documentation agent for the U.S. Prepetition Lenders and as the Investment Manager for the U.S. Prepetition Lenders (other than FastPay);

    b.    Continuing Guaranty, dated as of July 10, 2017, executed by Videology UK in favor of the U.S. Agent;

    c.    Pledge Agreement, dated as of July 10, 2017, by and between Videology and the U.S. Prepetition Agent;

    d.    Pledge Agreement, dated as of July 10, 2017, by and between Videology UK and the U.S. Prepetition Agent;

    e.    Amendment No. 1 to Loan and Security Agreements, dated as of January 12, 2018, by and among, FastPay, as U.S. Agent and U.S. Lender, FPP Sandbox LLC ("**FPP**" or the "**U.K. Prepetition Agent**"), as U.K. Prepetition Agent and U.K. Prepetition Lender (as defined below), TCP, as U.S. Documentation Agent and U.K. Documentation Agent, various affiliates of TCP, as U.S. Prepetition Lenders and U.K. Prepetition Lenders, and the Prepetition Borrowers ("**Amendment No. 1 to Loan and Security Agreements**");

    f.    Amendment No. 2 to Loan and Security Agreements, dated as of January 31, 2018, by and among, FastPay, as U.S. Prepetition Agent and U.S. Lender, FPP, as U.K. Prepetition Agent and U.K. Prepetition Lender, TCP, as U.S. Documentation Agent and U.K. Documentation Agent, various affiliates of TCP, as U.S. Prepetition Lenders and U.K. Prepetition Lenders, and the Prepetition Borrowers ("**Amendment No. 2 to Loan and Security Agreements**"); and

    g.    Amendment No. 3 to Loan and Security Agreements, dated as of January 12, 2018, by and among, FastPay, as U.S. Prepetition Agent and U.S. Prepetition Lender, FPP, as U.K. Prepetition Agent and U.K. Prepetition Lender, TCP, as U.S. Documentation Agent and U.K. Documentation Agent, various affiliates of TCP, as U.S.

Prepetition Lenders and U.K. Lenders, and the Prepetition Borrowers ("**Amendment No. 3 to Loan and Security Agreements**").

(b) "**U.K. Prepetition Loan Facility**"

    a.    Loan and Security Agreement, dated as of July 10, 2017, among the Prepetition Borrowers, the financial institutions party thereto from time to time as lenders (the "**U.K. Prepetition Lenders**"), the U.K. Prepetition Agent, and TCP, as documentation agent for the U.K. Prepetition Lenders and as the Investment Manager for the U.K. Prepetition Lenders (other than FPP);

    b.    Continuing Guaranty, dated as of July 10, 2017, executed by Videology UK in favor of the U.K. Prepetition Agent;

    c.    Pledge Agreement, dated as of July 10, 2017, by and between Videology and the U.K. Prepetition Agent;

    d.    Pledge Agreement, dated as of July 10, 2017, by and between Videology UK and the U.K. Prepetition Agent

    e.    Amendment No. 1 to Loan and Security Agreements;

    f.    Amendment No. 2 to Loan and Security Agreements; and

    g.    Amendment No. 3 to Loan and Security Agreements.

(c) "**EMEA PRepetition Factored Facility**"

    a.    Financing Agreement, made and entered into as of July 28, 2017, by and between Videology UK, as Seller, and FastPay Roundabout ("**FPR**" or the "**FastPay Factor**"), as Purchaser; and

    b.    Debenture, dated July 28, 2018, between Videology UK and the FastPay Factor.

(d) "**Prepetition Secured Loan Facilities**"

    a.    U.S. Prepetition Loan Facility;

    b.    U.K. Prepetition Loan Facility; and

    c.    EMEA Prepetition Factored Facility.

57731/0001-15896502v5

(e)    "**Prepetition Secured Parties**"

    a.    U.S. Prepetition Lenders;

    b.    U.S. Prepetition Agent;

    c.    U.K. Prepetition Lenders (and together with the "U.S. Prepetition Lenders", the "**Prepetition Lenders**");

    d.    U.K. Agent (and together with the "U.S. Prepetition Agent", the "**Prepetition Agents**"); and

    e.    FastPay Factor.

N.    <u>Immediate Entry</u>.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.    <u>DIP Facility Approval</u>.  The DIP Facility is hereby approved.  Any objections to the interim relief requested in the Motion that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.  The Debtors are authorized, pursuant to section 364 of the Bankruptcy Code, to enter into and be a party to the DIP Facility pursuant to the DIP Loan Documents (with such changes, if any, as were authorized to be made as amendments to the DIP Loan Documents in accordance with this Interim Order), to perform under the DIP Loan Documents and such other and additional documents necessary or desired to implement the DIP Facility or the DIP Loan Documents, and to obtain postpetition secured financing from the DIP Lender, to avoid immediate and irreparable harm to the Debtors' estates.

