# **EXHIBIT A**

*Second Amendment to Asset Purchase Agreement*

57731/0003-16243391v1

**SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT**

This **AMENDMENT** (the "**Amendment**"), dated as of August 21, 2018, to the **ASSET PURCHASE AGREEMENT**, dated as of May 4, 2018, as amended July 17, 2018 (the "**APA**"), by and among, Videology, Inc., a Delaware corporation (the "**Company**"), the direct and indirect wholly owned subsidiaries of the Company listed on Annex A thereto (the "**Sellers**"), and Amobee, Inc., a Delaware corporation ("**Purchaser**").  All capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the APA.

**WHEREAS**, pursuant to Section 13.5 of the APA, after the Closing, the APA may be amended, supplemented or changed, by written instrument signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

**WHEREAS**, Purchaser and the Sellers desire to amend the APA to reflect changes to the APA as set forth on the record of the Auction as agreed between Purchaser and the Sellers.

**NOW, THEREFORE,** in consideration of the premises and the mutual agreements contained herein and for other good and valuable consideration the sufficiency of which is hereby acknowledged, the undersigned hereby agree as follows:

1. Section 2.1(a) of the APA is hereby deleted and replaced in its entirety with the following:

   (a) all Accounts Receivable of the Company and the UK Company other than the Excluded Accounts Receivable (the "**Purchased Accounts Receivable**");

2. Section 2.2(r) of the APA is hereby deleted and replaced in its entirety with the following:

   (r) the Excluded IT Assets and the Excluded Accounts Receivable;

3. Section 3.1(a) of the APA is hereby deleted and replaced in its entirety with the following:

   **Purchase Price**. The consideration to be paid for the Purchased Assets pursuant to Section 3.1(b) (the "**Purchase Price**") shall consist of (i) an amount equal to (A) One Hundred Nineteen Million Dollars ($119,000,000) (the "**Cash Consideration**") *minus* (B) the amount by which the Purchased Accounts Receivable as set forth in the Closing Statement, is less than Thirty-Seven Million Dollars $37,000,000 *minus* (C) the amount of the Deposit *minus* (D) the Break-Up Fee *plus* (E) the UK Lease Credit (as so adjusted, the "**Adjusted Cash Consideration**"), and (ii) the assumption of the Assumed Liabilities.

4. Section 3.1(b) of the APA is hereby deleted and replaced in its entirety with the following:

**Closing Date Payments**. Promptly after the Closing and no later than four (4) Business Days thereafter, Purchaser shall pay, or cause to be paid, an amount equal to the Adjusted Cash Consideration as follows:

(i) an amount equal to the Closing Secured UK Indebtedness shall be paid, on behalf of the Group Companies, in accordance with the Payoff and Release Documentation;

(ii) [Intentionally Omitted];

(iii) an amount equal to the Cure Costs up to the Cure Cost Cap, shall be paid, on behalf of the Group Companies, to the Persons entitled thereto, in each case, in accordance with instructions to be delivered to Purchaser by the Sellers at least three (3) Business Days prior to the Closing Date; and

(iv) the remainder of the Adjusted Cash Consideration (such amount, the "**Cash Amount**") to the Sellers pursuant to wire instructions delivered to Purchaser by Sellers at least three (3) Business Days prior to the Closing Date.

5. Section 3.2(b)(i) of the APA is hereby deleted and replaced in its entirety with the following:

If the Closing shall occur, then the Deposit Amount shall be credited against the Purchase Price as set forth in the calculation of Adjusted Cash Consideration and Purchaser and the Sellers shall provide a joint written instruction to the Escrow Agent to release an amount equal to $1,950,000 to the Sellers (the amount retained by the Escrow Agent, the "**Adjustment Escrow**"); or

6. Section 3.3 of the APA is hereby deleted and replaced in its entirety with the following:

The Company, on behalf of itself and all other Sellers, shall deliver to Purchaser no later than one (1) Business Day prior to the Closing Date, a written statement certified by an authorized officer of the Company (the "**Closing Statement**") setting forth (a) the Closing Secured UK Indebtedness, (b) the Cure Costs, and (c) the Purchased Accounts Receivable, together with any information that Purchaser has reasonably requested to verify the amounts reflected in the Closing Statement. The Secured Indebtedness, the Cure Costs, and the Purchased Accounts Receivable shall be prepared consistently with the Accounting Principles and in accordance with the definitions within this Agreement. The Company shall incorporate any comments to the Closing Statement and the estimated amounts set forth therein from Purchaser. Sellers shall retain all rights with respect to the Excluded Receivables, and the Sellers shall retain all proceeds and collections from the Excluded Receivables without any obligation to pay any such proceeds or collections to the Purchaser.

