**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| VG LIQUIDATION, INC., *et al.*,[1] | Case No. 18-11120 (BLS) |
| Debtors. | Jointly Administered |
| | Hearing Date: May 15, 2019 at 1:30 p.m.<br>Objection Deadline: April 26, 2019 at 4:00 p.m.<br>Re: Docket Nos: 771, 773, 774, 775, 776, and 779 |

**DEBTORS' MOTION PURSUANT TO SECTION 105 OF THE BANKRUPTCY
CODE AND BANKRUPTCY RULE 9019 FOR ORDERS (I) APPROVING
THE PLAN SETTLEMENTAGREEMENT BY AND BETWEEN THE DEBTORS,
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,
GROUPM UK DIGITAL LTD. AND SKY UK LIMITED AND CERTAIN OF
THEIR AFFILIATES, AND THE AD HOC COMMITTEE OF CERTAIN
CONVERTIBLE PROMISSORY NOTEHOLDERS, AND (II) STAYING AND
OVERRULING THE CLAIM OBJECTIONS AND RELATED PROCEEDINGS
FILED BY CRG FINANCIAL LLC AS MOOT**

The above-captioned debtors and debtors in possession (the "Debtors") hereby submit this motion (the "Motion") for entry of orders, substantially in the form attached hereto as **Exhibit A** and **Exhibit B** (the "Proposed Orders"), pursuant to section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) approving the settlement (the "Plan Settlement") by and between the Debtors, the Official Committee of Unsecured Creditors (the "Committee"), GroupM UK Digital Ltd. and certain of its affiliates (collectively, "GroupM"), Sky UK Limited and certain of its affiliates (collectively, "Sky"), the Ad Hoc Committee of Certain Convertible Promissory Noteholders (the "Noteholders", and collectively with the Debtors, the Committee,

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: VG Liquidation, Inc. (f/k/a Videology, Inc.) (2191) ("Inc."), Collider Media, Inc. (8602) ("Collider"), VG MT Liquidation LLC (f/k/a Videology Media Technologies, LLC) (6243) ("VMT"), LucidMedia Networks, Inc. (8566) ("Lucid"), and VG Liquidation Ltd. (f/k/a Videology Ltd.), a company organized under the laws of England and Wales ("Ltd."). The address of the Debtors' corporate headquarters is 145 West Ostend Street, Suite 623, Baltimore, MD 21230.

57731/0003-17118337v7
April 12, 2019

GroupM, and Sky, the "Settlement Parties"), and (ii) initially staying and ultimately overruling the CRG Claim Objections and Related Proceedings (as defined below) as moot. In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1. The Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2. The predicates for the relief requested herein are section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019.

## BACKGROUND

### A. General Background

3. On May 10, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

4. The Debtors continue to manage and operate their business and financial affairs as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been requested in the Chapter 11 Cases.

5. On May 17, 2018, the United States Trustee for Region 3 appointed a statutory committee of unsecured creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code. *See* Docket No. 72.

6. Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Kenneth Tarpey in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 14].

### B. The Sale

7. On July 17, 2018, following a robust marketing and auction process, the Court entered the *Order (A) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Authorizing Assumption and Assignment of Unexpired Leases and Executory Contracts and (C) Granting Related Relief* [Docket No. 348] (the "Sale Order"). The Sale Order approved the sale (the "Sale") of substantially all of the Debtors' assets pursuant to an asset purchase agreement by and between the Debtors, as sellers, and Amobee, Inc., as purchaser (the "APA"). The purchase price increased by over $73 million from the original $45 million stalking horse bid (subject to adjustments) through over 50 bids at the auction.

8. The sale closed on August 21, 2018, and the net proceeds remaining after payoff of the Debtors' postpetition financing, approximately $67.2 million, were deposited into the Debtors' bank accounts.

