## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| VG Liquidation, Inc., *et al.*,[1] | Case No. 18-11120 (BLS) |
| Debtors. | Jointly Administered |

## AMENDED DISCLOSURE STATEMENT FOR AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF THE PLAN DEBTORS AS OF MAY 15, 2019

G. David Dean, Esq. (No. 6403)
Patrick J. Reilley, Esq. (No. 4451)
Katherine M. Devanney, Esq. (No. 6356)
COLE SCHOTZ P.C.
500 Delaware Ave., Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile:  (302) 652-3117
ddean@coleschotz.com
preilley@coleschotz.com
kdevanney@coleschotz.com

- and -

Irving E. Walker, Esq. (admitted *pro hac vice*)
COLE SCHOTZ P.C.
300 E. Lombard Street, Suite 1450
Baltimore, MD  21202
Telephone: (410) 230-0660
Facsimile:  (410) 528-9400
iwalker@coleschotz.com

*Counsel for Debtors*
*and Debtors in Possession*

Dated: May 15, 2019

---

[1]The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: VG Liquidation, Inc. (f/k/a Videology, Inc.) (2191), Collider Media, Inc. (8602), VG MT Liquidation LLC (f/k/a Videology Media Technologies, LLC) (6243), LucidMedia Networks, Inc. (8566), and VG Liquidation Ltd. (f/k/a Videology Ltd.), a company organized under the laws of England and Wales.  The address of the Debtors' corporate headquarters is 145 West Ostend Street, Suite 623, Baltimore, MD 21230.

## DISCLAIMERS

This is not a solicitation of acceptance or rejection of the proposed plan of reorganization. Acceptances or rejections may not be solicited until a disclosure statement has been approved by the Court.  This proposed disclosure statement is being submitted for approval but has not yet been approved by the Court.

THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE PLAN DEBTORS AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY PROVIDE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CAPITALIZED TERMS IN THIS DISCLOSURE STATEMENT NOT OTHERWISE DEFINED HEREIN SHALL HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN, ATTACHED TO THIS DISCLOSURE STATEMENT AS **EXHIBIT 1**.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT.  THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH, NOR REVIEWED BY, AND THE BENEFICIAL INTERESTS IN THE LIQUIDATING TRUST TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTERED STATEMENT FILED WITH, THE SECURITIES AND EXCHANGE COMMISSION (THE "S.E.C.") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR WITH ANY OTHER SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS.  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE S.E.C., ANY OTHER SECURITIES REGULATORY AUTHORITY, NOR ANY STATE SECURITIES COMMISSION, AND NEITHER THE S.E.C. NOR ANY STATE SECURITIES

COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

EXCEPT AS OTHERWISE SET FORTH HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF.

NO PERSON HAS BEEN AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS ANNEXED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO IN THE DISCLOSURE STATEMENT AND/OR PLAN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

THE SUMMARIES OF THE PLAN AND THE RELATED DOCUMENTS IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE PLAN AND THE RELATED DOCUMENTS.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE PLAN DOCUMENTS, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS HERETO.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, THE PLAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW.  THE

DESCRIPTION OF THE PLAN HEREIN IS ONLY A SUMMARY.  HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES-IN-INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED EXHIBITS AND ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.

FOR ANY CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY. BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

# TABLE OF CONTENTS

I.   INTRODUCTION ....................................................................................................1

    A.   Overview of Confirmation Process..................................................................1

    B.   Summary of Treatment of Claims and Equity Interests Under the Plan.................2

    C.   Entities Entitled to Vote on the Plan................................................................2

II.  BACKGROUND .....................................................................................................3

    A.   Business Overview........................................................................................3

    B.   Debtors' Capital Structure .............................................................................4

        1.   Equity Structure ...................................................................................4

        2.   Prepetition Secured Credit Facilities .......................................................5

III. EVENTS LEADING TO BANKRUPTCY .................................................................6

IV.  THE CHAPTER 11 CASES ......................................................................................8

    A.   Commencement of the Chapter 11 Cases ........................................................8

        1.   "First-Day" Motions and Related Applications..........................................8

        2.   Debtor-in-Possession Financing .............................................................8

        3.   Employment of Professionals ................................................................9

    B.   Creditor Matters ..........................................................................................9

        1.   Appointment of the Creditors' Committee ................................................9

        2.   Meeting of Creditors ...........................................................................10

        3.   Motion for Derivative Standing .............................................................10

        4.   The Creditors' Committee's D&O Demand .............................................10

    C.   Cross-Border Proceedings ...........................................................................11

    D.   Schedules and Statements ............................................................................11

    E.   Claims Bar Date .........................................................................................11

    F.   The Sale Process ........................................................................................11

i

G.     Mediation of Intercreditor Disputes ........................................................... 12

H.     The D&O Settlement ................................................................................... 13

I.     The CRG Objections to Note Claims ......................................................... 13

J.     The 9019 Motions ...................................................................................... 14

K.     Amended Plan Settlement Resolving CRG's Objections ............................ 14

V.    Summary of the Plan .............................................................................................. 16

A.     General ........................................................................................................ 16

B.     Overview of Chapter 11 ............................................................................. 16

C.     Unclassified and Administrative Expense Claims and Priority Claims ....... 17

     1.     Administrative Expense Claims ...................................................... 17

     2.     Priority Tax Claims ........................................................................ 17

     3.     Other Priority Claims ..................................................................... 17

     4.     Bar Dates and Objection Deadlines for Certain Administrative
            Expense Claims .............................................................................. 17

D.     Classification and Treatment of Classified Claims and Equity Interests ..... 18

     1.     Classification and Treatment of Claims and Interests ..................... 18

     2.     Non-Consensual Confirmation ....................................................... 20

     3.     Solicitation of the Plan Debtors ..................................................... 20

E.     Means for Implementation of the Plan ........................................................ 20

     1.     The Plan Settlement ....................................................................... 20

     2.     The D&O Settlement ...................................................................... 20

     3.     Appointment of a Liquidating Trustee and the Oversight
            Committee ...................................................................................... 20

     4.     Formation of the Liquidating Trust and Transfer of Liquidating
            Trust Assets ................................................................................... 20

     5.     Funding of the Liquidating Trust ................................................... 22

6.      Rights and Powers of the Liquidating Trust ...............................................23

7.      Obligation of the Liquidating Trustee to Pay Claims under the Plan ........23

8.      Distribution of Liquidating Trust Assets ...................................................23

9.      Tax Treatment of Liquidating Trust ..........................................................24

10.     Fees and Expenses of the Liquidating Trust ..............................................24

11.     Intervention ...............................................................................................25

12.     Directors/Officers on the Effective Date ...................................................25

13.     Liquidation of the Debtors .........................................................................25

14.     Wind-Down of the Non-Debtor Subsidiaries ............................................26

15.     Completion of the Wind-Down ..................................................................26

16.     Term of Injunctions or Stays......................................................................26

17.     Creditors' Committee.................................................................................27

18.     Termination of Professionals .....................................................................27

19.     Post-Confirmation Reporting.....................................................................27

F.      Provisions Governing Distributions.......................................................................27

1.      Distributions on the Effective Date............................................................27

2.      Disputed Reserves......................................................................................28

3.      Record Date for Distributions....................................................................28

4.      Delivery of Distributions ...........................................................................28

5.      Distributions to be made in U.S. Dollars. ..................................................29

6.      Time Bar to Cash Payments.......................................................................29

7.      Withholding and Reporting Requirements. ................................................30

8.      No Interest on Claims. ................................................................................30

9.      Setoff and Recoupment...............................................................................30

10.     Application of Distributions ......................................................................31

G.    Procedures for Resolving Disputed, Contingent, and Unliquidated Claims..........31

    1.    Distributions Pending Resolution of Disputes...........................................31

    2.    Objection Deadline ...................................................................................31

    3.    Estimation of Claims................................................................................31

    4.    Disallowance of Claims ...........................................................................32

H.    Treatment of Executory Contracts and Unexpired Leases ...................................32

    1.    Rejection of Executory Contracts and Unexpired Leases.........................32

    2.    Claims Based on Rejection of Executory Contracts or Unexpired Leases..................................................................................................32

I.    Conditions Precedent to the Effective Dave ........................................................32

VI.    EXCULPATION, INJUCTION, RELEASES, AND PRESERVATION OF CAUSES OF ACTION.........................................................................................33

A.    Exculpation ...........................................................................................................33

B.    Injunction .............................................................................................................34

C.    Termination of All Employee and Workers' Compensation Benefits...................35

D.    Exclusions and Limitations on Exculpation ........................................................36

E.    Debtor Releases ....................................................................................................36

F.    D&O Settlement Bar Order ..................................................................................36

H.    Preservation of Causes of Action.........................................................................36

    1.    Vesting of Causes of Action .....................................................................36

    2.    Preservation of All Causes of Action Not Expressly Settled or Released ..................................................................................................37

VII.    Statutory Requirements for Confirmation of the Plan ....................................................38

A.    Best Interests of Creditors Test/Liquidation Analysis .........................................39

B.    Feasibility..............................................................................................................41

C.    Acceptance by Impaired Classes .........................................................................41

D.      Confirmation Without Acceptance by All Impaired Classes...............................42

      1.      No Unfair Discrimination ...........................................................42

      2.      Fair and Equitable Test ..............................................................42

VIII.   PLAN-RELATED RISK FACTORS ................................................................43

A.      The Debtors May Not Be Able To Obtain Confirmation of the Plan...................43

B.      The Debtors Cannot State with any Degree of Certainty the Size of the Relevant
       Classes of Claims.....................................................................................44

C.      The Liquidating Trust Expenses May Increase Materially, Causing a Diminution
       of Recovery to Creditors..........................................................................44

IX.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES .............44

A.      Federal Income Tax Consequences ....................................................46

      1.      Federal Income Tax Consequences to Holders of Allowed General
         Unsecured Claims ......................................................................46

      2.      Accrued Interest ........................................................................48

      3.      Post-Effective Date Cash Distributions ...................................48

      4.      Market Discount.........................................................................48

      5.      Bad Debt or Worthless Securities Deduction ...........................49

B.      Backup Withholding and Information Reporting ..................................49

C.      Importance of Obtaining Professional Tax Assistance.........................49

X.      Recommendation and Conclusion ....................................................50

**TABLE OF EXHIBITS**

| Exhibit | Title |
|---|---|
| 1 | Amended Joint Chapter 11 Plan of Liquidating of the Plan Debtors |
| 2 | Debtors' Organizational Chart |
| 3 | Plan Distribution Analysis |
| 4 | Best Interest of Creditors Analysis |

## I.    **INTRODUCTION**

### A.    **Overview of Confirmation Process**

Videology Liquidation Inc., f/k/a Videology Inc. ("Inc.") and its debtor affiliates Videology Liquidation, Ltd., f/k/a Videology, Ltd. ("Ltd."), VG MT Liquidation LLC, f/k/a Videology Media Technologies, LLC ("VMT") (the "Plan Debtors," and together with debtors Collider Media, Inc. ("Collider"), and LucidMedia Networks, Inc. ("Lucid") and their non-debtor affiliates, "Videology"), transmit this Disclosure Statement (as may be amended, supplemented or otherwise modified from time to time, the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") in connection with the solicitation of votes on the confirmation of the Amended Joint Chapter 11 Plan of Liquidation for the Plan Debtors, a copy of which is annexed hereto as **Exhibit 1** (as may be amended, supplemented or otherwise modified from time to time, the "Plan").

The purpose of this Disclosure Statement is to set forth information: (i) regarding the history of the Debtors and their businesses; (ii) describing the Chapter 11 Cases; (iii) concerning the Plan; (iv) advising the holders of Claims and Interests of their rights under the Plan; and (v) assisting the holders of Claims entitled to vote on the Plan in making an informed judgment regarding whether they should vote to accept or reject the Plan.

On May 15, 2019, the Court held a hearing on approval of this Disclosure Statement. Following the hearing, the Bankruptcy Court entered an Order (the "Scheduling and Disclosure Statement Order"): (i) approving this Disclosure Statement as containing "adequate information" to enable a hypothetical, reasonable investor typical of holders of Claims against or Interests in the Plan Debtors to make an informed judgment as to whether to accept or reject the Plan; and (ii) authorizing the Debtors to use this Disclosure Statement in connection with the solicitation of votes to accept or reject the Plan.  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Scheduling and Disclosure Statement Order, enclosed herewith, sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating ballots (each a "Ballot," and collectively, the "Ballots").  In addition, detailed voting instructions accompany each Ballot.  Enclosed with this Disclosure Statement is one Ballot for each Estate in which you have a Claim on which you are entitled to a vote.  Each holder of a claim entitled to vote on the Plan should read this Disclosure Statement and the exhibits hereto, including the Plan and the Scheduling and Disclosure Statement Order, as well as the instructions accompanying the Ballot in their entirety before voting on the Plan.  These documents contain important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes.  No solicitation may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  In voting on the Plan, holders of claims entitled to vote should not rely on any information relating to the Debtors and their businesses other than the information contained in this Disclosure Statement, the Plan, and all exhibits hereto and thereto.

Additional copies of this Disclosure Statement are available upon reasonable request made to the offices of the Debtors' counsel, Cole Schotz P.C., 500 Delaware Ave., Suite 1410, Wilmington, DE 19801, Attn: G. David Dean, Esq., (302) 651-2012 (phone), ddean@coleschotz.com (email). Additional copies of this Disclosure Statement can also be accessed free of charge from the following website: https://omnimgt.com/sblite/videology/.

## B.    Summary of Treatment of Claims and Equity Interests Under the Plan

The following chart is a summary of the classification and treatment of Claims against and Interests in the Plan Debtors and the potential distributions under the Plan. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims against and Interests in the Plan Debtors. Each of the estimates set forth below are based on currently available information and are subject to change. The projected recovery percentage for holders of Allowed General Unsecured Claims are similarly based on the Debtors' good faith estimates, and actual recoveries may vary materially for the reasons stated more fully in Article VIII herein. In addition, the projected recovery percentage for Class 2A-2C Claims does not account for potential recoveries on account of any Causes of Action described herein. The "Estimated Total Recovery" percentage represents the estimate of all distributions to be made to holders of Allowed General Unsecured Claims. As set forth in the Plan, an initial distribution shall be made shortly after the Effective Date to holders of such claims in a reduced amount from Available Cash (net of reserves). Distributions to holders of Claims who are current or former employees will be net of applicable employment taxes and withholding taxes.

| Class | Description | Proposed Treatment | Estimated Total Recovery |
|---|---|---|---|
| N/A | Administrative Expense Claims | Unimpaired | 100% |
| N/A | Priority Tax Claims | Unimpaired | 100% |
| N/A | Other Priority Claims | Unimpaired | 100% |
| 1 | Secured Claims | Unimpaired | 100% |
| 2A | General Unsecured Claims (Inc.) | Impaired | $15 million for Noteholders <br><br> 36% for Non-Noteholders |
| 2B | General Unsecured Claims (Ltd.) | Impaired | 52% |
| 2C | General Unsecured Claims (VMT) | Impaired | 48% |
| 3A-3C | Equity Interests | Impaired | 0% |

## C.    Entities Entitled to Vote on the Plan

The holders of General Unsecured Claims in Classes 2A, 2B and 2C are the only Entities entitled to vote to accept or reject the Plan. Holders of General Unsecured Claims in Class 2A are entitled to vote to accept or reject the Plan as to Inc. Holders of General Unsecured Claims in Class 2B are entitled to vote to accept or reject the Plan as to Ltd. Holders of General Unsecured Claims in Class 2C are entitled to vote to accept or reject the Plan as to VMT. To confirm the Plan as to all three Plan Debtors, pursuant to section 1129(a)(10), holders of General Unsecured Claims against each Plan Debtor's Estate must vote to accept the Plan as to number of Claims (more than 1/2 of votes cast) and amount (at least 2/3 of votes cast). If you have more than one General Unsecured Claim against a single Plan Debtor, you are entitled to cast a single

2

vote in connection with all such Claims.  If you have Claims against multiple Plan Debtors, you are entitled to cast a separate (single) vote as to each Plan Debtor.