2.    <u>DIP Obligations</u>.  The DIP Loan Documents shall constitute and evidence the valid and binding effect of the Debtors' obligations under the DIP Facility, which DIP

Obligations shall be legal, valid, and binding obligations of the Debtors party thereto and enforceable against the Debtors, their estates, any successors thereto, including, without limitation, any trustee appointed in any of the Debtors' cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any such cases, or in any other proceedings superseding or related to any of the foregoing, any successors thereto, and any party determined to be the beneficial owner of the DIP Collateral by this Court. The Debtors and their successors shall be jointly and severally liable for repayment of any funds advanced pursuant to the DIP Loan Documents, together with interest thereon, at the times and in the amounts set forth in the DIP Loan Documents and all Obligations as defined and provided for in the DIP Credit Agreement (collectively, the "**DIP Obligations**"). No obligation, payment, transfer or grant of security under the DIP Loan Documents or the Interim Order, with respect to the DIP Facility shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

3.    <u>Authorization to Borrow</u>. Upon entry of this Interim Order and during the period prior to entry of the Final Order, the Debtors are immediately authorized to borrow from the DIP Lender under the DIP Facility, the Interim Advance of up to $20 million, subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order and in accordance with the Approved Budget. Subject to the terms and conditions of this Interim Order and the DIP Loan Documents and in accordance with the Approved Budget, the Debtors are authorized to use Cash Collateral until the earlier of (a) the Maturity Date and (b) the date upon which the Debtors' right to use Cash Collateral is terminated hereunder as a result of an Event of Default

(as defined in the DIP Credit Agreement). Once repaid, the DIP Facility Loans incurred may not be re-borrowed.

    4.     <u>Use of Proceeds</u>. The Debtors shall use advances of credit under the DIP Facility (the "**DIP Facility Loans**") only for the express purposes specifically set forth in this Interim Order, the DIP Loan Documents and in compliance with the Approved Budget subject to the permitted variances set forth in the DIP Loan Documents. The Debtors are authorized to use the proceeds of the DIP Facility Loans to (a) fund the post-petition working capital needs of the Debtors during the pendency of the Chapter 11 Cases, (b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in the DIP Loan Documents, (c) pay all Outstanding Prepetition Secured Obligations (defined below), and (d) pay the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the Approved Budget and this Interim Order. Notwithstanding anything herein, the extensions of credit under the DIP Facility shall not constitute cash collateral of the Prepetition Secured Parties.

    5.     <u>Repayment of Outstanding Prepetition Secured Loan Obligations</u>. Upon entry of this Interim Order, the Debtors shall use the proceeds of the DIP Facility to pay all outstanding obligations now due and payable under the Prepetition Secured Loan Facilities in full (including obligations that accrued postpetition) (the "<u>Outstanding Prepetition Secured Obligations</u>"), in accordance with the terms, conditions, and procedures set forth in the DIP Financing Agreement. Subject to the challenge period as set forth in in paragraph no. 30, nothing in this Order or the payment of the Outstanding Prepetition Secured Obligations shall be construed as a waiver or release of any claims the estate may hold against the Prepetition Secured Parties.

6.     <u>Budget and Reporting</u>.  Except as otherwise provided herein or approved by the DIP Lender, the proceeds from the DIP Facility shall be used only in compliance with the terms of the DIP Loan Documents.

(a) <u>Initial Approved Budget</u>.  Attached as **Exhibit 2** is the Initial Approved Budget containing a cash forecast for the period from the Petition Date through the Maturity Date setting forth projected cash flows and disbursements, in form, scope and substance acceptable to the DIP Lender.  Upon entry of this Interim Order and approval by the DIP Lender, the Initial Approved Budget shall be deemed an "**Approved Budget**."

(b) <u>Updated Budget</u>. No later than the date that is the two-week anniversary of the Closing Date, the Debtors shall prepare for the DIP Lender's review and consent an updated detailed rolling cash projection covering the period through the Maturity Date, which shall be updated weekly as necessary but shall not be updated less than once every two weeks (each, a "**Proposed Budget**").  Upon the Debtors' receipt of the DIP Lender's consent to a Proposed Budget, such budget shall become an Approved Budget and shall replace the then operative Approved Budget for all purposes.  The Initial Approved Budget shall be the Approved Budget until such time as a new Proposed Budget is approved, following which such Proposed Budget shall constitute the Approved Budget until a subsequent Proposed Budget is approved.  The Debtors shall operate in accordance with the Approved Budget and all disbursements shall be consistent with the provisions of the Approved Budget (subject to the Permitted Variance).  The Debtors may submit additional Proposed Budgets to the DIP Lender, but until the DIP Lender

consents to such Proposed Budget, no Proposed Budget shall become an Approved Budget and the Debtors shall continue to comply with the then operative Approved Budget (subject to the Permitted Variance).

(c) <u>Variance Reporting</u>. No later than 4:00 p.m. Pacific time on Friday of each week (commencing with the Friday falling during the first full calendar week after the Closing Date), the Debtors shall provide to the DIP Lender a report detailing the actual disbursements and receipts by the Debtors for the preceding week versus the line items contained in the Approved Budget for such period, as well as an explanation of any material variances for each line item (a "**Variance Report**").