7. Section 3.4 of the APA is hereby deleted and replaced in its entirety with the following:

(a) Within thirty (30) days following the Closing, if Purchaser objects to all or part of the calculation of the amounts set forth in the Closing Statement, Purchaser may deliver to the Sellers written notice of such objection (the "**Objection Notice**"). The Objection Notice, if any, shall specify in reasonable detail the nature and amount of any and all items in dispute, the amounts of any proposed adjustments (the "**Disputed Amount**") and the basis for Purchaser's proposed adjustments. If Purchaser does not deliver the Objection Notice to the Sellers within such thirty (30) day period, then the Closing Statement shall be deemed to be accepted by Purchaser and final, conclusive, and binding on the Parties. If Purchaser delivers the Objection Notice to the Sellers within such thirty (30) day period, then for a period of thirty (30) days following the delivery of the Objection Notice, Purchaser and the Seller shall use commercially reasonable efforts to resolve all objections relating to the

Closing Statement and any determination resulting from such good faith negotiations shall be final, conclusive and binding on the Parties.

(b) If Purchaser and the Sellers do not reach a final resolution of all objections within thirty (30) days following the delivery of the Objection Notice, Purchaser and the Sellers shall submit the issues remaining in dispute to the Neutral Auditor for resolution. The Sellers and Purchaser each agree to sign a customary engagement letter, if requested to do so by the Neutral Auditor. Sellers, Purchaser and their respective Representatives shall cooperate fully with the Neutral Auditor. The Neutral Auditor, acting as an expert and not as an arbitrator, shall resolve such disputed items and determine the values to be ascribed thereto, and using those values (together with other items not in dispute) shall determine the amount of the Final Adjustment. Any documents submitted by either Purchaser or the Sellers to the Neutral Auditor, either unilaterally or at the Neutral Auditor's request, shall be simultaneously submitted to the other Party. The Parties hereby agree that the Neutral Auditor shall only decide the specific disputed items, the values ascribed thereto and that using those values (together with the other undisputed items in the calculation of the amounts set forth in the Closing Schedule), shall determine the Final Adjustment and the Neutral Auditor's decision with respect to such disputed items and values must be within the range of values assigned to each such item in the Closing Statement and the Objection Notice, respectively. The Neutral Auditor shall be directed to resolve the disputed items and amounts and deliver to Purchaser and the Sellers a written determination (such determination to made consistent with this **Section 3.4(b)**, to include a worksheet setting forth all material calculations used in arriving at such determination and to be based solely on information provided to the Neutral Auditor by Purchaser or the Sellers) within thirty (30) days after being retained, which determination will be final, binding and conclusive on the Parties and their respective Affiliates, and their respective Representatives, successors and assigns. Each of Purchaser and the Sellers shall bear its own fees and expenses incurred by such Party in connection with any dispute resolved under this **Section 3.4(b)**, except that all fees and expenses charged by the Neutral Auditor relating to the work performed by the Neutral Auditor in connection with this **Section 3.4(b)** shall be borne by Purchaser, on the one hand, and the Sellers, on the other hand, in inverse proportion as such Parties may prevail on the disputed items resolved by the Neutral Auditor under this **Section 3.4(b)** (i.e., so that the prevailing party bears a lesser amount of such fees and expenses), which proportionate allocation is to be determined by the Neutral Auditor and be included in the Neutral Auditor's written determination. Notwithstanding anything herein to the contrary, the dispute resolution mechanism contained in this **Section 3.4(b)** shall be the exclusive mechanism for resolving disputes, if any, regarding the adjustment to the Purchase Price contemplated by this **Section 3.4**.

(c) Upon the determination of the Final Adjustment pursuant to **Section 3.4(a)** or **Section 3.4(b)**, the Purchase Price shall be adjusted as follows:

(i) If the Final Adjustment is positive, then the Purchase Price will be adjusted downward by the absolute value of such Final Adjustment. Within five (5) Business Days from the date on which the Final Adjustment is finally determined pursuant to Section 3.4, Purchaser and the Sellers shall provide a joint written instruction to the Escrow Agent to release (A) the amount of the Final Adjustment to Purchaser (up to a maximum amount equal to the then-remaining Adjustment Escrow), and (B) the remaining portion of the Disputed Amount after the foregoing payment to Purchaser (if any), to Sellers. The payment of the Final Adjustment (if any) shall be deemed an adjustment to Purchase Price.