### C. The Allocation Disputes

9. With the completion of the highly successful sale process, the Debtors turned their efforts to determining the fair and proper approach to formulating a Chapter 11 plan for each of the Debtors. While these Chapter 11 Cases are being administered jointly for procedural purposes, each Debtor has and had its own assets and own liabilities. The Debtors determined that before filing a plan, they would retain Dr. William Kerr of Berkeley Research Group, LLC ("BRG"), who was asked to provide an objective opinion on a fair allocation of the sale proceeds to the five Debtors' Estates. After several weeks, Dr. Kerr issued his report, concluding that a fair allocation of the net sale proceeds is as follows: 82% to Inc., which owned the technology and intellectual property on which the Debtors' businesses were based; 14% to Ltd.; 4% to VMT; and 0% to Collider and Lucid.

3

10. On November 21, 2018, the Debtors filed the Debtors' Motion for Allocation of Proceeds from the Sale of Substantially All of the Debtors' Assets [Docket No. 582] (the "Allocation Motion"), requesting the Court to adopt the allocation determined by Dr. Kerr. Five different responses were filed to the Allocation Motion by the following creditor groups (with the Debtors, the "Mediation Parties"): (1) the Committee, recognizing that different creditor groups would have differing views that could result in very expensive litigation and delays, to the detriment of all creditors, requested the Court to order mediation; (2) GroupM, the holder of the largest general unsecured claim against Ltd., disputed Dr. Kerr's allocation conclusions and also requested mediation prior to costly litigation to resolve "all issues related to the disposition of the sales proceeds and related matters (including, but not limited to, the validity and amount of the Noteholders' and Insiders' claims and the impact of intercompany claims"[2]; (3) Sky UK Limited, another large creditor of Ltd., which joined GroupM's objection and request for mediation; (4) CRG Financial LLC ("CRG"), a bankruptcy claims trader that acquired several million dollars in claims primarily from VMT creditors, which requested the opportunity to participate in any mediation; and (5) the Ad Hoc Committee of Certain Convertible Promissory Noteholders, which supported the Motion, disputed the assertions in the GroupM objection challenging the validity and enforceability of the Notes, and joined with the other parties in requesting mediation.

11. In addition to the proper allocation of sale proceeds, there were multiple other disputes between certain of the Mediations Parties, including the allocation of chapter 11 professional fees and expenses and the amount of intercompany claims of Ltd. and VMT against

---

[2] Preliminary Objection of GroupM UK Digital Ltd. to Debtors' Motion for Allocation of Proceeds from the Sale of Substantially all of the Debtors' Assets [Docket No. 611], at. 3, ¶ 4.

Inc., the resolution of which could materially impact the amounts of the respective recoveries by general unsecured creditors of the Debtors' estates.

12. On December 17, 2018, the Court conducted a status hearing on the Allocation Motion, and following that hearing, with the unanimous support of the Debtors and all of the other Mediation Parties, the Court arranged for proceedings relating to the Allocation Motion to be deferred and for the Honorable Kevin Gross to conduct a mediation to attempt to resolve all of the significant issues among the Mediation Parties that would impact their respective recoveries, in the interest of avoiding what all agreed would be very costly and complex litigation that would significantly delay the resolution of these cases and would diminish and delay distributions to creditors. The mediation was scheduled to be held on March 4, 2019.

    **D.** **The Committee's Motion for Authority to Sue the Noteholders to Dispute the Allowability of the Notes and Other Committee Demands**

13. In advance of the mediation, on February 21, 2019, the Committee filed the Motion of Official Committee of Unsecured Creditors for Entry of an Order Granting Derivative Standing and Authority to Prosecute and Settle Claims on Behalf of the Debtors' Estates [Docket No. 725] (the "Committee Standing Motion"). The Committee Standing Motion was based on the Committee's objections to the claims held by the Noteholders under certain Convertible Promissory Notes (the "Notes"), and requested authority to file against the Noteholders a "Complaint for Recharacterization of Alleged Claims as Equity, or Alternatively, Objecting to Alleged Claims and/or to Subordinate Alleged Claims". As reflected in its caption, the Committee's proposed Complaint sought (i) to recharacterize the Notes as equity interests, (ii) to eliminate or subordinate the portion of the Noteholders' claims based on a Change of Control Premium under which the amounts due under the Notes are increased by 300%, and (iii) to subordinate the Notes held by "Board Controlled Defendants".