## II.    BACKGROUND

### A.    Business Overview

Inc. is a Delaware corporation founded in 2007 and headquartered in Baltimore, Maryland. Its business was built to provide the software solution for the convergence of television and digital video, through the use of a proprietary allocation theory technology unique to the Debtors (the "Technology IP").  Before Inc., advertising technologies had not been developed to address the development of consumers accessing television and video across multiple devices.  Inc. built its technology to help advertisers and media companies, both buyers and sellers of advertising, to plan, execute, and measure ad campaigns across television and digital media, with innovations including a direct integration with Nielsen, the dominant provider of television data in the United States, as well as other data providers.  Inc.'s core value proposition is based on its use of the proprietary Technology IP and unique program algorithms. This capability optimally matches advertising agencies and other companies seeking effective ad campaign placement and implementation with media companies looking to fill inventory with high-impression ads resulting in maximum effectiveness.

In December 2010, Inc. established Ltd., a wholly-owned subsidiary organized under the laws of England with headquarters in London, followed by additional expansion into Europe ("EMEA") with the creation of a Spanish branch office in 2012 and a French branch office in 2013.  In 2013, Videology entered Canada by incorporating Videology Canada, Inc., and also entered the Asia Pacific region ("APAC") by establishing Videology Asia PTE LTD ("Videology Singapore"), in Singapore, and Videology Japan KK in Japan.  Inc. also expanded its product offerings in 2012 through the acquisition of data management and mobile specialist, Collider, and display and rich media company, Lucid.  In January 2013, Videology continued its expansion by establishing a wholly-owned subsidiary, Videology Australia PTY Ltd. in Australia.  Videology Singapore also provided support for clients in Korea.

In 2013, Inc. established VMT in the United States and as well as a similar entities in the APAC region (Videology Media Technologies PTE LTD) and in EMEA (Videology Media Technologies BV).  This evolution of Videology's approach to the market was done to improve its relationships with demand-side clients (i.e., agency holding companies that represent advertisers) and supply-side clients (i.e., media companies with advertising space to sell). VMT supported Inc. in the United States while the other VMT entities supported Ltd. and its subsidiaries and branches.   Attached as **Exhibit 2** is an organizational chart showing the corporate structure of the Videology group of companies as of the Petition Date.

Inc.'s demand-side clients primarily included advertising agency holding companies and advertisers.  On the supply-side, VMT's clients include media companies and publishers.  During the year prior to the Petition Date, the Videology platform delivered over 17 billion targeted impressions across digital video and television for more than 13,000 advertisers in 24 countries. At the time of the bankruptcy filings, Inc. and its affiliates were supporting over 4,000 active

3

users around the globe, with a customer base that included global agency holding companies, world-leading advertisers, media companies, and premium publishers.

The Debtors' executive and administrative offices were (and still are) located in Baltimore, Maryland.  The Debtors do not own any real property.  On the Petition Date, Videology had 212 employees, with 146 employed in the Debtors' U.S. operations; 59 employed in London for Ltd.; and 7 at Ltd.'s branch office in Madrid.  The Debtors' non-debtor foreign subsidiaries had 22 employees.

For the year ended December 31, 2017, the Debtors generated revenues on a consolidated basis of $143,240,252 and had a net loss on a consolidated basis of ($27,219,644).  For the year ended December 31, 2016, the Debtors generated revenues on a consolidated basis of $188,621,402 and had a net loss on a consolidated basis of ($31,586,799).

**B.**     **Debtors' Capital Structure**

**1.**     **Equity Structure**

During the years prior to the Petition Date, Inc. obtained funding for the development of its technology and operations through the sale of Preferred Stock in four separate equity financings, as summarized below.

- Series A Financing: Beginning in February and ending in July of 2008, Inc. sold shares of its Series A Preferred Stock to various investors, including New Enterprise Associates 12, Limited Partnership and Valhalla Partners II, L.P., the lead investors for such financing, for an aggregate purchase price of approximately $15.1 million.

- Series B Financing: Beginning in October of 2009 and ending in January of 2010, Inc. sold shares of its Series B Preferred Stock to various investors, including Comcast Ventures, LP, the lead investor for such financing, for an aggregate purchase price of approximately $16.4 million.

- Series C Financing: Beginning in March and ending in May of 2011, Inc. sold shares of its Series C Preferred Stock to various investors, including New Enterprise Associates 12, Limited Partnership, the lead investor for such financing, for an aggregate purchase price of approximately $30.4 million.

- Series D Financing: Beginning in May and ending in June of 2013, Inc. sold shares of its Series D Preferred Stock to various investors, including Catalyst Investors and New Enterprise Associates 12, Limited Partnership, for such financing, for an aggregate purchase price of approximately $68.2 million.

Inc. issued Series X Preferred Stock in consideration for the acquisition of Collider and Series Y Preferred Stock in consideration for the acquisition of LucidMedia.

In addition to obtaining funding through the equity financings described above, prior to the Petition Date, in August and October of 2017, Videology sold Convertible Promissory Notes

("Notes") to certain holders of its Preferred Stock for an aggregate purchase price of approximately $17.1 million to sustain its operations.  The financing was comparable to companies in similar circumstances seeking to sustain operations pending a sale transaction or subsequent financing.  The terms of the Notes included (a) two year maturity, (b) 8% interest, and (c) a change of control premium entitling holders to a payment of three times the principal amount of the Notes upon a Liquidation Event (as defined in the Notes and related documents and including a sale of the company).  To provide additional incentive to purchasers of the Notes, Videology created a new senior most class of equity, Series 1, into which holders of prior preferred shares (Series A, B, C and D) converted their existing equity in proportion to the value of notes purchased.  The terms of the Notes were negotiated by a disinterested Inc. director and reviewed by an outside financial investor who advised the Board that the terms of the Notes financing were within market parameters for similar financings based on Inc.'s size and financial performance.  The Series 1 Preferred Stock was referred to as "pull up" shares because it elevated the purchasers' existing preferred stock in terms of seniority.

## 2.    Prepetition Secured Credit Facilities

As of the Petition Date, the Debtors had three secured credit facilities, as described below.  They were negotiated after a process that began in January 2017 when Inc. engaged Armentum Partners to assist with refinancing Inc.'s existing senior secured credit facility with Wells Fargo.

### (1)    U.S. Loan Facility

Each Debtor, other than Ltd,, was a borrower under a Loan and Security Agreement dated as of July 10, 2017 (the "U.S. Loan Facility"), with financial institutions party thereto from time to time as lenders (the "U.S. Lenders"), Fast Pay Partners LLC ("FastPay") as agent for the U.S. Lenders (the "U.S. Agent"), and Tennenbaum Capital Partners, LLC ("TCP"), as documentation agent for the U.S. Lenders and as the Investment Manager for the U.S. Lenders (other than FastPay).  Certain affiliates of TCP were among the U.S. Lenders.  Ltd. was a guarantor of the U.S. Loan Facility.  The U.S. Loan Facility provided for revolving credit commitments from the U.S. Lenders in an aggregate principal amount of up to $40 million, and a maturity date of January 2020.  The U.S. Loan Facility was an asset-based revolving credit facility, issued in conjunction with the U.K. Loan Facility (as defined below), which extended credit based on a percentage of "eligible accounts" owing to the borrowers. The U.S. Loan Facility was secured by all of the Debtors' assets.  Interest on the U.S. Loan Facility accrued at variable rates based on the LIBOR Rate plus 8.50%.  The U.S. Loan Facility provided further that during any other event of default, interest was to accrue at the default rate of 3% over the non-default rate.

### (2)    U.K. Loan Facility

As of the Petition Date, each Debtor also was a borrower under a Loan and Security Agreement dated as of July 10, 2017 (the "U.K. Loan Facility" and together with the U.S. Loan Facility, the "Loan Facilities"), with financial institutions party thereto from time to time as lenders (the "U.K. Lenders" and together with the U.S. Lenders, the "Lenders"), FPP Sandbox LLC ("FPP"), as agent for the U.K. Lenders (the "U.K. Agent" and together with the U.S. Agent,

5

the "Agents"), and TCP, as documentation agent for the U.K. Lenders and as the Investment Manager for the U.K. Lenders (other than FPP). Certain affiliates of TCP were among the U.K. Lenders. Ltd. was also a guarantor of the U.K. Loan Facility.

The U.K. Loan Facility was an asset-based revolving credit facility, issued in conjunction with the U.S. Loan Facility, which extended credit based on eligible accounts owing to Ltd. The aggregate amount of revolver commitments under the U.K. Loan Facility also included $20,000,000 with respect to an eligible over advance, in addition to the revolving commitments under the same $40,000,000 committed under the U.S. Loan Facility. Both the U.K. Loan Facility and the U.S. Loan Facility provided that the revolver commitments under each Loan Facility could never exceed $70,000,000 (with an exception not relevant to actual events). The U.K. Loan Facility was secured by the same collateral as that of the U.S. Loan Facility. Interest on the U.K. Loan Facility accrued at variable rates based on the LIBOR Rate plus 10%. The U.K. Loan Facility, like the U.S. Loan Facility, also provided that during an event of default, interest would accrue at the default rate of 3% above the non-default rate. The U.K. Loan Facility also had a maturity date of January 2020.

### (3)    *The EMEA Factored Facility*

Prior to the Petition Date, Ltd. also was a party to a Financing Agreement dated as of July 28, 2017 (the "EMEA Factored Facility," and together with the Loan Facilities, the "Prepetition Secured Loan Facilities"), with FastPay Roundabout Limited ("FPR" or the "FastPay Factor" and together with the Lenders and the Agents, the "Prepetition Secured Parties"). The EMEA Factored Facility was a factoring agreement, with maximum commitments not to exceed $3 million. Under the terms of the EMEA Factored Facility, the FastPay Factor advanced to Ltd. 80% of accounts that it purchased with respect to account debtors that were not incorporated or organized in the United Kingdom, the United States or Canada (collectively, the "EMEA Accounts"). Essentially, the EMEA Accounts were with account debtors located in countries in Europe (other than the United Kingdom) and in the Middle East and Africa. The Agents and their affiliate FastPay Factor are parties to an Intercreditor Agreement dated as of July 27, 2017, which confirmed the FastPay Factor's priority in the EMEA Accounts and the Agents' priority in non-EMEA Accounts. Under the EMEA Factored Facility, Ltd. was required to pay a 14.5% factoring fee to the FastPay Factor on any amount advanced.

### III.    EVENTS LEADING TO BANKRUPTCY

During the summer of 2017, the Debtors asked LUMA Partners LLC ("LUMA"), a leading investment bank focused on digital media and marketing and media, to seek a strategic buyer for the Debtors' businesses and assets. Through these efforts, significant interest was expressed, and one letter of intent from a potential buyer was received. The letter of intent, however, was eventually withdrawn and ultimately the efforts that year to effect a sale transaction were not successful.

Given the lack of results from the strategic sale process, the Debtors undertook an effort to pursue a capitalization/refinancing in early 2018. During that time, however, the Debtors' largest customer (GroupM) became increasingly concerned with the Debtors' financial condition and in March 2018, imposed a global hold on payments owed to the Debtors for services

rendered in the ordinary course.  This delay in payments alarmed the Prepetition Secured Parties, though there was no payment default at the time.

On March 23, 2018, the Lenders sent a letter to the Debtors declaring an event of default under the Prepetition Secured Loan Facilities, based on the assertion that a "Material Adverse Effect" had occurred as a result of GroupM's actions and that the Prepetition Secured Parties considered themselves "insecure" with respect to the prospect of repayment of the Loan Facilities.  The Debtors disputed that any such default had occurred and promptly so advised the Prepetition Secured Parties.  In particular, at the time the Prepetition Secured Parties called a default, the total obligations owed to such parties were less than $20 million (US) and the Debtors had total accounts receivable of just under $60 million.  In addition, the Debtors advised the Prepetition Secured Parties that they were then in discussions with prospective purchasers.

Following the Lenders' March 23, 2018 notices of default, FastPay Factor issued its own purported notice of default on March 23, 2018 under the EMEA Factored Facility, describing the same purported events of default.  Following that March 23, 2018 notice of default, FastPay Factor ceased factoring any additional accounts and was repaid the entirety of the amounts due prior to the Petition Date.

Despite the Debtors' objections, the Prepetition Secured Parties refused to withdraw their notices of default and proceeded to restrict advances under the U.S. Loan Facility.  In addition, they seized control over the Debtors' bank accounts and for the period leading up to the Petition Date, acted as an administrator of such accounts and decided what creditor bills would be paid from funds in the Debtors' accounts.  Although the Prepetition Secured Parties did not accelerate the Loan Facilities, they used the proceeds from accounts collected by the Debtors to pay down the balance due under the Loan Facilities so that the revolver loan balance under the U.S. Loan Facility was paid in full, leaving only the amounts due under the loan documents for the Lenders' 3% "End of Term Premium."  The U.K. Loan Facility also was substantially paid down, so that as of the Petition Date, the balance due to the Prepetition Secured Parties was approximately $11.3 million, plus any loan fees due and payable under the loan documents.

In these challenging circumstances, the Debtors determined that the only way to preserve their businesses as going concerns was to find a strategic buyer for the business.  The Debtors therefore pursued efforts to reengage with parties that previously had undertaken due diligence for an acquisition from the prior efforts to find a strategic buyer.  Through these efforts, and despite the extreme challenges imposed by the Prepetition Secured Parties, the Debtors entered into an Asset Purchase Agreement with Amobee, Inc. ("Amobee") on May 4, 2018, under which Amobee agreed to purchase substantially all of the Debtors' businesses and assets, including the Technology IP, subject to higher and better bids and Bankruptcy Court approval.  The Debtors then filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on May 10, 2018.

## IV.    THE CHAPTER 11 CASES

### A.    Commencement of the Chapter 11 Cases

As noted above, on the Petition Date, the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  By an Order dated May 11, 2018 [D.I. 25], the Debtors' cases are being jointly administered for procedural purposes only. No trustee or examiner has been appointed in these cases.  Following the commencement of these cases, the Debtors continued to operate their businesses and to manage their properties as debtors-in-possession.

### 1.    "First-Day" Motions and Related Applications

Recognizing that any interruption of the Debtors' business would negatively impact the Debtors' business, they filed a number of motions along with their voluntary petitions to stabilize operations and to minimize disruptions.  The Bankruptcy Court granted these "first-day" motions which helped facilitate the Debtors' smooth transition into Chapter 11.  These first-day motions and orders included orders that (i) authorized the Debtors to pay certain prepetition amounts due to employees for wages and other compensation; (ii) approved procedures for the Debtors to address their obligations to utility providers, avoiding any discontinuance of utility services; and (iii) authorized the Debtors to continue to use their existing cash management system, bank accounts, and business forms.