(d) <u>Permitted Variance and Performance Covenants</u>.  For any four-week rolling period, tested on a cumulative basis, as opposed to a line-by-line basis, the Debtors' actual total disbursements including disbursements with respect to estate professional and advisor fees on a weekly basis shall not exceed the budgeted total disbursements in the Approved Budget by more than 10%. The foregoing permitted variance from the Approved Budget is referred to herein as the "**Permitted Variance**". The Debtors shall comply with the Permitted Variances and Performance Covenants as set forth in the DIP Credit Agreement.  The Debtors shall comply with the Approved Budget, subject to the Permitted Variances, and all budget requirements set forth herein and in the DIP Loan Documents.  Notwithstanding any provision to the contrary in this Section 6, the Debtors' failure to adhere to the Approved Budget or future Proposed Budgets shall not be an Event of Default under the DIP Credit Agreement or this Order

unless and until the termination of the Purchase Agreement (as defined in the DIP Credit Agreement).

7.    <u>Payment of DIP Fees and Expenses</u>.  The (a) Commitment Fee; (b) the Funding Fee; (c) Work Fee, which shall serve as a retainer for the DIP Lender's counsel; (d) the Stated Maturity Fee, and (e) the Exit Fee are each hereby approved and the Debtors are hereby authorized and directed to and shall pay such fees in accordance with, and on the terms set forth in this Interim Order and the DIP Loan Documents.  The Debtors are also hereby authorized and directed to pay upon demand, all other fees, costs, expenses and other amounts payable under the terms of this Interim Order and the DIP Loan Documents and all other reasonable fees and out-of-pocket costs and expenses of the DIP Lender in accordance with the terms of this Interim Order and the DIP Loan Documents (including, without limitation, the reasonable and documented postpetition fees and out-of-pocket costs and expenses of Arent Fox LLP as counsel and Bayard LLP as local counsel to the DIP Lender to the extent not covered by the portion of the Work Fee paid prior to the Petition Date), subject to receiving a written invoice therefor. None of such fees, costs, expenses or other amounts shall be subject to Court approval except as otherwise provided herein or required to be submitted in any particular format, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; <u>provided, however</u>, that copies of any such invoices shall be provided contemporaneously to the U.S. Trustee and the official committee of unsecured creditors (the "**Committee**"); <u>provided further, however</u>, that such invoices provided to the Committee may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information (the "**Redactions**"), and the provision of such invoices shall not

57731/0001-15896502v5

constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine. If the U.S. Trustee or the Committee objects to the reasonableness of the fees and expenses of the DIP Lender, and such objection cannot be resolved within ten (10) days of receipt of such invoices, the U.S. Trustee or the Committee may file with the Court and serve on the DIP Lender, an objection to the reasonableness of such fees and expenses (each, a "**Reasonableness Fee Objection**"). Without limiting the foregoing, if the Committee objects to the Redactions and such objection cannot be resolved within ten (10) days of receipt of such invoices, the DIP Lender shall file with the Court and serve on the Debtors, the Committee and the U.S. Trustee a request for Court resolution of the disputes concerning the propriety of the disputed Redactions (each, a "**Redaction Fee Objection**," and each Reasonableness Fee Objection and Redaction Fee Objection may be referred to herein generally as a "**Fee Objection**"). The Debtors shall pay, in accordance with the terms and conditions of this Interim Order and the Final Order, within ten (10) days after receipt of the applicable invoice (a) the full amount invoiced if no Fee Objection has been timely filed, and (b) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed. All such unpaid fees, costs, expenses and other amounts owed or payable to the DIP Lender shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order, and the DIP Loan Documents.

8. <u>Indemnification</u>. The Debtors are hereby authorized to and hereby agree to indemnify and hold harmless the DIP Lender and its affiliates, directors, officers, employees, agents, attorneys, or any other Person affiliated with or representing the DIP Lender (collectively, an "**Indemnified Party**") from and against: (a) all obligations, demands, claims, damages, losses and liabilities (including, without limitation, reasonable fees and disbursements

57731/0001-15896502v5

of counsel) (collectively, "**Indemnity Claims**") as set forth in the DIP Loan Documents including those asserted by any other party in connection with the transactions contemplated by the DIP Loan Documents; and (b) all losses or expenses incurred, or paid by the DIP Lender from, following, or arising from the transactions contemplated by the DIP Loan Documents (including reasonable and documented attorneys' fees and expenses), except for Indemnity Claims and/or losses directly caused by the DIP Lender's gross negligence, willful misconduct or the DIP Lender's breach of contract  In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of the Debtors or any of their respective directors, security holders or creditors, an Indemnified Party or any other Person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.  No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Loan Party or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is determined by a court of competent jurisdiction in a final non-appealable judgment or order to have resulted solely from such Indemnified Party's gross negligence or willful misconduct.  All indemnities of the Indemnified Parties shall constitute DIP Obligations secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order, the Final Order and the DIP Loan Documents.

9.      <u>Use of Cash Collateral</u>.  The Debtors are authorized to use Cash Collateral in accordance with and pursuant to this Interim Order, the DIP Loan Documents and the Approved Budget.  Prior to the Maturity Date and until indefeasible payment in full of the DIP Obligations,

the Debtors agree that they will not use or seek to use Cash Collateral other than pursuant to the terms of this Interim Order.