      (ii) If the Final Adjustment is negative, then there shall be no adjustment to the Purchase Price. Purchaser and the Sellers shall provide a joint written instruction to the Escrow Agent to release all of the Adjustment Escrow to Sellers.

8. Schedule 2.6(a) to the APA is hereby deleted in its entirety and replaced with Schedule 2.6(a) as set forth on <u>Exhibit A</u> hereto.

9. Section 4.3(a) of the APA is hereby deleted and replaced in its entirety with the following:

    [Intentionally Omitted];

10. Section 4.4(a) of the APA is hereby deleted and replaced in its entirety with the following:

by Sellers or Purchaser, if the Closing shall not have occurred by the close of business on August 21, 2018 (the "**Outside Date**"); *provided*, *however*, that a Party may terminate this Agreement pursuant to this **Section 4.4(a)** only if such Party is not in material breach of this Agreement as of the date of such termination; *provided*, *further*, that Sellers may terminate pursuant to this **Section 4.4(a)**, if the Closing has not occurred within one (1) Business Day after delivery by Sellers of the following:

    (i)    a certificate certifying as to the Seller's compliance with **Sections 10.1(a)** and **(b)**;
    (ii)    the deliverables set forth in **Sections 4.2(a)**, **(b)**, **(c)**, **(e)**, **(f)**, **(g)**, **(h)**, **(j)**, **(k)**, **and (l)**;
    (iii)    the Required Notices and the Required Consents; and
    (iv)    the certified Closing Statement;

11. Section 4.4(k) of the APA is hereby deleted and replaced in its entirety with the following:

    [Intentionally Omitted].

12. Annex B to the APA is hereby amended to add the following definitions:

"**Excluded Accounts Receivable**" means all Accounts Receivable arising under a written agreement governed by the laws of England that (1) prohibits assignment absent consent of the customer and (2) such written consent has not been obtained as of the Closing.

"**UK Lease Credit**" means an amount equal to £75,000.00 being a portion of the balance of the deposit account as at the Closing Date under the existing rent deposit deed dated 17 October 2012 and made between Denecroft Estates Limited and Videology Ltd.

"**UK Lease Retained Amount**" means an amount equal to (i) the balance of the deposit account as at the Closing Date, in the amount of £149,669.49, under the existing rent deposit deed dated 17 October 2012 and made between Denecroft Estates Limited and Videology Ltd; minus (ii) the UK Lease Credit.

13. Annex B to the APA is hereby amended to delete the definition of "Final Adjustment" and replace it in its entirety with the following:

"**Final Adjustment**" is equal to (a) the amount by which the Purchased Accounts Receivable as of the Closing is as finally determined pursuant to **Section 3.4(a)** or by the Neutral Auditor is less than such amount set forth in the Closing Statement *plus* (b) the amount of the Cure Costs (up to the Cure

      Costs Cap), if any, as finally determined pursuant to **Section 3.4(a)** or by the Neutral Auditor exceeded such amount set forth in the Closing Statement.

14. Assuming Closing occurs on August 21, 2018 (Eastern time), the Sellers have estimated that, subject to adjustment pursuant to Section 3.4, the Adjusted Cash Consideration will be $87,452,781.43.

15. The Sellers agree that subject to Closing, all rights and interests to the UK Lease Retained Amount shall be assigned to Amobee EMEA Limited to be applied toward the repair of certain preexisting conditions on the leased premises of Videology Ltd under the Lease dated 17 October 2012 and made between Denecroft Estates Limited, Videology Limited and Videology Inc.

      Except as expressly amended hereby, the APA remains in full force and effect and, except as set forth herein, nothing in this Amendment will be construed as a waiver of any of the rights or obligations of the parties under the APA.  This Amendment may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

**PURCHASER:**

**AMOBEE, INC.**

By_____
Name: Sambamurthy Natarajan
Title: Director

By_____
Name: Jeann Low
Title: Director

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

**SELLERS:**

**VIDEOLOGY, INC.**
**COLLIDER MEDIA, INC.**
**VIDEOLOGY MEDIA TECHNOLOGIES, LLC**
**LUCIDMEIDA NETWORKS, INC.**
**VIDEOLOGY LTD.**

By: _____
Name: Daniel J. Smith
Title: General Counsel, Secretary (Videology, Inc.)
       Vice President (Collider Media, Inc., Videology Media Technologies, LLC, LucidMedia Networks, Inc.)
       Attorney (Videology Ltd.)