5

14. The Noteholders dispute the Committee's assertions in the Committee Standing Motion. The Committee agreed that it would only pursue that motion in the event that the mediation did not achieve a result acceptable to the Committee.

15. As described below, the issues raised in the Committee Standing Motion were among the key issues addressed and resolved in the mediation, subject to confirmation of a chapter 11 plan acceptable to the Committee.

16. In addition to the claims asserted in the Committee Standing Motion, by letter dated October 25, 2018 (the "Committee Demand"), the Committee made demand upon current and former officers and directors of Inc. for alleged breach of fiduciary duties. The challenges to the Notes raised in the Committee Standing Motion were also raised in the Committee Demand. In addition to the Note challenges, the Committee asserted claims against the directors and officers of Inc. relating to prebankruptcy transactions with the Debtors' prepetition lenders, negotiations with GroupM and other vendors, and their oversight of efforts to sell the company prior to bankruptcy. The Committee made a demand of $54,959,110.58, and any other damages obtained based on the conduct outlined in the demand. Of that amount, $51,459,110.58 represented the aggregate Note amounts, with $3,500,000.00 relating to other alleged conduct.

17. As with the Committee Standing Motion, the Noteholders and directors and officers dispute the allegations made in the Committee Demand, and maintained that the directors and officers of the Debtors performed their duties extraordinarily well in the face of extremely difficult challenges, and throughout the relevant time periods prior to bankruptcy, acted in a manner consistent with the advice and recommendations of highly qualified lawyers, investment bankers, and other professionals.

6

E.   **The Mediation and Plan Settlement**

18.   To assist the Mediation Parties in preparing for the mediation, the Debtors provided a significant amount of information to all of the Mediation Parties, including CRG, in advance of the mediation.  At the Debtors' request, each of the Mediation Parties, including CRG, was given an opportunity to submit to the Debtors requests for documents and information.  For this purpose, the Debtors established a "data room" to provide the Mediation Parties, including CRG, easy access to the information provided, subject to the terms of a consensual protective order approved by the Court.

19.   In addition, the Debtors worked closely with their counsel and financial advisor to develop a financial modeling tool in the form of an Excel spreadsheet (the "Creditor Recovery Model").  The Creditor Recovery Model provided the Mediation Parties with projections of recoveries of general unsecured creditors in each of the Debtors' estates based on the Debtors' view as to the correct resolution of the issues to be mediated.  The Creditor Recovery Model also provided each of the Mediation Parties with the ability to change the key assumptions affecting recoveries, so that each of the parties could determine how a proposed compromise of one or more issues would affect creditor recoveries in each of the Debtor Estates.

20.   On March 4, 2019, the Mediation Parties, with their counsel and financial advisors, met in Wilmington, Delaware with the Honorable Kevin Gross, who led the parties through an intense mediation process scheduled to be completed in one day.  After a full day of discussions and negotiations guided by Judge Gross, all of the Mediation Parties, other than CRG, agreed to resolve all of the issues relating to the Allocation Motion, the Notes, intercompany claims, and related matters affecting creditor recoveries in each of the Debtors' cases. To confirm their agreement, the Mediation Parties negotiated a Plan Settlement Term Sheet (the "Plan Settlement Agreement"), which was finalized and signed by all of the Mediation

7

Parties other than CRG, as well as Judge Gross, by March 11, 2019. A copy of the final Plan Settlement Agreement is attached hereto as **Exhibit C**.

21. By March 29, 2019, the final signatures from all of the settling parties to the Plan Settlement Agreement were obtained.

22. As stated in the Plan Settlement Agreement, the terms set forth in the Agreement are to be incorporated into a Chapter 11 plan that the Mediation Parties, other than CRG, have agreed to support (the "Plan").