One of the critically important first-day motions was the Debtors' motion for authority to use cash collateral in which the Prepetition Secured Parties had a security interest.  By that motion, the Debtors requested authority to use their "cash collateral" to fund their ordinary course of business operations, free of the stranglehold the Prepetition Secured Parties had placed on the Debtors' bank accounts prior to the Petition Date.  By an interim order entered on May 11, 2018 [D.I. 32], the Court granted the Debtors' motion, ordered that the Prepetition Secured Parties release control over the Debtors' bank accounts, thus restoring the Debtors' ability to access their own funds, and authorized the Debtors to use cash collateral through May 23, 2018 subject to an interim budget.  By a second interim order entered on May 23, 2018 [D.I. 105], the Court approved with the consent of the Prepetition Secured Parties the Debtors' authority to use cash collateral and scheduled a hearing for final approval for June 5, 2018.  By an order entered on June 4, 2018, the Court approved the interim orders on a final basis [D.I. 161].

### 2.    Debtor-in-Possession Financing

Due to the actions of the Prepetition Secured Parties prior to the Petition Date, which greatly disrupted the Debtors' ability to conduct their business in an efficient and timely manner, the Debtors did not consider the Prepetition Secured Parties to be a reliable source for financing required during the sale process.  The Debtors therefore, with the assistance of counsel and other advisors, solicited and obtained interest in providing the needed financing from lenders not previously involved with the Debtors.  These efforts led to an agreement with Draper Lending, LLC (the "DIP Lender") to provide a  $25 million senior secured debtor in possession credit facility (the "DIP Facility"), which would allow the Debtors to pay off the Prepetition Secured Parties and still provide the Debtors with more than enough credit to ensure that the Debtors

8

would be able to conduct their businesses and complete a successful sale process, without concern about possible defaults or termination of availability due to any covenant or other loan terms.

On May 15, 2018, the Debtors sought approval (the "DIP Motion") to enter into the DIP Facility with the DIP Lender.  While the DIP Motion was pending, the Debtors and the Official Committee of Unsecured Creditors (the "Creditors' Committee") received an unsolicited, competing offer for post-petition financing from Marble Ridge Capital ("Marble Ridge").  On May 23, 2018, the Bankruptcy Court held a hearing to consider approval of the DIP Facility on an interim basis (the "Interim DIP Hearing").  At the Interim DIP Hearing, the DIP Lender made certain concessions, in light of the competing offer from Marble Ridge.  The next day, the Bankruptcy Court approved the DIP Facility on the modified basis and entered an order (the "Interim DIP Order") authorizing the Debtors to borrow up to $20 million on an interim basis under the DIP Facility [D.I. 118].

After entry of the Interim DIP Order, the Debtors used a portion of the DIP Facility to pay off the Prepetition Secured Parties, and sought approval of the DIP Facility on a final basis. Marble Ridge, with the support of the Creditors' Committee, vied to replace the DIP Lender with an alternative credit facility, but the Debtors had built a trusted business relationship with the DIP Lender, lacked knowledge about Marble Ridge, and urged the Court to approve the DIP Facility on a final basis.  On June 5, 2018, following a second contested financing hearing, the Bankruptcy Court entered a final order [D.I. 161] approving the $25 million DIP Facility with the DIP Lender.

### 3.    Employment of Professionals

To assist the Debtors in carrying out their duties as debtors-in-possession, the Bankruptcy Court authorized the Debtors to retain and employ the following professionals:  (a) Cole Schotz P.C. as bankruptcy counsel; (b) Berkeley Research Group as financial advisors and, subsequently, as testifying expert; (c) LUMA Securities LLC as investment bankers; (d) DWF LLC as special UK counsel; (e) Hogan Lovells US LLP as special corporate and transactional counsel; and (f) Omni Management Group as administrative agent.

### B.    Creditor Matters

### 1.    Appointment of the Creditors' Committee

On May 17, 2018, the United States Trustee for the District of Delaware (the "UST") appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code [D.I. 72], consisting of the following members:  (a) GroupM UK Digital Ltd.; (b) Beachfront Media, LLC; (c) FMEX, LLC d/b/a Futures Media; (d) SpotX, Inc.; (e) Chesapeake Paperboard Centre LLC; (f) Teads Finance SAS; and (g) Telaria, Inc.  On October 11, 2018, the UST filed an amended notice of appointment reflecting the resignation of Chesapeake Paperboard Centre LLC from the Creditors' Committee [D.I. 502].

The Creditors' Committee retained Cooley LLP as counsel, Whiteford, Taylor & Preston, LLC as Delaware counsel, and Gavin/Solmonese as financial advisors.  On June 28, 2018, the

Court entered orders approving the retention of Gavin/Solmonese, Whiteford, Taylor & Preston, LLC and Cooley LLP [D.I. 252, 253, and 254, respectively].

### 2.    Meeting of Creditors

The meeting of creditors pursuant to section 341 of the Bankruptcy Code was held on June 15, 2018. In accordance with Bankruptcy Rule 9001(5), a representative of the Debtors, and counsel to the Debtors, attended the meeting and answered questions posed by the UST and other parties in interest present at the meeting.

### 3.    Motion for Derivative Standing

On February 21, 2019, the Creditors' Committee filed the Motion of Official Committee of Unsecured Creditors for Entry of an Order Granting Derivative Standing and Authority to Prosecute and Settle Claims on Behalf of the Debtors' Estates [D.I. 725] (the "Derivative Standing Motion"), through which the Creditors' Committee sought standing to prosecute and settle certain derivative claims and Causes of Action against the Noteholders to *inter alia*, (i) recharacterize and/or subordinate the Notes; and (ii) challenge the validity of the liquidation premium set forth in the Notes that became due and payable upon a change of control. The Derivative Standing Motion asserted that, because the Debtors were controlled by certain holders of Notes (the "Noteholders"), it would be futile to ask the Debtors to pursue claims challenging the validity and enforceability of the Notes and vesting the Creditors' Committee with standing to pursue Noteholder claims was appropriate.

The Noteholders dispute the substantive and core assertions made in the Derivative Standing Motion. As for the statements in the Derivative Standing motion concerning the Debtors' board, prior to the filing of the Derivative Standing Motion, Inc.'s entire board of directors, except for Scott Ferber, had resigned following completion of the sale to Amobee, and Mr. Ferber had recused himself from any matters or issues relating to the Notes. Therefore, the Debtors disagree with the position in the Derivative Standing Motion that the Debtors were not in a position to fairly evaluate and litigate the enforceability of the Notes.

The issues raised in the Derivative Standing Motion were among the key issues addressed and resolved, subject to confirmation of a Chapter 11 plan, in the mediation, described below. Accordingly, the Creditors' Committee agreed to adjourn or defer consideration of the Derivative Standing Motion pending confirmation of a Chapter 11 plan, and the Debtors expect that upon Effective Date of the Plan, the Derivative Standing Motion will be withdrawn.

### 4.    The Creditors' Committee's D&O Demand

In addition to the claims asserted in the Derivative Standing Motion, by letter dated October 25, 2018 (the "Committee Demand"), the Creditors' Committee made demand upon current and former officers and directors of Inc. In addition to the Note challenges, the Committee Demand asserted claims against the Debtors' current and former directors and officers arising from (i) their approval of certain aspects of the transactions with the Lenders, (ii) negotiations with GroupM and other vendors, and (iii) their management and oversight of the sale process. The Committee Demand asserted damages of not less than $54,959,110.58, which was comprised of (i) the Noteholder claims and (ii) $3,500,000.00 relating to other alleged

conduct.  The Debtors' current and former directors and officers dispute the allegations made in the Committee Demand.

### C.   Cross-Border Proceedings

Contemporaneously with the filing of the Chapter 11 petitions, Inc. and Ltd. each filed an application with the High Court of Justice of England & Wales (the "High Court") requesting recognition of their Chapter 11 proceedings as foreign main proceedings, and the imposition of a moratorium to prevent creditors of Inc. and Ltd. from taking any enforcement actions against them in the United Kingdom.  The High Court granted Inc.'s application at the first hearing, but scheduled additional hearings with respect to Ltd.'s application to consider additional evidence.  At a hearing held on June 13, 2018, the High Court declined to recognize Ltd.'s Chapter 11 case as a foreign main proceeding under the governing UNCITRAL Model Law on Cross-Border Insolvency as incorporated into English law. The High Court, did, however, grant recognition of Ltd.'s Chapter 11 case as a foreign non-main proceeding and imposed a moratorium against actions by individual creditors against Inc. and Ltd.  On August 16, 2018, the High Court issued its opinion and judgment granting this relief.  The relief granted by the High Court provided the necessary assurance that the Debtors' joint efforts to conduct an orderly sale of their businesses and assets could be pursued through the Chapter 11 process without disruption from creditors in the United Kingdom who might not have been subject to U.S. bankruptcy laws.

### D.   Schedules and Statements

On June 13, 2018, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs ("Schedules") with the Bankruptcy Court [D.I. 196-205].  On June 28, 2018, Inc. and Ltd. filed amended Schedules [D.I. 261 and 262, respectively].  On July 9, 2018, the Debtors filed amended Schedules [D.I. 304-313].

### E.   Claims Bar Date

By order dated July 13, 2018 [D.I. 329], the Bankruptcy Court set September 14, 2018 at 5:00 p.m. (prevailing Eastern time) as the general claims bar date and November 9, 2018 at 5:00 p.m. (prevailing Eastern time) as the governmental claims bar date.  To date, the Debtors have received approximately 417 proofs of claim.

### F.   The Sale Process

The Debtors commenced these Chapter 11 Cases with the goal of selling their businesses and assets, including the Technology IP, as an ongoing business to maximize recoveries for the benefit of creditors.  As described above, prior to the Petition Date, the Debtors secured a stalking horse bid from Amobee, and filed a motion requesting that the Bankruptcy Court approve the sale of substantially all of the Debtors' assets to Amobee, subject to higher and better bids, and to approve certain bidding procedures to govern the sale process.  Following approval of the bid procedures, through the efforts of the Debtors' executives and investment banker, LUMA, the Debtors received one other qualified bid from ITV (Victor) Limited ("ITV").  On July 13, 2018, the Debtors, led by LUMA, conducted a lively auction between Amobee and ITV that resulted in over 50 bids and yielded a $73 million increase in the purchase price (subject to adjustments) from Amobee's original $45 million stalking horse bid.  The Bankruptcy

Court approved the sale to Amobee on the terms of a revised Asset Purchase Agreement on July 17, 2018 [D.I. 348]. The sale closed on August 21, 2018, and the net proceeds remaining after paying off the DIP Facility, approximately $67.2 million, were deposited into the Debtors' bank accounts. To maximize the interest earned on the net sale proceeds while the Debtors' pursued efforts to formulate and obtain Bankruptcy Court approval of a Chapter 11 plan, most of the net sale proceeds have been invested into Treasury bills.

### G.    Mediation of Intercreditor Disputes

With the completion of the highly successful sale process, the Debtors turned their efforts to determining the fair and proper approach to formulating a Chapter 11 plan for each of the Debtors. The Debtors retained Dr. William Kerr of Berkeley Research Group ("BRG") to provide an objective opinion on a fair allocation of the sale proceeds to the five Debtors' Estates. Dr. Kerr's report (the "Kerr Report") concluded that a fair allocation of the net sale proceeds is as follows: 82% to Inc., which owned the Technology IP; 14% to Ltd.; 4% to VMT; and 0% to Collider and Lucid.

On November 21, 2018, the Debtors filed the Debtors' Motion for Allocation of Proceeds from the Sale of Substantially All of the Debtors' Assets [D.I. 582] (the "Allocation Motion"), requesting the Court to adopt the allocation set forth in the Kerr Report. The Debtors received the following responses to the Allocation Motion:

(1) GroupM UK Digital Ltd., (with its affiliates, as defined in the Plan, "GroupM"), the holder of the largest general unsecured claim against Ltd., objected to the Allocation Motion and (i) disputed Dr. Kerr's allocation conclusions (ii) challenged the extent and validity of the claims of the Noteholders; and (iii) requested that the matter be the subject of a mediation between the parties;

(2) The Creditors' Committee (which ultimately determined that the metholodogy underlying the allocation set forth in the Kerr Report was sound) submitted a response that also requested mediation;

(3) Sky UK Limited, another large creditor of Ltd., joined in GroupM's objection;

(4) CRG Financial LLC ("CRG"), a claims trader that acquired several million in claims primarily from VMT creditors, filed a reservation of rights that did not object to the Allocation Motion but requested the right to participate in any mediation ordered by the Court; and

(5) An Ad Hoc Committee of Noteholders, filed a reservation of rights that disputed the assertions set forth in GroupM's objection regarding the validity of the Noteholder claims and joined in the other parties' requests for mediation.

On December 17, 2018, the Bankruptcy Court conducted a status conference with respect to the Allocation Motion, and following that hearing and with the unanimous support of the Debtors and the parties that submitted responses to the Allocation Motion (collectively, the "Mediation Parties"), arranged for the Honorable Kevin Gross, a well-respected sitting judge of the Bankruptcy Court not previously involved in the Debtors' cases, to preside over a mediation (the "Mediation") regarding (i) the disputed allocation of the sale proceeds among Debtors; (ii)

the validity of the Noteholder claims; (iii) the extent and validity of the intercompany claims reflected on the Debtors' Schedules; and (iv) all other issues in dispute among the Mediation Parties that bore a material impact on creditor recoveries in the Chapter 11 Cases.

Prior to the Mediation, each Mediation Party provided Judge Gross with a written submission setting forth its position with respect to each of the issues in dispute. In furtherance of that process, the Debtors produced a significant amount of information to the Mediation Parties through a series of document productions (made subject to the terms of a consensual protective order approved by the Bankruptcy Court). The Debtors, with the assistance of BRG, also developed a distribution model that reflected the Debtors' then-current projections and could be adjusted during the mediation to allow the Mediation Parties to analyze how differing settlement structures impacted recoveries for each of the Debtors' creditors.

Judge Gross presided over the Mediation on March 4, 2019, and each of the Mediation Parties actively participated. During the Mediation, the parties addressed the relative merits of the potential challenges to the Allocation Motion, the Notes and the intercompany claims as well as the costs attendant to such litigation and a drawn out plan confirmation process. All of the Mediation Parties acknowledged that the costs associated with such litigation were prohibitive. The Mediation Parties therefore focused on constructing a global resolution of all outstanding issues that could form the basis for a consensual and confirmable plan of liquidation that maximized creditor recoveries.

Ultimately, all of the Mediation Parties, other than CRG, agreed on the key terms of a global settlement. By March 11, 2019, all of the Mediation Parties other than CRG had signed a Plan Settlement Term Sheet[2] that memorialized the key terms thereof.

## H.     The D&O Settlement

Prior to the mediation, the Debtors successfully negotiated an agreement in principal with the Insurer relating to the allegations in the Committee Demand. Pursuant to the terms of the D&O Settlement, the Debtors and their Respective Estates have agreed to release Inc.'s former and current officers and directors and all other Insureds, in exchange for a payment by the Insurer to Inc. in the amount of $2,500,000.

Pursuant to the terms of the D&O Settlement, the Ds & Os shall cause the Insurer to pay Inc. the sum of $2,500,000. The terms of the D&O Settlement Order and the D&O Settlement are expressly incorporated into the terms of this Plan, notwithstanding anything in this Plan to the contrary.

## I.     The CRG Objections to Note Claims

Despite the Plan Settlement having the unanimous support of the Creditors' Committee and all other Mediation Parties, CRG (a claims trader which purchased a large position with VMT) did not agree to the Plan Settlement, arguing that it did not provide for sufficient

---

[2]  Three Noteholders did not sign the Plan Settlement term sheet; however, the Debtors do not believe that any of these Noteholders oppose the Plan Settlement.

recoveries to VMT creditors.  While the Debtors were in the process of preparing the Plan and the initial Disclosure Statement for filing, CRG commenced litigation against the Noteholders in a series of objections to their respective Note claims.  *See* D.I. 771, 773-76, 779.  In addition, CRG moved to compel Inc. to amend its schedules with respect to the Note claims.  *See* D.I. 795.