10.    <u>DIP Superpriority Claims</u>.    In accordance with section 364(c)(1) of the Bankruptcy Code, the DIP Obligations shall constitute allowed senior administrative expense claims against each Debtor and their estates (the "**DIP Superpriority Claims**") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to the entry of the Final Order with respect to section 506(c) only), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; <u>provided</u>, <u>however</u>, that the DIP Superpriority Claims shall be subject to and subordinate to only the Carve-Out; <u>provided</u>, <u>further</u> that the DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property and assets of the Debtors and their estates(except Avoidance Actions (defined below)) all DIP Collateral and all proceeds thereof, including for the avoidance of doubt, (i) any deposit in connection with a proposed Sale (whether terminated or otherwise) that becomes property of the Debtors' estates (a "**Sale Deposit**") subject, however, only to the senior lien rights of the stalking horse purchaser under the Purchase Agreement and such stalking horse bid protections as may be approved by this Court, (ii) claims against the Debtors' directors and officers (if any). For the avoidance of doubt, the DIP Superpriority Claims <u>shall not attach to</u>

any and all avoidance power claims or causes of action under sections 544, 545, 547, 548 through 551 and 553(b) of the Bankruptcy Code (the "**Avoidance Actions**").

11.    DIP Liens.

(a)    Effective immediately as of the entry of this Interim Order, as security for the DIP Obligations, the DIP Lender is granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (collectively, the "**DIP Liens**") on all DIP Collateral as collateral security for the prompt and complete performance and payment when due (whether at the Stated Maturity Date (i.e. September 30, 2018), by acceleration, or otherwise) of the DIP Obligations. The term "**DIP Collateral**" means collectively, all of the pre- and post-petition assets and property of the Debtors, including (x) 65% of the voting stock of (i) Videology Ltd. and (ii) any other Subsidiary formed or acquired by a U.S. Loan Party organized after the date hereof and organized in a jurisdiction other than the District of Columbia or a state, commonwealth or territory of the United States of America, and (y) all other tangible and intangible personal property of each Debtor (including, for the avoidance of doubt, Videology Ltd.), wherever located and whether now owned or hereafter acquired, including but not limited to all accounts, contracts rights, chattel paper, cash, general intangibles, investment property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments and commercial tort claims, together with all proceeds thereof, including insurance proceeds (as each such term above is defined in the UCC); provided; however the DIP Lender shall not be granted a DIP Lien on Avoidance Actions and the proceeds of such Avoidance Actions. For the avoidance of doubt, the DIP Liens shall not be superior to the liens in favor of the third parties that were in existence immediately prior to the Petition Date, including, but not limited to liens

held by governmental units, solely to the extent such liens are valid, perfected, unavoidable and enforceable liens as of the Petition Date (the "**Existing Prepetition Liens**").

(b)      Subject to the entry of the Final Order, to the fullest extent permitted by the Bankruptcy Code or applicable law, and except as otherwise set forth herein, any provision of any lease other than a real property lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or the payment of any fees or obligations to any entity in order for any of the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, shall have no force or effect with respect to the DIP Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Lender in accordance with the terms of the DIP Loan Documents, or this Interim Order.

12.      Priority of DIP Liens.

(a)      To secure the DIP Obligations, immediately upon and effective as of entry of this Interim Order, the DIP Lender, is hereby granted on a final basis, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected first priority DIP Liens in the DIP Collateral as follows, in each case subject to the Carve-Out:

(i)      pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to the Existing Prepetition Liens; and

(ii)      pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all DIP Collateral (other than as set forth in clause (i)) subordinate only to the Existing Prepetition Liens.

(b)     Except as expressly set forth herein, the DIP Liens and the DIP Superpriority Claims shall not be made junior to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any successor cases and/or upon the dismissal of any of the Chapter 11 Cases or any successor cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (C) any intercompany or affiliate lien or claim; and (D) subject to entry of the Final Order, any liens arising after the Petition Date excluding any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors.

13.     Carve-Out.

(a)     *Carve-Out*.  As used in this Interim Order, the term "**Carve-Out**" means, collectively, the sum of:  (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. §1930(a) and section 3717 of title 31 of the United States Code; (ii) the reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; and (iii) the aggregate amount of unpaid fees and expenses of the Debtors' and the Committee (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under sections 327(a), 328 or 1103(a) of the Bankruptcy Code (the "**Case Professionals**"), to the extent such fees and expenses are allowed and payable pursuant to an order of the Court (which order has not been reversed, vacated or stayed) ("**Allowed Professional Fees**"), and the reimbursement of out-of-pocket expenses allowed by the Court and incurred by the members of the Committee in the performance of their duties (but excluding fees