**Exhibit A**

**SCHEDULE 2.6(a)**

**PURCHASED CONTRACTS**

**Customer Contracts**:

1) License and Services Agreement, dated as of November 5, 2013, by and among the Company and Comcast Cable Communications Management, LLC, as amended by Amendment #1 to License and Services Agreement dated August 13, 2014, as further amended by Second Amendment to License and Services Agreement dated January 14, 2015, as further amended by Amendment #3 to License and Services Agreement dated May 1, 2015, as further amended by Amendment #4 to License and Services Agreement dated February 1, 2017.
2) (i) Master License and Services Agreement, dated as of August 13, 2015, by and between the Company and Fox Networks Group, Inc.; (ii) Statement of Work 1, dated as of August 18, 2015, by and between the Company and Fox Networks Group, Inc.; (iii) Term Sheet, dated as of March 10, 2016, by and between the Company and Networks Group, Inc.; (iv) Statement of Work 2, dated as of April 1, 2016, by and between the Company and Fox Networks Group, Inc.; and (v) Letter regarding Transition Period and Data Fee Adjustments, dated as of June 13, 2017, by and between the Company and Fox Networks Group, Inc.
3) (i) Master License and Services Agreement, dated as of November 5, 2013, by and between the Company and Yahoo Japan Corporation, as amended by Amendment No. 1 dated February 1, 2014, as further amended by Amendment No. 2 dated September 30, 2014, as further amended by Amendment No. 3 dated August 20, 2015, as further amended by Amendment No. 4 dated April 20, 2014; (ii) Agreement Regarding Handling Data JP; and (iii) Letter, dated March 24, 2017, by and between the Company and Yahoo Japan Corporation.

**Vendor Contacts**:

1) AWS Customer Agreement, as amended by AWS Data Transfer Private Pricing Program Addendum, effective as of August 1, 2017, by and between the Company and Amazon Web Services, Inc.
2) (i) Rackspace Service Order, effective as of November 29, 2007, by and between the Company (f/k/a TidalTV) and Rackspace US, Inc.; (ii) Rackspace Service Order, effective as of December 5, 2007, by and between the Company (f/k/a TidalTV) and Rackspace US, Inc.; (iii) Rackspace Service Order, effective as of February 15, 2008, by and between the Company (f/k/a TidalTV) and Rackspace US, Inc.; (iv) Rackspace Service Order, effective as of March 14, 2008, by and between the Company (f/k/a TidalTV) and Rackspace US, Inc.; (v) Service Order Renewal, effective as of September 23, 2008, by and between the Company (f/k/a TidalTV) and Rackspace US, Inc.; (vi) Service Order Renewal, effective as of October 1, 2008, by and between the Company (f/k/a TidalTV) and Rackspace US, Inc.; (vii) Hosting Service Agreement, effective as of March 29, 2011, by and between the Company (f/k/a TidalTV) and Rackspace US, Inc.; (viii) Hosting Service Agreement, effective as of July 21, 2011, by and between the Company (f/k/a TidalTV) and Rackspace US, Inc.; (xix) Hosting Service Agreement, effective as of November 11, 2013, by and between the Company (f/k/a TidalTV) and Rackspace US, Inc.; (xx) Hosting Service Agreement, effective as of June 9, 2015, by and between the Company and Rackspace US, Inc.; (xxi) Term Renewal Agreement, effective as of October 1, 2017, by and between the

Company and Rackspace US, Inc.; (xxii) Hosting Service Agreement, effective as of June 8, 2011, by and between the Company (f/k/a TidalTV) and Rackspace US, Inc.; (xxiii) Hosting Service Agreement, effective as of August 3, 2011, by and between the Company (f/k/a TidalTV) and Rackspace US, Inc.; (xxiv) Service Order, effective as of December 19, 2017, by and between the Company and Rackspace US, Inc.; (xxv) Hosting Service Agreement, effective as of September 3, 2015, by and between the Company, and Rackspace US, Inc.