23. As stated in the Plan Settlement Agreement, the Mediation Parties (other than CRG) agreed to the following:

- The Debtors' net sale proceeds/remaining cash is to be allocated to the Debtors' estates as follows: 82% (Inc.), 14% (Ltd.), 4% (VMT)

- Chapter 11 expenses (through the Effective Date of the Plan) are to be allocated as follows: 72% (Inc.), 22% (Ltd.), 6% (VMT)

- The intercompany claims among Inc., Ltd., and VMT are allowed in the following amounts:

    Prepetition Claims:
    VMT claim v. Inc.: $23,146,681
    Ltd. claim v. Inc.: $7,664,376
    Ltd. claim v. VMT: $671,132

    Post-petition administrative claims:
    Inc. claim v. VMT: $93,790
    Ltd. claim v. Inc.: $18,702,163
    Ltd. claim v. VMT: $147,657

- GroupM and affiliates and Sky UK Limited and affiliates are released of any potential Chapter 5 claims.

- GroupM and affiliates shall have collective allowed claims against Ltd. in the aggregate amount of $29,205,559.00, based on the amounts of the claims as filed against Ltd. GroupM and affiliates shall have no further claims against the Debtors.

- The claims filed by Sky UK Limited shall be allowed claims against Ltd. in the amounts of $4,228,146.30 and $604,050.69, as scheduled by Ltd.

- The Noteholders will receive on the Effective Date of the Plan payments totaling $15 million, to be distributed to all of the holders of the Notes on a pro rata basis based on the principal amount of their respective Notes, in full satisfaction of any claims and obligations that may be due and owing under the Notes. The Noteholders will be released of all estate claims against the Noteholders, and will not participate in any upside resulting from other general unsecured creditors of Inc. receiving a greater distribution than the amounts projected.

- The Debtors' D&O policy will be extinguished, in exchange for a payment of $2.5 million from the insurer and full releases of directors and officers.

- Inc. will dedicate $350,000 to fund professional expenses to be incurred to wind up foreign non-debtor subsidiaries in accordance with applicable foreign laws. ,

- The Debtors will file a joint non-consolidated debtor chapter 11 plan of liquidation for Inc., Ltd., and VMT. Collider and Lucid, which have no meaningful assets for distribution, will either be merged into Inc. or dismissed.

- The Liquidating Trustee and members of the Liquidating Trust advisory board will be appointed by the Committee.

24. As noted above, CRG participated in the mediation but was not willing to accept terms that were acceptable to the other Mediation Parties, and the other Mediation Parties were not willing to accept the terms requested by CRG.

25. CRG, knowing that the Debtors were in the process of preparing papers to implement the Plan Settlement Agreement and in a transparent effort to attack the Plan Settlement Agreement, decided to strike first, by filing multiple objections to the claims of the Noteholders, re-asserting several of the arguments set forth in the Committee Standing Motion to disallow or reduce the amounts of the claims filed by the Noteholders. *See* Docket Nos. 779, 776, 775, 774 773, 771 (together with such other objections that have or may be filed by CRG, the "CRG Claims Objections").

26. In addition, CRG also filed on April 9, 2019 its Motion to Compel Debtor VG Liquidation, Inc., to Amend Schedule F for VG Liquidation, Inc., with respect to Preferred Stockholders Claims [Docket No. 795]. CRG also has issued discovery requests to certain Noteholders as well as to the Debtors,[3] relating to the CRG Claims Objections (collectively with any other requests for relief relating to the CRG Claims Objections that CRG may file, the "CRG Related Proceedings").

27. A copy of the CRG discovery requests to certain Noteholders, which are exceedingly overbroad, is attached hereto as **Exhibit D**.

28. CRG scheduled a hearing to consider the CRG Claims Objections and the CRG Related Proceedings at the hearing to be held on May 15, 2019 at 10:30 a.m. (the "May 15 Hearing").