The CRG claims objections conflict with the Plan Settlement, and if they were to be sustained, the Plan Settlement would no longer be possible.  The Debtors asked the Bankruptcy Court to stay all proceedings relating to the CRG claims objections and motion to compel pending confirmation of the Plan, which would render the CRG claims objections moot.

### J.    The 9019 Motions

On April 12, 2019, the Debtors filed a motion requesting Bankruptcy Court approval of the settlement reflected in the Plan Settlement ("Plan Settlement Motion") [Docket No. 819].  On April 15, 2019, the Debtors also filed a motion for entry of an order setting the hearing and objection deadline with respect to the Global Settlement Motion and staying the CRG claim objections [D.I. 823].  On April 24, 2019, the Debtors filed a motion requesting Bankruptcy Court approval of the settlement reflected in the D&O Settlement ("D&O Settlement Motion") [D.I. 863].

On April 17, 2019, CRG filed a Preliminary Objection to Plan Settlement Motion and a Motion for Extension of Objection Deadline and Adjournment of Hearing on the Plan Settlement Motion and D&O Settlement Motion [D.I 831].On April 29, 2019, the Court held a telephonic hearing (the "Telephonic Hearing").   At the Telephonic Hearing, the Court scheduled the Plan Settlement Motion and the D&O Settlement Motion for a hearing on May 15, 2019.  The Court scheduled the CRG claim objections for a hearing on June 18, 2019.

On May 13, 2019, the Court entered the D&O Settlement Order [D.I. 953].

### K.    Amended Plan Settlement Resolving CRG's Objections

Prior to the hearing on May 15, 2019, the Mediation Parties, including CRG, reached the terms of a global settlement agreement.[3]  The Mediation Parties, including CRG, signed an Amended Plan Term Sheet Term Sheet (the "Plan Settlement") that memorialized the key terms thereof.  The terms of the Plan Settlement are:

- Available Cash Allocation.  The Available Cash will be distributed to the Plan Debtors in accordance with the Available Cash Allocation.

-  Chapter 11 Expenses Allocation.  The fees and expenses of Retained Professionals approved by the Court through the Effective Date shall be allocated to the Plan Debtors in accordance with the Chapter 11 Expenses Allocation.

- Intercompany Claims.  The Prepetition Intercompany Claims shall be Allowed as General Unsecured Claims against Inc. and VMT, as applicable.  The Postpetition Intercompany Claims shall be Allowed as Administrative Expense Claims against

---

[3] The Debtors withdrew the Plan Settlement Motion without prejudice.

Inc. and VMT, as applicable.  No further intercompany claims between Debtors shall be Allowed; *provided, however*, that nothing in this Plan shall affect the intercompany claims between any Debtor and Non-Debtor Subsidiary.

- <u>GroupM Claims</u>.  The GroupM Claims shall be Allowed as General Unsecured Claims against Ltd.  GroupM hereby releases all other claims against the Plan Debtors, including its scheduled claim against Inc.  The Plan Debtors shall release all Avoidance Actions against GroupM.

- <u>Sky UK Limited Claims</u>.  The Sky UK Limited Claims shall be Allowed as General Unsecured Claims against Ltd.  The Plan Debtors shall release all Avoidance Actions against Sky UK Limited, including, for the avoidance of doubt, any Avoidance Actions relating to payments made to "Sky Ad Smart" listed in Ltd.'s amended statement of financial affairs [D.I. 313, p. 31 of 42].

- <u>Noteholder Claims</u>.  The Noteholders shall receive the Noteholder Payments on the Effective Date (or as reasonably practical thereafter), in full satisfaction of any Claims and obligations that may be due and owing under the Notes.  Accordingly, notwithstanding anything in this Plan to the contrary, the Noteholders shall not become Beneficiaries under the Trust Agreement and shall not be entitled to any separate distribution on account of their claims by the Liquidating Trustee, as their claims will be satisfied on the Effective Date.  The Plan Debtors shall release all Causes of Action against the Noteholders.

- <u>CRG Claims, Purchase and Distribution</u>.  The CRG Claims shall be allowed.  On the Effective Date, the Purchasing Noteholders shall purchase from CRG, from proceeds of their respective distributions from the Noteholder Payments, the CRG Claims for the CRG Claims Purchase Price.  On the Effective Date, Inc. shall pay CRG the CRG Claims Purchase Price on behalf of the Purchasing Noteholders.  The CRG Claim Purchase Price shall be paid Pro Rata by the Purchasing Noteholders, based on the face amount of their respective Note Claims.  On the Effective Date, the Plan Debtors shall distribute to the Purchasing Noteholders their Pro Rata portion of the CRG Claims Distribution Amount, based on the amount of the CRG Claims Purchase Price paid by each Purchasing Noteholder.[4]

- <u>The D&O Settlement</u>.  The parties to the Plan Settlement agreed to the principal terms of the D&O Settlement.

- <u>Wind-Down Account</u>.  The Wind-Down Account shall be funded by Inc. on the Effective Date.

---

[4]  As of the filing of this Plan, the Plan Debtors and CRG are continuing to reconcile an approximately $266,000 portion of proof of claim no. 12 against VMT ("POC 12"), which is not included in the CRG Claim Amount.  If any of the approximately $266,000 portion of POC 12 against VMT is determined to be allowed, the Plan Debtors will include a revised Exhibit A in the Plan Supplement to reflect an increase in the CRG Claim Amount, as well as an increase in the CRG Claims Purchase Price to be paid to CRG by 48% of any such increased amount, and a corresponding increase to the CRG Claims Distribution Amount to be paid to the Purchasing Noteholders.

- Oversight Committee.  The member of the Creditors' Committee shall determine the appointments of the Liquidating Trustee and the Oversight Committee.

- Filing of Plan.  The Debtors agreed to file an amended plan consistent with the terms of the Plan Settlement and, with respect to Collider and Lucid, either dismiss those cases or merge them into Inc.  The Debtors have determined not to proceed to confirmation with Collider and Lucid, and Collider and Lucid instead intend to request the Bankruptcy Court to dismiss their cases.

## V.    Summary of the Plan

### A.    General

If the Plan is confirmed, the Debtors' Available Cash and remaining non-Cash assets, if any, will be liquidated on an orderly basis and proceeds will be distributed to holders of Allowed Claims in accordance with the terms of the Plan.  The Debtors believe the Plan provides the best recoveries possible for holders of Allowed Claims and strongly recommend that holders entitled to vote on the Plan exercise their right and vote to accept the Plan.  The Debtors believe that any alternative to confirmation of the Plan, such as conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or attempts by another party in interest to file a plan, would result in significant delays, litigation and additional costs and, ultimately, would lower the recoveries for holders of Allowed Claims.

The Plan does not substantively consolidate the Debtors.  Instead, the Plan separately classifies Claims against Inc., Ltd., and VMT, respectively.  As discussed more fully in Article IV of the Plan, the Debtors will establish a Liquidating Trust to make distributions to holders of Allowed Claims.

### B.    Overview of Chapter 11

Chapter 11 is the primary business reorganization chapter of the Bankruptcy Code and can be used to wind down a debtor's operations and sell its assets in a way that promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.  The commencement of a chapter 11 case creates an estate that comprises all of the debtor's legal and equitable interests in property as of the commencement of the chapter 11 case.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim against or equity interest in a debtor, and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan and the plan itself, will govern the treatment of claims and equity interests in accordance with the terms of the confirmed plan.

### C.    Unclassified and Administrative Expense Claims and Priority Claims

#### 1.    Administrative Expense Claims

Subject to the provisions of sections 328, 330, 331 or 363 of the Bankruptcy Code and according to the priorities established pursuant to section 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, unless otherwise agreed by the holder of an Administrative Expense Claim and the applicable Plan Debtor or the Liquidating Trustee, each holder of an Allowed Administrative Expense Claim will be paid the full unpaid amount of such Allowed Administrative Expense Claim in Cash by the Liquidating Trustee: (a) on the Effective Date or as soon as practicable thereafter, but in no event later than 30 days after the Effective Date (or, if not then due, when such Allowed Administrative Expense Claim is due or as soon as practicable thereafter); (b) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter, but in no event later than 30 days after such Claim is Allowed; (c) at such time and upon such terms as may be agreed upon by such holder and the Plan Debtors or the Liquidating Trustee, as the case may be; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

#### 2.    Priority Tax Claims

On the later of the Effective Date or the date on which a Priority Tax Claim (secured or unsecured) becomes an Allowed Priority Tax Claim, or, in each such case, as soon as practicable thereafter, but in no event later than 30 days after such event, each holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date will receive Cash from the Liquidating Trustee on account of such Claim in an amount equal to the Allowed amount of such Claim plus, to the extent applicable, any amount required to comply with section 1129(a)(9)(C) of the Bankruptcy Code.

#### 3.    Other Priority Claims

On or as soon as practicable after the Effective Date, but in no event later than 30 days after the Effective Date, unless otherwise agreed to by the holder of an Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, one of the following treatments, in the sole discretion of the Plan Debtors or the Liquidating Trustee, as the case may be: (a) full payment in Cash from the Liquidating Trustee of its Allowed Other Priority Claim; or (b) treatment of its Allowed Other Priority Claim in a manner that leaves such Claim Unimpaired.

#### 4.    Bar Dates and Objection Deadlines for Certain Administrative Expense Claims

By Order entered on August 27, 2018 [D.I. 422] (the "Administrative Bar Date Order"), the bar date for filing certain Administrative Expense Claims was October 9, 2018 at 5:00 p.m. (the "Administrative Expense Claims Bar Date"), requiring the filing of Administrative Expense Claims (other than "Excluded Claims" as defined in the Administrative Bar Date Order) that may have arisen, accrued or otherwise became due and payable from the Petition Date through August 30, 2018. Pursuant to this Plan, the deadline for filing any Administrative Expense Claims (except Professional Fee Claims and any claims that would qualify as Excluded Claims

under the Administrative Bar Date Order) that may have arisen, accrued or otherwise become due after August 30, 2018 through the Effective Date is the Supplemental Administrative Bar Date.

Any holder of a potential Administrative Expense Claim (except Excluded Claims) subject to the Administrative Bar Date Order that failed to file an Administrative Expense Claim by the Administrative Expense Claims Bar Date, or Supplemental Administrative Bar Date, as applicable (i) is forever barred, estopped and enjoined from asserting such claims against the Plan Debtors, their Estates or their property and (ii) shall not receive or be entitled to any payment or distribution of property from the Plan Debtors. Holders of Administrative Expense Claims that are Governmental Units, however, shall not be required to file request for allowance or payment of any Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than Professional Fee Claims) must be filed by the Liquidating Trustee and served on the requesting party by the Claims Objection Deadline.

Notwithstanding the foregoing, Entities asserting a Professional Fee Claim for services rendered solely with respect to a Debtor before the Effective Date must file and serve on the Plan Debtors, or the Liquidating Trustee, as applicable, and such other entities designated by the Bankruptcy Rules, the Confirmation Order or any other applicable order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim no later than thirty (30) days after the Effective Date.

Objections to Professional Fee Claims shall be filed and scheduled for hearing no later than twenty-one (21) days after deadline for filing Professional Fee Claim.

### D.    Classification and Treatment of Classified Claims and Equity Interests

#### 1.    Classification and Treatment of Claims and Interests

##### a.    Classes 1A-1C—Secured Claims

*Classification*: Class 1A consists of Secured Claims against Inc., Class 1B consists of Secured Claims against Ltd., and Class 1C consists of Secured Claims against VMT. The Debtors do not believe that as of the date of this Disclosure Statement, there are any unpaid Allowed Secured Claims.[5]

*Treatment*: Each holder of an Allowed Secured Claim will be placed in a separate subclass, and each subclass will be treated as a separate class for distribution purposes. On or as soon as practicable after the Effective Date, but in no event later than 30 days after the Effective Date, each holder of an Allowed Secured Claim shall receive, in full and final satisfaction of

---

[5] The Prepetition Secured Parties are holding $200,000 as a deposit on account of security for any alleged indemnity claim they may have under their Prepetition Secured Loan Facilities. The Debtors do not believe they have or will have an Allowed Secured Claim, and that any Claim they may have is disputed, contingent, and unliquidated.

such Claim, in the sole discretion of the Debtors, except to the extent any holder of an Allowed Secured Claim agrees to different treatment, either:

1) the collateral securing such Allowed Secured Claim;

2) Cash in an amount equal to the value of the collateral securing such Allowed Secured Claim; or

3) the treatment required under section 1124(2) of the Bankruptcy Code for such Claim to be reinstated or rendered Unimpaired.

*Voting*: Classes 1A, 1B and 1C are Unimpaired, and holders of Secured Claims are conclusively deemed to have accepted the Plan.  All Secured Claims shall be subject to Allowance under the provisions of the Plan.

### b.    Classes 2A-2C—General Unsecured Claims

*Classification*: Class 2A consists of General Unsecured Claims against Inc.; Class 2B consists of General Unsecured Claims against Ltd.; and Class 2C consists of General Unsecured Claims against VMT.

*Treatment of Classes 2A, 2B, and 2C*:  Pursuant to the Plan Settlement, on the Effective Date (or as soon as practicable thereafter), each Noteholder (which is in Class 2A) shall receive its Pro Rata share of the Noteholder Payments to be paid by Inc., provided that on the Effective Date (or as soon as practicable thereafter) Inc. shall pay to CRG, on behalf of the Purchasing Noteholders from the Purchasing Noteholders' Pro Rata share of the Noteholder Payments, the CRG Claims Purchase Price, and on the Effective Date (or as soon as practicable thereafter) Inc. shall pay the CRG Claims Distribution Amount to the Purchasing Noteholders, Pro Rata based on the Purchasing Noteholders' respective contribution to the CRG Claims Purchase Price.  All other holders of Allowed General Unsecured Claims in Classes 2A, 2B, or 2C shall become Beneficiaries of the Liquidating Trust.  On or as soon as practicable after the Effective Date, but in no event later than 30 days after the Effective Date, each holder of an Allowed General Unsecured Claim, except the Noteholders and CRG, shall receive an Initial Distribution.

*Voting*: Classes 2A, 2B and 2C are Impaired, and holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

### c.    Classes 3A-3C—Equity Interests

*Classification*: Class 3A consists of Equity Interests in Inc.  Class 3B consists of Equity Interests in Ltd., which are held solely by Inc.  Class 3C consists of Equity Interests in VMT, which are held solely by Inc.

*Treatment*: Holders of Equity Interests in Inc., Ltd., or VMT shall neither receive nor retain any property under the Plan.

19

*Voting*: Classes 3A, 3B and 3C are Impaired, and holders of Class 3A Equity Interests are conclusively deemed to reject the Plan.  Unless the Bankruptcy Court determines otherwise, as part of the Plan, Inc. agrees that Classes 3B and 3C shall be deemed to have accepted the Plan.

### 2.  Non-Consensual Confirmation

Because certain Classes are deemed to have rejected the Plan, the Plan Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Plan Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

### 3.  Solicitation of the Plan Debtors

Notwithstanding any provision of the Plan to the contrary, each Plan Debtor that is entitled to vote to accept or reject the Plan as a holder of a Claim against another Debtor shall not be solicited for voting purposes, and each such Plan Debtor will be deemed to have voted to accept the Plan.

### E.  Means for Implementation of the Plan

### 1.  The Plan Settlement

The terms of the Plan Settlement form the foundation of the Plan.  The Plan is based on and includes all of the terms of the Plan Settlement.

### 2.  The D&O Settlement

The terms of the D&O Settlement are also critical and necessary to implementing the Plan.  The Plan incorporates the D&O Settlement, and the Debtors' projected estimate for recoveries by creditors of Inc.'s Estate includes the $2,500,000 payment to be made by the insurers under the terms and conditions of the D&O Settlement.