and expenses of third party professionals employed by such members) ("**Committee Expenses**"), which amount under this clause (iii) shall not exceed the sum of: (x) an aggregate amount per week limited to the amount set forth in the Approved Budget for such week for Allowed Professional Fees and Committee Expenses as set forth in line item no. 30 of the Approved Budget incurred prior to the delivery of a Carve-Out Trigger Notice, *plus* (y) $150,000 for Allowed Professional Fees and Committee Expenses (the "**Post Carve-Out Notice Trigger Cap**") incurred from and after the delivery of the Carve-Out Trigger Notice (as defined below), *less* the outstanding amount of retainers received by Professionals prior to the Petition Date. No portion of the Carve-Out or any Cash Collateral may be used in violation of this Interim Order. Nothing in this Interim Order or otherwise shall be construed to increase the Carve-Out if actual (i) Allowed Professional Fees of any Case Professional or (ii) Committee Expenses are higher in fact than the fees and disbursements reflected in the Approved Budget.

      (b)    *Carve-Out Trigger Notice.* As used herein, the term "**Carve-Out Trigger Notice**" means a written notice provided by the DIP Lender to the Debtors, counsel to the Committee, and the U.S. Trustee that the Post Carve-Out Trigger Notice Cap is invoked, which notice may be delivered following the occurrence and during the continuance of an Event of Default and/or acceleration of the DIP Obligations under the DIP Loan Documents. Upon delivery of the Carve-Out Trigger Notice to the Debtors (the "**Termination Declaration Date**"), the Debtors shall provide notice by email and facsimile to all Case Professionals, at the email addresses and facsimile numbers set forth in each Professional's notice of appearance filed with the Bankruptcy Court (or, if there is no such notice of appearance, at such Professional's last known email address and facsimile number) within one (1) day after the Debtors' receipt of a Carve-Out Trigger Notice informing them that such Carve-Out Trigger Notice has been received

and further advising them that the Debtors' ability to pay such Case Professionals is subject to and limited by the Post Carve-Out Notice Trigger Cap.

(c)    *Payment of Allowed Professional Fees Prior to Termination Declaration Date.*  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)    *Payment of Carve-Out on or After the Termination Declaration Date.*  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  Any funding of the Carve-Out shall be added to, and made a part of the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code and applicable law.

(e)    *Objection Rights.*  Nothing contained herein is intended to constitute, nor shall be construed as consent to the allowed of any Case Professional's fees, costs and expenses by any party and shall not affect the rights of the Debtors, the DIP Lender or any other party in interest to object to the allowance and/or payment of any such amounts incurred or requested.

14.    Bankruptcy Code Sections 506(c) and 552(b) Waivers.  Subject to entry of a Final Order, without limiting the Carve-Out, the Debtors irrevocably waive and shall be prohibited from asserting (i) any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender upon the DIP Collateral and no costs or expenses of administration that have been or may be incurred in any of the Chapter 11 Cases at any time shall be charged against the DIP Lender or its claims or liens (including any claims or

liens granted pursuant to this Interim Order), and (ii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code in connection with the DIP Facility.

15.    <u>Application of Proceeds</u>.  Subject to the entry of the Final Order, in no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral, and all proceeds thereof shall be received and used in accordance with this Interim Order.

16.    <u>Disposition of Collateral; Application of Proceeds</u>.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, other than in the ordinary course of business or in connection with the payments contemplated under this Interim Order without the prior written consent of the DIP Lender (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lender or from any order of this Court).  Notwithstanding anything otherwise provided in this Interim Order, other than the DIP Liens, no liens or security interests existing as of the Petition Date shall attach to any Sale Deposit received by the Debtors in connection with a proposed or failed Sale of the Debtors' assets.  Notwithstanding anything otherwise provided herein, in the event any Sale is terminated and such Sale Deposit becomes property of the Debtors' estates (and is permitted to be retained by the Debtors) in accordance with the stalking horse agreement or similar sale agreement or any order of this Court governing the bidding procedures and sale process, such Sale Deposit shall be remitted directly to the DIP Lender, subject, however, only to the senior lien rights of the stalking horse purchaser under the Purchase Agreement and such stalking horse bid protections as may be approved by this Court.  Notwithstanding anything otherwise provided herein, 100% of any net cash proceeds of any sale of DIP Collateral outside of the ordinary course of business

shall, subject to the satisfaction of the Carve-Out, be used to immediately satisfy the DIP Obligations.

17.    <u>Restrictions on Granting Postpetition Liens</u>.    Other than the Carve-Out or as otherwise provided in this Interim Order, the Final Order or the DIP Loan Documents, no claim or lien having a priority superior or *pari passu* with those granted by this Interim Order and the DIP Loan Documents to the DIP Lender shall be granted or permitted by any order of this Court heretofore or hereafter entered in the Chapter 11 Cases, and the Debtors will not grant any such mortgages, security interests or liens in the DIP Collateral (or any portion thereof) or to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise, while (i) any portion of the DIP Facility, any DIP Facility Loans or any other DIP Obligations, are outstanding or (ii) the DIP Lender has any Commitment under the DIP Loan Documents.    For avoidance of doubt, there shall be no restriction and this paragraph shall not apply and excludes any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors.