3) (i) The Ultimate Software Group, Inc. Master Subscription Agreement, dated as of February 21, 2014, by and between the Company and The Ultimate Software Group, Inc., as amended by Amendment to the Ultimate Software Group, Inc. UltiPro Workplace Purchase Order and Master Subscription Agreement dated as of October 11, 2017; (ii) The Ultimate Software Group, Inc. UltiPro Workplace Purchase Order, effective as of February 21, 2013 by and between the Company and The Ultimate Software Group, Inc., as amended by Amendment to the Ultimate Software Group, Inc. UltiPro Workplace Purchase Order and Master Subscription Agreement dated as of October 11, 2017.

4) End User License Agreement, by and between the Company and Gams Development Corp.

5) Quote, effective as of April 19, 2013, by and between the Company and Gurobi Optimization.

6) (i) Special Pricing Form, effective as of November 2, 2016, by and between the Company and JumpCloud Inc.; (ii) Special Pricing Form, effective as of October 18, 2017, by and between the Company and JumpCloud Inc.; (iii) Special Pricing Form, effective as of October 18, 2017, by and between the Company and JumpCloud Inc.

7) (i) New Relic, Inc. Stand-Alone Order Form, dated as of December 31, 2013, by and between the Company and New Relic, Inc.; (ii) New Relic, Inc. Additional Subsequent Purchase Order Form, effective as of December 31, 2014, by and between the Company and New Relic, Inc.

8) (i) Master SAAS Agreement, dated as of March 7, 2018, by and between the Company and Snowflake Computing, Inc., as amended by Snowflake Computing, Inc. Data Sharing Amendment dated September 21, 2017; (ii) Snowflake Computing, Inc. SaaS Evaluation Agreement, effective as of January 9, 2017; (iii) Snowflake Computing, Inc. On Demand Order Form, dated as of March 8, 2017, by and between the Company and Snowflake Computing, Inc. (iv) Snowflake Computing, Inc. Capacity Order Form, dated as of [ ], by and between the Company and Snowflake Computing, Inc.; (v) Snowflake Computing, Inc. On Demand Order Form, dated as of [ ], by and between the Company and Snowflake Computing, Inc.; (vi) Snowflake Computing, Inc. Capacity Order Form, effective as of January 31, 2018, by and between the Company and Snowflake Computing, Inc.; (vii) Master SaaS Agreement, dated as of March 8, 2017, by and between the Company and Snowflake Computing, Inc., as amended by Snowflake Computing, Inc. Data Sharing Amendment dated September 21, 2017.

9) Quote / Order Form, dated as of March 9, 2017, by and between the Company and Pingdom.

10) (i) Master Data and Media Planning License Agreement, effective as of May 16, 2012, by and between the Company and The Nielsen Company (US), LLC; (ii) Platform Provider Access Agreement, effective as of December 19, 2014, by and between the Company and Catalina Marketing Corporation (Nielsen); (iii) Statement of Work, effective as of April 27, 2016, by and between the Company and NC Ventures LLC d/b/a Nielsen Catalina Solutions; (iv) Statement of Work, effective as of August 5, 2016, by and between the Company and NC Ventures LLC d/b/a Nielsen Catalina Solutions; (v) Statement of Work, effective as of October 3, 2016, by and between the Company and NC Ventures LLC d/b/a Nielsen Catalina Solutions; (vi) Statement of Work, effective as of January 11, 2017, by and between the Company and NC Ventures LLC d/b/a Nielsen Catalina Solutions; (vii) Statement of Work, effective as of July 10, 2017, by and between the Company and NC Ventures, LLC d/b/a Nielsen Catalina Solutions; (viii) Agreement for Identified

Audience Data (Cookie Match), effective as of August 6, 2012, by and between the Company and The Nielsen Company (US), LLC, as amended by Amendment dated June 1, 2014, as further amended by Amendment dated December 19, 2014; (ix) NBI Segment SOW, effective as of September 16, 2013, by and between the Company and The Nielsen Company (US), LLC.