29. On April 10, 2019, the Debtors filed the Joint Chapter 11 Plan of Liquidation of the Plan Debtors [Docket No.802], a proposed Disclosure Statement for Joint Chapter 11 Plan of Liquidation of the Plan Debtors [Docket No. 803], and Debtors' Motion for Order (A) Approving Disclosure Statement; (B) Scheduling Hearing on Confirmation of Plan; (C) Establishing Deadlines and Procedures for (I) Filing Objections to Confirmation of Plan, (II) Claim Objections and (III) Temporary Allowance of Claims for Voting Purposes; (D) Determining Treatment of Certain Unliquidated, Contingent or Disputed Claims for Notice, Voting and Distribution Purposes; (E) Setting Record Date; (F) Approving (I) Solicitation Packages and Procedures for Distribution, (II) Form of Notice of Hearing on Confirmation and Related Matters and (III) Forms of Ballots; (G) Establishing Voting Deadline and Procedures for

---

[3] As of the filing of this Motion, the Debtors' counsel has not yet received CRG's latest discovery requests, and has only seen the Notice of Service [Docket No. 814].

Tabulation of Votes; and (H) Granting Related Relief (the "<u>Motion for Approval of Disclosure Statement and Voting Procedures</u>").

30. The Motion for Approval of Disclosure Statement and Voting Procedures is scheduled to be heard at the May 15 Hearing.

**RELIEF REQUESTED**

31. By this Motion, the Debtors request entry of the Proposed Orders, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, (i) approving the Plan Settlement Agreement; (ii) authorizing the Debtors to take any and all actions necessary to effectuate the Plan Settlement Agreement; and (iii) initially staying and ultimately overruling the CRG Claim Objections and CRG Related Proceedings as moot.

**BASIS FOR RELIEF REQUESTED**

32. Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The Third Circuit has enumerated four factors that should be considered in determining whether a settlement should be approved. The four enumerated factors are "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *accord Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) (finding that the *Martin* factors are useful when analyzing a settlement of a claim against the debtor as well as a claim belonging to the debtor).

33. The decision to approve a settlement "is within the sound discretion of the bankruptcy court." *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006); *see*

11

*also In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986) (cited with approval in *Martin*). The bankruptcy court should not substitute its judgment for that of the debtor. *See Neshaminy Office Bldg. Assocs.*, 62 B.R. at 803. The bankruptcy court is not to decide the numerous questions of law or fact raised by litigation, but rather should canvas the issues to see whether the settlement falls below the lowest point in the range of reasonableness. *See Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *see also World Health Alts.*, 344 B.R. at 296 ("[T]he court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities." (internal citations and quotations omitted)).

34.     The resolution of issues embodied in the Plan Settlement Agreement is the result of a multiple compromises by the Committee and the prebankruptcy creditors holding the largest unsecured claims in the Debtors' cases. The Committee, as the representative of creditors in all of the Debtors' cases, including the VMT case, negotiated terms that the Committee determined are in the best interest of creditors. The Noteholders, which together hold the largest group of unsecured claims in Inc.'s case, determined that the Plan Settlement Agreement is a reasonable compromise. GroupM and Sky, who together hold the largest unsecured claims in Ltd.'s case, determined that the Plan Settlement Agreement is a reasonable compromise.

35.     All of the Mediation Parties, other than CRG, recognized and agreed that litigation over the issues resolved by the Plan Settlement Agreement would be very costly, and would subject creditors to a long delay in receiving what would be a diminished recovery due to the costs of litigation in legal and other professional fees and expenses, and lengthy time that would be required to resolve the key issues by court decisions.

36.     The Plan Settlement Agreement thus reflects a balancing of the competing interests of the Mediation Parties and falls well above the lowest point in the range of reasonableness necessary for Court approval.  In addition, as discussed below, the applicable *Martin* factors weigh in favor of approving the Plan Settlement Agreement.