### 3.  Appointment of a Liquidating Trustee and the Oversight Committee

The Debtors shall file a notice as part of the Plan Supplement designating the Creditors' Committee's selection of the Liquidating Trustee and the members of the Oversight Committee. The Plan Debtors shall seek approval of the designation of the Liquidating Trustee and the members of the Oversight Committee at the Confirmation Hearing.  If such designations are approved by the Bankruptcy Court, the Entities so designated shall be deemed appointed as Liquidating Trustee and the members of the Oversight Committee, as applicable, on the Effective Date.  The Liquidating Trustee and the members of the Oversight Committee shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Plan and the Liquidating Trust Agreement.  The Liquidating Trustee shall be entitled to employ counsel and other professionals, as may be necessary and appropriate, for the Liquidating Trust.

4.      **Formation of the Liquidating Trust and Transfer of Liquidating Trust Assets**

a) On the Effective Date, the Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the purpose of, among other things, (i) investigating, pursuing, litigating and, as applicable, settling, Liquidating Trust Claims, (ii) collecting, receiving, holding, maintaining, administering and liquidating the Liquidating Trust Assets, (iii) resolving all Disputed Claims, including objecting, prosecuting, settling and compromising in any manner approved by the Bankruptcy Court such Disputed Claims, except the Liquidating Trustee may, in its discretion, subject to any relevant provision of the Liquidating Trust Agreement, settle or compromise any Disputed Claim without Bankruptcy Court approval, (iv) paying all Liquidating Trust Expenses, (v) making all Distributions to the holders of Allowed Claims from the Liquidating Trust as provided for in the Plan and the Liquidating Trust Agreement, (vi) closing the Chapter 11 Cases, (vii) taking any actions necessary to wind-down the Debtors, and (viii) otherwise implementing the Plan and finally administering the Estates, all pursuant to and in accordance with the Plan and the Liquidating Trust Agreement.  The Liquidating Trust has no objective to, and shall not engage, in a trade or business and shall conduct their activities consistent with the Plan and the Liquidating Trust Agreement.

b) On the Effective Date, the Plan Debtors' Estates shall transfer and shall be deemed to have irrevocably transferred the Liquidating Trustee Assets to the Liquidating Trust, for and on behalf of the Beneficiaries, with no reversionary interest in the Plan Debtors.  In addition, the Plan Debtors shall transfer to the Liquidating Trustee for benefit of the Liquidating Trust, the Plan Debtors' evidentiary privileges, including the attorney/client privilege, as they relate to Liquidating Trust Assets, Claims of Beneficiaries and Disputed Claims.  Furthermore, the Creditors' Committee's counsel and financial advisor shall provide to the Liquidating Trustee (or such professionals designated by the Liquidating Trustee) documents and other information gathered, and relevant work product developed, during the Chapter 11 Cases in connection with its investigation of potential Liquidating Trust Claims, provided that the provision of any such documents and information shall be without waiver of any evidentiary privileges, including without limitation the attorney-client privilege, work-product privilege or other privilege or immunity attaching to any such documents or information (whether written or oral). The Plan shall be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for such relief. For purposes of this section, books and records include computer-generated or computer-maintained books and records and computer data, as well as electronically generated or maintained books and records or data, along with books and records of

21

any Debtor maintained by or in the possession of third parties, wherever located.

c) The Liquidating Trustee shall be deemed to be a "representative" of the Debtors' Estates under section 1123(b)(3)(B) of the Bankruptcy Code, and the Liquidating Trustee will be the trustee of the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3).  To the extent that any Liquidating Trust Asset cannot be transferred to the Liquidating Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Liquidating Trust Asset shall be deemed to have been retained by the applicable Plan Debtor and the Liquidating Trustee shall have been designated as a representative of the applicable Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to collect, maintain, administer and liquidate such Liquidating Trust Asset on behalf of such Estate.

d) Privileged Communications may be shared among the Liquidating Trustee and the Oversight Committee without compromising the privileged nature of such communications, in accordance with the "joint interest" doctrine.

e) Interests in the Liquidating Trust shall be uncertificated and shall be non-transferable except upon death of the interest holder or by operation of law.  Holders of interests in the Liquidating Trust shall have no voting rights with respect to such interests.  To the extent applicable, the issuance of interests in the Liquidating Trust shall be exempt from any securities laws registration requirements to the fullest extent permitted by section 1145 of the Bankruptcy Code. The Liquidating Trust shall have a term of five (5) years from the Effective Date. Notwithstanding the foregoing, the Oversight Committee may extend such term provided that the Liquidating Trust does not become subject to the Securities Exchange Act of 1934 (as now in effect or hereafter amended) and provided further that the Bankruptcy Court approves an extension based upon a finding that an extension is necessary for the Liquidating Trust to resolve all Claims, reduce all Liquidating Trust Assets to Cash, and to make final distributions to Beneficiaries.

## 5.    Funding of the Liquidating Trust

On the Effective Date, the Liquidating Trust shall be funded with the Liquidating Trust Assets and thereafter, by the recoveries from Liquidating Trust Claims which may be pursued by the Liquidating Trustee as set forth in the Plan or by such other means as approved by the Oversight Committee, acting through a majority thereof.

57731/0003-17169173v9

6.       **Rights and Powers of the Liquidating Trust**

The Liquidating Trustee shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidating Trust Agreement and the Plan, as applicable, including, without limitation, the right to seek testimony and the production of documents pursuant to the Bankruptcy Rules, including the right to undertake the following actions and any other actions permitted under, and in accordance with, the Liquidating Trust Agreement, subject to the terms of the Plan: (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Liquidating Trust Agreement; (2) investigate, and if appropriate, pursue, commence, prosecute, appeal, settle, abandon or compromise any Liquidating Trust Claims (subject to Article IX.C.1(b) of the Plan); (3) collect, receive, hold, maintain, invest, administer and liquidate the Liquidating Trust Assets; (4) calculate and make Distributions to holders of Allowed Claims and pay Liquidating Trust Expenses pursuant to this Plan and the Liquidating Trust Agreement; (5) establish and administer any Disputed Reserves; (6) object to Disputed Claims and, subject to any limitation set forth in this Plan, prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; (7) retain, employ and compensate professionals and other agents, provided, however, that any such compensation shall be made only out of the Liquidating Trust Assets, to the extent not inconsistent with the status of the Liquidating Trust as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d) for federal income tax purposes; (8) file all federal, state and local tax returns and pay any taxes of the Debtors and the Liquidating Trust required to be filed or paid by applicable law; and (9) otherwise implement this Plan and the Liquidating Trust Agreement and finally administer the Estates, including closing the Chapter 11 Cases and terminating and dissolving the Debtors and ultimately, the Liquidating Trust; all pursuant to the Plan and the Liquidating Trust Agreement.

On the Effective Date, and without having to obtain any further order of the Bankruptcy Court, the Liquidating Trustee and/or the Liquidating Trust are authorized to intervene or substitute as plaintiff, movant or additional party, as appropriate, in any Cause of Action where the subject matter of such Cause of Action involves a Liquidating Trust Asset, a Claim of a Beneficiary or a Disputed Claim.

7.       **Obligation of the Liquidating Trustee to Pay Claims under the Plan**

All payments to be made under the Plan, including, without limitation, payments required to be made on or after the Effective Date to holders of Allowed Secured Claims, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Professional Fee Claims or Allowed Other Priority Claims, shall be made by the Liquidating Trustee, except (i) to the extent deemed made by the Plan Debtors for tax purposes pursuant to Article IV.F.6 or (ii) the Noteholder Payments, which will be made by Inc.

8.       **Distribution of Liquidating Trust Assets**

Distributions shall be made by the Liquidating Trustee from time to time when the Cash is sufficient to make such a distribution practicable, in the Liquidating Trustee's sole and

absolute discretion (after consultation with the Oversight Committee) to economically distribute monies.

## 9.    Tax Treatment of Liquidating Trust

The Liquidating Trust is intended to be treated for U.S. federal income tax purposes (i) in part as a grantor trust that is a liquidating trust within the meaning of Treasury Regulations § 301.7701-4(d), and (ii) in part as one or more disputed ownership funds within the meaning of Treasury Regulations § 1.468B-9(b)(1). For U.S. federal income tax purposes, the transfer of the Liquidating Trust Assets to the respective Liquidating Trust will be treated as a transfer of the Liquidating Trust Assets from the Plan Debtors to the holders of Allowed Claims, subject to any liabilities of the Plan Debtors or the Liquidating Trust payable from the proceeds of such assets, followed by such holders' transfer of such assets (subject to such liabilities) to the Liquidating Trust. The holders of Allowed Claims will thereafter be treated for U.S. federal income tax purposes as the grantors and deemed owners of their respective shares of the Liquidating Trust Assets (subject to such liabilities). Such holders of Allowed Claims shall include in their annual taxable incomes, and pay tax to the extent due on, their allocable shares of each item of income, gain, deduction, loss and credit, and all other such items shall be allocated by the Liquidating Trustee to such holders using any reasonable allocation method. Notwithstanding the foregoing, distributions made as of the Effective Date to holders of Allowed Claims are intended to be treated for U.S. federal income tax purposes as distributions directly from the Plan Debtors to the holders of such Allowed Claims, and such holders shall include in their taxable incomes any interest earned on such distributions from the Effective Date to the date on which the actual distribution is made.

The Liquidating Trust Agreement will: (i) require that the Liquidating Trustee file income tax returns for the Liquidating Trust as a grantor trust (and file separate returns for the disputed ownership fund(s) pursuant to Treasury Regulations § 1.468B-9(b)(1)); (ii) pay all taxes owed by the Liquidating Trust on any net income or gain of the Liquidating Trust, including net income or gain of the disputed ownership fund(s), on a current basis from Liquidating Trust Assets; (iii) provide for consistent valuations for all Liquidating Trust Assets by the Liquidating Trustee and holders of Allowed Claims, and require that such valuations be used for all tax reporting purposes; (iv) limit the investment powers of the Liquidating Trustee in accordance with IRS Revenue Procedure 94-45; and (v) require that the Liquidating Trust, in accordance herewith, distribute at least annually all net income and the net proceeds from the sale or other disposition of all Liquidating Trust Assets in excess of amounts reasonably necessary to maintain the value of the remaining Liquidating Trust Assets and pay Liquidating Trust Expenses and Claims, including Disputed Claims.

## 10.    Fees and Expenses of the Liquidating Trust

Except as otherwise ordered by the Bankruptcy Court, the Liquidating Trust Expenses on or after the Effective Date shall be paid from the Liquidating Trust in accordance with the Liquidating Trust Agreement without further order of the Bankruptcy Court; *provided* that the members of the Oversight Committee shall serve without compensation except for payment of their reasonable costs and expenses. The Plan Debtors, the Liquidating Trustee, the Oversight

Committee and all professionals shall have no personal liability in the event there are insufficient funds to pay the Liquidating Trust Expenses.

### 11.    Intervention

On the Effective Date, and without having to obtain any further order of the Bankruptcy Court, the Liquidating Trustee and/or the Liquidating Trust are authorized to intervene or substitute as plaintiff, movant or additional party, as appropriate, in any Cause of Action where the subject matter of such Cause of Action involves a Liquidating Trust Asset, a Claim of a Beneficiary or a Disputed Claim.

### 12.    Directors/Officers on the Effective Date

On the Effective Date, the authority, power and incumbency of the persons then acting as directors and officers of the Debtors (except Inc.) shall be terminated and such directors and officers shall be deemed to have resigned or to have been removed from office without cause. The Plan shall not in any way affect the continued authority and position of any of the officers and directors of Inc. and the Non-Debtor Subsidiaries to oversee the wind-down of the Non-Debtor Subsidiaries, with assistance of professionals, in accordance with the laws of the jurisdictions governing them.   Upon the Liquidating Trustee's receipt of the Wind-Down Completion Notice, the power and incumbency of the Entities then acting as directors and officers of Inc. shall be deemed terminated and such directors and officers shall be deemed to have resigned or have been removed from office without cause.

### 13.    Liquidation of the Debtors

Except as otherwise provided in the Plan, upon the transfer pursuant to the Plan of the Liquidating Trust Assets to the Liquidating Trust, the Debtors (except for Inc.) will be deemed dissolved for all purposes without any necessity of filing any document, taking any further action or making any payment to any governmental authority in connection therewith.  With respect to Inc., upon service of the Wind-Down Completion Notice to the Liquidating Trustee, Inc. shall be deemed dissolved for all purposes without any necessity of filing any document, taking any further action or making any payment to any governmental authority in connection therewith. Notwithstanding the foregoing, as soon as practicable on or after the Effective Date, the Liquidating Trustee, on behalf of the Debtors shall, subject to, in the case of Inc., completion of the wind-down of the Non-Debtor Subsidiaries and receipt of the Wind-Down Completion Notice: (a) file their certificates of dissolution, together with all other necessary corporate documents, to effect dissolution of the Debtors under the applicable laws of their states of incorporation; and (b) complete and file their final federal, state and local tax returns, and, in the discretion of the Liquidating Trustee if necessary or appropriate, pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of each Debtor or its respective Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws. The filing of certificates of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders or the board of directors of each such Debtor and expressly without the need to pay any franchise or similar taxes in order to effectuate such dissolution.  As of the Effective Date,

the Liquidating Trust shall assume any outstanding responsibility of the Debtors under the Plan, except to the extent provided otherwise in the Plan.

### 14.    Wind-Down of the Non-Debtor Subsidiaries

(a)    <u>Wind-Down Account</u>.  On or before the Effective Date, Inc. shall establish the Wind-Down Account, which account shall be administered by the Wind-Down Representative in his or her sole discretion, subject to approval of the board of directors of Inc. The amount used to fund the Wind-Down Account shall not be used for any purpose other than to pay for the expenses of winding down the Non-Debtor Subsidiaries in accordance with the laws of the country under which each is organized and governed.  The Wind-Down Representative, subject to the terms and conditions of the Plan, shall wind-down the Non-Debtor Subsidiaries as expeditiously as reasonably practicable.  After all Non-Debtor Subsidiaries are wound-down, any remaining Cash in the Wind-Down Account shall be transferred to the Liquidating Trust for distribution to the Allowed Claims of Inc. pursuant to the terms of the Plan.

(b)    <u>Appointment and Compensation of the Wind-Down Representative</u>.  The Wind-Down Representative shall be identified in the Plan Supplement.  The Wind-Down Representative shall be compensated at a rate not to exceed $250 per hour, at the sole discretion of Inc.'s board of directors.  The Wind-Down Representative shall be entitled to monthly reimbursement of reasonable, out-of-pocket expenses incurred in connection with winding down the Non-Debtor Subsidiaries.  Out-of-pocket expenses shall include, but not be limited to, all reasonable travel, work related meals, report preparation, delivery services, photocopying, and other costs incurred in providing the services.  The Inc. board of directors may remove the Wind-Down Representative without cause and appoint any successor Wind-Down Representative.

(c)    <u>Payment of Wind-Down Expenses</u>.  The fees and expenses incurred by the Wind-Down Representative and any reasonable fee and expense reimbursement claims (including attorneys' and advisors fees and expenses) made by the Wind-Down Representative shall be paid in Cash from the Wind-Down Account without any further notice to or action, order, or approval from the Bankruptcy Court.  Payment of the Wind-Down Expenses shall be made in the ordinary course of business and shall not be subject to Bankruptcy Court approval; *provided, however,* that any disputes related to such fees and expenses shall be brought before the Bankruptcy Court.  The Wind-Down Representative shall be authorized to engage counsel and advisors to ensure that the winding up of the business and financial affairs of the Non-Debtor Subsidiaries is consistent with the applicable law to which each of such companies is subject.