18.    <u>Automatic Effectiveness of Liens</u>.    The DIP Liens shall not be subject to a challenge and shall attach and become valid, perfected, binding, enforceable, non-avoidable and effective by operation of law as of the date of the entry of this Interim Order on a final basis, without any further action by the Debtors and the DIP Lender, respectively, and without the necessity of execution by the Debtors or the filing or recordation, of any financing statements, security agreements, deposit control agreements, vehicle lien applications, mortgages, filings with a governmental unit (including, without limitation, the U.S. Patent and Trademark Office or the Library of Congress), or other documents or the taking of any other actions.    All DIP Collateral shall be free and clear of other liens, claims and encumbrances, except as provided in

the DIP Loan Documents, and this Interim Order. If the DIP Lender hereafter requests that the Debtors execute and deliver to the DIP Lender, financing statements, security agreements, pledge agreements, control agreements, collateral assignments, mortgages, or other instruments and documents considered by the DIP Lender to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens the Debtors are hereby authorized and directed to execute and deliver such financing statements, security agreements, pledge agreements, control agreements, mortgages, collateral assignments, instruments, and documents, and the DIP Lender is hereby authorized to file or record such documents in its discretion without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of the entry of this Interim Order; provided, however, no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens. The DIP Lender, in its sole discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to, or in lieu of, such financing statements, notices of liens or similar statements.[4]

19.    Protection Under Section 364(e) of the Bankruptcy Code. The DIP Lender has acted in good faith in connection with this Interim Order and its reliance on this Interim Order is in good faith. The reversal or modification on appeal of the authorizations under section 364 of the Bankruptcy Code contained in this Interim Order does not affect the validity of any DIP Obligation or the DIP Liens, whether or not the DIP Lender knew of the pendency of the appeal, unless such authorization and incurrence of DIP Obligations and DIP Lien and advance of the

---

[4] The provisions of Bankruptcy Code § 1146(a) do not apply herein.

DIP Facility Loan under 364 of the Bankruptcy Code in this Interim Order and the Final Order, were stayed pending appeal.

20.    <u>Reservation of Rights of the DIP Lender</u>.  Notwithstanding any other provision of this Interim Order to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of the DIP Lender under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of such parties to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of these Chapter 11 Cases, conversion of any of these Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of these Chapter 11 Cases, (iii) seek to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal or equitable or otherwise) of the DIP Lender.  The delay in or failure of the DIP Lender to seek relief or otherwise exercise their respective rights and remedies shall not constitute a waiver of any of the DIP Lender's rights and remedies.

21.    <u>Right to Credit Bid</u>.

(a)    *DIP Lender*.  Pursuant to section 363(k) of the Bankruptcy Code, unless the Court orders otherwise for cause as provided under section 363(k) of the Bankruptcy Code, the DIP Lender shall have the right to credit bid the total of the DIP Obligations for any or all of the DIP Collateral at a sale, lease or other disposition of such DIP Collateral outside the ordinary course of business (including any auction or similar sales), whether pursuant to a plan of reorganization or a motion pursuant to section 363 of the Bankruptcy Code or otherwise (which credit bid rights under section 363(k) or otherwise shall not be impaired in any manner).

57731/0001-15896502v5

(b)     A credit bid may be applied only to reduce the cash consideration with respect to those assets in which the party submitting such credit bid holds a perfected security interest. The DIP Lender shall be considered a "Qualified Bidder" with respect to their rights to acquire all or any of the assets by credit bid.

22.     <u>Remedies and Notice Upon the Occurrence of Maturity Date or Event of Default</u>. Upon prior written notice by the DIP Lender to counsel for the Debtors, counsel for the Committee, and the U.S. Trustee of the occurrence of an Event of Default (each as defined in the DIP Loan Documents and incorporated herein by reference) and without further order of the Court, the DIP Lender may (i) declare the DIP Obligations to be immediately due and payable; (ii) terminate the DIP Lender's commitment under the DIP Facility (other than the Carve-Out) or use of Cash Collateral; (iii) charge default rate interest; and/or (iv) upon five (5) business days' notice to counsel to the Debtors, counsel to the Committee and the U.S. Trustee, exercise all default-related rights and remedies against the DIP Collateral, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under sections 362 and 105 of the Bankruptcy Code or otherwise, <u>provided</u> <u>however</u>, that during the five (5) business day notice period, any party in interest shall have the right to file a pleading in opposition to the DIP Lender's exercise of rights and remedies including the delivery of the Carve-Out Trigger Notice; provided further that, unless otherwise ordered by the Court, the only issue that may be raised by any party in such pleading shall be whether in fact, an Event of Default has occurred and is continuing; <u>but provided further that</u>, if an Event of Default occurs as a result of the Debtors' failure to indefeasibly satisfy the DIP Obligations by the Stated Maturity Date (as defined in the DIP Loan Documents), unless otherwise ordered by the Court, the above referenced five (5) day notice period shall not apply and the Debtors and all other interested

parties shall not have the right to challenge whether or not the Maturity Date or an Event of Default has occurred.