11) (i) Online Data Services Agreement, dated as of January 30, 2014, by and between the Company and Acxiom Corporation; (ii) Master Services Agreement, dated as of March 31, 2016, by and between the Company and Acxiom Corporation; (iii) Data Use Terms and Conditions (UK), effective as of August 25, 2011, by and between Videology Limited and Acxiom Limited; (iv) Schedule Data Use Terms and Conditions (UK), effective as of May 31, 2014, by and between Videology Limited and Acxiom Limited, as amended by Addendum No. 1 to Schedule of Data Use and Conditions (UK), dated as of August 10, 2015, as further amended by Addendum No. 2 to Schedule of the Data Use and Conditions (UK), dated August 16, 2016, as further amended by Amendment to Addendum, dated as of August 29, 2017; (v) Schedule Data Use Terms and Conditions (France), dated as of March 31, 2015 by and between Videology Limited and Acxiom Limited, as amended by Amendment Agreement dated March 29, 2016; (vi) Confirmation, dated as of March 21, 2012, by and between Videology Ltd. and Acxiom Limited.

12) (i) Akamai Media Delivery – Combined Commitment Order Form, dated as of March 11, 2008, by and between the Company (f/k/a TidalTV, Inc.) and Akamai Technologies Limited, amended as of March 11, 2008; (ii) Akamai Media Delivery – Combined Commitment Order Form, dated as of September 1, 2008, by and between the Company (f/k/a TidalTV, Inc.) and Akamai Technologies Limited; (iii) Akamai Service Order Form Order ID 26766, dated as of November 30, 2010, by and between the Company (f/k/a TidalTV, Inc.) and Akamai Technologies, Inc.; (iv) Akamai Service Order Form Order ID 29818, dated as of February 10, 2011, by and between the Company (f/k/a TidalTV, Inc.) and Akamai Technologies, Inc.; (v) Akamai Service Order Form Order ID 31095, dated as of March 11, 2011, by and between the Company (f/k/a Tidal TV) and Akamai Technologies, Inc.; (vi) Akamai Service Order Form, dated as of [January 2, 2012], by and between the Company and Akamai Technologies, Inc., further amended by Addendum dated January 31, 2012; (vii) Akamai Service Order Form Order ID 49773, dated as of [February 14, 2012], by and between the Company and Akamai Technologies, Inc., further amended by Addendum dated March 31, 2012; (viii) Akamai Service Order Form Order ID 48302, dated as of [February 14, 2012], by and between the Company and Akamai Technologies, Inc., amended by Addendum dated February 29, 2012; (ix) Akamai Service Order Form Order ID 51761, dated as of [April 1, 2012], by and between the Company and Akamai Technologies, Inc., further amended by Addendum dated April 13, 2012; (x) Akamai Service Order Form Order ID 49296, dated as of April 30, 2012, by and between the Company and Akamai Technologies, Inc.; (xi) Akamai Service Order Form Order ID 74921, dated as of May 21, 2013, by and between the Company and Akamai Technologies, Inc.; (xii) Akamai Service Order Form Order ID 85335, dated as of October 24, 2013, by and between the Company and Akamai Technologies, Inc., as amended by Addendum dated October 30, 2014; (xiii) Akamai Service Order Form Order ID 122534, dated as of May 1, 2015, by and between the Company and Akamai Technologies, Inc.; (xiv) Akamai Service Order Form Order ID 123610, dated as of May 1, 2015, by and between the Company and Akamai Technologies, Inc., as amended by Addendum May 13, 2016; (xiv) Akamai Service Order Form, dated as of July 1, 2016, by and between the Company and Akamai Technologies, Inc., as amended by Addendum dated December 13, 2016; (xvi) Akamai Service Order Form Order ID 166762, dated as of November 30, 2016, by and between the Company and Akamai Technologies, Inc.

13) (i) Microstrategy Perennial Education Pass Agreement MicroStrategy Contract Number:

295484, by and between the Company and MicroStrategy Services Corporation, dated February 22, 2013; (ii) Master Application Service Provider, Software License and Services Agreement MicroStrategy Contract Number: 295684, by and between the Company and MicroStrategy Services Corporation, dated February 22, 2013; (iii) Microstrategy End User License Agreement MicroStrategy Contract Number: 2945484, by and between the Company and MicroStrategy Services Corporation, dated February 22, 2013; (iv) Purchase Agreement, by and between the Company and DataStrong (MicroStrategy), dated February 20, 2013; (v) Perennial Program Description, by and between the Company and MicroStrategy Services Corporation, dated May 8, 2012; (vi) Sales Order 367891, by and between the Company and MicroStrategy Services Corporation, dated June 23, 2016; (vii) Price Quotation and Purchase Agreement 312723, by and between the Company and MicroStrategy Services Corporation dated as of December 4, 2013.