**A**.     **The Probability of Success in Litigation**

37.     As with all litigation, the result of the litigation of matters resolved by the Plan Settlement Agreement is uncertain.  The litigation certainly would be complicated and no litigation result is assured.  Absent the settlement agreement reached by the Mediation Parties, disputes related to the matters resolved by the Plan Settlement Agreement would need to be litigated—including possible appeals—with no guarantees of a more favorable outcome for the Debtors' estates or creditors of Inc., Ltd., or VMT.  Indeed, litigation carries the risk that the Noteholders' claims against Inc. would be allowed in a higher amount than agreed to in the Plan Settlement Agreement, which would dilute the recovery of other creditors.  Similarly, there are risks that the intercompany claims of Ltd. and VMT against Inc. could be disallowed or reduced more than the amounts to which the competing creditor groups agreed in the Plan Settlement Agreement, which would reduce recoveries by creditors in the Ltd. and VMT cases. There also is a risk that VMT could have been substantively consolidated with Inc. (more than one of the Mediation Parties noted that VMT had no employees and business conducted in its name was done by Inc. employees) which would have the effect of reducing the recovery for creditors in the VMT case.

38.     In contrast to the uncertainty and inherent risk in litigating these matters and the unavoidable expenses that would be incurred in such litigation, the Plan Settlement Agreement reflects a compromise by the competing creditor groups from the best possible outcome that

might possibly be achieved if the issues were fully litigated. This compromise is well above the lowest point in the range of reasonableness. Accordingly, the Plan Settlement meets the first factor of the *Martin* test.

**B.    The Complexity of Litigation Involved and the Expense, Inconvenience, and Delay Necessarily Attending It**

39.    The Plan Settlement Agreement satisfies the third factor in *Martin*'s four-factor test because failing to achieve a consensual resolution of the matters being settled would add inconvenience, expense, and delays to the Chapter 11 Cases—adverse effects which would be borne by the Debtors and their creditors at large. The disputes between the parties are fact-intensive and, absent a settlement, would require considerable discovery and expert testimony concerning the allocation issues, the intercompany claims, and the facts and circumstances surrounding the issuance of the Notes. Absent the settlement, litigation involving, in part, allocation of the net sale proceeds and Chapter 11 expenses, intercompany claims, Noteholder claims and claims against directors and officers would be a complex, lengthy, and expensive process requiring costly expert analysis and testimony, extensive motion practice and a potentially long and expensive trials and other evidentiary hearings, and possible appeals. The likelihood of success of such litigation is uncertain. Consequently, distributions to creditors would be uncertain and significantly delayed absent approval of the settlement.

40.    In addition, the costs involved in such litigation would significantly reduce the funds available to pay creditors. It would be an unfortunate outcome for creditors if the Debtors' successful sale efforts and net sale proceeds available for creditors were reduced as a result of professional fees and expenses related to litigation made unnecessary by the Plan Settlement Agreement. Approval of the Plan Settlement Agreement will allow the Debtors and the major

14

creditor constituencies to proceed quickly to confirmation of a largely consensual Chapter 11 plan which will serve the best interest of all creditors.

41. In contrast, litigating the complex issues resolved in the mediation would materially delay the confirmation process and subject the Debtors' estates to substantial expenses that the holders of the largest creditor claims have determined are unnecessary and should be avoided. Accordingly, the third factor of *Martin*'s four-factor test is satisfied and weighs in favor of the Court approving the Plan Settlement.

### D.     Paramount Interests of Creditors

42. The Plan Settlement Agreement serves the paramount interest of the Debtors' creditors as it resolves claims and complex disputes without costly litigation and thereby preserves estate assets for the benefit of all creditors. Moreover, obviating litigation of the disputes covered by the Plan Settlement Agreement will allow the Debtors, the Committee, and other creditor representatives to focus on working collaboratively to bring these cases to an orderly and efficient resolution. Accordingly, the Debtors submit that the final *Martin* factor is also met.

43. The Plan Settlement is a sound exercise of the Debtors' business judgment. The Plan Settlement is the product of extensive arms'-length negotiations between the Mediation Parties and their respective representatives and represents a comprehensive resolution of the key issues in these cases affecting creditor recoveries, in a way acceptable to all major creditor groups (other than CRG). CRG, in its quest to achieve a higher level of profitability from its purchase of claims, apparently has determined that the proposed settlement is not in keeping with its targeted recovery from its post-bankruptcy claims purchases. CRG is entitled to press its own individual interest, but stands alone in not recognizing the reasonableness of the Plan Settlement.