### 15.    Completion of the Wind-Down

When the wind-down of the Non-Debtor Subsidiaries is completed, the Wind-Down Representative or the board of Inc. shall give the Liquidating Trustee the Wind-Down Completion Notice.

### 16.    Term of Injunctions or Stays

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the

date the Confirmation Order is entered, shall remain in full force and effect until the Chapter 11 Cases are closed.

### 17.   Creditors' Committee

As of the Effective Date, the Creditors' Committee shall dissolve, and its members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Cases.   The retention and employment of the Retained Professionals retained by the Creditors' Committee shall terminate as of the Effective Date, *provided*, *however*, that the Creditors' Committee shall exist, and its Retained Professionals shall be retained and their fees and expenses paid by the Liquidating Trust to the fullest extent permitted by law after such date with respect to applications filed pursuant to sections 330 and 331 of the Bankruptcy Code, including responding to any objections to such applications, whether formal or informal, and attendance at any hearing with respect to the consideration of the applications.

### 18.   Termination of Professionals

On the Effective Date, the engagement of each Retained Professional retained by either of the Debtors or the Creditors' Committee shall be terminated without further order of the Bankruptcy Court or act of the parties; *provided, however*, (a) such Retained Professional shall be entitled to prosecute their respective Professional Fee Claims and represent their respective constituents with respect to applications for payment of such Professional Fee Claims, and (b) nothing herein shall prevent the Liquidating Trustee from retaining any such Retained Professional on or after the Effective Date, which retention shall not require Bankruptcy Court approval.

### 19.   Post-Confirmation Reporting.

After the Effective Date, the Liquidating Trustee shall file all required post-confirmation reports.

### F.   Provisions Governing Distributions

### 1.   Distributions on the Effective Date

On the Effective Date or as soon thereafter as is reasonably practicable, the Liquidating Trustee (in consultation with the Oversight Committee) shall make, or shall make adequate reserves for, the distributions required to be made under the Plan to holders of Allowed Secured Claims, Allowed Administrative Expense Claims (including estimated unpaid Professional Fee Claims), Allowed Professional Fee Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims.   In addition, on the Effective Date or as soon as practicable thereafter: (a) the Debtors will pay the Noteholders their Pro Rata share of the Noteholder Payments, provided that the Purchasing Noteholders shall be paid their Pro Rata share of the sum of (i) the Noteholder Payments, less (ii) the CRG Claims Purchase Price, plus (iii) the CRG Claims Distribution Amount; and (b) the Debtors will pay CRG the CRG Claims Purchase Price on behalf of the Purchasing Noteholders.

## 2.    Disputed Reserves

(a)    <u>Establishment of Disputed Reserves</u>.  On the Effective Date or as soon thereafter as is reasonably practicable, the Liquidating Trustee (in consultation with the Oversight Committee) shall establish a Disputed Reserve for Disputed Secured Claims, Disputed Administrative Expense Claims, Disputed Priority Tax Claims, Disputed Other Priority Claims and Disputed General Unsecured Claims.  Prior to the Claims Objection Deadline, the Liquidating Trustee may also reserve for Claims to which the Liquidating Trustee is considering objecting but to which the Liquidating Trustee has not yet objected.

(b)    <u>Maintenance of Disputed Reserves</u>.    The property in the Disputed Reserves shall be held in trust for the benefit of the holders of Claims ultimately determined to be Allowed.   Each Disputed Reserve shall be closed and extinguished by the Liquidating Trustee, when all Distributions and other dispositions of Cash or other property required to be made hereunder will have been made in accordance with the terms of the Plan. Upon closure of a Disputed Reserve, all Cash (including any investment yield on the Cash) or other property held in that Disputed Reserve shall revest in and become the property of the Liquidating Trust.  All funds or other property that vest or revest in the Liquidating Trust pursuant to this paragraph shall be (a) used to pay and create an adequate reserve for future Liquidating Trust Expenses, and (b) thereafter distributed on a Pro Rata basis to holders of Allowed Claims in accordance with the terms of the Plan.

## 3.    Record Date for Distributions

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the date of the entry of the Confirmation Order will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the date of the entry of the Confirmation Order.  The Liquidating Trustee or Debtors, as applicable, shall have no obligation to recognize any transfer of any Claim occurring after the date of the entry of the Confirmation Order.  In making any Distribution with respect to any Claim, the Liquidating Trustee shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of claim filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the date of the entry of the Confirmation Order and upon such other evidence or record of transfer or assignment that are known to the Liquidating Trustee as of the date of the entry of the Confirmation Order.

## 4.    Delivery of Distributions

(a)    <u>General Provisions; Undeliverable Distributions</u>.  Subject to Bankruptcy Rule 9010 and except as otherwise provided in the Plan, Distributions to the holders of Allowed Claims shall be made by the Liquidating Trustee or Debtors, as applicable, at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim filed by such holder or (b) the last known address of such holder if no proof of Claim is filed or if the Debtors or Liquidating Trustee have been notified in writing of a change of address. If any Distribution is returned as undeliverable, the Liquidating Trustee may, in his or

57731/0003-17169173v9

her discretion, but is not obligated to, make such efforts to determine the current address of the holder of the Claim with respect to which the Distribution was made as the Liquidating Trustee deems appropriate, but no Distribution to any holder shall be made unless and until the Liquidating Trustee has determined the then-current address of the holder, at which time the Distribution to such holder shall be made to the holder without interest. Amounts in respect of any undeliverable Distributions made by the Liquidating Trustee shall be returned to, and held in trust by, the Liquidating Trustee until the Distributions are claimed or are deemed to be unclaimed property upon the expiration of four (4) months from the return of the undeliverable Distribution, as set forth below.  The Liquidating Trustee shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible.

(b)    <u>Minimum Distributions</u>.  Notwithstanding anything in the Plan to the contrary, if a distribution to be made to a holder of an Allowed General Unsecured Claim for such Distributions would be $100 or less, no such Distribution is required to be made to that holder.

(c)    <u>Unclaimed Property</u>.  Except with respect to property not distributed because it is being held in a Disputed Reserve, Distributions that are not claimed by the expiration of four (4) months from the date the Distribution is made (including any Noteholder Payments made by Inc. pursuant to this Plan), will be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest or revest in the Liquidating Trust, and the holders of such Claims with respect to which those Distributions are made (i) are forever barred, estopped and enjoined from asserting such claims against the Plan Debtors, their Estates or their property and (ii) shall not receive or be entitled to any payment or distribution of property from the Plan Debtors on account of such claims.  Nothing contained in this Plan shall require the Liquidating Trustee to attempt to locate any holder of an Allowed Claim. All funds or other property that vests or revests in the Liquidating Trust pursuant to this Article shall be distributed by the Liquidating Trustee to the other holders of Allowed Claims in accordance with the provisions of this Plan or the Liquidating Trust Agreement.

**5.    Distributions to be Made in U.S. Dollars.**

Cash payments made pursuant to the Plan or the Liquidating Trust Agreement shall be in United States dollars by checks drawn on a domestic bank selected by the Liquidating Trust, as applicable, or by wire transfer from a domestic bank, at the option of the Liquidating Trustee. Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be required to be made pursuant to the Plan.  Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

**6.    Time Bar to Cash Payments.**

Checks issued by the Liquidating Trustee on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for the reissuance of any check that becomes null and void pursuant to this section shall be made directly to the Liquidating Trustee by the holder of the Allowed Claim to whom the check was originally issued. Any Claim in respect of such voided check shall be made in writing on or

29

before the later of the first anniversary of the Effective Date or the four (4) month anniversary of the date on which the Distribution was made. After that date, all Claims in respect of void checks shall be discharged and forever barred and the proceeds of those checks shall revest in and become property of the Liquidating Trust as unclaimed property in accordance with section 347(b) of the Bankruptcy Code and be distributed as provided in the Plan.

## 7.    Withholding and Reporting Requirements.

In connection with the Plan, to the extent applicable, the Liquidating Trustee in its capacity as a disbursing agent under the Plan or any third party disbursing agent acting at the direction of the Liquidating Trustee (each, a "Disbursing Agent") will comply with all applicable tax withholding and reporting requirements imposed on it or on the Liquidating Trust by any governmental unit, and all Distributions pursuant to the Plan will be subject to applicable tax withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, each Disbursing Agent will be authorized to take any actions that may be necessary or appropriate to comply with such tax withholding and reporting requirements, including, without limitation, liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms the Disbursing Agent believes are reasonable and appropriate, including requiring Claim holders to submit appropriate tax and withholding certifications. To the extent any Claim holder fails to submit appropriate tax and withholding certifications as required by the Disbursing Agent, such Claim holder's Distribution may, in the Disbursing Agent's reasonable discretion, be deemed undeliverable and subject to the terms of the Plan.

Each Entity receiving (or deemed to receive) a Distribution pursuant to the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental unit on account of the Distribution, including income, withholding and other tax obligations.

The Plan Debtors and the Liquidating Trustee, as applicable, reserve the right to allocate and distribute all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and similar encumbrances.

## 8.    No Interest on Claims.

Except as specifically provided for in the Plan, the Confirmation Order or required by applicable law, interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after that Disputed Claim becomes an Allowed Claim. Except as expressly provided in the Plan or in a Final Order of the Bankruptcy Court, no Claim shall be Allowed to the extent that it is for postpetition interest or other similar charges.

## 9.    Setoff and Recoupment.

The Liquidating Trustee may, but shall not be required to, setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any claims or defenses of any nature whatsoever that any of the Plan Debtors, the Estates or the Liquidating

57731/0003-17169173v9

Trustee may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Plan Debtors, the Estates or the Liquidating Trustee of any right of setoff or recoupment that any of them may have against the holder of any Claim.

### 10.    Application of Distributions

To the extent applicable, all Distributions to a holder of an Allowed Claim shall apply first to the principal amount of such Claim until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date, and the remaining portion of such Distributions, if any, shall apply to any interest accrued on such Claim after the Petition Date (but only to the extent otherwise provided under the Plan).

### G.    Procedures for Resolving Disputed, Contingent, and Unliquidated Claims.

### 1.    Distributions Pending Resolution of Disputes

Notwithstanding any other provision of the Plan, the Liquidating Trustee shall not distribute Cash or other property on account of any Disputed Claim that is entirely disputed unless and until such Claim becomes an Allowed Claim. If a Claim is partially Disputed, the Liquidating Trustee shall make a Distribution to the Claim holder to the extent of the undisputed portion of the Claim pending resolution of the Disputed portion thereof.

### 2.    Objection Deadline

All objections to Disputed Claims (except Administrative Expense Claims, which are governed by separate deadlines) shall be filed and served upon the holders of each such Claim by the Claims Objection Deadline, unless otherwise ordered by the Bankruptcy Court after notice and a hearing.

### 3.    Estimation of Claims

At any time, (a) prior to the Effective Date, the Debtors, and (b) subsequent to the Effective Date, the Liquidating Trustee, may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidating Trust have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Claim, the Debtors or the Liquidating Trust, as applicable, may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

57731/0003-17169173v9

### 4. Late-Filed Claims

Except as otherwise agreed, or ordered by the Bankruptcy Court, any person or entity that was required to file a proof of claim in the form and manner specified in the Bar Date Order and failed to do so on or before the applicable bar date shall not, with respect to such Claim, be treated as a creditor of the Debtors for the purpose of voting and distribution, unless on or before the Confirmation Hearing the Bankruptcy Court has entered an order deeming such Claim to be timely filed.

### H.    Treatment of Executory Contracts and Unexpired Leases

### 1.    Rejection of Executory Contracts and Unexpired Leases

The Plan shall constitute a motion to reject all executory contracts and unexpired leases not previously rejected pursuant to an order of the Bankruptcy Court unless otherwise set forth in the Plan Supplement, and the Plan Debtors shall have no further liability thereunder.  The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code and that the rejection thereof is in the best interest of the Plan Debtors, their Estates and all parties in interest in the Chapter 11 Cases.  Notwithstanding the foregoing, to the extent the Policy is deemed to be executory, the Plan Debtors do not seek to reject the Policy through this general rejection provision.

### 2.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Claims created by the rejection of executory contracts and unexpired leases pursuant to the Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Debtors no later than thirty (30) days after the entry of the Confirmation Order by the Bankruptcy Court.  Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Article VII.A for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Plan Debtors, their Estates, successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in the Plan.  Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided in the Plan shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of the Plan.

### I.    Conditions Precedent to the Effective Dave

The following are conditions precedent to the Effective Date that must be satisfied or waived:

1.    The Confirmation Order has become a Final Order;

2.    The Confirmation Order shall be in full force and effect;

3.      The Liquidating Trust Agreement shall have been executed;

4.      The Liquidating Trustee shall have been appointed and shall have accepted such appointment;

5.      Members of the Oversight Committee shall have been appointed; and

6.      The proceeds from the D&O Settlement shall have been received by Inc.

Notwithstanding the foregoing, the Plan Debtors (with the consent of the Creditors' Committee) reserve the right to waive the occurrence of any condition precedent to the Effective Date or to modify any of the foregoing conditions precedent. Any such written waiver of a condition precedent set forth in the Plan may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## VI.   EXCULPATION, INJUCTION, RELEASES, AND PRESERVATION OF CAUSES OF ACTION

### A.    Exculpation

THE EXCULPATED PARTIES SHALL NEITHER HAVE NOR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY AND ALL CLAIMS, CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES TAKING PLACE OR ARISING FROM AND AFTER THE PETITION DATE AND PRIOR TO THE EFFECTIVE DATE RELATED IN ANY WAY TO THE PLAN DEBTORS, INCLUDING, WITHOUT LIMITATION, THOSE THAT ANY OF THE PLAN DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF ANY OF THE PLAN DEBTORS OR THE ESTATES AND FURTHER INCLUDING THOSE IN ANY WAY RELATED TO THE LIQUIDATING TRUST AGREEMENT, CHAPTER 11 CASES, OR THIS PLAN, INCLUDING ANY ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR RELATED TO, FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, CONFIRMING OR CONSUMMATING THIS PLAN, THE DISCLOSURE STATEMENT, THE POST-PETITION DEBTOR IN POSSESSION FINANCIAL APPROVED BY THE BANKRUPTCY COURT, THE LIQUIDATING TRUST AGREEMENT OR ANY OTHER CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR

33

ENTERED INTO IN CONNECTION WITH THIS PLAN OR ANY OTHER POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH THE PLAN DEBTORS; PROVIDED, HOWEVER, THE FOREGOING PROVISIONS OF THIS ARTICLE IX.A SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

### B.     Injunction

1. FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE PLAN DEBTORS, THE LIQUIDATING TRUST OR THE LIQUIDATING TRUSTEE, OR THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER.

2. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THIS PLAN OR IN OBLIGATIONS ISSUED PURSUANT TO THIS PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE PLAN DEBTORS, THE ESTATES, THE LIQUIDATING TRUST, THE LIQUIDATING TRUSTEE, OR THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED PRIOR TO THE EFFECTIVE DATE.

3. THE RIGHTS AFFORDED IN THIS PLAN AND THE TREATMENT OF ALL CLAIMS AND EQUITY INTERESTS IN THIS PLAN SHALL BE IN EXCHANGE FOR (I) CLAIMS AGAINST THE PLAN DEBTORS, ANY OF THEIR ASSETS OR PROPERTIES, GROUPM, SKY UK LIMITED, AND THE NOTEHOLDERS, INCLUDING IN EACH CASE ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AND (II) EQUITY INTERESTS IN THE PLAN DEBTORS OF ANY NATURE WHATSOEVER.

4. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THIS PLAN OR WITH RESPECT TO OBLIGATIONS ISSUED PURSUANT TO THIS PLAN, ALL PARTIES AND ENTITIES ARE PERMANENTLY ENJOINED, ON AND AFTER THE EFFECTIVE DATE, ON ACCOUNT OF ANY CLAIM OR EQUITY INTEREST SATISFIED AND RELEASED HEREBY, FROM:

(a)     COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST ANY PLAN DEBTOR, THE LIQUIDATING TRUST OR THE LIQUIDATING TRUSTEE, OR THEIR SUCCESSORS AND ASSIGNS, AND THEIR ASSETS AND PROPERTIES;

34

(b)    ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST ANY DEBTOR, THE LIQUIDATING TRUST OR THE LIQUIDATING TRUSTEE, THEIR SUCCESSORS AND ASSIGNS, AND THEIR ASSETS AND PROPERTIES;

(c)    CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST ANY PLAN DEBTOR, THE LIQUIDATING TRUST OR THE LIQUIDATING TRUSTEE OR THE PROPERTY OR ESTATE OF ANY DEBTOR OR THE LIQUIDATING TRUST;

(d)    ASSERTING ANY RIGHT OF SUBROGATION AGAINST ANY PLAN DEBTOR, THE LIQUIDATING TRUST OR THE LIQUIDATING TRUSTEE OR AGAINST THE PROPERTY OR ESTATE OF ANY OF THE PLAN DEBTORS OR THE LIQUIDATING TRUST, EXCEPT TO THE EXTENT THAT A PERMISSIBLE RIGHT OF SUBROGATION IS ASSERTED WITH RESPECT TO A TIMELY FILED PROOF OF CLAIM; OR

(e)    COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND IN RESPECT OF ANY CLAIM OR EQUITY INTEREST OR CAUSE OF ACTION RELEASED OR SETTLED HEREUNDER.

5.    NOTWITHSTANDING ANY PROVISION IN THIS PLAN OR THE CONFIRMATION ORDER TO THE CONTRARY, NOTHING CONTAINED IN THIS PLAN OR THE CONFIRMATION ORDER SHALL (I) EXTINGUISH, IMPACT, OR RELEASE ANY RIGHT OF SETOFF, RECOUPMENT, OR SUBROGATION OF ANY KIND (A) HELD BY ANY CREDITOR OR VENDOR WHICH IS ASSERTED IN A TIMELY FILED PROOF OF CLAIM OR OBJECTION TO THIS PLAN, OR PURSUANT TO SECTION 503(b)(1)(D) OF THE BANKRUPTCY CODE OR (B) THAT IS OR MAY BE ASSERTED AS AN AFFIRMATIVE DEFENSE OR OTHER DEFENSE TO A CAUSE OF ACTION OR CLAIM ASSERTED BY A PLAN DEBTOR OR THE LIQUIDATING TRUST AGAINST SUCH CREDITOR OR VENDOR; OR (II) AFFECT THE APPLICABILITY OF 26 U.S.C. § 7421(a).

### C.    Termination of All Employee and Workers' Compensation Benefits

Except as otherwise provided in the Liquidating Trust Agreement, all existing employee benefit plans and workers' compensation benefits not previously expired or terminated by the Plan Debtors will be terminated on or before the Effective Date.  Inc. previously sponsored a 401(k) plan for its employees.  The plan was terminated in December 2018.  The only contributions made under the plan were contributions deducted from employees' salaries based on their deferral elections, with no matching contribution by Inc.  In connection with preparing the final tax return for the plan, the plan's auditors have preliminarily determined that certain compensation was not taken into account in calculating the amount of employees deferrals to be withheld and contributed to the plan.  Management is discussing with the auditors whether a correction is needed.  If so, there is a standard IRS correction procedure that may be followed, and management believes the amount of any costs associated with any such correction is not expected to be material to recoveries by creditors of Inc.

### D.    Exclusions and Limitations on Exculpation

Notwithstanding anything in the Plan to the contrary, no provision of the Plan or the Confirmation Order, including, without limitation, the exculpation provision contained in Article IX.A of the Plan, shall (a) modify, release or otherwise limit the liability of any Entity who is, or becomes, the subject of a Liquidating Trust Claim (to the extent, and only to the extent, related to such Liquidating Trust Claim), (b) modify, release or otherwise limit the liability of any Entity not specifically released or exculpated hereunder, including, without limitation, any Entity that is otherwise liable under theories of vicarious or other derivative liability or that is a non-Debtor third party guarantor of any obligation of the Plan Debtors, or (c) affect the ability of the Internal Revenue Service to pursue non-Debtors to the extent allowed by non-bankruptcy law for any liabilities that are related to any federal income tax liabilities that owed by the Plan Debtors or the Plan Debtors' Estates.

### E.    Debtor Releases

PURSUANT TO THE TERMS OF THE PLAN SETTLEMENT, THE PLAN DEBTORS AND THEIR ESTATES HEREBY RELEASE THE NOTEHOLDERS OF ANY AND ALL CAUSES OF ACTION HELD BY THE PLAN DEBTORS OR THEIR ESTATES, OTHER THAN THE PINNACLE PRESERVED CLAIMS. THE PLAN DEBTORS AND THEIR ESTATES FURTHER RELEASE GROUPM AND SKY UK LIMITED OF ANY AND ALL AVOIDANCE CLAIMS, PURSUANT TO THE TERMS OF THE PLAN SETTLEMENT.

### F.    D&O Settlement Bar Order

Except as expressly otherwise permitted by the D&O Settlement, all Barred Persons are permanently barred, enjoined, and restrained from commencing, prosecuting, conducting, asserting or continuing in any manner, directly, indirectly, or derivatively, against the D&O Releasees, in any court, arbitration proceeding, administrative agency, or other forum, any and all suits, actions, causes of action, cross-claims, counterclaims, third party claims or other demands (including any of the Claims released in the D&O Settlement) in any federal or state court or any other judicial or non-judicial proceeding (including, without limitation, any proceeding in any judicial, arbitral, mediation, administrative, or other forum) against or affecting any of the D&O Releasees, which is based in whole or part on any allegation, claim, demand, cause of action, matter or fact directly or indirectly relating in any way to or arising in connection with the Debtors, the Debtors' bankruptcy estates, the Policy, and/or the facts and circumstances underlying the Demand Letter and the Claims (each as defined in the D&O Settlement Motion), whether or not asserted therein.

### G.    Preservation of Causes of Action

#### 1.    Vesting of Causes of Action

(a)    Except as otherwise provided in the Plan or the Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any and all Liquidating Trust Claims that the Plan Debtors' Estates may hold against any Entity, together with proceeds of the

foregoing, if any, are reserved for, assigned to, and shall become property of the Liquidating Trust on the Effective Date.

(b)    Except as otherwise proved in the Plan, Confirmation Order or the Liquidating Trust Agreement, after the Effective Date, the Liquidating Trustee shall have the exclusive right to institute, prosecute, abandon settle, or compromise any Liquidating Trust Claims, in its sole discretion and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases.

### 2.    Preservation of All Causes of Action Not Expressly Settled or Released

(a)    Unless a Cause of Action against any Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order), the Plan Debtors expressly reserve such Cause of Action, including all Liquidating Trust Claims to be transferred by the Plan Debtors to the Liquidating Trust pursuant to the Plan, which include without limitation the Causes of Action, and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, the Plan or the Confirmation Order or any other Final Order (including the Confirmation Order).  In addition, the Liquidating Trustee reserves the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

(b)    Subject to the immediately preceding paragraph, any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that any such obligation, transfer, or transaction may be reviewed by the Liquidating Trustee subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether: (i) such Entity has filed a proof of claim against the Debtors in the Chapter 11 Cases; (ii) the Debtors or the Liquidating Trust have objected to any such Entity's proof of claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtors or the Liquidating Trust have objected to any such Entity's scheduled Claim; or (v) any such Entity's scheduled Claim has been identified by the Debtors or the Liquidating Trust as disputed, contingent, or unliquidated.

(c)    Preserved Litigation Claims include any and all Causes of Action that may be asserted against the Prepetition Secured Parties, including but not limited to:

- Intentional or constructive fraudulent conveyances under section 544(b) of the Bankruptcy Code and applicable law, and section 548 of the Bankruptcy Code.

- Preference payments under section 547 of the Bankruptcy Code.

- Breach of contract or breach of the implied covenant of good faith and fair dealing.

- Breach of fiduciary duty.

- Common law and statutory conspiracy.

- Claims for civil remedies against racketeer influenced and corrupt organizations under chapter 96 of title 18 of the United States Code.

- Claims for claims for overpayments, unjust enrichment, fraud, negligent misrepresentation, tortious interference with contract or prospective economic advantage, and civil conspiracy, whether under federal law or the laws of any state.

- Equitable subordination, including under section 510(c) of the Bankruptcy Code.

- Aiding and abetting any act or omission of any Entity.

-  Objections to fees, interest, or other charges paid by the Debtors.

The failure of the Debtors to list a claim, right, cause of action, suit or proceeding shall not constitute a waiver or release by the Debtors of such claim, right of action, suit or proceeding. **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Causes of Action against them as any indication that the Liquidating Trustee will not pursue any and all available Causes of Action against them.**

## VII.  <u>Statutory Requirements for Confirmation of the Plan</u>

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (2) they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

➢ The Plan complies with the applicable provisions of the Bankruptcy Code.

➢ The Debtors will have complied with the applicable provisions of the Bankruptcy Code.

➢ The Plan has been proposed in good faith and not by any means forbidden by law.

➢ Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment (1) made before the confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court, if the date of such payment is to be fixed after the Confirmation of the Plan.

➢ Either each holder of an impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code, for Claims and Equity Interests deemed to reject the Plan.

➢ Each Class of Claims or Equity Interests that is entitled to vote on the Plan has either accepted the Plan or is not impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code.

➢ Except the extent that the holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

➢ Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan unless such a liquidation or reorganization is proposed in the Plan, and the Plan is feasible.

➢ At least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

➢ The Debtors have paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

➢ In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtors will pay quarterly fees no later than the last day of the calendar month, following the calendar quarter for which the fee is owed in each of the Debtors' Chapter 11 Cases for each quarter (including any fraction thereof), to the Office of the United States Trustee for the District of Delaware, until the case is closed.

## A.    Best Interests of Creditors Test/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the

39

effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the bankruptcy court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if each of the debtor's chapter 11 cases were converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed.

In chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

Under the Plan, several issues impacting the allocation of Cash to the Plan Debtors' Estates and intercreditor disputes relating to the allowability of claims are resolved without the significant delay and expense of litigation that would be necessary in the absence of the Plan Settlement.  Such litigation, if pursued, would significantly reduce the amount of Cash available to pay creditors, as enormous professional fees and expenses would be incurred in the intercreditor litigation, and such litigation also would significantly delay the timing of even a reduced distribution to creditors holding Allowed Claims.   In addition, in the event of a conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, the liquidation value available to holders of Allowed General Unsecured Claims would be reduced by the costs, fees and expenses of administration of the Chapter 7 cases, including trustee commissions payable to the chapter 7 trustee. The trustee and any newly retained professionals would have to expend considerable time and effort to review and understand issues raised by the liquidation of the Debtors, thereby duplicating the efforts of the Debtors, the Creditors' Committee and their respective professionals and resulting in the incurrence of fees and expenses anticipated to exceed materially the fees and expenses that would be incurred by the Liquidating Trustee and its professionals under the Plan.

Attached as **Exhibit 3** is the Plan Debtors' distribution analysis (the "Distribution Analysis"), which projects estimated distributions to creditors of the three Estates under the terms of the Plan.  The Distribution Analysis eliminates certain claims to which objections have not yet been filed, including (i) certain filed proofs of Claim that the Debtors believe were filed against the wrong Debtor, (ii) duplicate Claims, (iii) Claims that should be reclassified from priority Claims or Administrative Expense Claims to General Unsecured Claims, and (iv) certain Claims that the Debtors do not believe should be allowed on the merits, including proofs of claim filed by Pinnacle Ventures, L.L.C. against each estate in the amounts of $5,650,000 and $2,000,000, respectively.  The Debtors have not yet obtained relief from the Bankruptcy Court certain claims not included in the Distribution Analysis, and thus it is possible that the Debtors or Liquidating Trustee may not succeed on all potential claim objections.  As a result, it is possible that the claims pools estimated in the Distribution Analysis could increase.  Moreover, the Debtors have not reconciled all of the filed proofs of Claim, so it is also possible that the claims

pools could be reduced by additional objections that have not yet been identified, particularly (but not exclusively) books and records objections in which a Claim may be legitimate in some amount but is overstated.  Creditors voting on the Plan, therefore, should consider that the Distribution Analysis is based on the Debtors' best estimate at the time, and is not an attempt to project an exact amount of Cash available for distribution or to predict an exact claims pool for the Estates.

In addition, attached as **Exhibit 4** is an analysis reflecting the Debtors' view of the comparison of the outcome for creditors under the Plan compared to the projected outcome in the event of a hypothetical chapter 7 case (the "Best Interest Analysis").  As reflected in the Best Interest Analysis, the Debtors firmly believe that General Unsecured Creditors holding Allowed Claims will receive more under the Plan than they would in the event the Cases were converted to chapter 7.  The Plan is, therefore, in the best interests of each Claim holder.

## B.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation of the Plan is not likely to be followed by the liquidation of the reorganized debtors or the need for further financial reorganization, unless the plan contemplates such liquidation. As the Plan provides for the liquidation of the Debtors' assets, and the Debtors currently have the funds necessary to fund the payments provided for under the Plan, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

## C.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation of the Plan, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

The Claims in Classes 1A-1C (Secured Claims), if any, are not impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan.

41

The Claims in Classes 2A-2C (General Unsecured Claims) are impaired under the Plan and the Holders of such Allowed Claims and Interests are entitled to vote to accept or reject the Plan. Each of the voting Classes (Classes 2A-2C) will have accepted the Plan if the Plan is accepted (or deemed accepted) by at least two-thirds in amount and a majority in number of the Claims of such Classes (other than the Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

The members of Classes 3A-3C (Equity Interests) will not receive a distribution under the Plan, are deemed to reject the Plan, and are not entitled to vote on the Plan.

### D.     <u>Confirmation Without Acceptance by All Impaired Classes</u>

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, through a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

Because members of Classes 3A-3C will not receive a distribution under the Plan, the Debtors will be seeking to "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code.

### 1.     No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in treatment of classes of equal rank (e.g., classes of the same legal character). Bankruptcy courts will consider a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.     Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class.

*Secured Claims*: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the

42

plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

*Unsecured Claims*.  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

*Equity Interests*.  The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (1) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (2) if the class does not receive the amount as required under (1) hereof, no class of equity interests junior to the non-accepting class my receive a distribution under the plan.

The Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code in view of the deemed rejection by Classes 3A-3C.