23.    <u>Modification of Stay</u>.  Subject to the terms set forth herein, the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms, rights, benefits, privileges, remedies and provisions of this Interim Order, and the DIP Loan Documents including without limitation, to permit the DIP Lender to exercise all rights and remedies provided for in the DIP Loan Documents and take any and all actions provided therein, in each case, without further notice, application to, order of or hearing before this Court, including those set forth in paragraph 22 of this Interim Order.

24.    <u>Survival of DIP Liens, DIP Superpriority Claims, and Other Rights</u>.  If, in accordance with section 364(e) of the Bankruptcy Code, this Interim Order does not become a final non-appealable order, if a trustee terminates this Interim Order, or if any of the provisions of this Interim Order are hereafter modified, amended, vacated or stayed by subsequent order of this Court or any other court, such termination or subsequent order shall not affect the priority, validity, enforceability or effectiveness of (or subordination to the Carve-Out of) any lien, security interests or any other benefit or claim authorized hereby with respect to any DIP Obligations incurred prior to the effective date of such termination or subsequent order.  All such liens, security interests, claims and other benefits shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted herein, including the liens and priorities granted herein, with respect to any DIP Loan, subject to the Carve-Out.

25.    <u>Survival of this Interim Order</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order: (i) confirming any plan of

reorganization in any of the Chapter 11 Cases; (ii) converting any of the Chapter 11 Cases to a chapter 7 case; or (iii) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Interim Order as well as the DIP Superpriority Claims and the DIP Liens in the DIP Collateral granted pursuant to this Interim Order and the DIP Loan Documents shall continue in full force and effect notwithstanding the entry of any such order.  Such claims and liens shall maintain their priority as provided by this Interim Order and the DIP Loan Documents, and to the maximum extent permitted by law, until all of the DIP Obligations are indefeasibly paid in full in cash and discharged or otherwise treated under a plan of reorganization, which is reasonably acceptable to the DIP Lender.  In no event shall any plan of reorganization be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the DIP Loan Documents unless agreed to by and among the Debtors and the DIP Lender.

    26.   <u>Modifications of DIP Loan Documents</u>.  The Debtors and the DIP Lender are hereby authorized, to implement, in accordance with the terms of the DIP Loan Documents, any non-material modifications of the DIP Loan Documents without further notice, motion or application to, order of or hearing before, this Court.  Any material modification or amendment to the DIP Loan Documents shall only be permitted pursuant to an order of this Court, after being submitted to this Court upon five (5) days' notice to the U.S. Trustee and counsel to the Committee; <u>provided</u>, that any forbearance from, or waiver of, (a) a breach by the Debtors of a covenant representation or any other agreement or (b) a default or an Event of Default, in each case under the DIP Loan Documents shall not require an order of this Court.  In the event of any inconsistency between this Interim Order and the DIP Credit Agreement, this Interim Order shall control.

57731/0001-15896502v5

27.  <u>Insurance Policies</u>.  Upon entry of this Interim Order, on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral: (i) the DIP Lender shall be, and shall be deemed to be, without any further action by or notice to any person, named as additional insureds; and (ii) the DIP Lender shall be and shall be deemed to be, without any further action by or notice to any person, named as loss payee for DIP Collateral on which the DIP Lien holds a first priority lien.  The Debtors are hereby authorized on a final basis, to and shall take any actions necessary to have the DIP Lender be added as an additional insured and loss payee on each insurance policy maintained by the Debtors consistent with this Interim Order which in any way relates to the DIP Collateral.

28.  <u>Financial Information</u>.  The Debtors shall deliver to the DIP Lender such financial and other information concerning the business and affairs of the Debtors and any of the DIP Collateral as may be required pursuant to the DIP Loan Documents and/or as the DIP Lender shall reasonably request from time to time.  The Debtors shall allow the DIP Lender access to the premises in accordance with the terms of the DIP Loan Documents for the purpose of enabling the DIP Lender to inspect and audit the DIP Collateral and the Debtors' books and records.

29.  <u>Proofs of Claim</u>.  Notwithstanding any order entered by the Bankruptcy Court in relation to the establishment of a bar date in the Chapter 11 Cases to the contrary, or otherwise, the DIP Lender shall not be required to file proofs of claim in the Chapter 11 Cases for any claim allowed herein.

30.  <u>Investigation Rights and Challenge Period - Outstanding Prepetition Secured Obligations</u>.

(a)  Subject to the entry of a Final Order, the payment of the Outstanding Prepetition Secured Obligations pursuant to paragraph 5 of this Interim Order, in and of itself,

31

shall not operate as a release of claims against the Prepetition Secured Parties, which is otherwise provided in paragraph 30(b) and (c).