14) Master Service Level Agreement, by and between the Company and Celergo LLC, dated as of March 21, 2013.
15) Statement of Work No. 1 – General Work Order, by and between the Company and Celergo LLC, dated as of March 21, 2013.
16) Statement of Work No. 2 – United Kingdom Local Payroll, by and between the Company and Celergo LLC, dated as of July 8, 2013.
17) Consulting Agreement, by and between the Company and Hat Creek Enterprises, Inc., dated as of December 31, 2017, as amended by Amendment, dated as of May 2, 2018.
18) Consulting Agreement, by and between the Company and Fundraising Management Group, LLC, dated as of March 21, 2016, as amended by Amended and Restated Consulting Agreement, dated as of March 25, 2016.

**Purchased Occupancy Leases**:
1) Lease Agreement, dated as of January 26, 2011, by and between the Company (f/k/a TidalTV, Inc.) and Chesapeake Paperboard Centre, LLC, as amended by First Amendment to Lease Agreement dated November 23, 2011, as further amended by Second Amendment to Lease Agreement dated February 3, 2012.
2) Lease Agreement, dated as of July 27, 2014, by and between the Company and Executive II Limited Partnership, as amended by Lease Amendment No. 1 dated January 25, 2015.
3) Lease, dated as of October 17, 2012, by and among the Company, the UK Company and Denecroft Estates Limited.

**Equipment Leases**:

1) Master Lease Agreement No. 9800184, dated as of March 5, 2015, by and between Apple Financial Services and the Company.
2) Master Lease Agreement No. 001-6708910-500, dated as of October 10, 2014, by and between Dell Financial Services and the Company.
3) Master Lease Agreement No. 001-6708910-501, dated as of December 10, 2014, by and between Dell Financial Services and the Company.
4) Master Lease Agreement No. 001-6708910-502, dated as of August 12, 2014, by and between Dell Financial Services and the Company.
5) Master Lease Agreement No. 001-6708910-503, dated as of April 10, 2015, by and between Dell Financial Services and the Company.
6) Master Lease Agreement No. 001-6708910-504, dated as of December 10, 2016, by and between Dell Financial Services and the Company.
7) Dell Financial Services Parent Contract for 500-504 (not a separate contract)- Lease

    #001- 6708910-000.
8) Equipment, Software & Services Agreement No. 7961846001, dated as of May 14, 2015, by and between General Electric Capital Corporation and the Company.
9) Equipment, Software & Services Agreement No. 7964855001, dated as of June 3, 2015, by and between General Electric Capital Corporation and the Company.
10) Equipment/Payment Change Amendment Agreement No. 7956524001, effective September 28, 2015, by and between GE Capital and the Company.
11) Rental Agreement #102320, dated April 1, 2016 by and between the Company and OneSource Water, LLC
12) Lease Renewal Agreement, dated February 9, 2017, by and between the Company and Pitney Bowes Global Financial Services
13) Sales Order & Service Agreement, dated as of August 3, 2015, by and between Videology LTD and Paragon Document Solutions Ltd
14) Sales Order & Service Agreement, dated as of February 5, 2015, by and between Videology LTD and Paragon Document Solutions Ltd

**Benefit Plans**:

1) The following Benefit Plans offered to the UK Employees:
    a. private medical cover with AXA PPP Healthcare (Pan: 6550Q Elect Health Select);
    b. dental coverage with Cigna Healthcare (Plan 0000MD0118);
    c. life insurance (Unum Life Assurance Master Plan 9(A) Reference: 73030848);
    d. The Elect Self Invested Pension Plan provided by Aegon;
    e. medical insurance (Mercer Marsh Benefits);
    f. elect pension (Mercer Marsh Benefits);
    g. dental insurance (Mercer Marsh Benefits); and
    h. group life assurance (Mercer Marsh Benefits).
2) Agreement with TimeTastic subject to certain Terms and Conditions set forth at https://help.timetastic.co.uk/hc/en-us/articles/115003310165-Terms-and-Conditions.

3) Agreement with Kiddivouchers subject to certain Terms and Conditions set forth at : https://static.widerplan.com/kiddivouchers/information/KiddiVouchers%20Employer%20Terms%20and%20Conditions.pdf

**Intellectual Property Assignment Agreements**:

1) All intellectual property assignment agreements entered into with the UK Company and each UK Employee.