44.    As reflected by the support of all other creditor representatives, the proposed settlement takes into account the competing interests of different creditor groups, and (i) is fair and equitable; (ii) represents a compromise that rests well above the lowest point in the range of reasonableness; (iii) obviates the expense, delay, inconvenience, and uncertainty that would attend any litigation of the key issues; and (iv) advances the paramount interests of creditors. Therefore, the Plan Settlement satisfies Bankruptcy Rule 9019 and should be approved by the Court.

### E.    The CRG Claims Objections and CRG Related Proceedings Should Be Initially Stayed and Ultimately Denied as Moot

45.    CRG, as the lone dissident among the Mediation Parties, filed the CRG Claims Objections and CRG Related Proceedings in an attempt to derail the Plan Settlement Agreement and confirmation of a Plan.  However, if the Court approves the Plan Settlement Agreement, all of the issues raised in the CRG Claims Objections and CRG Related Proceedings will be fully resolved on terms acceptable to all of the major creditor groups without the need for litigation.

46.    In these circumstances, the CRG Claim Objections and CRG Related Proceedings should be initially stayed[4] and ultimately denied as moot, because approval of the Plan Settlement Agreement will resolve all issues raised in the objections, rendering the CRG Related Proceedings a pointless burden on the Debtors' estate.  Just today, the Debtors were served with requests for admissions, interrogatories and requests for production, the responses to which—unless stayed--would require significant time and attention by the Debtors and their professionals.  The Debtors respectfully submit that they should not be required to respond to

---

[4]    Counsel for the Debtors will promptly confer with counsel for CRG to attempt to agree on a stay of the CRG Claims Objections and CRG Related Proceedings pending Court consideration of this Motion.  In the event that CRG does not agree to such a stay, the Debtors will file a motion for expedited consideration of the portion of this Motion requesting a stay.

these requests—or CRG's objections and related proceedings—until the Court has determined whether to approve the Plan Settlement Agreement.

47. This result is consistent with the District Court's decision in *Law Debenture Trust Co. v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.)*, 339 B.R. 91 (D. Del. 2006). In *Kaiser Aluminum*, LDTC was a creditor of the debtors and a non-party to a settlement agreement (the "PBGC Settlement") between the debtors and the Pension Benefit Guaranty Corporation (the "PBGC"), another creditor of the debtors. *Id*. at 92-93. LDTC objected to PBGC's claim (the "LDTC Claim Objection"). *Id*. The bankruptcy court initially stayed the LDTC Claim Objection and later overruled it as moot after approving the PBGC Settlement.

48. On appeal to the Delaware District Court, LDTC contended that the Bankruptcy Court erred in considering the PBGC Settlement without first resolving the LDTC Claim Objection. *Id.* at 93. LDTC argued that it had an "express statutory right under Section 502(a) of the Bankruptcy Code to object to the claim of another creditor, and that the bankruptcy court erred in preventing the LDTC from prosecuting its objection. *Id.*

49. The District Court rejected LDTC's arguments and held that the bankruptcy court did not err in staying the LDTC Claim Objection and subsequently mooting the objection after proceeding to evaluate and approve the settlement. *Id*. at 95. The District Court expressly held that "there is no direct conflict between Section 502(a) and Rule 9019 which would require the Bankruptcy Court to resolve claim objections before approving a settlement." *Id.* at 94. Rather, the Court recognized that requiring the Bankruptcy Court to resolve claim objections before approving a settlement would "undermine the important policy of promoting settlements in bankruptcy proceedings by requiring the parties to litigate the very issues that the settlement seeks to resolve." *Id. See also In re Heritage Org., L.L.C.,* 375 B. R. 230, 308 (Bankr. N.D.