The votes of holders of Classes 3A-3C are not being solicited because, under the Plan, there will be no distribution to the holders of such Classes.  Classes 3A-3C are, therefore, conclusively deemed to have rejected the Plan pursuant to section 1129(b) of the Bankruptcy Code.  Notwithstanding the deemed rejected by Classes 3A-3C or any Class that votes to reject the Plan, the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

## VIII.  PLAN-RELATED RISK FACTORS

### A.  The Debtors May Not Be Able To Obtain Confirmation of the Plan

The Debtors cannot ensure that they will receive the requisite acceptance to confirm the Plan.  But, even if the Debtors do receive the requisite acceptances, there can be no assurance that the Bankruptcy Court will confirm the Plan.  The Bankruptcy Court could still decline to confirm the Plan if it were to determine that any of the statutory requirements for confirmation had not been met, including a determination that the terms of the Plan are fair and equitable to non-accepting Classes.  Therefore, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

B. **The Debtors Cannot State with any Degree of Certainty the Size of the Relevant Classes of Claims**

The Debtors cannot know with any certainty, at this time, the number or amount of Claims in Voting Classes that will ultimately be Allowed. The Claims estimates set forth herein and as projected in the Best Interest Analysis are based on various assumptions and the Debtors' best estimates at the time this Disclosure Statement was filed. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect. Such differences may adversely affect the percentage recovery to holders of such Allowed Claims under the Plan. Accordingly, it is nearly impossible to state with any certainty what creditor recoveries will be.

C. **The Liquidating Trust Expenses May Increase Materially, Causing a Diminution of Recovery to Creditors**

The Debtors' estimate of the Liquidating Trust Expenses include the Debtors' estimate of the costs and expenses required to pay: (a) professional fees and costs incurred by the Liquidating Trust in connection with Claims administration, reconciliation, or disputes of any asserted Liquidating Trust Claims; (b) all reasonable compensation of the Liquidating Trustee in the performance of its duties under the Liquidating Trust Agreement and the Plan, including compensation, fees and costs of professionals, consultants, agents and employees retained or to be retained by the Liquidating Trustee for services rendered to the Liquidating Trustee in connection with the Liquidating Trust Assets, and the reasonable expenses of members of the Oversight Committee; and (c) all reasonable expenses relating to liquidating the Liquidating Trust Assets.

In addition, if more Cash is required to fund the Liquidating Trust Expenses, recoveries to creditors may be materially affected. Substantially increased and unexpected funding requirements for Liquidating Trust Expenses could be the result of: (a) newly filed litigation or developments in pending litigation; or (b) changes in laws or regulations relating to the administration of the Liquidating Trust. While the Debtors, the Liquidating Trust and the Liquidating Trustee, as applicable, will make all reasonable efforts to mitigate any increases in Liquidating Trust Expenses, their ability to do so may be constrained. Therefore, the costs and expenses that must be reserved, and which may be expended, to satisfy these obligations, may materially affect creditor recoveries.

IX. **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to certain holders of Allowed Claims that are "United States persons", as defined under Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "Tax Code") . The following summary is based on the Tax Code, Treasury Regulations promulgated thereunder (the "Regulations"), judicial decisions, administrative rules and pronouncements as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below. This summary does not address the federal income tax consequences to the Debtors, to holders of Equity Interests or to holders whose Claims are not

Impaired under the Plan (i.e., Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Tax Claims and Allowed Secured Claims). The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular holder of an Allowed Claim in light of its particular facts and circumstances. In addition, this summary addresses only U.S. federal income taxes. Thus, the following discussion does not address foreign, state or local tax consequences, or any estate, gift or other non-income tax consequences, of the Plan, nor does it purport to address the federal income tax consequences of the Plan to holders of Allowed Claims that are subject to special treatment under the Tax Code (such as Persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, holders liable for the alternative minimum tax, holders whose functional currency is not the U.S. dollar, holders that received their Claims as compensation, S corporations, broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental entities, pass-through entities such as partnerships and holders of Claims who are themselves in bankruptcy). Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim or Equity Interest.

If a partnership holds an Allowed Claim, the tax treatment of a partner of such partnership will generally depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding an Allowed Claim, you should consult your tax advisors.

The following discussion assumes that the Plan will be implemented as described herein and does not address the tax consequences if the Plan is not carried out. Furthermore, this discussion assumes that holders of Allowed Claims only hold Claims in a single Class. This discussion further assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form. In addition, a substantial amount of time may elapse between the confirmation date and the receipt of a final distribution under the Plan. Events subsequent to the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder.

This summary of the U.S. federal income tax consequences of the Plan is not binding on the Internal Revenue Service (the "IRS"), and no ruling will be sought or has been sought from the IRS with respect to any of the tax aspects of the Plan, no opinion of counsel has been obtained or will be obtained by the Debtors with respect thereto, and no tax opinion is given by this Disclosure Statement. The U.S. federal income tax consequences of certain aspects of the Plan may therefore be uncertain due to the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below.

The following discussion is not exhaustive. The discussion is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each holder of an Allowed Claim. Accordingly, each holder of an Allowed Claim is strongly urged to consult

57731/0003-17169173v9

with its own tax advisor regarding the U.S. federal, state, local, and foreign income and other tax consequences of the Plan.

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE UNITED STATES INTERNAL REVENUE SERVICE, YOU ARE HEREBY NOTIFIED THAT ANY DISCUSSION OF TAX MATTERS SET FORTH IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) WAS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN AND WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER FEDERAL, STATE, OR LOCAL TAX LAW. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.    **Federal Income Tax Consequences**

1.    **Federal Income Tax Consequences to Holders of Allowed General Unsecured Claims**

In accordance with the Plan, each Noteholder (which is in Class 2A) shall receive its Pro Rata share of the Noteholder Payments to be paid by Inc.  All other holders of Allowed General Unsecured Claim in Classes 2A, 2B, or 2C shall, in full and final satisfaction of such Claim, become Beneficiaries of the Liquidating Trust.  Through this means, holders of Class 2A, 2B and 2C Allowed General Unsecured Claims shall receive their Pro Rata portion of Cash available to holders of Allowed General Unsecured Claims of Inc., Ltd. and VMT, respectively.

The Debtors intend that the Liquidating Trust will be treated for U.S. federal income tax purposes (i) in part as a grantor trust that is a liquidating trust within the meaning of Treasury Regulations § 301.7701-4(d) (with income and gain on Liquidating Trust Assets taxed at the beneficial owner level on a flow-through basis, as more fully described below), and (ii) in part as one or more Disputed Reserves that are disputed ownership funds within the meaning of Treasury Regulations § 1.468B-9(b)(1) (with net income and gain on Liquidating Trust Assets taxed at the separate entity level of the Disputed Reserves). The remainder of this discussion assumes that this treatment is correct. It is possible that the IRS could require an alternative characterization of the Liquidating Trust, which could result in different (and possibly adverse) tax consequences to the Liquidating Trust and/or holders of Allowed General Unsecured Claims.

Except to the extent of the Disputed Reserves, the Liquidating Trust will not be treated as a taxable entity for U.S. federal income tax purposes. Accordingly, except to the extent distributions are made to holders of Allowed General Unsecured Claims as of the Effective Date (as described below), the Debtors will be deemed to have distributed to the holders of Allowed General Unsecured Claims an undivided interest in their Pro Rata shares of the Liquidating Trust Assets, subject to any liabilities of the Debtors assumed by the Liquidating Trust and any liabilities of the Liquidating Trust themselves, and such holders will be deemed to have contributed such assets (subject to such liabilities) to the Liquidating Trust in exchange for beneficial interests in the Liquidating Trust.

Each holder of an Allowed General Unsecured Claim (such holders are referred to in this discussion as "Beneficial Owners") will recognize gain or loss upon receipt of such Pro Rata share equal to the difference between the "amount realized" by such Beneficial Owner and such holder's adjusted tax basis in his, her or its Claim. The amount realized is equal to the fair market value of such Beneficial Owner's Pro Rata share of the Liquidating Trust Assets (subject to any applicable liabilities), less the amount (if any) allocable to accrued but unpaid interest, as discussed below. Any gain or loss realized by a Beneficial Owner generally should constitute capital gain or loss to such creditor, unless such Claim is not a capital asset in the hands of such Beneficial Owner. If an Allowed General Unsecured Claim is a capital asset and it has been held for more than one year, the holder will realize long-term capital gain or loss. The deductibility of capital losses is subject to limitations. The tax basis of the applicable Liquidating Trust Assets deemed received in the exchange will equal the amount realized by the Beneficial Owner and the holding period for such assets will begin on the day following the exchange. For the avoidance of doubt, holders of Allowed General Unsecured Claims are not intended to be treated for federal income tax purposes as receiving Liquidating Trust Assets that are contributed to any Disputed Reserve until such time as such Disputed Reserve makes distributions, in which case (and at which time) the holders of Allowed General Unsecured Claims are intended to be treated as receiving the distributions actually received from the Disputed Reserve, if any.

For federal income tax purposes, it is intended that each Beneficial Owner be treated as an owner of the Liquidating Trust and, thus, will be subject to tax on such Beneficial Owner's Pro Rata share of taxable income or gain (if any) of the Liquidating Trust, regardless of whether the corresponding cash proceeds are distributed to each Beneficial Owner. Accordingly, each Beneficial Owner will be required to include its annual taxable income, and pay tax to the extent due on, its allocable share of each item of income, gain, loss, deduction or credit recognized by the Liquidating Trust (including interest or dividend income earned on bank accounts and other investments) and the Liquidating Trustee will allocate such items to the holders using any reasonable allocation method. If the Liquidating Trust sells or otherwise disposes of a Liquidating Trust Asset in a transaction in which gain or loss is recognized, each Beneficial Owner that is entitled to a distribution from such Liquidating Trust Asset (or the proceeds thereof) will be required to include in income gain or loss equal to the difference between (a) the Beneficial Owner's Pro Rata share of the Cash or property received in exchange for the applicable Liquidating Trust Asset sold or otherwise disposed of and (b) the Beneficial Owner's adjusted basis in its Pro Rata share of the applicable Liquidating Trust Asset. The character and amount of any gain or loss will be determined by reference to the character of the asset sold or otherwise disposed of. Each Beneficial Owner will be required to report any income or gain recognized on the sale or other disposition of an applicable Liquidating Trust Asset whether or not the Liquidating Trust distributes the sale proceeds currently and may, as a result, incur a tax liability before the Beneficial Owner receives a distribution from the Liquidating Trust.

Notwithstanding the foregoing, distributions made as of the Effective Date to holders of Allowed General Unsecured Claims are intended to be treated for U.S. federal income tax purposes as made directly from the Debtors to the holders of such Allowed Claims, and such holders shall include in their taxable incomes any interest earned on such distributions from the Effective Date to the date on which the actual distribution is made. The federal income tax consequences to holders of Allowed General Unsecured Claims will differ and will depend on factors specific to each such holder, including, but not limited to: (i) whether the holder's

47

Allowed General Unsecured Claim (or a portion thereof) constitutes a claim for principal or interest, (ii) the origin of the holder's Allowed General Unsecured Claim, (iii) whether the holder reports income on the accrual or cash basis method, (iv) whether the holder receives distributions under the Plan in more than one taxable year, (v) whether the holder's Claim is Allowed or Disputed on the Effective Date, (vi) whether the holder has previously included in income any accrued but unpaid interest with respect to the surrendered Allowed General Unsecured Claim and (vii) whether the holder has taken a bad debt deduction or otherwise recognized a loss with respect to the Allowed General Unsecured Claim.

### 2.    Accrued Interest

Holders of Allowed General Unsecured Claims will recognize ordinary income to the extent that they receive Cash or property, including beneficial interests in the Liquidating Trust, that is allocable to accrued but unpaid interest that the holder has not yet included in its income. If an Allowed General Unsecured Claim includes interest, and if the holder receives less than the amount of the Allowed General Unsecured Claim pursuant to the Plan, the holder must allocate the Plan consideration between principal and interest. The Plan provides that, to the extent applicable, all distributions to a holder of an Allowed Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date, and the remaining portion of such distributions, if any, shall apply to any interest accrued on such Claim after the Petition Date (but only to the extent otherwise provided under the Plan). There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such holder and attributable to principal under the Plan is properly allocable to interest. Holders of Allowed General Unsecured Claims are urged to consult their own tax advisors in this regard. If the Plan consideration allocable to interest with respect to an Allowed General Unsecured Claim is less than the amount that the holder has previously included as interest income, the previously included but unpaid interest may be deducted, generally as a loss.

### 3.    Post-Effective Date Cash Distributions

Because certain holders of Allowed General Unsecured Claims, including Disputed Claims that ultimately become Allowed Claims, may receive Cash distributions after the Effective Date, the imputed interest provisions of the Tax Code may apply and cause a portion of the subsequent distributions to be treated as interest. Additionally, because holders may receive distributions with respect to an Allowed General Unsecured Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the holder may be deferred. All holders of Allowed General Unsecured Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Claims.

### 4.    Market Discount

If a holder of an Allowed General Unsecured Claim purchased the Claim for an amount that is less than its stated redemption price at maturity, the amount of the difference may be treated as "market discount" for U.S. federal income tax purposes, unless the difference is less than a specified de minimis amount. Under the market discount rules, the holder is required to

57731/0003-17169173v9

treat any gain on the sale, exchange, retirement or other disposition of, the Allowed General Unsecured Claim as ordinary income to the extent of the market discount that the holder has not previously included in income and which is treated as having accrued on the Allowed General Unsecured Claim at the time of its payment or disposition.

### 5.    Bad Debt or Worthless Securities Deduction

A holder who receives in respect of an Allowed General Unsecured Claim an amount less than the holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the Tax Code or a worthless securities deduction under section 165(g) of the Tax Code. The rules governing the character, timing and amount of bad debt and worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed General Unsecured Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### B.    Backup Withholding and Information Reporting

Generally, information reporting requirements will apply to all payments or distributions under the Plan and by the Liquidating Trust, unless you are an exempt recipient. Additionally, a holder may be subject to backup withholding at applicable rates, unless the holder (i) is a person exempt from backup withholding and, when required, demonstrates this or (ii) is a United States Person (as defined by Section 7701(a)(30) of the Tax Code) that provides a correct taxpayer identification number ("TIN") on IRS Form W-9 (or a suitable substitute form) and timely provides the other information and makes the representations required by such form and complies with the other requirements of the backup withholding rules. A holder may become subject to backup withholding if, among other things, the holder (i) fails to properly report interest and dividends for U.S. federal income tax purposes or (ii) in certain circumstances, fails to certify, under penalty of perjury, that it has furnished a correct TIN. A holder that does not timely provide a correct TIN also may be subject to penalties imposed by the IRS. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your United States federal income tax liability provided the required information is properly furnished to the IRS.

### C.    Importance of Obtaining Professional Tax Assistance

**THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN SOME CASES UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM. ACCORDINGLY, EACH HOLDER OF AN ALLOWED CLAIM IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING**

**THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

X.   <u>**Recommendation and Conclusion**</u>

The Debtors believe that confirmation of the Plan is in the best interest of all creditors. The Plan provides for a fair and equitable distribution to creditors in a manner consistent with the Bankruptcy Code.  The Debtors believe that any alternative to confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, would result in significant delays, complex and expensive litigation, and additional costs, and would result in a reduction in the distribution of payments ultimately available to be made to Holders of Allowed Claims.  Accordingly, the Debtors urge the holders of Claims entitled to vote to accept the Plan.

TO BE COUNTED, YOUR BALLOT WITH YOUR ORIGINAL SIGNATURE INDICATING YOUR ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE SOLICITATION AGENT BY NO LATER THAN **June 28, 2018 at 5:00 p.m.**

*[Remainder of Page Intentionally Left Blank; Signatures to Follow]*

Dated: May 15, 2019
    Baltimore, MD

Videology LIQUIDATION, INC.

By: /s/ *Kenneth Tarpey*
Name: Kenneth Tarpey
Title: Chief Financial Officer

Videology LIQUIDATION LTD.

By: /s/ *Kenneth Tarpey*
Name: Kenneth Tarpey
Title: Chief Financial Officer

VMT LIQUIDATION LLC

By: /s/ *Kenneth Tarpey*
Name: Kenneth Tarpey
Title: Chief Financial Officer

*The Plan Debtors*

51