(b)   Subject to the entry of a Final Order, the Committee shall have until the earlier of sixty (60) days from the date of the Committee's appointment or seventy-five (75) days from the Petition Date, and all parties-in-interest (including a trustee, if appointed or elected prior to the Investigation Termination Date, as defined herein) (the "**Non-Debtor Parties**") shall have seventy-five (75) days from the Petition Date (each, as applicable, the "**Investigation Termination Date**") to investigate the validity, perfection, and enforceability of the liens and security interests in favor of the Prepetition Secured Parties and securing the Outstanding Prepetition Secured Obligations (the "**Prepetition Liens**") and Outstanding Prepetition Secured Obligations, and to assert any other claims or causes of action against the Prepetition Secured Parties.  If any Committee, or any Non-Debtor Party hereafter granted authority and standing by this Court, determines that there may be a challenge to the Prepetition Liens or against the Prepetition Secured Parties by the Investigation Termination Date, then upon five (5) days' written notice to the Debtors and the Prepetition Secured Parties, such Committee or other Non-Debtor Party hereafter granted authority and standing by this Court shall be permitted to file and prosecute an objection or claim related thereto (each, a "**Challenge**"), and shall have only until the applicable Investigation Termination Date to file such objection or claim (or otherwise initiate an appropriate action on behalf of the Debtors' estates) setting forth the basis of any such challenge, claim, or cause of action; provided, however, that nothing

contained in this Interim Order shall be deemed to confer standing on any Committee or any Non-Debtor Party to commence a Challenge. If a Challenge is not filed on or before the Investigation Termination Date, then, without further action by any party or any further order of this Court, the following shall be deemed to be immediately and irrevocably binding on the Debtors and the Debtors' estates, the Committee, and all parties-in-interest and any and all successors-in-interest thereto: (i) The Outstanding Prepetition Secured Obligations (A) constitute legal, valid, and binding joint and several Obligations (as defined in the Prepetition Credit Agreement) of each Debtor and each of their estates, (B) are not subject to any offset, defense, or counterclaim, (C) are not subject, whether in whole or in part, to any avoidance, disallowance, reduction, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (D) constitute finally allowed claims for all purposes in the Chapter 11 Cases and any subsequent chapter 7 cases, and shall not be subject to challenge by any party-in-interest as to validity, priority or otherwise; (ii) the Prepetition Secured Loan Facilities are valid and enforceable by the Prepetition Secured Parties against each of the applicable Debtors and their estates; (iii) the Prepetition Liens constitute valid, existing, binding, enforceable, and duly perfected liens in and to the collateral, having the priority set forth in the Prepetition Secured Loan Facilities and subject and subordinate only to certain permitted priority liens to the extent and as provided in the Prepetition Loan Agreements; (iv) no claim of or cause of action held by the Debtors exists against the Prepetition Agents, any of the Prepetition Lenders, or any of their respective agents, whether arising under

applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the Prepetition Secured Loan Facilities (or the transactions contemplated thereunder), Outstanding Prepetition Secured Obligations, or the Prepetition Liens, including without limitation, any right to assert any disgorgement or recovery; and (v) the Debtors and their estates shall be deemed to have released, waived, and discharged each of the Prepetition Secured Parties (whether in their prepetition or postpetition capacity), together with their respective officers, directors, employees, agents, attorneys, professionals, affiliates, subsidiaries, assigns, and/or successors, from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, Outstanding Prepetition Secured Obligations or their prepetition relationship with such Debtor or any affiliate thereof relating to any of the Prepetition Secured Loan Facilities or any transaction contemplated thereby, including, without limitation, any claims or defenses as to the extent, validity, priority, or enforceability of the Prepetition Liens or Outstanding Prepetition Secured Obligations, and any claims or defenses under chapter 5 of the Bankruptcy Code or any other causes of action.

(c) The Prepetition Agents shall cooperate in all reasonable requests for information in order to assist the Committee in its investigation under this Paragraph 30. Notwithstanding anything to the contrary herein: (a) the determinations and releases in subparagraph 30.b. of this Interim Order shall be binding on the

Debtors effective upon entry of this Interim Order, (b) if any such Challenge is timely commenced, the determinations and releases in subparagraph 30.b. of this Interim Order shall nonetheless remain binding on all parties-in-interest and preclusive except with respect to the party asserting the Challenge and to the extent that such stipulations are expressly and successfully challenged in such Challenge; and (c) the Prepetition Secured Parties reserve all of their rights to contest on any grounds any Challenge. For the avoidance of doubt, any trustee appointed or elected in these cases shall, until the Investigation Termination Date (and thereafter, if a Challenge is commenced on or prior to the Investigation Termination Date) for the duration of any adversary proceeding or contested matter commenced pursuant to this paragraph with respect to a Challenge (whether commenced by such trustee or commenced by any other party-in-interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgments, admissions, confirmations, and stipulations of the Debtors in this Order.

31.    _Immediate Effect of Order_.  The terms and conditions of this Interim Order shall be effective and immediately enforceable upon its entry by the Clerk of the Court notwithstanding any potential application of Bankruptcy Rule 6004(h) or otherwise. Furthermore, to the extent applicable, the notice requirements and/or stays imposed by Bankruptcy Rules 4001(a)(3), 6003(b), and 6004(a) are hereby waived for good and sufficient

57731/0001-15896502v5

cause. The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

Dated: May 24, 2018
Wilmington, Delaware

THE HONORABLE BRENDAN L. SHANNON,
CHIEF UNITED STATE BANKRUPTCY JUDGE