17

Tex. 2007) ("While any party in interest has a statutory right to object to a claim, the Trustee, as the representative of the estate, has the ability to compromise that objection, as long as the objectant is given notice and an opportunity to be heard with respect to the fairness and wisdom of the compromise.").[5]

50.    Consistent with the *Kaiser Aluminum* precedent, this Court upheld and adopted this approach in the case of *In re CMTSU Liquidation, Inc.,* Case No. 17-10772 (BLS) ("*Ciber*"). In *Ciber*, the debtors reached a settlement with a creditor holding a large unsecured claim in the case (*see* Docket No. 789), and the creditors' committee objected to the settlement, arguing that the creditor's claim was overstated and that the settlement would improperly grant the creditor "an unreasonably high, class-skewing general unsecured claim."[6] The *Ciber* committee also argued that the debtors' proposed settlement was an "attempted end run" around the committee's objection to the claim and that the committee had the right to litigate its claim objection on the merits. Following *Kaiser Aluminum*, this Court overruled the committee's objections and approved the debtors' settlement with the creditor. As the Court noted: "I think it speaks to the wisdom of the *Kaiser Aluminum* decision regarding the appropriateness of a settlement even in the pendency of a claim objection." Transcript of Hearing on Nov. 15, 2017, at 41.[7]

51.    In accordance with *Kaiser Aluminum* and *Ciber*, the Court should approve the Plan Settlement Agreement and overrule the CRG Claims Objections and CRG Related Proceedings as moot, given that the Debtors have determined that the Plan Settlement is in the

---

[5] In addition, to the extent the CRG Claims Objections purport to assert derivative claims on behalf of the estate, it is well settled that the Debtors have exclusive standing to compromise such claims. *See, e.g., In re Emoral*, 740 F.3d 875, 879 (3d Cir. 2014).

[6] *See* Official Committee of Unsecured Creditors' Objection to Debtors' Motion for an Order pursuant to Bankruptcy Code Section 105 and Bankruptcy Rule 9019 Approving the Settlement by and among the Debtors and Zayo Group, LLC [Docket No.817].

[7] A copy of the Transcript is attached hereto as **Exhibit E**.

best interests of the Estates and all creditors. *Kaiser*, 339 B.R. at 95 ("[T]he debtor is charged with fiduciary responsibilities to all creditors to resolve claims in the best interest of the estate"). If the CRG Claims Objections were to be permitted to proceed and the Noteholders were to be forced to bear the cost of litigation, the Plan Settlement could fail, subjecting the Debtors' Estates to the burdens and delays of litigation that are unnecessary and not in the best interest of creditors.

### **NOTICE**

52.    Notice of this Motion will be given to (i) the Office of the U.S. Trustee, (ii) counsel to the Official Committee of Unsecured Creditors, (iii) counsel to the Settlement Parties; (iv) counsel to CRG and (v) all parties entitled to notice under Del. Bankr. L.R. 2002-1.  The Debtors submit that, under the circumstances, no other or further notice is required.

[*Remainder of page intentionally blank*]

**CONCLUSION**

WHEREFORE, for these reasons the Debtors respectfully request entry of the Proposed Orders, substantially in the form attached hereto, (i) approving the Plan Settlement Agreement, (ii) initially staying and ultimately overruling the CRG Claims Objections and CRG Related Proceedings as moot, and (iii) granting such other and further relief as the Court deems just and proper.

Dated: April 12, 2019

        COLE SCHOTZ P.C.

        */s/ Katherine M. Devanney*
        Patrick J. Reilley (No. 4451)
        G. David Dean (No. 6403)
        Katherine M. Devanney (No. 6356)
        500 Delaware Avenue, Suite 1410
        Wilmington, DE 19801
        Telephone: (302) 652-3131
        Facsimile: (302) 652-3117
        preilley@coleschotz.com
        ddean@coleschotz.com
        kdevanney@coleschotz.com

        - and –

        Irving E. Walker
        300 E. Lombard Street, Suite 1450
        Baltimore, MD 21202
        Telephone: (410) 230-0660
        Facsimile: (410) 528-9400
        iwalker@coleschotz.com

        *Counsel for Debtors and*
        *Debtors in Possession*